## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:**

| | |
|---|---|
| NATIONAL FISHERIES INSTITUTE, <br><br> RESTAURANT LAW CENTER, <br><br> PHILLIPS FOODS, INC., <br><br> HERON POINT SEAFOOD, LLC, <br><br> NEWPORT INTERNATIONAL OF TIERRA VERDE, INC., <br><br> 3FISH, INC., <br><br> HANDY SEAFOOD INC., <br><br> SHAW'S SOUTHERN BELLE FROZEN FOODS, INC., <br><br> SUPREME CRAB & SEAFOOD, INC., <br><br> CEBU PACIFIC LLC, <br><br> BYRD INTERNATIONAL INC., <br><br> and <br><br> CRUSTACEA SEAFOOD COMPANY, INC. <br><br>          Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> U.S. DEPARTMENT OF COMMERCE, <br><br> NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, <br><br> NATIONAL MARINE FISHERIES SERVICE, | Case No. 1:25-cv-00223 |

|  |  |
|---|---|
| HOWARD LUTNICK, in his official capacity as Secretary of Commerce, U.S. DEPARTMENT OF COMMERCE,<br><br>EUGENIO PIÑEIRO SOLER, in his official capacity as Assistant Administrator for Fisheries for NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION FISHERIES<br><br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security, U.S. DEPARTMENT OF HOMELAND SECURITY<br><br>and<br><br>SCOTT BESSENT, in his official capacity as Secretary of Treasury, U.S. DEPARTMENT OF THE TREASURY<br><br>        Defendants. |  |

## **COMPLAINT**

### I.    INTRODUCTION

1.    Plaintiffs, National Fisheries Institute; Restaurant Law Center; Phillips Foods, Inc.; Heron Point Seafood, LLC; Newport International of Tierra Verde, Inc.; 3Fish, Inc.; Handy Seafood Inc.; Shaw's Southern Belle Frozen Foods, Inc.; Supreme Crab & Seafood, Inc.; Cebu Pacific LLC; and Byrd International Inc. (collectively, "Plaintiffs") bring this action to challenge the U.S. Department of Commerce's September 2, 2025, determinations under the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1371(a)(2), comparability findings ("CFs" or "Determinations"). Acting through the National Oceanic and Atmospheric Administration ("NOAA") and its National Marine Fisheries Service ("NMFS"), the Department of Commerce imposed sweeping import prohibitions that, effective January 1, 2026, will bar the entry of seafood

products from 240 fisheries across 46 nations—including those that supply nearly the entire U.S. market for pasteurized blue swimming crab ("BSC") meat.

2.       These Determinations lack reasoned explanation, fishery-specific evidence, or consideration of the devastating domestic and international economic consequences they are already causing. After nearly a decade of agency assurances, phased implementation, and repeated deferrals, NOAA's blanket denial of CFs constitutes arbitrary and capricious decision-making within the meaning of the Administrative Procedure Act ("APA"). *See* 5 U.S.C. § 706(2).

3.       For U.S. seafood importers and processors, including Plaintiffs, the consequences are immediate and irreparable. The challenged Determinations will prohibit the lawful importation of the only commercially viable sources of BSC meat, forcing plant shutdowns, layoffs, supply interruptions, and permanent loss of market share. No domestic or approved fishery can substitute in quantity, quality, or form. These harms flow directly from NOAA's failure to conduct a reasoned, transparent analysis or to account for the reliance interests its prior policies created.

4.       Plaintiff National Fisheries Institute is a national trade association whose member companies are U.S.-based seafood importers and processors reliant on seafood products, including BSC, sourced from foreign fisheries with denied CFs. Collectively, Plaintiffs represent the U.S. seafood import and processing industry directly affected by the challenged Determinations. The Determinations arbitrarily and capriciously deny CFs for these fisheries, imposing import bans without adequate justification and in violation of the MMPA and the APA. Specifically, NMFS's new "standardized decision-making process" prioritizes a checklist of structural regulatory elements—such as the existence of prohibitions on intentional mortality, monitoring programs, and mitigation measures—over an assessment of whether a foreign regulatory program has comparable conservation outcomes, such as incidental mortality and serious injury rates for marine

mammals that align with U.S. standards. This approach represents an unexplained departure from the MMPA's results-oriented mandate, which requires foreign regulatory programs to be "comparable in effectiveness" to the U.S. program in reducing marine mammal bycatch, not merely comparable in form or structure. *See* 50 C.F.R. § 216.24(h)(6)(iii) (emphasizing "comparable results" in the implementing rule).

5.      The MMPA's import provisions prohibit the entry of fish products from foreign commercial fisheries that do not meet U.S. standards for marine mammal protection, but they do not authorize NMFS to impose bans based solely on the absence of specific regulatory components without evaluating actual effectiveness. In the 2025 Notice, NMFS describes its process as a "prioritization approach" that evaluates whether harvesting nations have "laws, regulations, and processes in place" to address marine mammal interactions, focusing heavily on gear types, mitigation presence, and documentary evidence of programs, while downplaying or ignoring evidence of low bycatch outcomes or equivalent protections. 90 Fed. Reg. 42,395 (Sept. 2, 2025). For instance, denials for Philippine and Indonesian gillnet and pot/trap fisheries cite risks to species like Irrawaddy dolphins, as well as insufficient data, but fail to credit evidence of bycatch rates *below* potential biological removal levels or alternative measures achieving results comparable to U.S. fisheries.[1] This checklist-driven methodology deviates from prior NMFS interpretations, which emphasized outcomes over rigid structural requirements, without reasoned explanation as required by the APA.

6.      As a result, the Determinations are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA. Plaintiffs seek declaratory and

---

[1] NOAA Fisheries, *Marine Mammal Protection Act Import Provisions: Comparability Finding Application Final Report—Philippines* (Aug. 2025), *available at* https://www.fisheries.noaa.gov/s3/2025-08/Philippines-final-2025-508.pdf. **Exhibit A**.

injunctive relief to set aside the unlawful CFs, remand the matter to NMFS for reconsideration consistent with the MMPA's results-based standard, and enjoin enforcement of the associated import bans pending resolution of this action.

## II.  JURISDICTION AND VENUE

7.    This action arises under the APA, 5 U.S.C. §§ 701-706, and challenges final agency action taken pursuant to the Marine Mammal Protection Act, 16 U.S.C. § 1371(a)(2). This Court has exclusive jurisdiction over this action under 28 U.S.C. § 1581(i)(1)(C)-(D).

## III.  PARTIES

### A.  Plaintiffs

8.    Plaintiff NATIONAL FISHERIES INSTITUTE ("NFI") is a non-profit association organized under 501(c)(6) of the Internal Revenue Code and headquartered in Reston, Virginia. NFI is dedicated to advancing seafood safety, responsible trade, sustainability, and nutrition education. It represents the full seafood supply chain, including wild-capture harvesters, vessel owners, aquaculture operations, producers, processors, importers, exporters, distributors, cold storage, logistics providers, and retail and restaurant establishments that sell seafood products. Through policy engagements, market research, and industry collaboration, NFI promotes best practices in sustainability and resource stewardship, and works to ensure that seafood remains a vital, accessible, healthy, and sustainable food choice for all Americans.

9.    NFI administers the Crab Council, an industry-led sustainability initiative founded in 2009. The Crab Council comprises approximately 30 member companies that collectively represent roughly 85% of all BSC meat imported into the United States. The Council invests roughly $1 million annually to sponsor BSC Fisheries Improvement Projects ("FIPs") in Indonesia, the Philippines, Vietnam, India, Thailand, and Sri Lanka. These FIPs are designed to promote the

sustainability of the resource, reduce bycatch, improve monitoring and traceability, and promote compliance for foreign BSC fisheries.

10.    NFI's membership includes the individual Plaintiffs named in this action. NFI brings this suit on its own behalf and in a representational capacity on behalf of its members, who are directly and adversely affected by the Determinations and resulting import prohibitions.

11.    Plaintiff RESTAURANT LAW CENTER ("RLC") is a non-profit entity organized under 501(c)(6) of the Internal Revenue Code and headquartered in Washington, D.C. RLC is the only independent public policy organization created specifically to represent the interests of the food service industry in the courts. This labor-intensive industry is comprised of over one million restaurants and other foodservice outlets employing nearly 16 million people—approximately 10 percent of the U.S. workforce.

12.    Restaurants and other foodservice providers are the second largest private sector employers in the United States. Through first party and amicus participation, the RLC has provided courts with perspectives on legal issues that have the potential to significantly impact its members and the industry, as is the case with the Determinations and resulting import prohibitions.

13.    The RLC is affiliated with the National Restaurant Association ("NRA"), the world's largest foodservice trade association. All restaurant members in good standing with the NRA or one of its affiliated state restaurant associations are automatically members of the RLC. In addition, some of the individual Plaintiffs named in this action are also an integral part of the RLC's members seafood supply chain. The RLC brings this suit on its own behalf and in a representational capacity on behalf of its members.

14.    Plaintiff PHILLIPS FOODS, INC. ("Phillips") is a Maryland corporation headquartered in Baltimore, Maryland. Phillips manufactures and distributes seafood products

throughout the United States and abroad. It sources raw materials from multiple countries, including Indonesia, Philippines, and Vietnam—nations whose fisheries were denied comparability findings in the Determinations. Phillips has imported BSC and related seafood products from these countries since 1989. Its business derived from the affected fisheries represents $179,986,956 in annual revenue. Phillips also maintains substantial capital investments tied to international trade, including property, plants, and equipment valued at $14,682,353. The company's operations depend heavily on raw materials sourced in Asia, produced in Asia, then shipped to the U.S. for direct sales or for further processing into value-added products..

15.    Effective January 1, 2026, Phillips will be unable to import products from the denied fisheries. The resulting supply disruption will force Phillips to shut down certain operations by October 15, 2025 to avoid stranded inventory. No commercially viable substitute source exists. U.S. BSC landings would have to increase by over 500 million - pounds to replace imports—an increase that is not feasible given current supply and labor constraints. As a result, Phillips will be unable to fulfill existing customer programs with distributors, restaurants, retailers, and club stores. The company anticipates forced shutdowns of certain overseas processing facilities, leading to layoffs and potential permanent loss of skilled workers whose retraining would be costly and time-consuming if operations resume. Phillips also faces layoffs of U.S. and Canadian employees, loss of certain financing tied to affected product lines, and permanent erosion of market share as products are removed from menus and retail placements. The longer the restrictions remain in effect, the more difficult it will be for Phillips to reestablish customer relationships and restore its market position.

16.    Plaintiff HERON POINT SEAFOOD, LLC ("Heron Point") is a New Hampshire limited liability company headquartered in Newmarket, New Hampshire, with operations in New

Hampshire and Virginia. Heron Point imports BSC and related seafood products from countries including Vietnam, Indonesia and Sri Lanka—nations whose export fisheries were denied comparability findings in the Determinations. Heron Point's business derived from these denied fisheries represents over $50 million in annual revenue. The company maintains exclusive supply arrangements with major third-party processors in the affected countries and supports thousands of workers domestically and internationally whose employment depends on Heron Point's continued operations.

17.     Effective January 1, 2026, Heron Point will be unable to import products from the denied fisheries. Given ocean transit times of eight to ten weeks from Southeast Asia, shipments departing after mid-October 2025 will arrive in the United States only after the effective date and be refused entry, leaving Heron Point with over $10 million in stranded inventory. The company also faces potential loss of credit lines and financing tied to its import operations. A substantial majority of Heron Point's customers rely exclusively on the company for their BSC supply, and Heron Point will be unable to fulfill these customer commitments. No commercially viable substitutes exist: the 2025 denials affect approximately 89% of global BSC supply and 100% of BSC products from the denied fisheries. The Chesapeake Bay fishery—already overfished— cannot replace that volume. As a result, Heron Point faces permanent loss of skilled labor, loss of market share, reputational harm, and other long-term business impacts.

18.     Plaintiff NEWPORT INTERNATIONAL OF TIERRA VERDE, INC. ("Newport") is a Florida corporation headquartered in Saint Petersburg, Florida, with employees in Florida, Georgia, Maryland, and Texas, and inventory facilities located across the United States. Founded in 1964, Newport distributes seafood products nationwide. It sources certain products from Indonesia, Philippines, Sri Lanka, Vietnam, and parts of China—countries whose export fisheries

8

were denied comparability findings in the Determinations. Newport has imported from several of these countries for more than 20 years, with supply relationships dating back to the 1990s. Its business derived from the denied fisheries represents over $40 million in annual revenue. Newport maintains exclusive packing arrangements with multiple processing facilities in Asia that pack exclusively for Newport and collectively employ thousands of workers domestically and abroad. Newport has made advance capital investments in these facilities in exchange for exclusive production rights.

19.    Effective January 1, 2026, Newport will lose access to approximately half of its BSC products sourced from denied fisheries. To avoid stranded inventory, Newport plans to cease ordering from those fisheries before year-end, but it still faces potential losses from in-transit shipments and existing inventory. A substantial portion of Newport's business consists of customer programs and supply contracts dependent on products from denied fisheries. Newport cannot source substitute BSC from approved fisheries because the species is wild-caught and cannot be produced in sufficient quantifies to meet U.S. demand. Newport's exclusive processing facilities in the affected countries will be forced to shut down before year-end, threatening thousands of jobs. Newport's lines of credit are tied to financial projections and covenants; the loss of a significant portion of its supply places the company at risk of default and loss of financing in 2026. Newport also anticipates layoffs of U.S. employees beginning in early 2026, permanent loss of skilled labor both domestically and overseas, loss of market share, and reputational harm from its inability to fulfill customer obligations.

20.    Plaintiff 3FISH, INC. ("3Fish") is a North Carolina corporation headquartered in Gastonia, North Carolina. The company operates a manufacturing facility that produces and distributes value-added seafood products throughout the United States and internationally. 3Fish

has been engaged in seafood manufacturing for more than thirty years. 3Fish purchases certain raw materials from U.S. importers who source from Indonesia and the Philippines, countries whose export fisheries were denied comparability findings in the Determinations. The majority of 3Fish's revenue depends on products derived from these fisheries, which supply essential ingredients used in most of the company's seafood lines. Business associated with the denied fisheries represents approximately $40 million in annual revenue.

21.     Effective January 1, 2026, 3Fish will be unable to obtain these raw materials from its import partners. The supply chain has already been affected, with rising prices in anticipation of the ban. There are no viable substitutes: U.S. fisheries are harvested to sustainable limits, and other international sources cannot provide the required volume or quality. Without access to materials from the denied fisheries, 3Fish will be forced to halt production, resulting in layoffs, loss of grocery and foodservice contracts, and nationwide supply disruptions. The company will suffer reputational damage, loss of skilled labor, and permanent erosion of market share. The denied fisheries poses an existential and irreparable threat to 3Fish, given the substantial portion of its revenue that depends on products from the denied fisheries.

22.     Plaintiff HANDY SEAFOOD INC. ("Handy") is a Maryland corporation headquartered in Salisbury, Maryland. Founded in 1894, Handy is a family-owned business and is one of the oldest seafood processors in the United States. Handy sources certain products from Indonesia, a country whose fisheries were denied comparability findings in the Determinations. The majority of Handy's crab meat and a substantial portion of its crab cakes are sourced from Indonesia.

23.     Effective January 1, 2026, Handy will be unable to import crab products from Indonesia. To avoid stranded finished goods inventory, the company will cease production in late

October. As a result, Handy may have over $1 million in stranded packaging and ingredient inventory in Indonesia. Furthermore, Handy cannot source substitute crab meat from approved fisheries from other countries because the affected crab species are wild-caught and cannot be produced in sufficient quantities elsewhere. Once finished goods inventory is depleted, Handy will be unable to supply key U.S. customers. The import restrictions will cause loss of skilled labor across the supply chain and reputational harm to Handy as a reliable supplier. Even if denied fisheries eventually regain import eligibility, recovery could take years due to permanent loss of customer relationships and production capability. The restrictions also place at risk Handy's U.S. salaried workforce and its professionals in Asia due to a significant loss of revenues.

24.    Plaintiff SHAW'S SOUTHERN BELLE FROZEN FOODS, INC. ("Shaw's") is a Florida corporation headquartered in Jacksonville, Florida, operating a manufacturing facility that distributes seafood products nationwide. Shaw's purchases certain products from importers who source from Sri Lanka, Indonesia, the Philippines, Vietnam, India, and parts of China—countries whose export fisheries were denied comparability findings in the Determinations. Shaw's has relied on these supply chains for decades and depends on BSC sources from the denied fisheries, which represent over $10 million in annual revenue.

25.    Effective January 1, 2026, Shaw's will face severe disruption when its suppliers can no longer import BSC from the denied fisheries. The company anticipates forced shutdowns of processing operations, layoffs of workers, breaches of customer contracts, and permanent loss of market share. Shaw's cannot readily source substitute from approved fisheries by the effective date, as no equivalent supply is available in commercial quantities. The restrictions therefore pose a direct threat to Shaw's business viability, given its substantial dependence on products originating from the denied fisheries.

26.    Plaintiff SUPREME CRAB & SEAFOOD, INC. ("Supreme") is a Florida corporation headquartered in Weston, Florida. Supreme distributes products nationwide to food-service and retail channels. Supreme sources certain crab products from Indonesia, Vietnam, and parts of China—countries whose crab and fish export fisheries were denied comparability findings in the Determinations. The crab species supplied to Supreme are indigenous to Southeast Asia and not available from U.S. fisheries, and domestic production cannot meet U.S. demand. Supreme's business from the denied fisheries represents a substantial portion of its total revenue, with no alternative approved regions from which to source comparable products.

27.    Effective January 1, 2026, Supreme will be unable to import crab and fish products from the denied fisheries. To avoid stranded inventory, Supreme must cease purchasing from denied fisheries at least 60 days before the effective date, given production lead times of two weeks and ocean shipping times of approximately 60 days. Supreme currently has multiple containers scheduled to arrive in January and February 2026 from denied fishery countries, which must be cancelled if the prohibition takes effect—representing shipments of substantial volume and value. As a result, Supreme faces layoffs, potential plant shutdowns, permanent loss of skilled labor, permanent loss of market share, and reputational harm from its inability to fulfill customer agreements. Supreme supplies over 100 customers, including both repeat purchasers and those with formal contractual requirements for specific products.

28.    Plaintiff CEBU PACIFIC LLC ("Cebu Pacific") is a Maryland limited liability company, and Plaintiff BYRD INTERNATIONAL INC. ("Byrd International") is a Maryland corporation, both headquartered in Salisbury, Maryland. Cebu Pacific serves as the importer for Byrd International and distributes seafood products throughout the United States, primarily to east coast states and California. Together, Cebu Pacific and Byrd International seafood products

including BSC, red swimming crab, tuna, and various finfish products from countries including Indonesia, Philippines, and Vietnam—countries whose export fisheries were denied comparability findings in the Determinations. The companies have imported BSC from these countries for approximately 30 years, with supply relationships dating back to the 1990s. Their business derived from the denied fisheries represents over $40 million in annual revenue. Cebu Pacific and Byrd International own and manage processing facilities in Asia that pack exclusively for their operations and collectively employ approximately 800 workers both domestically and abroad.

29.    Effective January 1, 2026, Cebu Pacific and Byrd International will be unable to import products from the denied fisheries. The resulting supply disruption will force the companies to shut down their processing facilities and lay off their workforce, resulting in permanent loss of skilled labor. The companies supply major national foodservice distributors and maintain long-standing customer relationships dependent on products from the denied fisheries. Cebu Pacific and Byrd International cannot source substitute products from approved fisheries because there are little to no picking operations for blue and red swimming crab in other countries. As a result, the companies face breaches of customer contracts, permanent loss of market share, and reputational harm from their inability to fulfill supply obligations.

30.    Plaintiff CRUSTACEA SEAFOOD COMPANY, INC. ("Crustacea") is a Texas corporation headquartered in Katy, Texas. Crustacea distributes crab products nationwide. Crustacea sources BSC from Indonesia and Philippines—countries whose crab and fish export fisheries were denied comparability findings in the Determinations. The crab species supplied to Crustacea are indigenous to Southeast Asia and not available from U.S. fisheries, and domestic production cannot meet U.S. demand. Crustacea's business from the denied fisheries represents a

substantial portion of its total revenue, with no alternative approved regions from which to source a sufficient quantity of products.

31.     Effective January 1, 2026, Crustacea will be unable to import crab products from the denied fisheries. Crustacea's business derived from these denied fisheries represents approximately $10 million in annual revenue.

32.     The interests of NFI, RLC, its members, and all Plaintiffs have been, are being, and will continue to be adversely affected by Defendants' violations of federal law as described herein. These injuries are direct, concrete, and irreparable, and can be remedied only if the Court sets aside the unlawful actions and orders Defendants to comply with the MMPA and APA. Plaintiffs have no other adequate remedy at law.

**B.     Defendants**

33.     Defendant UNITED STATES is the sovereign entity whose departments and agencies took the actions challenged herein.

34.     Defendant U.S. DEPARTMENT OF COMMERCE is a cabinet department that oversees NOAA and NMFS.

35.     Defendant NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION is a federal agency within the U.S. Department of Commerce that houses NMFS.

36.     Defendant NATIONAL MARINE FISHERIES SERVICE is a federal agency within NOAA that is part of the U.S. Department of Commerce.

37.     Defendant HOWARD LUTNICK is the Secretary of Commerce for the U.S. Department of Commerce. He is sued in his official capacity.

38.     Defendant EUGENIO PIÑEIRO SOLER is the National Oceanic and Atmospheric Administration's Assistant Administrator for Fisheries. He is sued in his official capacity.

14

39.    Defendant KRISTI NOEM is the Secretary of Homeland Security. She is sued in her official capacity.

40.    Defendant SCOTT BESSENT is the Secretary of the Treasury. He is sued in his official capacity.

## IV.    LEGAL BACKGROUND

### A.    The Marine Mammal Protection Act

41.    Congress enacted the MMPA in 1972 to protect and restore marine mammal populations that "are, or may be, in danger of extinction or depletion as a result of man's activities." 16 U.S.C. § 1361(1). Congress sought to ensure that marine mammal species and populations "should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and, consistent with this major objective, they should not be permitted to diminish below their optimum sustainable population." *Id.* § 1361(2).

42.    To achieve certain objectives internationally, the MMPA empowers the Secretary of the Treasury to "ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. § 1371(a)(2).

43.    In determining whether to ban seafood imports, the Secretary of Commerce "shall insist on reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing technology in use for such fish or fish products exported from such nation to the United States." *Id.* § 1371(a)(2)(A). The MMPA does not define "reasonable proof" or "United States standards."

44.    In practice, NMFS has interpreted "United States standards" to incorporate key MMPA benchmarks, such as the bycatch limits, the goal of reducing incident morality and serious injury to insignificant levels approaching a zero rate, the requirement to implement take reduction plans, monitoring programs, and preparation of stock assessment reports. *Id*.

### B.    MMPA Implementing Regulations

45.    NMFS has promulgated regulations establishing a process for determining whether each export fishery complies with the import provisions. 81 Fed. Reg. 54,390 (Aug. 15, 2016) (codified at 50 C.F.R. § 216.0).

46.    Under the regulations, "a fish or fish product caught with commercial fishing technology which results in the incidental mortality or incidental serious injury of marine mammals in excess of U.S. standards is any fish or fish product harvested in an exempt or export fishery for which a valid comparability finding is not in effect." 50 C.F.R. § 216.24(h)(1)(i).

47.    The regulations further state that "it is unlawful for any person to import, or attempt to import, into the United States for commercial purposes any fish or fish product if such fish or fish product: (A) Was caught or harvested in a fishery that does not have a valid comparability finding in effect at the time of import; or (B) Is not accompanied by a Certification of Admissibility where such Certification is required . . . or by such other documentation as the Assistant Administrator may identify and announce in the Federal Register that indicates the fish or fish product was not caught or harvested in a fishery subject to an import prohibition. . . .". *Id*. § 216.24(h)(1)(ii).

48.    Thus, while there is no definition of "United States standards," the regulations center on the concept of a "valid comparability finding." Such a finding remains valid for four years. *Id*. § 216.24(h)(8)(iv).

49.    A harvesting nation must apply for a comparability finding before NMFS can issue one. *Id.* § 216.24(h)(6)(ii). The application must include reasonable proof of the effects of the relevant fisheries on marine mammals and documentary evidence demonstrating that the conditions for comparability finding have been met. *Id.* § 216.24(h)(6)(i).

i.    <u>Required Findings for a Comparability Finding</u>

50.    The regulations require NMFS to make specified findings and consider mandatory factors before issuing comparability findings. *Id*. § 216.24(h)(6)(iii), (h)(7).

51.    In doing so, NMFS "shall consider documentary evidence provided by the harvesting nation and relevant information readily available from other sources." *Id.* § 216.24(h)(6)(ii). When the agency is tasked with identifying foreign commercial fishing operations as exempt or export fisheries, they are also allowed to consider other sources that include published literature and reports on fishing vessels, regional fishery management organizations, nongovernmental organizations, industry organizations, academic institutions, and citizens and citizen groups. *Id*. § 216.24(h)(3)(iv).

52.    First, NMFS must find that the harvesting nation: (1) "Prohibits the intentional mortality or serious injury of marine mammals in the course of commercial fishing operations"; and (2) "Demonstrates that it has procedures to reliably certify that exports of fish and fish products to the United States are not the product of an intentional killing or serious injury of a marine mammal." *Id.* § 216.24(h)(6)(iii)(A).

53.    Second, NMFS must find that the harvesting nation "maintains a regulatory program with respect to the fishery that is ***comparable in effectiveness*** to the U.S. regulatory program with respect to incidental mortality and serious injury of marine mammals in the course of commercial fishing operations." *Id.* § 216.24(h)(6)(iii)(B) (emphasis added).

17

54.     To qualify as "comparable in effectiveness" to the U.S. regulatory program, the harvesting nation's regulatory program must "provide[] for, or effectively achieve[] comparable results as," among other things: marine mammal assessments that estimate population abundance for marine mammal stocks in waters under the harvesting nation's jurisdiction that are incidentally killed or seriously injured in the export fishery; a calculation of "bycatch limits" (defined as the potential biological removal ("PBR") or a comparable scientific metric, for marine mammal stocks that are incidentally killed or seriously injured by the fishery); a requirement to implement measures in the export fishery designed to reduce the total incidental mortality and serious injury of a marine mammal stock below the bycatch limit; implementation of monitoring procedures in the export fishery designed to estimate incidental mortality or serious injury in the export fishery, ". . . including an indication of the statistical reliability of those estimates"; and a comparison of the incidental mortality and serious injury levels in the fishery with the bycatch limit and a showing that the fishery does not exceed the bycatch limit. *Id.* § 216.24(h)(6)(iii)(C).

       ii.   <u>Mandatory Additional Considerations</u>

55.     NMFS is also required to consider:

    a.   "U.S. implementation of its regulatory program for similar marine mammal stocks and similar fisheries."

    b.   "The extent to which the harvesting nation has successfully implemented measures to reduce incidental mortality and serious injury of marine mammals to levels below the bycatch limit."

    c.   Whether measures for the export fishery "have reduced or will likely reduce the cumulative incidental mortality and serious injury of each marine mammal stock below the bycatch limit."

d.  "[O]ther relevant facts and circumstances, which may include the history and

nature of interactions with marine mammals in th[e] export fishery, whether the

level of incidental mortality and serious injury . . . exceeds the bycatch limit for a

marine mammal stock, the population size and trend of the marine mammal stock,

. . . the population level impacts of the incidental mortality or serious injury of

marine mammals," and the conservation status of the marine mammal stocks.

*Id.* § 216.24(h)(7).

### C.     Drawing Reasonable Conclusions from Available Information

56.     Where a harvesting nation's submission is insufficient, NMFS "shall draw

reasonable conclusions regarding the fishery based on readily available and relevant information

from other sources," including information about analogous fisheries. *Id.* § 216.24(h)(6)(ii).

i.     <u>Validity Period and Import Ban</u>

57.     If NMFS issues a comparability finding, it is valid for four years from its

publication, unless otherwise indicated. *Id.* § 216.24(h)(8)(iv).

58.     Absent a valid comparability finding, the Secretaries of the Treasury and Homeland

Security shall prohibit the importation of fish and fish products until such time that NMFS issues

a valid comparability finding for the fishery. *Id.* § 216.24(h)(1)(i), (h)(9). If NMFS denies a

comparability finding, the regulation permits a harvesting nation to reapply at any time and

requires NMFS to decide within 90 days of a complete submission, *id.* § 216.24(h)(9)(ii)(B)-(C).

NFMS's 2025 notice, however, states nations "may reapply . . . at any time after January 1, 2026."

90 Fed. Reg. 42,398 (Sept. 2, 2025).[2]

---

[2] As discussed below in Count IV, this is arbitrary, capricious, and contrary to the law.

ii.    <u>Implementation Tools</u>

59.    The regulatory framework provides implementation and tailoring tools, including:

a.    Certificates of Admissibility for specific products to certify products from approved fisheries or sources; and

b.    Harmonized Tariff Schedule ("HTS") targeting to ensure restrictions apply only to products from denied fisheries. *See* 90 Fed. Reg. at 42,398.

60.    Further, the MMPA's import regime itself provides several tailoring mechanisms short of blanket prohibitions:

a.    The Assistant Administrator may require "other documentation" announced in the *Federal Register* to demonstrate a shipment is not from a prohibited fishery, 50 C.F.R. § 216.24(h)(1)(ii)(B);

b.    The Assistant Administrator may impose intermediary-nation controls to prevent circumvention—paired with a certification and reconsideration process, *id.* § 216.24(h)(9)(iv);

c.    The Assistant Administrator may reconsider comparability findings at any time based on new information, *id.* § 216.24(h)(6)(vii); and, upon issuance of a comparability finding, remove an import prohibition effective on publication in the *Federal Register*, *id.* § 216.24(h)(9)(ii)(D); and

d.    The rule also permits narrowing at the fishery-definition level (gear, species, and area) in the List of Foreign Fisheries, enabling targeted application and refinement, 50 C.F.R. § 216.24(h)(4)(ii)(A)-(B).

V.    **FACTUAL BACKGROUND**

A.    **The 2025 Comparability Finding Determinations**

61.    On September 2, 2025, NMFS published the 2025 CF Determinations for fisheries on the List of Foreign Fisheries for nations exporting fish and fish products to the United States. *See* 90 Fed. Reg. 42,395 (Sept. 2, 2025) ("Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection Act—Notification of Comparability Findings and Implementation of Import Restrictions; Certification of Admissibility for Certain Fish Products"). According to the notice, this was "the first time that NMFS has evaluated and issued final comparability findings for all harvesting nations and fisheries seeking to export fish and fish products to the United States (135 nations covering approximately 2,500 fisheries)." *Id*.

62.    NMFS denied CFs to 240 fisheries across 46 nations, establishing an effective date of January 1, 2026, for the corresponding import prohibitions. *Id.* at 42,398. The notice states: "[i]f a nation is denied a comparability finding for its fisheries, it may reapply for a comparability finding for the affected fisheries at any time after January 1, 2026." 90 Fed. Reg. at 42,398.

63.    The rationale for these Determinations is set forth in a July 2, 2025 Decision Memorandum titled "Issuance of Marine Mammal Protection Act (MMPA) Comparability Findings–Decision Memorandum[3]" and in country-specific comparability reports[4] for each harvesting nation (collectively, the "Determinations"). In these documents, NMFS concluded that the denied fisheries failed to meet U.S. standards for marine mammal protection and that import bans would take effect January 1, 2026.

---

[3] *Available at* https://www.fisheries.noaa.gov/s3/2025-08/MMPA-Comparability-Findings-Decision-Memo-Signed-508.pdf. **Exhibit B**.

[4] *Available at* https://www.fisheries.noaa.gov/international-affairs/2025-marine-mammal-protection-act-comparability-finding-determinations. **Exhibit C**.

64.     The Decision Memorandum describes NMFS's analytical approach as employing: (i) standardized report templates, (ii) tiered risk screens keyed to gear type and protected stocks, (iii) default PBR values where nation-specific limits were unavailable, and (iv) a conservative classification of fisheries as "export" when information was limited. Decision Memorandum at 7.

65.     The memorandum acknowledges that "the Final Rule explains that NMFS was aware that harvesting nations would experience difficulty providing documentary evidence of 'sufficient detail, quality, and reliability,' particularly because data would be incomplete, lacking, or unquantifiable." *Id.* at 8. Nevertheless, when information did not align with NMFS's expectations, the agency made default Determinations rather than drawing reasonable conclusions from available sources.

66.     The Decision Memorandum further states that "[t]he MMPA neither defines 'U.S. standards' nor does it identify any specific measures that NMFS must consider in the context of evaluating a foreign nation's commercial fishing operations pursuant to section 1371(a)(2)(A). In light of this fact, NMFS determined that, for purposes of implementing section 1371(a)(2), 'U.S. standards' were those set out for domestic fisheries under sections 1376 and 1377 of the MMPA." *Id*. at 14. This approach effectively engrafted domestic regulatory requirements onto foreign fisheries without accounting for differences in governance structures or capacity.

67.     NMFS narrowed the scope of information it considered to data provided by harvesting nations or information already contained within NMFS files. It defined "readily available" information as materials "physically held by any office within NMFS (i.e., hard-copy format) and any information stored electronically in databases routinely consulted by NMFS in the ordinary course of its work." Information submitted outside public comment periods—unless provided by a harvesting nation in response to a specific request—was excluded. *Id.* at 8 n. 16.

This definition precluded consideration of scientific and industry data from other reliable sources, including information maintained by Plaintiffs and the Crab Council.

68.    NMFS published a consolidated list identifying each denied fishery by country and fishery identifier. *See* NOAA, *2025 Final Comparability Finding Denials* (Aug. 2025).[5]

69.    The Determinations prohibit imports of fish and fish products from the denied fisheries beginning January 1, 2026, affecting billions of dollars in seafood trade and disrupting established supply chains that serve U.S. consumers and businesses.

**B.    Examples of Flawed CF Denial Rationales**

70.    Plaintiffs allege, as illustrative examples and not an exhaustive list, that NMFS's Determinations relied on standardized templates and default assumptions rather than the results-oriented standard required by 50 C.F.R. § 216.24(h)(6)-(7) and the MMPA. The Determinations also fail to consider information that could have led to different conclusions. NMFS limited its review to data from harvesting nations and materials in its own files, having stated that it would not consider information provided outside public comment periods unless requested from a nation directly. This self-imposed limitation excluded relevant data held by Plaintiffs and other reliable sources.

   i.    Philippines

71.    In the *Philippines Final Determination*, NMFS denied comparability findings for multiple BSC pot/trap and gillnet fisheries, citing "high-risk gear," "inadequate data," and that bycatch limits were "likely exceeded," while concluding mitigation measures were "not likely" to

---

[5] *Available at* https://www.fisheries.noaa.gov/s3/2025-08/2025-Final-Comparability-Finding-Denials-lined.pdf. **Exhibit D**.

reduce bycatch below the limit.[6] The Philippines is the fourth-largest global producer of BSC and the second-largest exporter to the United States.

72.    NMFS did not conduct a gear-specific effectiveness analysis comparing outcomes for pots and traps—gear types associated with low entanglement risk—to gillnets, instead defaulting to adverse findings when data were limited. This approach failed to draw reasonable conclusions from readily available sources, contrary to 50 C.F.R. § 216.24(h).

73.    NMFS also relied on the presence of Irrawaddy dolphins in certain coastal regions as evidence of high risk, without distinguishing between the geographic range of those populations and the areas where the BSC pot/trap fisheries actually operate, which are primarily in shallow coastal waters outside the dolphins' typical habitat. Available data, including FIP assessments and local monitoring, show that pot and trap gear used in the Philippines' BSC fishery have virtually no recorded interactions with marine mammals, including Irrawaddy dolphins.

74.    BSC pot/trap fisheries in the Philippines are subject to ongoing FIPs that implement bycatch-reduction practices and enhanced monitoring. The Monterey Bay Aquarium, in collaboration with the Philippines' Bureau of Fisheries and Aquatic Resources, has supported the Blue Swimming Crab National Management Plan, which strengthens bycatch monitoring and promotes ecosystem-based management. NMFS's failure to account for these active conservation measures and species-distribution data demonstrates an arbitrary departure from the results-oriented standard required by the MMPA and its implementing regulations.

---

[6] NOAA Fisheries, *Marine Mammal Protection Act Import Provisions: Comparability Finding Application Final Report—Philippines* (Aug. 2025), *available at* https://www.fisheries.noaa.gov/s3/2025-08/Philippines-final-2025-508.pdf. *See* Exhibit A.

ii.   Vietnam

75.   In the *Vietnam Final Determination*, NMFS denied a multi-gear fishery including gillnets, trawls, traps, and stationary nets, citing "high risk," monitoring/reporting gaps, and that mitigation outcomes were "unknown," while asserting that bycatch limits were "likely exceeded."[7]

76.   NMFS combined disparate gear types without evaluating gear-specific results, thereby substituting process checklists for the regulation's results-oriented test and failing to draw reasonable conclusions from readily available information where nation-specific data were limited, in violation of 50 C.F.R. § 216.24(h).

iii.   Indonesia

77.   Indonesia is one of the largest exporters of BSC to the United States. In the *Indonesia Final Determination*, NMFS denied BSC gillnet fisheries while acknowledging BSC-specific monitoring (including logbooks and port sampling), and then stated that "additional considerations" were "not pertinent" to comparability.[8]

78.   NMFS thereby failed to consider mandatory factors, including whether measures have reduced or are likely to reduce mortality below the bycatch limit and other relevant facts and circumstances—as required by 50 C.F.R. § 216.24(h). Instead, it over-relied on default assumptions rather than the fishery-specific record.

---

[7] NOAA Fisheries, *Marine Mammal Protection Act Import Provisions: Comparability Finding Application Final Report—Vietnam* (Aug. 2025), *available at* https://www.fisheries.noaa.gov/s3/2025-08/Vietnam-final-2025-508.pdf. **Exhibit E**.

[8] NOAA Fisheries, *Marine Mammal Protection Act Import Provisions: Comparability Finding Application Final Report—Indonesia* (Aug. 2025), *available at* https://www.fisheries.noaa.gov/s3/2025-08/Indonesia-final-2025-508.pdf. **Exhibit F**.

79.    Indonesia participates in the Marine Stewardship Council ("MSC") certification program for BSC, which includes measures to improve gear selectivity and reduce bycatch. In 2020, the fisheries joined the In-Transition to MSC program, which supports fisheries demonstrating verifiable progress towards MSC certification.

iv.    <u>Sri Lanka</u>

80.    In the *Sri Lanka Final Determination*, NMFS denied multiple fisheries—including BSC crab nets, gillnets, and pot fisheries—on the grounds that Sri Lanka had not implemented sufficient bycatch reporting or mitigation and that its measures were "voluntary" and "not clear" to reduce bycatch to sustainable levels or to be "comparable in effectiveness."[9]

81.    NMFS did not demonstrate, through fishery or gear-specific results analysis, that pots, traps, or crab nets (which present lower entanglement risk) failed to meet U.S. standards. Instead, it pooled gear types and relied on conclusory assertions and uncertainty, contrary to 50 C.F.R. § 216.24(h).

82.    These illustrative examples reflect the NFMS's template-driven, default-heavy approach, as described in the Decision Memorandum and Federal Register notice, and support Plaintiffs' claims that the 2025 CF denials are arbitrary, capricious, and contrary to law**.**

**C.    The Crab Council's Sustainability Efforts**

83.    Since 2009, NFI's Crab Council has invested approximately $1 million annually to sponsor BSC FIPs in Indonesia, the Philippines, Vietnam, India, Thailand, and Sri Lanka.

84.    Among other sustainability efforts, these FIPs are designed to:

---

[9] NOAA Fisheries, *Marine Mammal Protection Act Import Provisions: Comparability Finding Application Final Report—Sri Lanka* (Aug. 2025), *available at* https://www.fisheries.noaa.gov/s3/2025-08/Sri-Lanka-final-2025-508.pdf. **Exhibit G**.

    a.  Reduce marine mammal bycatch through gear modifications and operational practices;

    b.  Enhance bycatch monitoring and data collection;

    c.  Improve stock assessments for both target species (BSC) and non-target species (including marine mammals);

    d.  Promote MMPA compliance to ensure continued market access; and

    e.  Advance sustainable fishing practices that protect marine ecosystems.

85.    The Crab Council's FIP investments represent industry-led, voluntary conservation efforts undertaken in anticipation of MMPA compliance requirements and in collaboration with foreign governments, conservation organizations, and scientific institutions. Despite repeated efforts by the Crab Council to engage with NMFS regarding these initiatives and their demonstrated conservation benefits, NMFS declined to consider such information. NMFS's failure to account for the existing FIP measures and investments in its effectiveness analysis was arbitrary and inconsistent with its obligation to use the best scientific information available.

86.    The 2025 comparability finding denials undermine these multi-year, multi-million-dollar conservation investments by:

    a.  Providing no mechanism for ongoing FIP improvements to achieve comparability findings before the January 1, 2026 effective date;

    b.  Imposing categorical denials without considering phased implementation or conditional approvals that would incentivize continued improvement; and

    c.  Creating market disruption that eliminates industry incentives for future voluntary conservation investments.

### D.    The Compressed Implementation Timeline Will Have a Devastating Impact

87.    In 2024, the United States imported roughly 6.8 billion pounds of seafood valued at approximately $27.5 billion. The impending import prohibitions challenged here will affect about $3.9 billion (13%) of the value and 1.1 billion pounds (16%) of import volume. Abruptly halting imports from major fisheries will disrupt long-established supply chains, increase costs for U.S. seafood companies, and cut off access to critical raw materials unavailable domestically. The burden will fall most heavily on small and mid-sized businesses, many of which will have no choice but to close facilities, layoff U.S. employees, and consider winding down the business itself.

88.    The U.S. seafood supply is insufficient to offset these losses. For example, annual imports of canned crabmeat total approximately 62 million pounds, while domestic production is only 29,000 pounds—less than 0.05% of imports.[10] The result will be fewer seafood options, higher prices, and reduced access to affordable protein for American consumers.

89.    The September 2, 2025, Federal Register notice provides only four months—until January 1, 2026—for implementation of the import prohibitions. This compressed timeline is manifestly insufficient for affected parties to restructure supply chains, identify and qualify alternative approved sources (if any exist), renegotiate customer contracts, and manage existing inventory and in-transit shipments. It also prevents the orderly closure or restructuring of processing operations in denied countries and affords inadequate time for foreign governments to develop and implement corrective measures addressing NMFS's identified deficiencies. As a result, Plaintiffs and other stakeholders face immediate and severe disruption with no practical means to mitigate the economic and operational consequences within the allotted period.

---

[10] *See* United States Census Bureau, Annual Imports of Seafood and Fish Products by Country, by Value and Volume, *available at* https://www.census.gov/foreign-trade/data/index.html. **Exhibit H.**

90.    Alternative approved sources cannot fill demand within the compressed four-month window. The BSC market is highly specialized, with limited suppliers capable of meeting U.S. quality, safety, and volume requirements. The denied fisheries represent a substantial share of global BSC supply available to the U.S. market.

91.    Plaintiffs have engaged in numerous discussions with affected nations, whose representatives have expressed frustration that they cannot reapply for comparability finding until January 1, 2026. By that time, the economic damage will already have occurred. These nations believe the denials were based on factual misperceptions that they could address if given the opportunity. NMFS's refusal to engage departs sharply from the 2016 MMPA Import Rule, which expressly provides that, "[a] harvesting nation with an export fishery with a comparability finding that expired, was denied or terminated may re-apply for a comparability finding *at any time* by submitting an application to the [NOAA] Assistant Administrator, along with documentary evidence demonstrating that the harvesting nation has met the conditions." 50 C.F.R. § 216.24 (h) (9) (emphasis added). NMFS should promptly engage with nations seeking reconsideration and evaluate information provided by parties such as the Crab Council in accordance with its statutory obligations.

### E.    Border Enforcement Mechanism

92.    Effective January 1, 2026, NMFS will implement HTS mapping and Certificate of Admissibility screening to identify entries of fish and fish products originating from denied fisheries for refusal at the border. 90 Fed. Reg. at 42,395.

93.    U.S. Customs and Border Protection will enforce these restrictions by refusing entry of BSC products and other seafood derived from denied fisheries, based on country of origin

declarations and HTS classification. These measures will cause immediate and widespread supply disruption for Plaintiffs and the broader U.S. seafood industry.

94.    As a direct consequence of Defendants' actions, Plaintiffs face: (a) loss of supply from their primary source fisheries; (b) stranded inventory already in transit or awaiting clearance; (c) breach of supply contracts with customers dependent on BSC products; (d) closure of processing facilities employing U.S. and foreign workers; and (e) potential business failure for companies whose BSC operations depend substantially on imports from the denied fisheries.

## VI.    CLAIMS FOR RELIEF

### COUNT I
### Contrary to Law: As-Applied Violation of Statutory Authority in the 2025 Comparability Finding Cycle

95.    Plaintiffs reallege and incorporate by reference ¶¶ 1-94.

96.    As applied in the 2025 Comparability Findings, NMFS's methodology violates the MMPA, 16 U.S.C. § 1371(a)(2). Under the MMPA, the Secretary must "insist on **reasonable proof** from the government of any harvesting nation . . . of the effects on ocean mammals of the commercial fishing technology in use." 16 U.S.C. § 1371(a)(2)(A) (emphasis added). The statute authorizes import restrictions only where commercial fishing operations "result[] in the incidental kill or incidental serious injury of ocean mammals **in excess of United States standards**." 16 U.S.C. § 1371(a)(2)(A) (emphasis added).

97.    This language is explicitly results-oriented: it focuses on whether foreign fishing causes excess bycatch, supported by reasonable proof of actual effects. Congress did not authorize conditioning market access on adoption of U.S.-style regulatory programs, monitoring systems, or procedural requirements. The mandate centers on outcomes (excess mortality), not process (regulatory structure).

98.     As applied in 2025, NMFS's implementing regulation exceeded this authority by converting the outcomes-based standard into a regulatory-program-comparison regime. It indirectly required foreign nations to prove their "regulatory program" includes elements mirroring the domestic U.S. framework under 16 U.S.C. §§ 1371, 1387, essentially engrafting the MMPA onto each country and evaluating it under that regulatory construct. This did not account for obvious differences in how foreign nations set out to sustain their fisheries.

99.     NMFS has shifted the "in excess of United States standards" from a bycatch-results test into a regulatory-process test, inverting the statute: imports are banned unless foreign nations affirmatively prove their programs "provide for, or effectively achieve comparable results" to U.S. regulations—not just comparable conservation outcomes. 50 C.F.R. § 216.24(h)(6)(iii)(B). The statute imposes no such burden.

100.    Congress knew how to mandate regulatory harmonization when intended. Compare 16 U.S.C. § 1371(a)(2) (results-focused: "incidental kill . . . in excess of United States standards") with 16 U.S.C. § 1385 (process-focused: requiring specific "dolphin protection" standards including vessel requirements, observer programs, and captain certifications for tuna imports). The choice of outcomes-oriented language in § 1371(a)(2) reflects a deliberate emphasis on conservation results over regulatory mimicry.

101.    In the 2025 cycle, NMFS applied this overreach as a non-tariff trade barrier detached from the statute's conservation goals. NMFS denied comparability findings to 240 fisheries across 46 nations based not on evidence of excess marine mammal mortality, but on absent U.S.-style documentation, monitoring gaps, and "uncertainty" about regulatory effectiveness. The statute does not permit bans for procedural deficiencies absent proof that fishing causes excess bycatch.

102. Post-*Loper Bright*, this Court owes no deference to NMFS's expansive interpretation.[11] The best reading of § 1371(a)(2) limits the Secretary to:

    a. Requiring reasonable proof concerning the effects of foreign fishing on marine mammals;

    b. Assessing whether those effects (i.e., incidental kill/serious injury rates) exceed U.S. standards (i.e., comparable U.S. fisheries' bycatch rates or sustainability thresholds); and

    c. Banning imports only where excess mortality is demonstrated.

103. Congress did not empower the Secretary to impose a certification scheme conditioning market access on procedural alignment with U.S. domestic programs, irrespective of actual outcomes.

104. By denying market access in the 2025 cycle based on regulatory gaps rather than proven excess bycatch, NMFS exceeded its statutory authority. The Determinations are thus contrary to law and must be set aside. 5 U.S.C. § 706(2)(C).

## COUNT II
### Arbitrary and Capricious: Misapplication of the Results-Oriented Standard

105. Plaintiffs reallege and incorporate by reference ¶¶ 1-104.

106. The governing regulation requires NMFS to assess whether foreign regulatory programs "provide for, or effectively achieve comparable results" to U.S. programs, establishing a results-oriented standard. 50 C.F.R. § 216.24(h)(6)(iii)(B).

---

[11] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

107.    NMFS acted arbitrarily and capriciously by failing to conduct reasoned effectiveness analyses for the denied fisheries, instead relying on the presence or absence of specified documentation and thereby misapplying the regulatory standard.

108.    NMFS's country-specific Final Reports do not demonstrate reasoned, gear-specific or fishery-specific effectiveness evaluations. Instead, the reports apply standardized templates and base conclusions on documentary gaps rather than assessing whether foreign measures achieve comparable conservation results. *See*, *e.g.*, Philippines Final Report; Indonesia Final Report; Vietnam Final Report.

109.    A proper results-oriented analysis demands evaluating whether marine mammal mortality in the export fishery exceeds comparable U.S. fisheries or sustainability thresholds—and whether foreign measures effectively reduce mortality below those thresholds—regardless of whether the foreign regulatory structure mirrors U.S. procedures.

110.    NMFS instead substituted process compliance for outcomes assessment by using template defaults and treating incomplete data as presumptive failures, in violation of the regulatory standard.

111.    Where nation-specific data is lacking, the regulation mandates drawing reasonable conclusions from available information, not defaulting to denial. 50 C.F.R. § 216.24(h). NMFS failed to fulfill this obligation when making its Determinations.

112.    NMFS's failure to apply the results-oriented standard renders the Determinations arbitrary and capricious.

## COUNT III
### Arbitrary and Capricious: Failure to Draw Reasonable Conclusions and Consider Required Factors

113.    Plaintiffs reallege and incorporate by reference ¶¶ 1-112.

114.    Under the regulations, when information submitted by a harvesting nation is incomplete or data-limited, NMFS is required to "draw reasonable conclusions regarding the fishery based on readily available and relevant information from other sources," including analogous fisheries. 50 C.F.R. § 216.24(h)(6)(ii).

115.    NMFS is also required to consider the fishery-specific factors enumerated in 50 C.F.R. § 216.24(h)(7), including:

    a.    U.S. implementation of its regulatory program for similar marine mammal stocks and similar fisheries;

    b.    The extent to which the harvesting nation has successfully implemented measures to reduce marine mammal bycatch;

    c.    Whether measures have reduced or will likely reduce cumulative mortality below bycatch limits; and

    d.    Other relevant facts and circumstances, including the history and nature of interactions with marine mammals, population size and trend, and conservation status.

116.    NMFS failed to fulfill these regulatory obligations, rendering its decisions arbitrary, capricious, and contrary to law.

117.    The Decision Memorandum explains that, in data-limited contexts, NMFS applied conservative defaults, including automatic PBR lookups, and maintained "Export" classifications when record information was limited. Decision Memorandum at 6.

118.    The country-specific Final Reports do not demonstrate that NMFS drew reasonable conclusions from readily available sources before issuing denials. The regulation expressly requires NMFS to consider "documentary evidence provided by the harvesting nation and relevant

information readily available from other sources," including data about analogous fisheries. 50 C.F.R. § 216.24(h)(6)(ii).

119.    Readily available sources that NMFS should have consulted include: regional observer programs and collaborative monitoring data, scientific literature documenting marine mammal interaction rates for comparable gear types, peer-reviewed studies and management reports on bycatch reduction measure effectiveness, and NMFS's own data on marine mammal interactions in comparable U.S. fisheries. *See also id.* § 216.24(h)(3)(iv) (requiring the agency to consider other sources that include published literature and reports on fishing vessels, regional fishery management organizations, nongovernmental organizations, industry organizations, academic institutions, and citizens and citizen groups when it is tasked with identifying foreign commercial fishing operations as exempt or export fisheries.).

120.    The Final Reports for Vietnam, Indonesia, and the Philippines—illustrative of the broader pattern across all the Determinations, but specifically the denied fisheries—reflect monitoring gaps and uncertainty, yet do not show that NMFS used available information to reach reasonable conclusions before defaulting to denial. By treating data limitations as presumptive failures rather than drawing reasonable conclusions from available evidence, NMFS violated 50 C.F.R. §216.24(h) and acted arbitrarily and capriciously.

121.    The Decision Memorandum asserts that factors under § 216.24(h)(7) were "addressed within the standardized framework." Decision Memorandum 14-16. However, NMFS deliberately restricted the scope of information it would consider, defining "readily available" data to include only "information physically held by any office within NMFS (i.e., hard copy format) and any information stored electronically in databases routinely consulted by NMFS in the

ordinary course of its work," and excluding "information provided to NMFS outside public notice and comment periods unless the information was from one of the harvesting nations." *Id*. at 8 n.16.

122.    This self-imposed limitation excluded information from industry participants, conservation organizations, and scientific institutions—including Plaintiffs' decade-long FIP data and investments—that could have informed reasonable conclusions about fishery effectiveness. Despite this acknowledged narrow evidentiary record, NMFS's Final Reports for the 240 denied fisheries do not demonstrate that the agency drew reasonable conclusions from the limited data it did consider or that it applied mandatory factors in a reasoned, fishery-specific manner.

123.    Specifically, the Final Reports fail to articulate how NMFS evaluated: gear-specific interaction risk in comparable U.S. fisheries; trends in bycatch over time; whether existing mitigation measures have achieved or are likely to achieve bycatch reduction; and how conservation status of affected marine mammal stocks informs the comparability analysis.

## COUNT IV
## Unlawful Agency Action

124.    Plaintiffs reallege and incorporate by reference ¶¶ 1-123.

125.    The governing regulation establishes a continuing process for reapplication and prompt removal of import prohibitions when a CF is denied, terminated, or expires. It provides that a harvesting nation "may re-apply . . . at any time," that NMFS must decide within 90 days of complete information, and that, if a CF is issued, NMFS must lift the import prohibition effective upon Federal Register publication. 50 C.F.R. § 216.24(h)(9)(ii)(B)-(D).

126.    NMFS adopted this "at any time" reapplication right and immediate-removal mechanism through notice-and-comment rulemaking in the 2016 Final Rule, which expressly confirms both provisions. 81 Fed. Reg. 54,390, 54,438-39 (Aug. 15, 2016).

127.    In a 2025 ***notice*** (not a rule) announcing CF determinations, NMFS stated that nations denied a CF "may reapply . . . at any time after January 1, 2026." 90 Fed. Reg. 42,395, 42,398 (Sept. 2, 2025).

128.    This post-January 1, 2026 limitation conflicts with the regulation's "at any time" reapplication entitlement and 90-day decision deadline. Agencies cannot narrow or override regulatory rights via a mere notice. This limitation is therefore not in accordance with law and exceeds NMFS's authority. 5 U.S.C. § 706(2)(A), (C).

129.    Because the 2016 Final Rule adopted the reapplication standard through notice and comment, the 2025 notice substantively amended that standard by imposing a new timing restriction without such rulemaking, thereby altering regulated parties' rights and obligations. This violates the APA's procedural requirements. 5 U.S.C. § 706(2)(D).

130.    The 2025 notice also fails to acknowledge or reconcile its conflict with the regulation's safety-valve purposes. It disregards the reliance interests of exporters and importers who depended on the rule's guarantee of immediate reapplication and prompt relief, and instead delays remedies until after the import restrictions take effect—contradicting the rule's objective to minimize trade disruptions and lift prohibitions promptly upon issuance of a CF. This unexplained departure is arbitrary and capricious. 5 U.S.C. § 706(2)(A).

131.    Having previously solicited comments on the regulation's "at any time" re-application safeguard in 2016, NMFS could revise that standard only through new notice-and-comment rulemaking. Instead, it embedded a contrary limitation in a 2025 notice announcing CF outcomes—without proposal, comment, or explanation. To impose a post-January 1, 2026 wait, NMFS must propose a rule and seek comment; a notice cannot circumvent the APA or override the existing regulation.

**COUNT V**
**Arbitrary and Capricious: Failure to Consider Reliance Interests**

132.    Plaintiffs reallege and incorporate by reference ¶¶ 1-131.

133.    When an agency changes its application of a longstanding regulatory standard in a manner that disrupts reasonable reliance interests, it must "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dept of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020). The agency's complete failure to undertake this analysis renders its action arbitrary and capricious. *Id*. at 1913-15; *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

134.    The 2016 Final Rule established a framework under which foreign fisheries could obtain comparability findings and maintain U.S. market access by meeting comparable standards. 50 C.F.R. § 216.24(h). It described an "iterative process" with an initial five-year exemption period—extended three times to nine years (2016-2025)—acknowledging that "harvesting nations would be at different stages in their efforts to regulate commercial fisheries interactions with marine mammals and would need time and support to build capacity." 90 Fed. Reg. 42,395.

135.    The regulation defines comparability as whether foreign programs "provide for, or effectively achieve comparable results as" U.S. programs—explicitly establishing a results-oriented rather than process-oriented test. 50 C.F.R. § 216.24(h)(6)(iii)(B). This formulation reasonably invited reliance: fisheries and industry participants expected that demonstrable conservative outcomes would satisfy the rule, even if achieved through different regulatory means.

136.    In reliance on that standard, Plaintiffs and industry participants made substantial good-faith investments over nine years to achieve outcomes-based compliance, including:

38

a.  The Crab Council, an NFI-led initiative representing approximately 85% of U.S. BSC imports, collectively invested about $1 million annually since 2009 to sponsor FIPs in multiple countries, specifically aimed at reducing marine mammal bycatch and achieving the conservation outcomes contemplated by the MMPA;

b.  Individual Plaintiffs made significant capital investments in processing facilities, supply chains, and contracts premised on the regulatory framework's assurance that fisheries demonstrating effective marine mammal protection could obtain comparability findings and retain market access, representing over $200 million in combined annual revenue from the affected fisheries;

c.  Plaintiffs maintain exclusive arrangements with processing facilities in countries with denied fisheries, collectively employing thousands of workers whose continued employment depends on U.S. market access;

d.  NFI member companies sourcing, processing, and distributing in the United States seafood products from denied fisheries, in addition to BSC, also have made significant capital investments, similar to those summarized above, totaling hundreds of millions of dollars and upon information and belief such companies have also made investments of time and financial resources in ensuring that the fisheries involved are sustainably operated and managed;

e.  All of these investments were made in reliance on the regulation's express standard that foreign programs need only "effectively achieve comparable results," not replicate U.S. procedural requirements.

137.  In the Determinations, NMFS shifted the governing application by requiring programs to replicate U.S. procedural elements—such as specific documentations and monitoring

programs—rather than evaluating whether those programs achieved comparable conservation results. This transformed the rule into a process-oriented test contrary to its text and prior interpretation.

138.    This shift nullified Plaintiffs' investments effectively worthless. Despite nearly a decade of work and millions of dollars invested in measures designed to "effectively achieve comparable results" in reducing marine mammal bycatch, NMFS denied CFs based on procedural gaps, not outcomes. The agency emphasized documentation deficiencies and the absence of U.S.-style regulatory procedural architecture, while disregarding evidence of effective marine mammal protection. The Determination documents focus predominantly on paperwork and monitoring formats rather than actual conservation results.

139.    The determinations fail entirely to acknowledge these reliance interests. The Comparability Finding Notice, Decision Memorandum, and country-specific reports omit any assessment of Plaintiffs' multi-year FIP investments, capital commitments, or supply relationships built during the exemption period. They also disregard the severe economic disruptions resulting from the four-month implementation timeline (September 2025 to January 2026), which provides insufficient time for restructuring or sourcing alternatives.

140.    Regulatory disclaimers warning that denials might occur do not negate reliance interests; agencies must still evaluate them. *Regents*, 140 S. Ct. at 1913. The flaw here is not Plaintiff's awareness of potential denials, but NMF's failure to apply or even consider the outcomes-based standard as written which Plaintiff's relied on during the exemption period.

141.    The economic disruption caused by the 2025 CF denials constitutes precisely the type of reliance interest the Supreme Court required agencies to address in *Regents*. *See* 140 S. Ct. at 1914 (considering economic impacts including employer replacement costs ($6.3 billion), loss

of economic activity ($215 billion), and lost tax revenue ($60 billion) as factors the agency was required to address in its decision-making process). The APA violation arises not from NMFS's weighing of those interests, but from its complete failure to acknowledge or assess them at all.

142.    The 2025 denials will prohibit approximately $3.89 billion in seafood imports annually—representing 13% of total U.S. seafood import value ($27.5 billion) and 16% of import volume (1.09 billion of 6.8 billion pounds). The prohibitions affect 240 fisheries across 46 nations, disrupting established supply relationships across multiple species. The impact is especially acute for BSC products: the denials will eliminate 89% of imports (45.3 million of 51.1 million pounds), while domestic U.S. production of canned crabmeat totals only 29,000 pounds, less than 0.05% of import volume—making domestic substitution effectively impossible.

143.    Although agencies have discretion and are "not required to pursue" specific accommodations, they must at least acknowledge reliance interests and consider whether implementation mechanisms could mitigate disruption while still achieving statutory objectives. *Regents*, 140 S. Ct. at 1914. By demanding replication of U.S. procedural structures years after outcomes-based compliance efforts, NMFS moved the goalposts without recognizing or addressing those reliance interests.

144.    NMFS's failure to identify, assess, or weight these substantial reliance interests—economic, operational, and environmental—renders the Determinations arbitrary and capricious. *See Regents*, 140 S. Ct. at 1913-15; *State Farm*, 463 U.S. at 43 (agency action is arbitrary when it "entirely failed to consider an important aspect of the problem").

## COUNT VI
**Arbitrary and Capricious: Failure to Use Best Available Scientific Information Readily Available**

145.    Plaintiffs reallege and incorporate by reference ¶¶ 1-144.

146.    The governing regulation requires foreign regulatory programs to be "comparable in effectiveness" to U.S. programs, meaning they must "provide for, or effectively achieve comparable results as" U.S. programs with respect to marine mammal protection. 50 C.F.R. § 216.24(h)(6)(iii)(B). This results-oriented standard focuses on conservation outcomes: whether foreign measures effectively reduce marine mammal mortality and serious injury to levels comparable to those in U.S. fisheries.

147.    To determine whether foreign fisheries "effectively achieve comparable results," NMFS must assess the actual conservation outcomes, including marine mammal bycatch rates, the effectiveness of mitigation measures, and whether mortality levels are comparable to analogous U.S. fisheries. These determinations inherently require evaluating the incidental take of marine mammals by commercial fishing operations.

148.    The MMPA mandates that "[a]ny determination by the Secretary under this subchapter shall be made on the basis of the best scientific evidence available." 16 U.S.C. § 1373(a). Because comparability findings under § 1371(a)(2) require assessing whether foreign fishing operations result in marine mammal take "in excess of United States standards," those findings constitute determinations "under this subchapter" and must be based on the best scientific evidence available.

149.    NMFS acknowledged this obligation in the Federal Register notice, stating that "determinations will be made based on the best scientific information available" and that NMFS would "take into consideration the uncertainty of any scientific information provided by a harvesting nation or that is otherwise readily available." 90 Fed. Reg. at 42,396-97.

150.    Despite that acknowledgment, NMFS imposed an unlawful limitation on the scope of scientific evidence it would consider. The Decision Memorandum states: "Information that was

'readily available' to NMFS during the comparability finding process was limited to the information physically held by any office within NMFS (i.e., hard copy format) and any information stored electronically in databases routinely consulted by NMFS in the ordinary course of its work. Decision Memorandum at 8, n. 16. It did not include information provided to NMFS outside public notice and comment periods unless the information was from one of the harvesting nations and was required by NMFS in making its findings." *Id*.

151.    This self-imposed restriction excluded readily available, directly relevant scientific evidence necessary to evaluate whether denied fisheries "effectively achieve comparable results," including:

a.   Data from the Crab Council's Fisheries Improvement Plans, documenting bycatch reduction measures, monitoring outcomes, and conservation effectiveness in BSC fisheries over nine years of implementation;

b.   Peer-reviewed scientific studies and published research analyzing marine mammal interaction rates with pot or trap gear and other fishing methods used in the denied fisheries;

c.   Regional observer program data and monitoring reports from international fisheries management organizations documenting actual marine mammal bycatch in analogous fisheries; and

d.   Scientific assessments and data from conservation organizations working directly with affected fisheries on marine mammal protection measures.

152.    By limiting its consideration to information already in NMFS's internal files or provided by foreign governments, NMFS made it impossible to apply the regulation's results-oriented standard. Evidence of actual conservation effectiveness—the very information needed to

determine whether foreign measures achieve comparable outcomes—was excluded based on its source rather than its scientific quality or relevance.

153.    This approach violates § 1373(a)'s requirement to use "best scientific evidence available." NMFS cannot satisfy its statutory obligation by consulting only a subset of available evidence for administrative convenience or based on the identity of the source. The MMPA requires using the best evidence that exists, not merely the evidence NMFS elects to acknowledge.

154.    The failure to use best available scientific evidence is particularly arbitrary because:

a.    The governing regulation expressly requires an effectiveness-based evaluation, which necessitates examining scientific evidence of actual outcomes;

b.    Plaintiffs and the Crab Council have invested approximately $1 million annually since 2009 to generate scientific data on bycatch reduction and safe sustainable resource management in the affected fisheries;

c.    NMFS has stated it would "not engage with companies or foreign governments to discuss comparability determinations, nor will it accept or respond to supplemental materials proving compliance until after January 1, 2026," effectively closing the door on the very scientific evidence needed to evaluate "comparable results"; and

d.    The regulation itself requires NMFS to "consider documentary evidence provided by the harvesting nation and relevant information readily available from other sources," 50 C.F.R. § 216.24(h)(6)(ii), confirming that NMFS must look beyond government submissions to other credible scientific sources.

## COUNT VII
### Without Observance of Procedure Required by Law

155.    Plaintiffs reallege and incorporate by reference ¶¶ 1-154.

156.    NMFS failed to observe mandatory procedures required by law, rendering the 2025 comparability finding denials unlawful under 5 U.S.C. § 706(2)(D).

157.    The MMPA requires the Secretary to "insist on reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing technology in use." 16 U.S.C. § 1371(a)(2)(A). NMFS exceeded this statutory mandate by demanding that foreign nations demonstrate near-replication of U.S. regulatory programs, rather than providing reasonable proof of effects on marine mammals, as the statute requires.

158.    The governing regulation directs NMFS to apply a results-oriented standard, evaluating whether foreign programs "provide for, or effectively achieve comparable results as" U.S. programs. 50 C.F.R. § 216.24(h)(6)(iii)(B). Instead, NMFS applied a process-oriented standard focused on regulatory structure, documentation, and procedural alignment, rather than on demonstrated conservation outcomes.

159.    When submissions were incomplete or data-limited, the regulation requires that NMFS "shall draw reasonable conclusions regarding the fishery based on readily available and relevant information from other sources." 50 C.F.R. § 216.24(h)(6)(ii). NMFS failed to do so, instead issuing automatic denials based on information gaps without drawing reasonable conclusions from available sources, contrary to the regulatory mandate.

160.    The regulation further requires NMFS to consider enumerated factors when making comparability determinations, including U.S. implementation for similar fisheries, whether foreign measures have reduced or will reduce mortality below bycatch limits, and other relevant facts and circumstances. 50 C.F.R. § 216.24(h)(7). The Determination documents contain no analysis demonstrating that NMFS evaluated these mandatory factors for the denied fisheries.

161.    By failing to follow these binding procedures—each designed to ensure reasoned, evidence-based decision-making—NMFS acted without observance of procedure required by law, requiring vacatur of the Determinations under 5 U.S.C. § 706(2)(D).

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.  Declare that NMFS's September 2, 2025, comparability finding determinations violate the MMPA, and are arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and without observance of procedure required by law, within the meaning of the APA;

B.  Vacate the 2025 Comparability Finding determinations in their entirety and set aside all import prohibitions resulting from those unlawful determinations;

C.  In the alternative, if the Court declines to grant vacatur, issue preliminary and permanent injunction relief staying enforcement of the import prohibitions pending remand and reconsideration;

D.  Remand the matter to NMFS with instructions to reconsider all 2025 comparability finding determinations using a lawful resulted-oriented methodology consistent with the MMPA, its implementing regulations, and the APA;

E.  With respect to Count IV, declare unlawful and set aside NMFS's restriction in the September 2, 2025 notice limiting reapplications until after January 1, 2026, and order NMFS to accept and adjudicate reapplications within 90 days of submission;

F.  Award Plaintiffs their reasonable costs and attorneys' fees pursuant to 28 U.S.C. § 2412; and

G.  Grant such other and further relief as the Court deems just and proper.

Dated: October 9, 2025                    Respectfully submitted,

                                          _____
                                          Ashley Akers
                                          ashley.akers@hklaw.com
                                          Rafe Petersen (Pro Hac Vice)
                                          rafe.petersen@hklaw.com
                                          Andrew McAllister
                                          andrew.mcallister@hklaw.com
                                          Kamran Mohiuddin (Pro Hac Vice)
                                          kamran.mohiuddin@hklaw.com
                                          Maggie P. Pahl (Pro Hac Vice)
                                          maggie.pahl@hklaw.com
                                          HOLLAND & KNIGHT LLP 800
                                          17th Street N.W., Suite 1100
                                          Washington, D.C. 20006
                                          Tele: 202.441.5870
                                          Fax: 202.955.5564

                                          *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Ashley Akers, one of the attorney for Plaintiffs, certify that the foregoing document was filed electronically with the Court's Case Management/ Electronic Case Filing (CM/ECF) system on October 9, 2025. The Court and/or Clerk of the Court may serve and give notice to counsel by CM/ECF electronic transmission.

Respectfully submitted

Dated: October 9, 2025

/s/ Ashley Akers
Ashley Akers
HOLLAND & KNIGHT LLP
1650 Tysons Blvd.,
Suite 1700
Tysons, VA 22102
Tele: 202.441.5870

*Attorney for Plaintiffs*

# EXHIBIT A



# Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report
# Philippines

## Summary

Based on the Philippines' initial application, its responses to the clarification questions, and the information described below, NMFS has determined that the following Philippines' fisheries are comparable in effectiveness to the U.S. regulatory program: Exempt Fishery IDs 2126, 2204, 2205, 2206, 2208, 12660 and Export Fishery IDs 2124, 2125, 2127, 2131, 2132, 2207, 2209, 2210, 12658, and 12659. The following longline fisheries are excluded from the comparability finding determination as they are currently not operational and the Philippines would need to apply for comparability for these fisheries if they become active: Fishery ID 2128, 12485, and 12486. The remaining fisheries 2129, 2130, 2133, and 2134 are not comparable as they are using gear (gillnets and crab pots) that has a high likelihood of entangling marine mammals, including potentially 16 U.S.C. § 1387(f)(3) stocks, including the Irrawaddy dolphin, which is at a high risk of extinction. The bycatch limit for the Irrawaddy dolphins has likely been exceeded by gillnet and crab pot fishery interactions.

Philippines has a prohibition on the intentional killing of marine mammals; licenses vessels; and has marine mammal bycatch monitoring for purse seine vessels under the Western and Central Pacific Fisheries Commission (WCPFC) and a marine mammal stranding network that includes procedures for responding and reporting strandings. Bycatch monitoring data and marine mammal abundance data are lacking in Philippines fisheries that include gear with a high-risk of interaction with marine mammals, and to-date mitigation measures are not likely to reduce the bycatch of Irrawaddy dolphins below the bycatch limit.

### Fisheries that are not recommended for Comparability Finding

| Fishery ID[1] | Target Species | Gear Type | Area | Rationale for Denial |
|---|---|---|---|---|
| 2129 | Blue swimming crab | Pots/traps, (Bottom) | EEZ, (FAO:71 Pacific Western Central), Major areas: Visayan Sea, Samar Sea, San Miguel Bay; Bays/Gulfs | Gear with high-risk of entanglement with 16 U.S.C. § 1387(f)(3) stock.<br><br>Inadequate data collection on marine mammal bycatch.<br><br>Bycatch limit of 16 U.S.C. § 1387(f)(3) stock likely exceeded. |

---

[1] The Fishery ID number is NOAA's internal reference number from our IAICRS database and has no other independent meaning.

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Philippines**

| | | | | |
|---|---|---|---|---|
| | | | | Mitigation measures are not likely to reduce bycatch below the bycatch limit. |
| 2130 | Blue swimming crab | Gillnets and entangling nets (not specified), (Surface) | EEZ, (FAO:71 Pacific Western Central), Major areas: Visayan Sea, Samar Sea, San Miguel Bay; Bays/Gulfs nationwide | Gear with high-risk of entanglement with 16 U.S.C. § 1387(f)(3) stock.<br><br>Inadequate data collection on marine mammal bycatch.<br><br>Bycatch limit of 16 U.S.C. § 1387(f)(3) stock likely exceeded.<br><br>Mitigation measures are not likely to reduce bycatch below the bycatch limit. |
| 2133 | Skipjack tuna | Drift gillnets, (Surface) | EEZ, (FAO:71 Pacific Western Central), municipal waters; nationwide | Gear with high-risk of entanglement with 16 U.S.C. § 1387(f)(3) stock.<br><br>Inadequate data collection on marine mammal bycatch.<br><br>Bycatch limit of 16 U.S.C. § 1387(f)(3) stock likely exceeded.<br><br>Mitigation measures are not likely to reduce bycatch below the bycatch limit. |
| 2134 | Demersal fishes nei* | Set gillnets/set nets (anchored), (Surface) | EEZ, (FAO:71 Pacific Western Central), municipal waters; nationwide | Gear with high-risk of entanglement with 16 U.S.C. § 1387(f)(3) stock.<br><br>Inadequate data collection on marine mammal bycatch.<br><br>Bycatch limit of 16 U.S.C. § 1387(f)(3) stock likely exceeded.<br><br>Mitigation measures are not likely to reduce bycatch below the bycatch limit. |

*Not elsewhere included (nei) - when the product is not specifically provided for in the Harmonized Trade System, the description covering such product is generally considered to be a "residual provision" by use of the phrase "not elsewhere included".

The Philippines submitted information for three longline fisheries that are not currently operational and the Philippines will need to reapply for a comparability finding for these fisheries when the relevant information on the marine mammal bycatch monitoring and reporting for this fishery is available, and in the event that it is seeking to export this fishery to the United States. See Question 4.

| Fishery ID | Target species | Gear | Area of Operation |
|---|---|---|---|
| 2128 | Bigeye tuna, Skipjack tuna, Yellowfin tuna | Longlines (not specified), (Pelagic) | High Seas, (FAO:71 Pacific Western Central), International waters |
| 12485 | Bigeye tuna, Skipjack tuna, Yellowfin tuna | Longlines (not specified), (Pelagic) | High Seas, (FAO:34 Atlantic Eastern Central, FAO:31 Atlantic Western Central), ICCAT |
| 12486 | Bigeye tuna, Skipjack tuna, Yellowfin tuna | Longlines (not specified), (Pelagic) | High Seas, (FAO:57 Indian Ocean Eastern, FAO:51 Indian Ocean Western), IOTC |

# Comparability Finding Analysis

1. **Does the nation have a prohibition on the intentional killing or serious injury of marine mammals in the course of commercial fishing operations? OR Does the nation have procedures to reliably certify that fish and fish products were not caught in association with the intentional killing or serious injury of marine mammals in the course of commercial fishing operations?**

Response: Yes, *Fisheries Administrative Order (FAO) No. 185* prohibits take and capture of dolphins in Philippines' waters, as well as sale, purchase, possession, transport or export of dead or live dolphins in any form, whether raw or processed. FAO No. 185 also declares it illegal to wound or kill dolphins in the course of fishing and requires that any dolphins accidentally caught be immediately released unharmed. The *Revised FAO Order No. 185-1* expanded these prohibitions to whales and porpoises.

2. **Does the nation have a Marine Mammal Bycatch Reduction Program? A bycatch reduction program, for purposes of compliance with the import provisions, is defined as having the following components:**

   a. **The ability to control/monitor its fishing operations that may take marine mammals (e.g., authorizations, permits, licenses, and/or registrations for vessels)**

Response: Yes. The *Philippine Fisheries Code of Republic Act No. 10654 series of 2015*, "An Act to Prevent, Deter and Eliminate Illegal, Unreported, and Unregulated Fishing amending Republic Act No. 8550;", Section 7 - Access to Fishery Resources states that the: "Department shall issue such number of licenses and permits for the conduct of fishery activities subject to harvest control rules and reference points as determined by scientific studies or best available evidence. Preference shall be given to resource users in the local communities adjacent or nearest to the municipal waters." The *Fisheries Administrative Order No. 198-1 series of 2018* under Chapter II Section 5 requires registration of fishing gears used for commercial fishing purposes.

   b. **A program to monitor its fisheries for incidences of marine mammal mortality and serious injury in the course of commercial fishing operations**

Response: Besides the ring net and purse seine fisheries operating under WCPFC, the Philippines currently does not have a program to monitor its fisheries for incidences of marine mammal mortality

and serious injury in the course of commercial fishing operations. Philippines stated that Fishery ID 2129 (blue swimming crab, pot fishery) has dockside inspection reporting (75-99% coverage) but did not provide any monitoring forms or other documentation to suggest that there is marine mammal bycatch reporting. In 2020, the Philippines implemented voluntary guidelines on a municipal catch documentation and traceability system for local government units to manage fishery resources; however, these guidelines and the catch reporting form do not include marine mammal reporting. The Philippines has stated that it is developing a fishermen interview process covering 5-10% of most of its fisheries but did not provide any further information or documentation of implementation. The Philippines has a well-established stranding network that includes procedures for responding to and reporting marine mammal strandings. Philippine export fisheries are listed in Table 1.

**Table 1. Philippine Export Fisheries**

| Fishery ID | Target Species | Gear | Area of Operation | Monitoring Program |
|---|---|---|---|---|
| 2124 | Bonitos nei, Herrings/sardines nei, Mackerels nei, Round scad, Various squids nei | Ring nets, (Surface) | EEZ, (FAO:71 Pacific Western Central), EEZ, (FAO:81 Pacific Southwest, FAO:71 Pacific Western Central), Coastal waters, Nationwide, Major Areas - Zamboanga Peninsula, Basilan, Sulu, Tawi-Tawi, Palawan, Visayan Sea and Ticao Pass/San Bernardino Strait, Palawan, Iloilo | None for the fishery, strandings network |
| 2125 | Bigeye tuna, Skipjack tuna, Yellowfin tuna | Purse seines, (Pelagic) | High Seas, (FAO:71 Pacific Western Central), High Seas Pocket 1 | Observer Program (75-99% coverage) Logbook |
| 2127 | Bigeye tuna, Skipjack tuna, Yellowfin tuna | Purse seines, (Pelagic) | High Seas, (FAO:71 Pacific Western Central), High Seas Pocket 1 | Observer Program (100% Coverage) Logbook |
| 2129 | Blue swimming crab | Pots/traps (Bottom) | EEZ, (FAO:71 Pacific Western Central), Major areas: Visayan Sea, Samar Sea, San Miguel Bay; Bays/Gulfs | Dockside inspection but no marine mammal monitoring (75-99% coverage) |
| 2130 | Blue swimming crab | Gillnets and entangling nets (not specified), (Surface) | EEZ, (FAO:71 Pacific Western Central), Major areas: Visayan Sea, Samar Sea, San Miguel Bay; Bays/Gulfs nationwide | None for the fishery, strandings network |
| 2131 | Octopuses nei | Pots/traps (Bottom) | EEZ, (FAO:71 Pacific Western Central), Major areas: South Sulu Sea, Tawi-tawi, Jolo, Basilan, Palawan, Caraga | None for the fishery, strandings network |

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Philippines**

| 2132 | Various squids nei | Trawls (not specified), (Surface) | EEZ, (FAO:71 Pacific Western Central), year-round; nationwide | None for the fishery, strandings network |
|---|---|---|---|---|
| 2133 | Skipjack tuna | Drift gillnets, (Surface) | EEZ, (FAO:71 Pacific Western Central), municipal waters; nationwide | None for the fishery, strandings network |
| 2134 | Demersal fishes nei | Set gillnets/set nets (anchored), (Surface) | EEZ, (FAO:71 Pacific Western Central), municipal waters; nationwide | None for the fishery, strandings network |
| 2207 | Herring/sardine nei, Various squids nei | Fyke nets, (Surface) | EEZ, (FAO:71 Pacific Western Central), nationwide | None for the fishery, strandings network |
| 2209 | Dolphinfishes nei, Tunas nei | Trolling lines, (Surface) | EEZ, (FAO:71 Pacific Western Central), municipal waters; offshore | None for the fishery, strandings network |
| 2210 | Bonitos nei, Herrings/sardines nei, Mackerels nei, Round scad, Various squids nei | Purse seines, (Surface) | EEZ, (FAO:71 Pacific Western Central), EEZ, (FAO:81 Pacific Southwest, FAO:71 Pacific Western Central),Coastal waters, Nationwide, Major Areas - Zamboanga Peninsula, Basilan, Sulu, Tawi-Tawi, Palawan, Visayan Sea and Ticao Pass/San Bernardino Strait, Palawan, Iloilo | None for the fishery, strandings network |
| 12658 | Bigeye tuna, Skipjack tuna, Yellowfin tuna | Purse seines, (Pelagic) | EEZ, Papua New Guinea, (FAO:71 Pacific Western Central), Parties to the Nauru Agreement | Observer program (75-99% coverage) Logbook |
| 12659 | Bigeye tuna, Skipjack tuna, Yellowfin tuna | Ring nets, (Pelagic) | High Seas, (FAO:71 Pacific Western Central), High Seas Pocket 1 | Observer program (75-99% coverage) Logbook |

**c. A requirement to report all marine mammal mortality and serious injury in the course of commercial fishing operations**

Response: The Philippines does not have a requirement to report all marine mammal mortality and serious injury in the course of commercial fishing operations although there is some degree of marine mammal bycatch monitoring, see response to Question 2b.

**d. Prioritization of fisheries for mitigation of unsustainable marine mammal bycatch as described in 16 U.S.C. § 1387(f)(3) (in particular those over the bycatch limit, of small population size, or declining rapidly, based on available financial resources) in response to reported bycatch occurring in fishing operations. Prioritization of fisheries**

**should be similar to U.S. take reduction teams and development of take reduction plans and including an evaluation of whether the nation has provided a bycatch limit and whether that bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stock(s), and whether any mitigation is effective or reconsidered if not effective.**

Response: The Philippines provided a list of marine mammal species co-occurring with its export fisheries and provided population abundance estimates and bycatch limits for some species. Philippines indicated injury or mortality of certain species, primarily from its WCPFC fisheries, including Bryde's whale (stock: unknown), common bottlenose dolphin (stock: Philippines), false killer whale (stock: global), long-beaked common dolphin (stock not specified), melon-headed whale (stock: Sula Sea, Philippines), pantropical spotted dolphin (stock: Philippines), rough-toothed dolphin (stock: global), sperm whale (stock: global), and spinner dolphin (stock: Southern Tañon Strait). Of these stocks, the total injury and mortality of common bottlenose dolphin (13.70) exceeded the bycatch limit (2.1).

These bycatch estimates are likely under-representations as a whole as there is no marine mammal bycatch monitoring program outside of the WCPFC fisheries. A report from the Philippine Marine Mammal Stranding Network of strandings from 2005 to 2016 indicated that the most frequent species that stranded was the spinner dolphin (115), followed by the Fraser's dolphin (67), Risso's dolphin (52), melon-headed whale (45), pantropical spotted dolphin (37), and dwarf sperm whale (36) (Aragones et al. 2017). [2]

Mitigation measures for the WCPFC purse and ring net fisheries include a prohibition on intentional encirclement of marine mammals and no setting of gear when marine mammals are sighted in the area. For the other export fisheries, the Philippines indicated there were safe handling and release practices, no setting when marine mammals were present, reduction in net length for gillnet (Fishery ID 2133), and reduction in main line length (Fishery ID 2131), as well as fishermen education programs and marine mammal identification guides.

The Philippines, primarily at the local level, has also designated marine protected areas (MPAs). The Philippines stated that the Scientific Advisory Group and the Management Board of Fisheries Management Area have prioritized implementing regulations to establish spatial closures, and Local Government Units have full jurisdiction over the municipal waters and the ability to adopt closures identified as hotspots as mitigation measures. In Fishery Management Area 11, for Fishery IDs 2130 and 2131, the Philippines indicated area-based closures as per the Bago City Municipal Ordinance and a proposed conservation area in Malampaya Sound under Malampaya Sound Protected Landscape and Seascape.

Due to limitations in data, the actual bycatch numbers and unsustainable bycatch of potential 16 U.S.C. § 1387(f)(3) stocks particularly in fisheries with a high-risk gear, such as gillnets, is unknown. It is unknown if mitigation measures including MPAs are effective in reducing bycatch.

Philippines also indicated bycatch of Irrawaddy dolphin (stock: Malampaya Sound) in Fishery IDs 2133 and 2130. See response to Question 6.

---

[2] Aragones, L.V., Laggui, H.L.M., Amor, A.K.S. 2017. The Philippine Marine Mammal Strandings from 2005 to 2016. A PMMSN Publication. Technical Report No.1. Quezon City, Philippines.

3. **Does the nation ban the use of large-scale high seas drift gillnet gear or other gear prohibited for use by U.S. fishermen?**

Response: While no information in the Philippines application materials suggests that it prohibits the use of large-scale driftnet fishing, none of its fisheries utilize large-scale drift gillnet gear, and no other information submitted suggests it uses gear prohibited by the United States.

4. **Does the nation implement marine mammal bycatch reduction measures in fisheries regulated under a regional fishery management organization (RFMO), which are required for U.S. fishermen by that RFMO?**

Response: The United States and the Philippines are both members of WCPFC and ICCAT. The United States is not a member of IOTC. For WCPFC, IOTC, and ICCAT observer coverage and marine mammal bycatch reporting are required for longline and purse seine fisheries.

The Philippines confirmed that it does not have any longline fisheries operating pursuant to any RFMO and as a result, is not implementing any RFMO longline data collection and monitoring requirements. Should the Philippines seek to develop a longline fishery that becomes the source of fish and/or fish products exported to the United States, the Philippines must apply for and receive a comparability finding for its longline fisheries to export those products to the United States (see Table 2).

**Table 2. Inactive Philippine Export Fisheries under RFMOs**

| Fishery ID | Target species | Gear | Area of Operation |
|---|---|---|---|
| 2128 | Bigeye tuna, Skipjack tuna, Yellowfin tuna | Longlines (not specified), (Pelagic) | High Seas, (FAO:71 Pacific Western Central), International waters |
| 12485 | Bigeye tuna, Skipjack tuna, Yellowfin tuna | Longlines (not specified), (Pelagic) | High Seas, (FAO:34 Atlantic Eastern Central, FAO:31 Atlantic Western Central), ICCAT |
| 12486 | Bigeye tuna, Skipjack tuna, Yellowfin tuna | Longlines (not specified), (Pelagic) | High Seas, (FAO:57 Indian Ocean Eastern, FAO:51 Indian Ocean Western), IOTC |

The Philippines has four purse seine or ring net fisheries under WCPFC (see Table 1). For purse seine vessels, WCPFC requires member states to comply with CMM 2011-03 that prohibits vessels from setting a purse seine net on a school of tuna associated with a cetacean in the high seas and exclusive economic zones of the Convention Area. Under the *Fisheries Administrative Order No. 271 Series of 2023,* the Philippines prohibits the intentional encirclement or setting by purse seine and ring net fisheries on cetaceans and prohibits the onboard retention of cetaceans.

5. **In cases where a U.S. Take Reduction Team has implemented marine mammal bycatch reduction measures for transboundary stocks shared with the United States, are the nation's measures similar or comparable in effectiveness? (Include in the response if the nation has provided a bycatch limit and if the bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stocks, either in one fishery or cumulatively over a number of fisheries)**

Response: Not applicable. The Philippines and the United States do not share any transboundary stocks.

6.  **For marine mammal stocks that are not transboundary but are considered at high risk of extinction, does the nation implement mitigation/risk reduction measures comparable to what is or would be required in the United States? (Include in the response if the nation has provided a bycatch limit and if the bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stocks, either in one fishery or cumulatively over a number of fisheries)**

Response: The Philippines has two known populations of Irrawaddy dolphins, Malampaya Sound, Palawan and in the coastal waters of Bago and Pulupandan, Negros Occidental, and these stocks could be considered at high risk of extinction. There are an estimated 35 Irrawaddy dolphins in Malampaya and 6 -13 mature individuals in the Iloilo-Guimaras Strait population. [3,4] In particular, the gillnet fisheries, including the blue swimming crab fisheries, co-occur with Irrawaddy dolphins and have a high-risk of interactions based on gear type.

Currently, the Philippines lacks a comprehensive monitoring program for marine mammal bycatch and has limited information on Irrawaddy dolphin bycatch. The Philippines indicated injury of Irrawaddy dolphins in the blue swimming crab gillnet fishery (Fishery ID 2130) and the skipjack tuna drift gillnet fishery (Fishery ID 2133). The Iloilo-Guimaras Strait and Malampaya populations of Irrawaddy dolphins are small and the bycatch limits have likely been exceeded by gillnet as well as crab pot fishery interactions (Fishery ID 2129). [5]

Municipalities in Fisheries Management Area No. 11, which cover the Malampaya Sound, Palawan and Bago and Pulupandan, Negros Occidental areas, have implemented measures that include:

*   Designation of past protected areas in the Provinces of Negros Occidental and Iloilo (1990, 1995, 1998, 2002)
*   Permits and gear restrictions for crab fishing in Ajuy, Iloilo (2023)
*   Prohibitions enacted from 1998 to 2023 in multiple municipalities on fishing or taking protected species.

There is no evidence that existing mitigation measures have successfully reduced the bycatch of Irrawaddy dolphins below the bycatch limit.

Philippines described on-going and upcoming efforts that may be assessed by NMFS as part of future comparability finding determinations. These include developing a multi-sectoral plan to eliminate bycatch of threatened wildlife; establishing a National Technical Working Group to assess and develop conservation measures in critical areas; implementing a proposed conservation area Malampaya Sound; and planning to strengthen collaborative networks with institutions for marine mammal monitoring and reporting.

---

[3] Dolar, M., de la Paz, M. & Sabater, E. 2018. Orcaella brevirostris (Iloilo-Guimaras Subpopulation). The IUCN Red List of Threatened Species 2018: e.T123095978A123095988.

[4] Whitty, T. 2016. Multi-methods approach to characterizing the magnitude, impact, and spatial risk of Irrawaddy dolphin (*Orcaella brevirostris*) bycatch in small-scale fisheries in Malampaya Sound, Philippines. Marine Mammal Science. 32:3, 1022-1043

[5] Whitty, T. 2016. Multi-methods approach to characterizing the magnitude, impact, and spatial risk of Irrawaddy dolphin (*Orcaella brevirostris*) bycatch in small-scale fisheries in Malampaya Sound, Philippines. Marine Mammal Science. 32:3, 1022-1043

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Philippines**

# Additional Considerations

In reviewing a nation's fisheries and marine mammals stocks, how do they compare to:

1. **U.S. implementation of its regulatory program for similar marine mammal stocks and similar fisheries (e.g., considering gear or target species), including transboundary stocks governed by regulations implementing a take reduction plan (50 CFR § 229.2), and any other relevant information received during consultations**

Response: Not applicable.

2. **The extent to which the harvesting nation has successfully implemented measures in the export fishery to reduce the incidental mortality and serious injury of marine mammals caused by the harvesting nation's export fisheries to levels below the bycatch limit**

Response: Not applicable.

3. **Whether the measures adopted by the harvesting nation for its export fishery have reduced or will likely reduce the cumulative incidental mortality and serious injury of each marine mammal stock below the bycatch limit, and the progress of the regulatory program toward achieving its objectives**

Response: Not applicable.

4. **Other relevant facts and circumstances, which may include the history and nature of interactions with marine mammals in this export fishery, whether the level of incidental mortality and serious injury resulting from the fishery or fisheries exceeds the bycatch limit for a marine mammal stock, the population size and trend of the marine mammal stock, and the population level impacts of the incidental mortality or serious injury of marine mammals in a harvesting nation's export fisheries and the conservation status of those marine mammal stocks where available**

Response: Not applicable.

5. **The record of consultations under 50 CFR § 216.24(h)(5) of this section with the harvesting nation, results of these consultations, and actions taken by the harvesting nation and under any applicable intergovernmental agreement or regional fishery management organization to reduce the incidental mortality and serious injury of marine mammals in its export fisheries**

Response: NMFS and the Philippines held two technical consultations in February 2020 and March 2021.

6. **Information gathered during onsite inspection by U.S. government officials of a fishery's operations**

Response: Not applicable.

7. **For export fisheries operating on the high seas under an applicable intergovernmental agreement or regional fishery management organization to which the United States is a party, the harvesting nation's record of implementation of, or compliance with, measures adopted by that regional fishery management organization or intergovernmental agreement for data collection, incidental mortality and serious injury mitigation or the conservation and management of marine mammals; whether the harvesting nation is a party or cooperating non-party to such intergovernmental agreement or regional fishery management organization; the record of United States implementation of such measures; and whether the United States has imposed additional measures on its fleet not required by an intergovernmental agreement or regional fishery management organization**

Response: See response to Question 4. The United States and Philippines are members of ICCAT and WCPFC.

8. **For export fisheries operating on the high seas under an applicable intergovernmental agreement or regional fisheries management organization to which the United States is not a party, the harvesting nation's implementation of and compliance with measures, adopted by that regional fisheries management organization or intergovernmental agreement, and any additional measures implemented by the harvesting nation for data collection, incidental mortality and serious injury mitigation or the conservation and management of marine mammals and the extent to which such measures are comparable in effectiveness to the U.S. regulatory program for similar fisheries**

Response: See response to Question 4. The United States is not a member of IOTC.

## Overall Summary for Additional Considerations

The additional considerations were not pertinent to determining whether the nation's marine mammal bycatch reduction program is comparable in effectiveness to the U.S. regulatory program.

# Engagement History

NMFS engaged in two technical consultations in February 2020 and March 2021 as well as numerous email exchanges of information with the Philippines. The Philippines has been responsive to emails.

# EXHIBIT B

**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
Silver Spring, MD 20910

July 3, 2025

MEMORANDUM FOR:     Eugenio Piñeiro Soler
                    Assistant Administrator
                      for Fisheries

THROUGH:            Emily Menashes         MENASHES.EMILY. Digitally signed by
                    Deputy Assistant Administrator HANSON.13658212 MENASHES.EMILY.HANSON.1365
                      for Operations       20            821220
                                                         Date: 2025.07.09 17:16:59 -04'00'

FROM:               Alexa Cole                 COLE.ALEXA. Digitally signed by
                    Director, Office of International Affairs, ANNE.136582 COLE.ALEXA.ANNE.136
                      Trade, and Commerce                  5825030
                                               5030        Date: 2025.07.03
                                                           09:18:14 -04'00'

SUBJECT:            Issuance of Marine Mammal Protection Act (MMPA)
                    Comparability Findings – **DECISION MEMORANDUM**


**SUMMARY**

The Marine Mammal Protection Act (MMPA) precludes the import into the United States of fish
and fish products taken in foreign commercial fisheries that have serious injury and mortality
of marine mammals in excess of U.S. standards.  Regulations issued to implement the MMPA
fish import provisions require exporting nations to receive a finding that their regulatory program
for marine mammal bycatch mitigation in each fishery is comparable in effectiveness to the U.S.
program.  Over 130 nations have applied for comparability findings for over 2500 foreign
fisheries.  Under our regulations, NMFS must finalize our comparability findings no later than
November 30, 2025; however, per the terms of a recent settlement agreement, we must issue our
final determinations by September 1, 2025.  Comparability determinations are made on a fishery-
by-fishery basis, not on a nation-basis.  Any fishery that does not receive a comparability finding
will be subject to import restrictions on the fish and fish products from that foreign fishery.
These import restrictions will go into effect on January 1, 2026.

**BACKGROUND**

**A.     MMPA Provisions Governing the Importation of Fish and Fish Products into the
        United States**

The MMPA requires the United States to ban the importation of fish or fish products that have
been caught with commercial fishing technology that results in the incidental kill or incidental
serious injury of marine mammals in excess of U.S. standards.  *See* 16 U.S.C. § 1371(a)(2).  For

purposes of applying Section 1371(a)(2) of the MMPA, the Secretary of Commerce shall insist on reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on marine mammals of the commercial fishing technology in use for such fish or fish products exported from such nation to the United States. *Id.* at § 1371(a)(2)(A). The MMPA also states it is unlawful to import into the United States any fish if such fish was caught in a manner which the Secretary of Commerce has proscribed for persons subject to the jurisdiction of the United States, whether or not any marine mammals were in fact taken incidental to the catching of the fish. *Id.* at §1372(c)(3). The prohibition includes, among other things, the intentional killing or serious injury of marine mammals in the course of commercial fishing. *Id.* at § 1378(a)(5); 50 C.F.R. § 229.3(f).

In 2008, the Center for Biological Diversity and Turtle Island Restoration Network filed a petition for rulemaking requesting that NMFS and other relevant federal agencies exercise their authority under the MMPA to ban the imports of swordfish and swordfish products from nations that had failed to provide reliable information regarding the incidental mortality and serious injury of marine mammals in foreign fishing gear used to catch swordfish. NMFS initiated a new rulemaking process in response to the petition. The U.S. commercial fishing industry supported the rulemaking because it wanted fisheries in other nations to be subject to the same standards of marine mammal conservation as U.S. commercial fisheries. In addition, in 2011 and 2012, non-governmental organizations urged NMFS to ban the importation of Canadian and Scottish farmed salmon into the United States due to intentional killing of seals, which is prohibited under the MMPA. NMFS issued a proposed rule in 2015 that addressed the incidental and intentional killing and serious injury of marine mammals and the importation of fish and fish products into the United States; however, the rule applied to a substantially larger universe of nations and fisheries than the petitioners requested originally.[1]

The MMPA Import Provisions Final Rule ("Final Rule") was published in 2016.[2] The Final Rule established a process to evaluate a harvesting nation's regulatory program concerning the incidental and intentional mortality and serious injury of marine mammals in fisheries operated by nations that export fish and fish products to the United States. Harvesting nation's commercial fisheries are required to be classified by NMFS as either "Exempt"[3] or "Export"[4] fisheries based on the risk of marine mammal bycatch (i.e., entanglement or capture) in fishing gear. This list of Exempt and Export fisheries, known as the List of Foreign Fisheries (LOFF), was last updated in 2020 and currently consists of approximately 1,400 Export fisheries and 1,100 Exempt fisheries totaling approximately 2,500 fisheries across 135 nations.[5] Despite the

---

[1] NMFS received public comment on the petition over the course of nearly seven years, including requests to ban additional fish and fish products from other harvesting nations. NMFS determined that the rulemaking would be broader in scope than the 2008 petition and not limited in application to swordfish fisheries.

[2] *See* 81 Fed Reg. 54390 (August 15, 2016).

[3] An "Exempt" fishery is a foreign commercial fishery determined by NMFS to have a remote likelihood of, or no known, incidental mortality and serious injury of marine mammals in the course of commercial fishing operation. Exempt fisheries are considered to be the functional equivalent to Category III fisheries under the U.S. regulatory program.

[4] An "Export" fishery is a foreign commercial fishery determined by NMFS to have more than a remote likelihood of incidental mortality and serious injury of marine mammals in the course of commercial fishing operations. Export fisheries are considered to be the functional equivalent to Category I and II fisheries under the U.S. regulatory program.

[5] NMFS expects to update the LOFF in late 2025.

name, Exempt fisheries are still subject to the import provisions – they are, however, subjected to more limited conditions for comparability evaluation, namely demonstrating a prohibition on intentional mortality and serious injury of marine mammals in the course of commercial fishing operations or demonstrating it has procedures to reliably certify that exports of fish and fish products to the United States are not the product of an intentional killing or serious injury of a marine mammal.

Fish and fish products from fisheries identified on the LOFF may only be imported into the United States if the harvesting nation has applied for, and NMFS has issued, a comparability finding. A comparability finding means the harvesting nations' Export and/or Exempt fisheries meet the applicable conditions specified in the Final Rule.[6] Comparability findings are fishery-specific, not nation-specific, so nations receiving a partial denial will be able to continue exporting fish or fish products to the United States from any fishery that receives a comparability finding. All final comparability findings will be published in the *Federal Register* and, in cases where NMFS denies or terminates a comparability finding for a fishery, it will coordinate with the Secretaries of Treasury and Homeland Security to identify and prohibit the importation of fish and fish products into the United States. The Final Rule also established a five-year exemption period before imports would be subject to trade restrictions. The exemption period has been extended three times and ends on December 31, 2025.

Pursuant to a settlement agreement in *NRDC, et al. v. Raimondo, et al.,* and consistent with the Final Rule, in December 2024 and January 2025 NMFS issued letters informing nations that it was preliminarily denying comparability findings for one or more of the nations' fisheries, along with the reasons for the preliminary denial, and offered an opportunity for nations to supply reliable information to refute the preliminary denial[7]. Also pursuant to the settlement agreement, NMFS is required to issue final comparability findings for all harvesting nations and submit the findings to the *Federal Register* for publication on or before September 1, 2025. On January 1, 2026, NMFS, in cooperation with the Secretaries of Treasury and Homeland Security, will implement the prohibition on the importation of fish and fish products into the United States from all harvesting nations' fisheries for which NMFS has denied a comparability finding.

Additional details regarding the Final Rule, its applicability to the 2025 final comparability findings, and NMFS's process and methodology for making the findings are provided below.

## B.    Litigation History

Litigation involving 16 U.S.C. § 1371(a)(2) increased significantly following the publication of the Final Rule. Environmental NGOs filed several lawsuits claiming the U.S. Government has violated its non-discretionary duty under the MMPA to impose import bans on foreign nations' fish and fish products that have been harvested in violation of the MMPA's standards. The cases and their status are summarized below.

- *Natural Resources Defense Council, Inc., et al. v. Ross, et al.*, Case 18-00055 (CIT) – On March 21, 2018, Plaintiffs initiated a lawsuit in the Court of International Trade alleging

---

[6] The applicable regulatory conditions are contained in 50 CFR §§ 216.24(h)(6) & (7).
[7] NMFS issued a preliminary denial letter to Namibia in June 2025 upon further review of relevant information.

that NMFS's failure to ban imports of fish and shrimp from gillnet fisheries in the northern Gulf of California violated the MMPA and Administrative Procedure Act (APA). The Plaintiffs were concerned that the Mexican commercial gillnet fisheries resulted in the incidental mortality and serious injury of the critically-endangered vaquita porpoise. On July 16, 2018, the court granted Plaintiff's request for a preliminary injunction and ordered the United States to ban the importation of all fish and fish products from four specified Mexican commercial fisheries – shrimp, curvina, chano, and sierra – that use gillnets in the vaquita's range. During the pendency of the litigation, NMFS published a Federal Register notice on March 9, 2020, stating that the Government of Mexico lacked a regulatory program comparable in effectiveness to the U.S. regulatory program. An import ban was immediately executed for all shrimp, curvina, sierra, chano and certain other fish and their products that are caught with gillnets inside the vaquita's range. Thereafter, the court lifted its preliminary injunction and entered an order of voluntary dismissal on April 22, 2020.

- *Sea Shepherd New Zealand and Sea Shepherd Conservation Society v. United States, et al.*, Case 1:20-cv-00112 (CIT) – On May 21, 2020, Plaintiffs initiated a suit in the Court of International Trade alleging NMFS's failure to ban imports from New Zealand's North Island West Coast set net and trawl fisheries and its denial of their petition for rulemaking violated the MMPA and APA. The Plaintiffs were concerned about the threats these fisheries pose to endangered Māui dolphins and moved for a preliminary injunction to ban imports of seafood into the United States from New Zealand's set net and trawl fisheries. The court granted a preliminary injunction and imposed import restrictions for the export fisheries operating on the West Coast North Island within the Māui dolphin's range. The court's order effectively removed the operative exemption period protections for these fisheries. In January 2024, and in response to the Government of New Zealand's renewed request for comparability findings, NMFS concluded that New Zealand met the requirements under the MMPA and the Final Rule and issued a comparability finding for the West coast, North Island multi-species set-net and trawl fisheries and lifted the embargo on fish and fish products from these fisheries.

- *Natural Resources Defense Council, et al. v. National Marine Fisheries Service, et al.*, 1:24-cv-00148 (CIT) – On August 8, 2024, Plaintiffs initiated a suit in the Court of International Trade alleging the United States violated the MMPA and APA when it failed to ban the importation of fish and fish products from a number of gillnet fisheries in Canada, Ecuador, France, Indonesia, India, Mexico, South Africa, the United Kingdom and commercial fisheries in South Korea; failed to insist on "reasonable proof" from such nations on the effects of their export fisheries on marine mammals; and failed to provide notice and comment on the last extension of the final rule's exemption period. The parties executed a Settlement Agreement on January 15, 2025, which required the United States to implement the MMPA Import Provisions pursuant to an agreed-upon schedule. The court issued a Stipulation of Dismissal of the case on March 25, 2025, but retained jurisdiction to oversee the compliance with the schedule for issuing the final comparability findings.

- *Māui and Hector's Dolphin Defenders NZ Inc. v. National Marine Fisheries Service, et al.,* 1:24-cv-00218 (CIT). On December 4, 2024, Plaintiffs initiated a suit in the Court of International Trade challenging NMFS's 2024 comparability findings for New Zealand's West Coast North Island set-net and trawl fisheries. Plaintiffs assert that NMFS's comparability findings and its failure to ban imports from these fisheries violated the MMPA and APA. The parties have briefed the case and are awaiting a decision from the court.

## COMPARABILITY FINDING APPLICATION PROCESS

The current action is the first time that NMFS has evaluated and will be issuing final comparability findings for the entire group of harvesting nations (135 nations covering approximately 2,500 fisheries) seeking to export fish and fish products to the United States. NMFS's Final Rule and the implementation of the import provisions program under 16 U.S.C. § 1371(a)(2) was designed to be an iterative process based on the fact that harvesting nations would be at different stages in their efforts to regulate commercial fisheries interactions with marine mammals and would need time and support to build capacity. In addition, NMFS expected that the quality and quantity of data about the harvesting nations' efforts would vary considerably. These factors led NMFS to concentrate its efforts on this initial set of findings on developing a baseline of knowledge for all nations identified on the LOFF.

The first round of comparability findings proved to be a significantly more complex and time-intensive undertaking than NMFS had anticipated at the time the Final Rule was promulgated. The practical challenges and differences associated with a diverse group of nations became clear early in the process. Many of the harvesting nations had never confronted the problem of commercial fisheries' interactions with marine mammals and it was unrealistic to expect that 135 nations would address the issue in the same way.[8] Despite these challenges, NMFS applied the framework established by the Final Rule and proceeded to develop an understanding about whether the harvesting nations had laws, regulations, and processes in place to address incidental mortality and serious injury of marine mammals in the course of their commercial fisheries operations and whether their regulatory programs were comparable in effectiveness to the United States' regulatory program. NMFS has, since enacting the Final Rule, coordinated closely with harvesting nations, the U.S. Department of State, the Office of the U.S. Trade Representative, the U.S. Department of Homeland Security, and other experts to gather as much information as possible to make informed decisions about whether a harvesting nation's fisheries would qualify for a comparability finding.

## A.    Classifying Fisheries in the List of Foreign Fisheries

As described in the Background section, foreign commercial fishing operations were classified as either "Exempt" or "Export" based on their frequency of marine mammal interactions. NMFS reviewed import trade data of fish and fish products to identify harvesting nations and their commercial fisheries and coordinated with each of the harvesting nations prior to finalizing the

---

[8] NMFS explained in its Final Rule that the MMPA prioritizes action for those stocks defined as "strategic" and expressed hope that nations would also prioritize their actions for threatened and endangered species and those for which bycatch is unsustainable. *See* 81 Fed Reg. 54390, *supra,* note 1 at 54397 (Response to Comment 11).

LOFF.  Harvesting nations were asked to provide information about their commercial fisheries, including for example, the number of participants involved in a fishery, number of vessels, gear type, target species, the geographic area of operation, fishing season, frequency of and measures to reduce incidental mortality and serious injury of marine mammals in those fisheries, whether the harvesting nation had any programs to assess marine mammal populations, and whether any laws, decrees, regulations, or measures existed to reduce incidental mortality and serious injury of marine mammals or prohibit the intentional killing or serious injury of marine mammals in the course of commercial fishing operations.

If a harvesting nation did not provide enough information to allow NMFS to precisely classify a fishery, NMFS erred on the side of caution and classified the fishery as an "Export" fishery until such time as the harvesting nation could demonstrate otherwise.  This approach is comparable to how NMFS manages domestic commercial fisheries pursuant to 16 U.S.C. §§ 1386 and 1387.  Essentially, where data are lacking for a domestic fishery, the MMPA regulations at 50 CFR § 229.2 (definition of "Category II" fishery) indicate that the fishery should be classified as Category II.[9]  Also, in response to harvesting nations' concerns about the inadequacy or unavailability of marine mammal abundance estimates, NMFS stated it would treat such situations similarly to the United States' implementation of its stock assessment program, which is guided by the "best scientific information available" standard.[10]   NMFS evaluated all readily available information to classify the fisheries and published the LOFF in the *Federal Register*.[11]

## B.    The International Affairs Information Capture and Reporting System (IAICRS) Served as the Primary Mechanism for Gathering Information from Harvesting Nations

In 2019, NMFS launched a web-based information and data collection system, IAICRS, as a way to facilitate implementation of the Final Rule and achieve maximum consistency and standardization in how data were reported by harvesting nations and the type of data reported.  IAICRS Users are foreign government agencies of harvesting nations that provided data to NMFS in accordance with guidance provided by NMFS to demonstrate that they met the Final Rule's requirements.  In particular, NMFS required that harvesting nations provide the following information for all of its fisheries on the LOFF, including but not limited to: (1) fishery target species; (2) gear types; (3) area of fishing operations; (4) existing fisheries; (5) lists of all marine mammals in the nations' waters and/or that overlap with its fisheries, including stock abundance estimates, recent and planned abundance survey dates and bycatch limits; (6) timing of the fishery(ies); (7) annual mortality rates of marine mammal interactions in fisheries that export fish and fish products to the United States; (8) marine mammal monitoring programs; (9) bycatch reduction measures; and (10) copies of relevant laws, decrees, and implementing regulations or

---

[9] *See* 80 Fed. Reg. 48172, 48176 (August 11, 2015).
[10] *See* 16 U.S.C. § 1386(a)*; see also, supra* note 12 at 54400 (Response to Comment 31) ("NMFS will consider all data, including abundance estimates, provided in a harvesting nation's application for a comparability finding for an export fish in light of the U.S. implementation of its stock assessment program for the same or similar marine mammal stocks and its bycatch mitigation measures for similar fisheries."); *see also,* 89 Fed. Reg. 12257 (February 16, 2024) (NMFS's List of Fisheries for 2024).
[11] *See* 85 Fed. Reg. 63527 (October 8, 2020).

measures related to commercial fisheries and marine mammal interactions.[12]  Harvesting nations submitted their 2019 Progress Reports[13] through IAICRS, provided information about their fisheries for updated LOFF determinations, and submitted their applications for comparability findings through IAICRS in 2021.

NMFS understood that performing stock assessments is a technical and resource-intensive activity and that some harvesting nations were unlikely to have the capacity to conduct such assessments given their limited financial and staffing resources and technical expertise, and lack of data, among other limitations.[14]  To address this, NMFS created a tool within IAICRS – the "Lookup Table" – to assist nations that lacked the necessary tools, resources, or expertise to estimate marine mammal population abundance in their waters.  The "Lookup Table" is a compilation of known information about extant marine mammal species and stocks from available scientific literature, including peer-reviewed research articles, NMFS Stock Assessment Reports, International Whaling Commission reports, International Union for Conservation of Nature reports, ICES studies and reports, and technical memoranda, among others.  A nation could browse this table to select marine mammal species or stocks present in its waters or interacting with its fisheries and information about the stock status for that species or stock would automatically populate within the nation's application.

NMFS asked nations to provide bycatch limits for all marine mammal species and stocks interacting with its fisheries in IAICRS.  A nation could list the bycatch limit as "unknown" if the species was not identified (such as "Dolphin unspecified") or if it had not calculated a bycatch limit based on population abundance survey data.  A nation could also provide bycatch limits that it calculated based on its domestic stock surveys and using its own methods for calculation that may not be the same as the calculations for Potential Biological Removal (PBR).  For nations that selected marine mammal species or stocks from the "Lookup Table" or nations that had not calculated a bycatch limit but provided information about population abundance, IAICRS automatically generated a bycatch limit using the calculation for PBR.

Nations provided information about marine mammal fishery interactions including co-occurrence, annual estimates of incidental injury, and annual estimates of incidental mortality, for each individual fishery on the LOFF.  Annual estimates of injury and mortality for a given species or stock were averaged to determine a fishery's average annual estimated mortality.  The nation could provide the average estimated mortality value or IAICRS could calculate the average value from the annual data provided by the nation.  IAICRS links the fishery information

---

[12] The IAICRS tool User Guide was provided to all harvesting nations and contains instructions for completing applications for comparability findings.  In many cases, harvesting nations' laws, decrees, and implementing regulations needed to be translated into English and there may have been changes in meaning during the translation process. NMFS evaluated the information provided by the harvesting nation and made determinations based on its best understanding of the nation's laws, decrees, and regulations. However, NMFS ultimately deferred to a nation's interpretation of its own laws, decrees, and regulations and the representations made about such.

[13] Progress reports consist of information describing a harvesting nation's update on actions it has taken over the previous two years to develop, adopt, and implement its regulatory program, as well as information on the performance of its export fisheries in reducing incidental mortality and serious injury of marine mammals.

[14] The United States faces similar challenges in its pursuit of conducting stock assessments of marine mammal stocks found in its waters.  *See* NMFS Guidelines for Preparing Stock Assessment Reports Pursuant to the Marine Mammal Protection Act, NMFS Instruction 02-204-01. (February 7, 2023) ("sometimes the data necessary to conduct such an assessment are not available.").

with the marine mammal species or stock information provided or selected by the nation.  Where multiple fisheries interact with a given marine mammal species or stock, IAICRS sums the average annual estimated mortality for each fishery interacting with that marine mammal species or stock and generates a total average annual mortality for that species or stock.  This total average annual mortality for any given marine mammal species or stock was assessed against the bycatch limit for that marine mammal species or stock in IAICRS.  IAICRS compiles this information and displays whether the bycatch limit is exceeded for any given marine mammal species or stock.

In addition to the information provided by the harvesting nations through IAICRS, NMFS reviewed fisheries individually to assess details about each fishery including marine mammal interactions, monitoring programs, and bycatch reduction measures.  NMFS also reviewed all marine mammals listed in the nation's application as co-occurring with that nation's fisheries as well as any marine mammals for which NMFS had readily available information or scientific expertise to determine which species or stocks may occur in that nation's waters to fully assess the nation's fisheries and to identify which fisheries may be contributing to exceedance of a bycatch limit, as appropriate.

**C.     NMFS Applied the "Best Scientific Information Available" Standard to Classify Fisheries and Issue Final Comparability Findings for Harvesting Nations.**

The MMPA states that the Secretary "shall insist on reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing technology in use for such fish or fish products exported from such nation to the United States."  16 U.S.C. § 1371(a)(2)(A).  The term "reasonable proof" is not defined by the MMPA; therefore, NMFS explained in its Final Rule that it will, "as a matter of practice, use the best scientific information available" to evaluate a harvesting nation's regulatory program for a given export fishery and that harvesting nations must provide NMFS with documentary evidence of "sufficient detail, quality, and reliability."[15] NMFS also stated that it would take into consideration the uncertainty of any scientific information provided by a harvesting nation or that is otherwise readily available.[16]

The Final Rule explains that NMFS was aware that harvesting nations would experience difficulty providing documentary evidence of "sufficient detail, quality, and reliability", particularly because data would be incomplete, lacking, or unquantifiable.  Many of the harvesting nations faced challenges providing NMFS with marine mammal and commercial fisheries' data, largely because they lacked the resources, expertise, or funding to acquire the data to fully support their application for a comparability finding.  As discussed above, NMFS created a database to ensure that it sought consistent information from all exporting nations and

---

[15] *See* 81 Fed. Reg. 54390, 54406 (August 15, 2016) (Response to Comment 56).

[16] *See id.* (Response to Comment 55) ("NMFS will only make its comparability finding determinations based on the information provided by the nation, and any other readily available information, taking into consideration scientific uncertainty.").  Information that was "readily available" to NMFS during the comparability finding process included the information physically held by any office within NMFS (i.e., hard copy format) and any information stored electronically in databases routinely consulted by NMFS in the ordinary course of its work.  It did not include information provided to NMFS outside public notice and comment periods unless the information was from one of the harvesting nations and was required by NMFS in making its findings.

to standardize, to the greatest extent possible, the information received and how it would be interpreted.  However, the information received from all harvesting nations was uneven in its volume, scope, and detail.  Ultimately, NMFS evaluated each application based on the best scientific information available and exercised reasonable judgment when faced with uncertainty, a lack of data, or imperfect data.[17]

**The U.S. Regulatory Program Governing the Incidental Mortality and Serious Injury of Marine Mammals Informed the Comparability Findings**

Historically, the United States has applied an iterative process to address the incidental take of marine mammals in the context of its domestic commercial fisheries.[18]  Despite numerous successes across a range of fisheries, NMFS has acknowledged over the years that more work is needed to reduce marine mammal bycatch within its domestic fisheries.  This section describes the current process governing the incidental take of marine mammals in domestic commercial fisheries, the challenges NMFS has experienced in addressing incidental take under the MMPA within its domestic commercial fisheries, and why NMFS concluded that "U.S. standards" for purposes of section 1371(a)(2) of the MMPA are defined to be the regulatory measures required of U.S. commercial fishing operations.

**A.    The "U.S. Standards" for Regulating Incidental Mortality and Serious Injury in Domestic Commercial Fisheries**

NMFS may authorized the take of marine mammals incidental to commercial fisheries in accordance with 16 U.S.C. §§ 1386 and 1387 of the MMPA.  NMFS is required to prepare Stock Assessment Reports (SAR) for marine mammal stocks that occur in waters under the jurisdiction of the United States and may also prepare such reports for stocks present on the high seas.  A SAR must be based on the best scientific information available and include, among other things, a description of the stock's range, its status, a description of the commercial fisheries that interact with each marine mammal stock, a minimum population estimate, "potential biological removal" (PBR) levels[19], and estimates of human-caused mortality and serious injury by source. *See* 16 U.S.C. § 1386(a).  The information included in a SAR is used by NMFS to regulate and reduce the incidental mortality and serious injury of marine mammals in U.S. commercial fisheries.

---

[17] Specifically, NMFS is required to "draw reasonable conclusions regarding the fishery based on readily available information" in those cases where a harvesting nation provides insufficient documentary evidence in support of its application. *See* 50 CFR 216.24(h)(6)(ii); *see also,* 80 Fed. Reg. 48172, 48178 (August 11, 2015) (noting that the Assistant Administrator may rely on other information such as indirect evidence of bycatch in the fishery or information from analogous fisheries if a harvesting nation does not provide sufficient relevant information).

[18] *See* 81 Fed Reg. 54390, *supra* note 9, at 48173-48174 (describing the history of the United States' implementation of the MMPA's import provisions and amendments to the MMPA's provisions governing the incidental take of marine mammals in U.S. commercial fisheries).

[19] The Potential Biological Removal level is defined by the MMPA as the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population (16 U.S.C. §1362(20).  PBR is calculated using the minimum population abundance estimate (Nmin), times the population recovery factor (RF), times one-half the maximum or estimated net reproductive rate (Rmax) (Bycatch Limit = Nmin x RF x (0.5Rmax)).

NMFS classifies commercial fisheries according to their levels of incidental marine mammal mortality and serious injury (e.g., List of Fisheries (<u>Category I</u> (frequent), <u>Category II</u> (occasional), and <u>Category III</u> (remote likelihood)).[20]  The classification system consists of a two-tiered, stock-specific approach that first addresses the total impact of all fisheries on each marine mammal stock and then addresses the impact of the individual fisheries on each stock.[21] This approach is based on the rate, in numbers of animals per year, of incidental mortalities and serious injuries of marine mammals due to commercial fishing operations relative to a stock's PBR.  Importantly, the tier analysis requires a minimum amount of data and NMFS does not always have sufficient data to perform a tier analysis on certain fisheries.  In cases where NMFS does not have reliable data, NMFS determines whether the incidental mortality and serious injury is "occasional" by evaluating other factors (e.g., fishing techniques, gear used, qualitative data from logbooks, etc.).[22]  Following the classification process, NMFS issues marine mammal authorizations for Category I and II fisheries and prescribes, as appropriate, one or more regulatory measures for the fishery.  *See id.* at § 1387.  Any regulatory requirements pertaining to a fishery will be based on a number of factors, including but not limited to the fishery's classification in the List of Fisheries, the status of the affected marine mammal species or stock, and rates of human-caused mortality and serious injury.  For example, Category I and II fisheries typically require owners of vessels to register with the Marine Mammal Authorization Program, accommodate an onboard observer upon request, and comply with any applicable take reduction plans.

NMFS also has responsibilities where marine mammals from species or stocks designated as depleted on the basis of their listing as threatened or endangered pursuant to the Endangered Species Act (ESA) are potentially impacted by commercial fisheries.  *See* 16 U.S.C. 1387(f)(2). Where a depleted marine mammal species or stock is affected, the MMPA provides that NMFS shall allow the incidental taking of such species or stock if the incidental mortality or serious injury from commercial fisheries will have (i) a negligible impact on such species or stock; (ii) a recovery plan has been developed or is being developed for a species or stock under the ESA; and, (iii) where it is required under Section 1387 of the MMPA, a monitoring program has been established, vessels engaged in the fisheries are registered, and a take reduction plan has been developed or is being developed for the species or stock.  *See id.* at § 1371(a)(5)(E).  Once NMFS determines that each requirement has been met, the agency publishes a list of those fisheries for which it has made a determination and issues an appropriate permit for each authorization granted.  The process described above focuses on affirmatively providing permits for incidental take, and to the best of NMFS's knowledge is a statutory construct that is unique to the United States' regulatory scheme involving commercial fisheries interactions with marine mammals.

---

[20] Category I:  annual mortality and serious injury of a stock in a given fishery is greater than or equal to 50 percent of the PBR level; Category II:  annual mortality and serious injury of a stock in a given fishery is greater than 1 percent and less than 50 percent of the PBR level; Category III:  annual mortality and serious injury of a stock in a given fishery is less than or equal to 1 percent of the PBR level.

[21] *See, e.g.,* 89 Fed. Reg. 12257 (February 16, 2024).

[22] *See id.* at 12258.

B.    **MMPA Section 1387 Take Reduction Process and Take Reduction Teams**

In accordance with the MMPA, NMFS *must* develop and implement a Take Reduction Plan (TRP) for each strategic stock[23] that interacts with a Category I or II fishery.  In addition, NMFS *may* develop a TRP for other marine mammal stocks that interact with a Category I fishery and if the agency determines that the fishery has a high level of serious injury and mortality across a number of marine mammal stocks.  *See id.* at § 1387(f)(1).  The long-term goal of a TRP is to reduce, within five years, the incidental mortality and serious injury to insignificant levels approaching a zero mortality and serious injury rate, taking into account the economics of the fishery, the availability of existing technology, and the existing state or regional fishery management plans.  This long-term goal is often referred to as the zero mortality rate goal or ZMRG.  NMFS has defined "insignificant levels approaching a zero mortality and serious injury rate" as 10% of a stock's PBR level.  The rationale for 10% of a stock's PBR is that this small amount of mortality and serious injury will not significantly delay the time to recovery for most stocks and therefore still allows for the MMPA's overarching goal of recovering all stocks to their optimum sustainable population levels to be met.  ZMRG is ultimately a goal that commercial fisheries should approach.[24]

TRPs are developed by a Take Reduction Team (TRT) whose purpose is to assist NMFS in the development of a draft TRP and provide recommendations to reduce marine mammal bycatch in particular commercial fisheries.  The TRT process is an iterative one, whereby initial recommendations and plans are refined over time to ensure they are meeting their goals.  A TRT's recommendations may be included by NMFS in a final TRP and implementing regulations.  *See id.* at §§ 1387(f)(6) – (f)(9).  TRPs, however, are not required for Category III fisheries.  *Id.* at § 1387(f).  A TRP includes a variety of regulatory and non-regulatory measures designed to reduce the incidental mortality and serious injury of certain marine mammal stocks incidental to the fishery or fisheries subject to the TRP.  *See id.* at §§ 1387(f)(2) and (f)(4).  TRPs include measures like time/area closures and gear modifications to reduce marine mammal bycatch in commercial fishing gear.  Such measures may be time bound or indefinite depending on whether the amount of mortality and serious injury exceeds a stock's PBR level and/or whether a particular TRP includes a limit or cap on the number of animals killed or seriously injured in a given fishery.  Importantly, however, the MMPA does not require NMFS to close (i.e., a complete shutdown) a fishery if a stock's PBR is exceeded.  In such a situation, NMFS usually reconvenes a TRT to consider additional regulatory measures to further reduce bycatch below the PBR.[25]

---

[23] A "strategic" stock is defined as one for which the level of direct human-caused mortality exceeds the potential biological removal level; (B) is declining and likely to be listed as threatened under the Endangered Species Act (ESA); or (C) which is listed under the ESA or is designated as depleted under the MMPA.  *See* 16 U.S.C. § 1362(19).

[24] The House Conference Report that accompanied the original inclusion of ZMRG stated ". . . the objective of regulation would be to approach as closely as is feasible the goal of zero mortality and injury to marine mammals . . . [i]t may never be possible to achieve this goal, human fallibility being what it is, but the objective remains clear."  H.R. Conf. Rep. No. 92-1488.

[25] NMFS's 2004 final rule establishing the agency's insignificance threshold as 10 percent of the PBR of a stock of marine mammals supports this position.  *See* 69 Fed. Reg. 43338, 43340 & 43344 (July 20, 2004) ("Appropriate" action is to be taken when NMFS determines the established target level of mortality and serious injury of marine mammals incidental to commercial fisheries has been exceeded.  NMFS also explained that the ZMRG threshold is

TRPs may also recommend specific levels of monitoring for a fishery to account for any incidental mortality and serious injury of marine mammals during the course of commercial fishing operations.  *See id.* at §§ 1387(d)(1) & (f)(9).  Examples of monitoring methods include at-sea monitoring through observers, electronic monitoring using onboard video cameras, and self-reporting of any incidental mortality and injury of marine mammals.  *See id.* at §§ 1387(d) & (e).  Observers and electronic monitoring systems collect data on the catch and discards caught by U.S. commercial fishing vessels and document bycatch of marine mammals.  These data are used primarily to monitor federal commercial fisheries and some state fisheries and inform sustainable fisheries management.  Observers also collect data to support compliance monitoring with fishing and safety regulations.

## C.    The Practical Challenges of Managing U.S. Commercial Fisheries Interactions with Marine Mammals under the MMPA

The MMPA is not unlike many other environmental laws that seek to balance the protection and conservation of natural resources with the needs of humans.  In the case of U.S. commercial fisheries, NMFS must follow specific procedures and consider standards prior to making a final decision whether to authorize the incidental mortality and serious injury of marine mammals, the level of taking, in what manner, and any measures necessary to reduce such interactions.  Of course, NMFS must take steps to reduce incidental mortality and serious injury of marine mammals in commercial fisheries to insignificant levels approaching a zero mortality and serious injury rate within statutory timeframes but in so doing, it must also take into account a variety of factors.  *Compare* §§ 16 U.S.C. 1387(a)(1) and 1387(f)(2).

TRTs (and ultimately, NMFS) must consider the economics of the fishery, the availability of existing technology, and existing fishery management plans when deciding whether take reduction measures are needed to achieve the long-term goal of a TRP.  The economics of the fishery influence whether, and if so how, a commercial fishery is regulated, including the specific measures (e.g., bycatch reduction gear, time/area closures, etc.) imposed by NMFS under the MMPA.  In some cases, the lowest cost option may be selected as a component of a TRP so long as it is expected to achieve the short-term goal of a TRP (this may be the case even though the measure(s) would not provide the maximum conservation value).  Also, the availability of existing technology influences decision-making.  For instance, if new gear technology is unavailable for a fishery, not applicable across a broad range of fisheries, too costly for the fishery, or the technology has not yet been demonstrated to be effective in reducing bycatch of marine mammals, a TRT could recommend that the TRP has met the long-term goal even if mortality and serious injury exceeds 10% of a stock's PBR.

The MMPA also allows NMFS to prioritize the development of TRPs based on the availability of funding.  *See id.* at §1387(f)(3).  Where funding is insufficient, NMFS must give highest priority to the development and implementation of TRPs for marine mammal species or stocks whose level of incidental mortality and serious injury exceeds the PBR level, those that have a small population size, and those which are declining most rapidly.  *Id.; see also,* Memorandum Addressing NMFS' Priorities for Convening Take Reduction Teams (May 30, 2024).  In

---

not defined in such a manner to shut-down or significantly curtail the activities of commercial fishing simply because a fishery exceeds the threshold.).

practice, therefore, NMFS usually focuses its efforts on those fisheries that pose the greatest risk to marine mammal species or stocks, with particular consideration given to gear type, conservation status of the species or stock, frequency of interaction, and numbers of marine mammals affected by the fishery.[26]

Other practical challenges make it difficult for NMFS to address incidental mortality and serious injury of marine mammals. For example, lack of the necessary marine mammal abundance data to estimate population size for an individual species or stock precludes a calculation of the stock's or species' PBR level; lack of mortality and serious injury data complicates efforts to assess the effects of certain fisheries on marine mammal species or stocks that might overlap with such fisheries; the type of bycatch reduction measures and how and when they are deployed could create significant safety concerns for fishermen; and the levels and types of observer coverage (i.e., humans v. electronic monitoring) vary considerably across fisheries with some benefiting from higher levels of coverage, while others may not have any observer requirements.[27]

Today, among the hundreds of fisheries operating in waters under the jurisdiction of the United States and on the high seas, there are six TRPs addressing 32 marine mammal stocks.[28] The progress that has been made through these existing TRPs has not happened overnight; instead, it is the result of many years of dedicated work through the TRT process. Ultimately, efforts to address incidental mortality and serious injury of marine mammals across all U.S. commercial fisheries, whether through the TRP/TRT process or otherwise, vary considerably. Every fishery is regulated to one degree or another based on the specifics of the fishery, status of the affected marine mammal species or stocks, availability of funding, data availability, the impact of regulations on the economics of the fishery, and other factors prescribed by the MMPA. Some fisheries are subjected to more restrictive MMPA regulatory measures while others are subjected to more limited measures, if any.[29] It is clear, therefore, that the U.S. domestic program for managing marine mammal interactions with commercial fisheries is not a "one-size fits all" approach and is constantly evolving to meet the needs of fishermen and marine mammals.

---

[26] *See, e.g.,* Wade, *et al.* (2021), "Best Practices for Assessing and Managing Bycatch of Marine Mammals". Frontiers in Marine Science 8:757330. doi: 10.3389/fmars.2021.757330.

[27] *See id.*

[28] *See supra note 3* at 12280-81 (list of U.S. fisheries currently being managed under the TRP/TRT process). Of course, there are certainly more Category I and II fisheries identified in the U.S. that are not currently subject to the TRP/TRT process; however, as discussed in more detail in Section III.C of this memorandum, the MMPA provides NMFS with authority to give highest TRP/TRT priority to species or stocks whose level of incidental mortality and serious injury exceeds the PBR, those that have a small population size, and those that are declining most rapidly. Efforts to address incidental mortality and serious injury continue across all fisheries subject to the priorities of the agency.

[29] For example, all vessel owners or operators in Category I – III fisheries are required to report incidental mortality and serious injuries of marine mammals within 48 hours of the end of the fishing trip (50 CFR § 229.6), but vessel owners or operators in Category III fisheries are not required to register with NMFS, accommodate observers aboard vessels, or obtain a marine mammal authorization due to the remote likelihood of mortality and serious injury of marine mammals during fishing operations. *See* 89 Fed. Reg. 77789 (Sept. 24, 2024); *see also,* https://www.fisheries.noaa.gov/national/marine-mammal-protection/marine-mammal-protection-act-list-fisheries.

### D. "Comparable in Effectiveness" is Based on the MMPA's U.S. Standards for Regulating the Incidental Take of Marine Mammals in Commercial Fisheries

The MMPA neither defines "U.S. standards" nor does it identify any specific measures that NMFS must consider in the context of evaluating a foreign nation's commercial fishing operations pursuant to section 1371(a)(2)(A). In light of this fact, NMFS determined that, for purposes of implementing section 1371(a)(2), "U.S. standards" were those set out for domestic fisheries under sections 1376 and 1377 of the MMPA."[30]

The MMPA and the Final Rule take a results-oriented approach as it relates to NMFS' determination as to: (1) what constitutes a regulatory program that is "comparable in effectiveness"; and (2) whether to allow the importation of fish and fish products from harvesting nations. NMFS explained that it did not intend to regulate marine mammals within a harvesting nation's coastal waters; instead, NMFS would evaluate whether a harvesting nation that seeks to export fish and fish products to the United States maintains a regulatory program that is "comparable in effectiveness" (*not identical*), to the U.S. regulatory program, meaning that the regulatory program effectively achieves comparable results to the U.S. regulatory program.[31] (emphasis added). And as described earlier, NMFS' intention was to make comparability finding determinations based on the "reasonable proof" provided by a nation and any other readily available information, taking into consideration scientific uncertainty.[32]

NMFS evaluated each harvesting nation's application for a comparability finding against a suite of regulatory conditions.[33] For both Export and Exempt fisheries, the harvesting nation was first required to demonstrate that it prohibits the intentional mortality and serious injury of marine mammals in the course of commercial fishing operations; or that it had procedures to reliably certify that exports of fish and fish products to the United States are not the product of an intentional killing or serious injury of a marine mammal.[34] Next, and specific to an Export fishery, the harvesting nation was required to demonstrate that it maintained a regulatory program with respect to the fishery that is comparable in effectiveness to the U.S. regulatory

---

[30] *See* 81 Fed. Reg. 54390, *supra* note 1 at 54410 (describing NMFS's Preferred Alternative).

[31] *See* 80 Fed Reg. 48172, 48175 (August 11, 2015) ("NMFS is not proposing to require that a harvesting nation match every aspect of the U.S. regulatory program to obtain a comparability finding for an export fishery. Instead, the conditions allow for flexibility in granting a comparability finding to programs that effectively achieve comparable results to the U.S. regulatory program even where they use different mechanisms to do so."); 81 Fed. Reg. 54390, 54401 (August 15, 2016)(Response to Comment 36 "In using the terms 'comparable in effectiveness' NMFS means that the regulatory program effectively achieves comparable results to the U.S. regulatory program. This approach gives harvesting nations flexibility to implement the same type of regulatory program as the United States or a program that is completely different but achieves the same results."); and 81 Fed. Reg. 54390, 54410 (describing NMFS's Preferred Alternative 2).

[32] *See* 81 Fed. Reg. at 54406 (Response to Comment 55).

[33] *See* 50 CFR §§ 216.24(h)(6) & (7). All of the regulatory conditions were considered by NMFS in one form or another. As NMFS stated in its Final Rule, ". . . NMFS will examine whether the harvesting nation maintains a regulatory program that includes, or effectively achieves comparable results, as certain conditions specified in paragraph (h)(6)(iii) of the rule, subject to additional considerations specified in paragraph (h)(7) of the rule. The conditions specified in paragraph (h)(6)(iii) are features of the U.S. regulatory program." *See* 81 Fed. Red. 54390, 54391-92 (August 15, 2016).

[34] The MMPA prohibits the intentional killing or serious injury of a marine mammal unless the intentional mortality or serious injury is imminently necessary in self-defense or to save the life of a person in immediate danger. *See* 16 U.S.C. 1371(c).

program and that it met the conditions related to intentional killing and serious injury of marine mammals in the course of commercial fisheries. In this case, Export fisheries were subjected to greater scrutiny and held to higher standards.[35]

Ultimately, the approach NMFS followed, as prescribed in the Final Rule, is consistent with the U.S. program for managing domestic fisheries under the MMPA, as described above, and its implementing regulations, and takes into account the practical realities of issuing comparability findings to various foreign sovereign nations, each of which has its own regulatory scheme governing marine mammal interactions with its commercial fisheries.

E.    **Achieving Consistency in Comparability Finding Determinations Across 135 Harvesting Nations' Disparate Regulatory Programs**

To achieve consistency across the array of nations and fisheries that NMFS had to consider, NMFS created a standardized decision-making process that tiered off the Final Rule's framework. The first round of comparability findings utilized a template report entitled "Marine Mammal Protection Act Import Provisions Comparability Finding Application Report" ("Report"). The Report template was generated based on a series of questions NMFS posed to harvesting nations through its IAICRS database. Each question related to one or more of the regulatory conditions in 50 CFR §§ 216.24(h)(6) & (7) and, to the extent a harvesting nation was able, the nation populated the IAICRS database with responsive information.

Although the Reports do not explicitly identify each and every regulatory condition, all were considered by NMFS before final comparability decisions were issued. In the case of the "Additional Considerations" found at 50 CFR § 216.24(h)(7), for example, NMFS responded to each consideration where documentary evidence was produced by a nation or the information was otherwise readily available. The first consideration is captured above and, where possible, in one or more portions of each Report. The second, third, and fourth considerations query topics that are similar and related. These pertain to, in large part, a harvesting nation's efforts to reduce bycatch, whether the measures have proven effective in reducing bycatch levels (including below known bycatch limits), the history of fisheries interactions with marine mammals, population abundance estimates, and marine mammal conservation status. These topics were also addressed throughout each Report and NMFS's administrative record as a whole. Information pertaining to the fifth and sixth considerations was included in NMFS's IAICRS database and/or other portions of the administrative record. Finally, the seventh and eighth considerations focus on the execution of a harvesting nation's commercial fisheries under RFMOs or other inter-governmental agreements and the effectiveness of the nation's bycatch reduction program. Again, these considerations were addressed in each Report, e.g. response to questions 3 and 4, and NMFS's administrative record as a whole.[36]

---

[35] Because Exempt fisheries, like Category III fisheries in the U.S., are considered to have a remote likelihood of bycatch of marine mammals, they are subject to a lesser standard, as are Category III fisheries. These fisheries are not required to have a regulatory program for incidental mortality and serious injury that is comparable in effectiveness to the U.S. regulatory program applicable to Category I and II fisheries but they must still meet the requirements in 50 CFR § 216.24(h)(6)(iii)(A)(1) or 216.24(h)(6)(iii)(A)(2).

[36] The Report template includes a separate section for the Additional Considerations identified in subsection (h)(7). To the extent NMFS had information relevant to the Additional Considerations that was not discussed elsewhere in the individual nations' reports, it was discussed in that section. Where NMFS noted "N/A" for one or

NMFS considered all marine mammals that the nations included in their applications as well as any additional marine mammals for which NMFS had readily available information or scientific expertise to indicate that those additional stocks or species occurred in the nations' waters. Using the information submitted through IAICRS, NMFS prepared Reports for every harvesting nation that submitted a comparability finding application. All of the Reports included the same set of questions, which effectively were a subset of the topics that NMFS determined to be most aligned with, and most relevant to, the U.S. regulatory program.[37] First, every Report addressed whether harvesting nations had a prohibition on intentional killing or serious injury of marine mammals in the course of commercial fishing operations and whether they had elements of a bycatch reduction program (e.g., monitoring, reporting, and/or mitigation). The intentional prohibition provision, in and of itself, was a threshold issue for NMFS. Failure to demonstrate a prohibition, or alternative measures such as licensing conditions that in their totality served as a prohibition, resulted in a denial of a comparability finding. NMFS then asked whether Export nations prioritized individual fisheries based on their relative risk to marine mammals.

The U.S. domestic regulatory program prioritizes action based on the risks presented to marine mammals by different fisheries. As explained above, the MMPA establishes a process for prioritizing the development and implementation of regulations to address marine mammal incidental mortality and serious injury in those fisheries that carry specific risks to strategic stocks that interact with Category I or II fisheries. Accordingly, NMFS developed a step-wise process designed to review the harvesting nations' regulatory programs in light of a comparable prioritization scheme. Specifically, NMFS evaluated whether the harvesting nation maintained a regulatory program for its Export fisheries that provided for, or effectively achieved comparable results to the U.S. regulatory program. *See id.* at § 216.24(h)(6)(iii)(B).

A harvesting nation's regulatory program was scrutinized largely based on the relative risk presented to marine mammals by the Export fishery. In particular, NMFS focused heavily on the type of gear used in the fishery and the status of the potentially affected marine mammal species/stock. For example, NMFS was especially concerned with fisheries using high-risk gear (e.g., gillnets) that overlap with what NMFS referred to as a "16 U.S.C. § 1387(f)(3)" marine mammal stock/species, and without other mitigation measures in place.[38] NMFS exercised considerable judgment based on the available data, the differences among harvesting nations' regulatory programs and the resources at their disposal, and the specific facts and circumstances surrounding their Export fisheries. Again, the U.S. domestic program, as described above, weighed heavily in NMFS's evaluation of the Export fisheries, the applicable regulatory conditions, and whether NMFS would have expected a harvesting nation to have established a "like for like" regulatory program for Export fisheries that interact with marine mammal stocks/species in a manner similar to U.S. commercial fisheries.

---

more responses, "N/A" was meant to convey that information related to the question could be found elsewhere in the Report or administrative record.

[37] These were effectively the regulatory conditions specified in 50 CFR § 216.24(h)(6)(iii).

[38] A 16 U.S.C. § 1387(f)(3) stock/species is one that is considered to be either an endangered marine mammal species/stock <u>or</u> a species/stock that (a) experiences a level of incidental mortality and serious injury that exceeds the PBR level, (b) has a small population size, and (c) is declining most rapidly.

Finally, in the case of a marine mammal stock/species listed under the ESA, NMFS considered whether a harvesting nation must satisfy the same standards set forth in 16 U.S.C. § 1371(a)(5)(E) of the MMPA (e.g., demonstrate that incidental take would be negligible). As explained earlier, 16 U.S.C. § 1371(a)(5)(E) is a permitting scheme that affirmatively authorizes incidental take of marine mammal stocks/species listed under the ESA if certain statutory criteria are met. The negligible impact standard is a unique construct of the MMPA and the process of making such determinations is complex.[39] The term "negligible impact", as defined in regulation, focuses on whether the impact resulting from a specified activity ultimately affects the stock/species annual rates of recruitment or survival.[40] In practice, the individual regulatory measures (e.g., mitigation) applicable to the specified activity are key in determining whether the taking will be negligible. NMFS's responsibility under the Final Rule was to determine whether a harvesting nation's regulatory program was comparable in effectiveness to the U.S. regulatory program, irrespective of the status of a particular marine mammal stock/species. There is no requirement that harvesting nations maintain the exact same regulatory scheme as prescribed under the MMPA, section 101(a)(5)(E) included. NMFS's focus was on whether the harvesting nation's strategy, including its management measures, was ultimately comparable in effectiveness to the U.S. regulatory program, including in those cases where ESA-listed stocks/species were affected.

## IV.    Comparability Finding Recommendations

The final rule requires that comparability finding determinations be issued on a fishery-by-fishery basis (i.e., for each individual fishery on the LOFF). The following information and attached tables represent the results and recommendations of the evaluation process.

After review of the marine mammal bycatch monitoring and mitigation programs described in their respective applications, **I recommend that 89 nations receive comparability findings for all of their export and exempt fisheries on the LOFF** (Table 1). Seafood exports to the United States from these nations amounted to about $13 billion or approximately 52% of the recent average annual imports of edible seafood in 2024. Included in these 89 nations are four of our top ten largest seafood trading partners.

The 34 nations listed in Table 2 received a comparability finding for some but not all of their export fisheries having failed to meet the MMPA's import provisions requirements in some fisheries. **I recommend that these 34 nations receive a comparability finding for some of their fisheries and a denial of a comparability finding for at least one fishery.** Table 2 includes a summary of the basis of denial of some comparability findings and indicates the number of fisheries recommended for denial, which is explained more fully in the individual reports for these nations. For many of the nations in Table 2, their marine mammal bycatch regulatory programs for certain fisheries lack sufficient marine mammal monitoring and mitigation for high risk gear and/or high risk species.

---

[39] *See* NMFS, Criteria for Determining Negligible Impact under MMPA Section 101(a)(5)(E), Procedural Directive 02-204-02 at 2 (June 17, 2020).

[40] *See* 50 CFR § 216.103. (negligible impact is "an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival.").

Based on our analysis, the 8 nations listed in Table 3 failed to meet the MMPA's import provisions requirements to receive a comparability finding for any of their exempt and export fisheries.  **Therefore, I recommend that these 8 nations receive a denial of a comparability finding for all of their fisheries.**  Table 3 includes a brief summary of the basis of denial of comparability findings, which is explained more fully in the individual reports for these nations. For most of these nations, intentional take of marine mammals is allowed in some or all of their exempt and export fisheries, which is not consistent with the standards applicable to U.S. fisheries.

Four nations did not submit applications for comparability findings (Table 4), either because they did not respond to NMFS' requests for information and offers of assistance or because diplomatic communications with those nations are constrained.  **All of the export and exempt fisheries on the LOFF for these four nations are denied a comparability finding given their failure to submit an application for comparability.**  Three nations submitted applications that were not reviewed because they only export products as an intermediary for the harvesting nation or were not currently exporting to the United States (Table 5).  No comparability determinations were made for these nations.

The estimated value of seafood that may be affected by denial of comparability findings is also indicated in Tables 2, 3, and 4.  For those nations recommended for denials of comparability findings for all of their fisheries (Table 3), exports to the United States amounted to about $12.8 million in 2024, or approximately 0.05% of U.S. edible seafood imports.  Russia, previously among the top 10 exporters of seafood to the United States, is among the nations recommended for a denial of all fisheries; however, U.S. seafood imports from Russia in 2024 were nil because Russia is currently banned from exporting seafood to the United States through executive order. Of the countries on Table 4, Venezuela is the only significant exporter, and accounts for 0.4% of seafood exports to the United States in 2024.

For those nations recommended for denials of comparability findings for only some of their fisheries (Table 2), their total seafood exports to the United States amounted to about $11.8 billion in 2024, or approximately 47% of U.S. edible seafood imports.  For the nations listed in Table 2, it is difficult to estimate precisely the amount of trade to be prohibited (non-comparable fisheries) relative to trade allowed based on available trade data.[41]  After mapping fishery IDs as closely as possible to Harmonized Tariff Schedule (HTS) codes, NMFS estimates the value of 2024 trade that relates to fisheries subject to a partial denial is approximately $3.6 billion. Import prohibitions could affect some but not all of the current trade from the nations listed in

---

[41] NMFS compared fisheries to potentially relevant Harmonized Tariff Schedule (HTS) codes to calculate as nearly as possible the import values for denied fisheries.  Fish and fish products harvested from individual fisheries could be imported under a range of HTS codes and trade under a given HTS code from a nation receiving a partial denial could include some products subject to denial of comparability findings while other trade in those products is allowed.  Some fisheries' target species include generic categories of species and the HTS codes subject to enforcement of import prohibitions may be refined and narrowed.  The actual volume and value of trade affected could decrease if further analysis indicates some HTS codes included in these calculations could not be used to import product from denied fisheries.  Nations may also be able to export individual fish or fish products under covered HTS codes if they demonstrate that they were not harvested in a fishery subject to an import prohibition through a Certification of Admissibility.

Table 2 and entry documentation and other trade program requirements could affect other trade flows from those nations.

**RECOMMENDATION**

I recommend that you concur with the comparability finding determinations for all nations as described above, in the attached tables, and the individual country reports.

I concur                              I do not concur                              Let's discuss

Attachments - Country Reports

# EXHIBIT C


An official website of the United States government  Here's how you know ⌄




**Notice:**

The U.S. government is closed. This site will not be updated; however, NOAA websites and social media channels necessary to protect lives and property will be maintained. To learn more, visit **commerce.gov**.

For the latest forecasts and critical weather information, visit **weather.gov**.

*Please note: Some content on this site may be updated as limited tasks may continue.

# 2025 Marine Mammal Protection Act Comparability Finding Determinations for Harvesting Nations

NOAA Fisheries announced its Marine Mammal Protection Act comparability determinations in the Federal Register, covering about 2,500 fisheries across 135 nations. Of these, 240 fisheries from 46 nations were denied comparability findings, restricting their ability to export to the United States.

In August 2025, NOAA Fisheries announced its 2025 Marine Mammal Protection Act comparability finding determinations in the Federal Register. These determinations cover approximately 2,500 fisheries in 135 nations seeking to export fish and fish products to the United States. Comparability finding determinations are made for each nation on a fishery-by-fishery basis. A total of 240 fisheries from 46 nations were denied comparability findings.

NOAA Fisheries conducted a detailed analysis of each comparability finding application submitted by harvesting nations. Details regarding each nation's comparability finding determination are categorized in the lists below. Each harvesting nation's Comparability Finding Application Final Report can be accessed by clicking on the nation under Lists 1, 2, and 3 below. Additional documents detailing NOAA Fisheries' evaluation process, the fisheries denied and granted comparability findings for each nation, and the trade information associated with fishery denials (including Harmonized Tariff Codes) can be found at the bottom of this page.

Nations whose fisheries were denied comparability findings are prohibited from importing fish and fish product from those fisheries into the United States beginning January 1, 2026, and may reapply for a comparability finding for the affected fisheries at any time after January 1, 2026. More information on seafood import restrictions and how they will be implemented under this program, is available here.

For additional questions, please contact MMPA.LOFF@noaa.gov.

# List 1: Nations receiving comparability findings for all export/exempt fisheries

1. Albania
2. Antigua and Barbuda
3. Argentina
4. Australia
5. The Bahamas
6. Bahrain
7. Barbados
8. Belgium
9. Belize
10. Bermuda
11. Brunei
12. Bulgaria
13. Cambodia
14. Canada
15. Cape Verde
16. Cook Islands
17. Costa Rica
18. Côte d'Ivoire (Ivory Coast)
19. Croatia

20. [Cyprus](#)
21. [Denmark](#)
22. [Dominican Republic](#)
23. [Egypt](#)
24. [Estonia](#)
25. [Falkland Islands](#)
26. [Faroe Islands](#)
27. [Federated States of Micronesia](#)
28. [Fiji](#)
29. [Finland](#)
30. [France](#)
31. [France – St. Pierre Miquelon](#)
32. [French Polynesia](#)
33. [French Southern & Antarctic Lands](#)
34. [Georgia](#)
35. [Germany](#)
36. [Greece](#)
37. [Greenland](#)
38. [Guatemala](#)
39. [Guyana](#)
40. [Honduras](#)
41. [Hong Kong](#)
42. [Iceland](#)
43. [India](#)
44. [Israel](#)
45. [Italy](#)
46. [Jamaica](#)
47. [Japan](#)
48. [Kiribati](#)
49. [Latvia](#)
50. [Lithuania](#)
51. [Maldives](#)
52. [Malta](#)
53. [Marshall Islands](#)
54. [Mauritius](#)

10/9/25, 8:27 PM                         2025 Marine Mammal Protection Act Comparability Finding Determinations for Harvesting Nations | NOAA Fisheries

Case 1:25-cv-00223-N/A    Document 3    Filed 10/09/25    Page 84 of 141

55. Morocco
56. Nauru
57. The Netherlands
58. New Zealand
59. Nicaragua
60. Norway
61. Pakistan
62. Palau
63. Panama
64. Papua New Guinea
65. Poland
66. Portugal
67. Saint Helena/Tristan da Cunha (UK)
68. Samoa
69. Seychelles
70. Sierra Leone
71. Singapore
72. Slovenia
73. Solomon Islands
74. South Africa
75. Spain
76. St. Vincent and the Grenadines
77. Sweden
78. Tanzania
79. Thailand
80. Tonga
81. Trinidad and Tobago
82. Tunisia
83. Turks and Caicos
84. Tuvalu
85. Ukraine
86. United Kingdom
87. Uruguay
88. Vanuatu
89. Yemen

10/9/25, 8:27 PM 2025 Marine Mammal Protection Act Comparability Finding Determinations for Harvesting Nations | NOAA Fisheries

Case 1:25-cv-00223-N/A Document 2 Filed 10/09/25 Page 85 of 141

# List 2: Nations denied comparability findings for some fisheries

1. [Bangladesh](#)
2. [Brazil](#)
3. [Cameroon](#)
4. [Chile](#)
5. [China](#)
6. [Colombia](#)
7. [Ecuador](#)
8. [El Salvador](#)
9. [Ghana](#)
10. [Indonesia](#)
11. [Ireland](#)
12. [Kenya](#)
13. [Liberia](#)
14. [Madagascar](#)
15. [Malaysia](#)
16. [Mauritania](#)
17. [Mexico](#)
18. [Mozambique](#)
19. [Myanmar (Burma)](#)
20. [Nigeria](#)
21. [Oman](#)
22. [Peru](#)
23. [Philippines](#)
24. [Saudi Arabia](#)
25. [Senegal](#)
26. [Somalia](#)
27. [South Korea](#)
28. [Sri Lanka](#)
29. [St. Kitts and Nevis](#)
30. [Suriname](#)
31. [Taiwan](#)
32. [Türkiye](#)

10/9/25, 8:27 PM    2025 Marine Mammal Protection Act Comparability Finding Determinations for Harvesting Nations | NOAA Fisheries

Case 1:25-cv-00223-N/A    Document 2    Filed 10/09/25    Page 86 of 141

33. [United Arab Emirates](#)

34. [Vietnam](#)

# List 3: Nations denied comparability findings for all fisheries

1. Benin*

2. [Grenada](#)

3. [Guinea](#)

4. Haiti*

5. Iran*

6. [Namibia](#)

7. [New Caledonia](#)

8. [Russia](#)

9. [Saint Lucia](#)

10. [The Gambia](#)

11. [Togo](#)

12. Venezuela*

*Nations that did not submit an application for a comparability finding, and therefore do not have a Comparability Finding Application Report.

# Additional 2025 Comparability Determination Documents:

[Decision Memorandum](#)

[2025 Final Comparability Finding Denials for Harvesting Nations' Fisheries](#)

[2025 Final Comparability Finding Approvals for Harvesting Nations' Fisheries](#)

[Harmonized Tariff Schedule Codes under the MMPA Import Prohibitions](#)

*Last updated by [Office of International Affairs, Trade, and Commerce](#) on 09/02/2025*

# EXHIBIT D

**2025 Final Comparability Finding Denials**

| Fishery ID* | Target Species or Product | Gear Type | Area of Operation | RFMO |
|---|---|---|---|---|
| | **Bangladesh** | | | |
| | **Export Fisheries** | | | |
| 12713 | Apocrypts bato (Apocryptes bato); Blacktip shark (Carcharhinus limbatus); Bombay-duck (Harpadon nehereus); Cowtail stingray (Pastinachus sephen); Dwarf whipray (Himantura walga); Eel worm goby (Taenioides anguillaris); False baelama anchovy (Thryssa encrasicholoides); Flatfishes nei (Pleuronectiformes); Fringescale sardinella (Sardinella fimbriata); Gangetic hairfin anchovy (Setipinna phasa); Goldsilk seabream (Acanthopagrus berda); Goldspotted grenadier anchovy (Coilia dussumieri); Grey bambooshark (Chiloscyllium griseum); Himantura leoparda (Himantura leoparda); Honeycomb stingray (Himantura uarnak); Indian white prawn (Fenneropenaeus indicus); Largehead hairtail (Trichiurus lepturus); Leopard whipray (Himantura undulata); Long-tailed butterfly ray (Gymnura poecilura); Longjaw thryssa (Thryssa setirostris); Morays nei (Muraenidae); Muraenesocidae (Muraenesocidae); Pama croaker (Otolithoides pama); Panna croaker (Panna microdon); Paradise threadfin (Polynemus paradiseus); Pseudapocryptes elongatus (Pseudapocryptes elongatus); Reeve's croaker (Chrysochir aureus); Savalai hairtail (Lepturacanthus savala); Scaly hairfin anchovy (Setipinna taty); Scaly whipray (Himantura imbricata); Sea catfishes nei (Ariidae); Silky shark (Carcharhinus falciformis); Slender bambooshark (Chiloscyllium indicum); Speckled shrimp (Metapenaeus monoceros); Spottail shark (Carcharhinus sorrah); Spotted numbfish (Narcine timlei); Tiger shark (Galeocerdo cuvier); Walking goby (Scartelaos histophorus); Yellowfin seabream (Acanthopagrus latus) | Other (Please Specify) Set bag nets, (Demersal) | EEZ,(FAO:57 Indian Ocean Eastern),57.1,Bay of Bengal | IOTC |
| 220 | Barramundi(=Giant seaperch) (Lates calcarifer); Black pomfret (Parastromateus niger); Blackspotted croaker (Protonibea diacanthus); Blacktip shark (Carcharhinus limbatus); Blotched tiger-toothed croaker (Pterotolithus maculatus); Chinese silver pomfret (Pampus chinensis); Donkey croaker (Pennahia anea); Flathead grey mullet (Mugil cephalus); Flathead sillago (Sillaginopsis panijus); Fourfinger threadfin (Eleutheronema tetradactylum); Fringescale sardinella (Sardinella fimbriata); Goldsilk seabream (Acanthopagrus berda); Goldspot mullet (Chelon parsia); Grey bambooshark (Chiloscyllium griseum); Groupers nei (Epinephelus spp); Hilsa shad (Tenualosa ilisha); Indian mackerel (Rastrelliger kanagurta); Indian threadfin (Leptomelanosoma indicum); Indo-Pacific king mackerel (Scomberomorus guttatus); Mackerels nei (Scombridae); Malabar grouper (Epinephelus malabaricus); Narrow-barred Spanish mackerel (Scomberomorus commerson); Oblique-banded grouper (Epinephelus radiatus); Orange-spotted grouper (Epinephelus coioides); Pama croaker (Otolithoides pama); Paradise threadfin (Polynemus paradiseus); Pennahia spp (Pennahia spp); Reeve's croaker (Chrysochir aureus); Silky shark (Carcharhinus falciformis); Silver pomfret (Pampus argenteus); Slender bambooshark (Chiloscyllium indicum); Snappers/jobfishes nei (Lutjanidae); Spottail shark (Carcharhinus sorrah); Striped grouper (Epinephelus latifasciatus); Tiger shark (Galeocerdo cuvier); Yellowfin seabream (Acanthopagrus latus) | Drift gillnets, (Pelagic) | EEZ,(FAO:57 Indian Ocean Eastern),57.1,Bay of Bengal | IOTC |
| | **Brazil** | | | |
| | **Export Fisheries** | | | |
| 380 | Bluefish (Pomatomus saltatrix); Largehead hairtail (Trichiurus lepturus); Lebranche mullet (Mugil liza); Serra Spanish mackerel (Scomberomorus brasiliensis); White mullet (Mugil curema) | Gillnets and entangling nets (not specified), (Surface) | EEZ,(FAO:41 Atlantic Southwest),41.2.1, 41.2.2 | |
| 382 | Blackfin goosefish (Lophius gastrophysus) | Gillnets and entangling nets (not specified), (Bottom) | EEZ,(FAO:41 Atlantic Southwest),41.2.1, 41.2.2,According to Article 2, VI – the minimum permitted depth is 250 meters, as established by Interministerial Normative Instruction MPA/MMA No. 3, of September 4, 2009. | |
| 12944 | Argentine croaker (Umbrina canosai); Brazilian codling (Urophycis brasiliensis); Largehead hairtail (Trichiurus lepturus); Striped weakfish (Cynoscion striatus); Whitemouth croaker (Micropogonias furnieri) | Gillnets and entangling nets (not specified), (Bottom) | EEZ,(FAO:41 Atlantic Southwest),41.2.1, 41.2.2,According to Article 6, fishing within 1 nautical mile is prohibited for motorized vessels, as established by Interministerial Normative Instruction MPA/MMA No. 12, of August 22, 2012 | |
| | **Cameroon** | | | |
| | **Export Fisheries** | | | |
| 403 | Catfishes nei (Ictalurus spp); Groundfishes nei (Osteichthyes); Haddock (Melanogrammus aeglefinus); Hakes nei (Merluccius spp); Northern cods nei (Gadus spp); Saithe(=Pollock) (Pollachius virens); Soles nei (Soleidae); Tusk(=Cusk) (Brosme brosme) | Gillnets and entangling nets (not specified), (Demersal) | EEZ,(FAO:34 Atlantic Eastern Central),34.3.5,FAO Area 34 - coastal Cameroon | CECAF, COMHAFAT, COREP |
| 404 | Herrings/sardines nei (Clupeidae); Jack and horse mackerels nei (Trachurus spp); Mackerels nei (Scombridae) | Fixed gillnets (on stakes), (Pelagic),Longlines (not specified), (Pelagic) | EEZ,China,(FAO:34 Atlantic Eastern Central),34.3.5,None provided | CECAF, COMHAFAT, COREP |
| 405 | Pelagic fishes nei (Osteichthyes) | Fixed gillnets (on stakes), (Pelagic),Longlines (not specified), (Pelagic) | EEZ,(FAO:34 Atlantic Eastern Central),34.3.5,Cameroon region | CECAF, COMHAFAT, COREP |
| | **Chile** | | | |
| | **Export Fisheries** | | | |

*The Fishery ID is NOAA's internal reference number from our database and has no other independent meaning.

1

**2025 Final Comparability Finding Denials**

| Fishery ID* | Target Species or Product | Gear Type | Area of Operation | RFMO |
|---|---|---|---|---|
| 828 | Bastard halibuts nei (Paralichthys spp); Bigeye flounder (Hippoglossina macrops); Black cusk-eel (Genypterus maculatus); Blue squat lobster (Cervimunida johni); Cabinza grunt (Isacia conceptionis); Carrot squat lobster (Pleurocodes monodon); Chilean jack mackerel (Trachurus murphyi); Chilean nylon shrimp (Heterocarpus reedi); Corvina drum (Cilus gilberti); Cusk-eels nei (Genypterus spp); Fine flounder (Paralichthys adspersus); Jumbo flying squid (Dosidicus gigas); Pacific chub mackerel (Scomber japonicus); Pacific sandperch (Prolatilus jugularis); Palm ruff (Seriolella violacea); Patagonian redfish (Sebastes oculatus); Peruvian rock seabass (Paralabrax humeralis); Pink cusk-eel (Genypterus blacodes); Plownose chimaera (Callorhinchus callorynchus); Red cusk-eel (Genypterus chilensis); Sciaenas nei (Sciaena spp); Snoek (Thyrsites atun); South Pacific hake (Merluccius gayi); Southern rays bream (Brama australis) | Gillnets and entangling nets (not specified), (Demersal),Longlines (not specified), (Demersal) | EEZ,(FAO:87 Pacific Southeast),87.2.14, 87.2.15, 87.2.16, 87.2.17, 87.3.11,Artisanal Gillnets and Longline Fishery for South Pacific hake. Operating Between Chilean administrative Regions: Coquimbo (IV) to Los Lagos (X). #16 | |
| 835 | Corvina drum (Cilus gilberti); Plownose chimaera (Callorhinchus callorynchus); South Pacific hake (Merluccius gayi); Southern rays bream (Brama australis) | Gillnets and entangling nets (not specified), (Demersal) | EEZ,(FAO:87 Pacific Southeast),87.2.11, 87.2.12, 87.2.13, 87.2.14, 87.2.15, 87.2.16, 87.2.17, 87.3.11,Artisanal Gillnet fishery for Southern rays bream (reineta). Operating in Chilean administrative Region: Arica y Parinacota (XV) to Los Lagos (X). #22 | |
| | **China** | | | |
| | **Export Fisheries** | | | |
| 721 | Anchovies nei (Engraulis spp); Bombay-duck (Harpadon nehereus); Largehead hairtail (Trichiurus lepturus); Shortspine African angler (Lophius vaillanti); Yellow croaker (Larimichthys polyactis) | Stow nets, (Midwater) | EEZ,(FAO:61 Pacific Northwest),East China Sea; South China Sea; Yellow & Bohai Sea | |
| 729 | Gazami crab (Portunus trituberculatus) | Gillnets and entangling nets (not specified), (Bottom) | EEZ,(FAO:61 Pacific Northwest),East China Sea; Yellow & Bohai Sea | |
| 742 | Anchovies nei (Engraulis spp); Butterfishes/pomfrets nei (Stromateidae); Common squids nei (Loligo spp); Filefishes nei (Cantherhines (=Navodon) spp); Frigate and bullet tunas (Auxis thazard, A. rochei); Hairtails nei (Trichiurus spp); Herrings/sardines nei (Clupeidae); Purpleback flying squid (Sthenoteuthis oualaniensis); Scads nei (Decapterus spp); Skipjack tuna (Katsuwonus pelamis) | Falling nets, (Surface) | EEZ,(FAO:61 Pacific Northwest),South China Sea; East China Sea; Yellow & Bohai Sea | |
| 743 | Anchovies nei (Engraulis spp); Bonitos nei (Sarda spp); Butterfishes/pomfrets nei (Stromateidae); Common dolphinfish (Coryphaena hippurus); Common squids nei (Loligo spp); Filefishes nei (Cantherhines (=Navodon) spp); Hairtails/scabbardfishes nei (Trichiuridae); Herrings/sardines nei (Clupeidae); Pacific chub mackerel (Scomber japonicus); Scads nei (Decapterus spp); Skipjack tuna (Katsuwonus pelamis) | Boat-operated lift nets, (Surface) | EEZ,(FAO:61 Pacific Northwest),East China Sea; Yellow & Bohai Sea | |
| | **Colombia** | | | |
| | **Export Fisheries** | | | |
| 894 | Dolphinfishes nei (Coryphaenidae); Groundfishes nei (Osteichthyes); Groupers nei (Epinephelus spp); Mackerels nei (Scombridae); Snappers nei (Lutjanus spp); Wreckfish (Polyprion americanus) | Gillnets and entangling nets (not specified), (Midwater) | EEZ,(FAO:31 Atlantic Western Central, FAO:87 Pacific Southeast),Zona económica exclusiva del Pacífico y Caribe colombianos | |
| | **Ecuador** | | | |
| | **Export Fisheries** | | | |
| 1179 | Bigeye tuna (Thunnus obesus); Black skipjack (Euthynnus lineatus); Common dolphinfish (Coryphaena hippurus); Eastern Pacific bonito (Sarda chiliensis); Escolar (Lepidocybium flavobrunneum); Indo-Pacific sailfish (Istiophorus platypterus); Marlins nei (Makaira spp); Pacific sierra (Scomberomorus sierra); Skipjack tuna (Katsuwonus pelamis); Striped marlin (Tetrapturus audax); Swordfish (Xiphias gladius); Wahoo (Acanthocybium solandri); Yellowfin tuna (Thunnus albacares) | Gillnets and entangling nets (not specified), (Surface) | EEZ,(FAO:87 Pacific Southeast),87.1.4,continental EEZ | |
| | **El Salvador** | | | |
| | **Export Fisheries** | | | |
| 1197 | Carangids nei (Carangidae); Carcharhinus sharks nei (Carcharhinus spp); Croakers/drums nei (Sciaenidae); Croakers/drums nei (Sciaenidae); Groupers/seabasses nei (Serranidae); Grunts/sweetlips nei (Haemulidae (=Pomadasyidae)); Hammerhead sharks/etc. nei (Sphyrnidae); Mackerels nei (Scombridae); Requiem sharks nei (Carcharhinidae); Sea catfishes nei (Ariidae); Snappers/jobfishes nei (Lutjanidae); Snooks(=Robalos) nei (Centropomus spp); Yellowfin snook (Centropomus robalito) | Drift gillnets, (Midwater),Gillnets and entangling nets (not specified), (Pelagic),Hand Implements (not specified), (Midwater) | EEZ,(FAO:77 Pacific Eastern Central),Artisanal and coastal fisheries, manual activity and boat maximun 8 meters manual | |
| 1192 | Lobsters nei (Reptantia) | Set gillnets/set nets (anchored), (Bottom) | EEZ,(FAO:77 Pacific Eastern Central),Coastal artisanal fisheries, shallow waters | |
| 1196 | Carcharhinus sharks nei (Carcharhinus spp); Common dolphinfish (Coryphaena hippurus); Hammerhead sharks/etc. nei (Sphyrnidae); Marlins nei (Makaira spp); Marlins,sailfishes,etc. nei (Istiophoridae); Yellowfin tuna (Thunnus albacares) | Drifting longlines, (Pelagic) | High Seas,EEZ,(FAO:77 Pacific Eastern Central),None provided | IATTC |
| 1198 | Carcharhinus sharks nei (Carcharhinus spp); Common dolphinfish (Coryphaena hippurus); Marlins,sailfishes,etc. nei (Istiophoridae); Tunas nei (Thunnini) | Drifting longlines, (Pelagic) | EEZ,(FAO:77 Pacific Eastern Central),ARTISANAL FISHERIES | |
| | **Ghana** | | | |
| | **Export Fisheries** | | | |
| 1332 | Mackerels nei (Scombridae); Porgies/seabreams nei (Sparidae) | Gillnets and entangling nets (not specified), (Demersal) | EEZ,(FAO:34 Atlantic Eastern Central),nearshore, Ghana EEZ | CECAF |
| 1330 | Anchovies nei (Engraulis spp); Herrings/sardines nei (Clupeidae) | Purse seines, (Pelagic) | EEZ,(FAO:34 Atlantic Eastern Central),Ghana EEZ, Gulf of Guinea | CECAF |
| 1337 | Marine crustaceans nei (Crustacea); Marine molluscs nei (Mollusca) | Set gillnets/set nets (anchored), (Bottom) | EEZ,(FAO:34 Atlantic Eastern Central),Ghana EEZ | CECAF |
| | **Grenada** | | | |

**2025 Final Comparability Finding Denials**

| Fishery ID* | Target Species or Product | Gear Type | Area of Operation | RFMO |
|---|---|---|---|---|
| | **Exempt Fisheries** | | | |
| 1254 | Marine crabs nei (Brachyura) | Pots/traps, (Bottom) | EEZ,(FAO:31 Atlantic Western Central),None provided | |
| 1251 | Groupers nei (Epinephelus spp); Snappers nei (Lutjanus spp) | Handlines and hand-operated pole-and-lines, (Demersal) | EEZ,(FAO:31 Atlantic Western Central),north, south, SE and NE coasts of mainland Grenada, and the Grenada Grenadines - Carriacou, and Petite Martinique | |
| 1252 | Groupers nei (Epinephelus spp); Snappers nei (Lutjanus spp) | Set longlines, (Bottom) | EEZ,(FAO:31 Atlantic Western Central),north, south, SE and NE coasts of mainland Grenada, and the Grenada Grenadines - Carriacou, and Petite Martinique | |
| 1253 | Groupers nei (Epinephelus spp); Snappers nei (Lutjanus spp) | Pots/traps, (Bottom) | EEZ,(FAO:31 Atlantic Western Central),north, south, SE and NE coasts of mainland Grenada, and the Grenada Grenadines - Carriacou, and Petite Martinique | |
| 12603 | Caribbean spiny lobster (Panulirus argus) | Diving (SCUBA and/or free-diving), (Benthic),Pots/traps, (Bottom) | EEZ,(FAO:31 Atlantic Western Central),Fishing occurs along the coastal reef aroind the entire island chain. | |
| 1258 | Various squids nei (Loliginidae, Ommastrephidae) | Handlines and hand-operated pole-and-lines, (Midwater) | EEZ,(FAO:31 Atlantic Western Central),West Coast of Grenada | |
| | **Export Fisheries** | | | |
| 1257 | Albacore (Thunnus alalunga); Bigeye tuna (Thunnus obesus); Blackfin tuna (Thunnus atlanticus); Dolphinfishes nei (Coryphaenidae); Skipjack tuna (Katsuwonus pelamis); Skipjack tuna (Katsuwonus pelamis); Wahoo (Acanthocybium solandri); Yellowfin tuna (Thunnus albacares) | Drifting longlines, (Surface),Trolling lines, (Surface) | EEZ,(FAO:31 Atlantic Western Central),East & west coast of Grenada | |
| | **Guinea** | | | |
| | **Export Fisheries** | | | |
| 1440 | African sicklefish (Drepane africana); Arius spp (Arius spp); Atlantic bluefin tuna (Thunnus thynnus); Barracudas nei (Sphyraena spp); Bigeye tuna (Thunnus obesus); Bluespotted seabream (Pagrus caeruleostictus); Bobo croaker (Pseudotolithus elongatus); Cameroon croaker (Pseudotolithus moorii); Cassava croaker (Pseudotolithus senegalensis); Common cuttlefish (Sepia officinalis); European barracuda (Sphyraena sphyraena); Frigate tuna (Auxis thazard); Guachanche barracuda (Sphyraena guachancho); Guinea croaker (Pseudotolithus epipercus); Guinean sea catfish (Arius parkii); Longneck croaker (Pseudotolithus typus); Red pandora (Pagellus bellottii); Skipjack tuna (Katsuwonus pelamis); Sompat grunt (Pomadasys jubelini); Tuna-like fishes nei (Scombroidei); West African croakers nei (Pseudotolithus spp) | Encircling gillnets, (Midwater),Multiple bottom otter trawls, (Pelagic),Purse seines, (Pelagic),Trawls (not specified), (Demersal) | High Seas,EEZ,Cape Verde Islands,Guinea-Bissau,Liberia,Mauritania,Senegal,Sierra Leone,(FAO:34 Atlantic Eastern Central),ZEE GUINEE | ICCAT |
| | **Indonesia** | | | |
| | **Export Fisheries** | | | |
| 12567 | Metapenaeus shrimps nei (Metapenaeus spp); Parapenaeopsis shrimps nei (Parapenaeopsis spp); Penaeus shrimps nei (Penaeus spp) | Trammel nets, (Bottom) | EEZ,(FAO:57 Indian Ocean Eastern, FAO:71 Pacific Western Central) | |
| 1376 | Arius spp (Arius spp); Cobia (Rachycentron canadum); Marine fishes nei (Osteichthyes); Thinspine sea catfish (Plicofollis tenuispinis) | Gillnets and entangling nets (not specified), (Demersal) | High Seas,EEZ,(FAO:57 Indian Ocean Eastern, FAO:71 Pacific Western Central),also operates in territorial and archipelagic waters | |
| 12391 | Swimming crabs/etc. nei (Portunidae) | Gillnets and entangling nets (not specified), (Bottom) | EEZ,(FAO:57 Indian Ocean Eastern, FAO:71 Pacific Western Central),also operates in territorial and archipelagic waters | |
| 1373 | Coralgroupers nei (Plectropomus spp); Flatfishes nei (Pleuronectiformes); Groupers nei (Epinephelus spp); Humpback grouper (Cromileptes altivelis); Jobfishes nei (Pristipomoides spp); Pinjalo (Pinjalo pinjalo); Snappers nei (Lutjanus spp); Tomato hind (Cephalopholis sonnerati) | Gillnets and entangling nets (not specified), (Demersal) | EEZ,(FAO:57 Indian Ocean Eastern, FAO:71 Pacific Western Central),also operate in territorial and archipelagic waters | |
| 1375 | Bigeye tuna (Thunnus obesus); Dolphinfishes nei (Coryphaenidae); Skipjack tuna (Katsuwonus pelamis); True tunas nei (Thunnus spp); Yellowfin tuna (Thunnus albacares) | Gillnets and entangling nets (not specified), (Pelagic) | EEZ,(FAO:57 Indian Ocean Eastern, FAO:71 Pacific Western Central),also operates in territorial and archipelagic waters | |
| | **Ireland** | | | |
| | **Export Fisheries** | | | |
| 1386 | Common spiny lobster (Palinurus elephas) | tangle nets, (Demersal) | EEZ,(FAO:27 Atlantic Northeast),none provided | |
| 1388 | Salmonids nei (Salmonidae) | Unknown/Gear not known/Not provided, (Midwater) | EEZ,(FAO:27 Atlantic Northeast) | |
| | **Kenya** | | | |
| | **Export Fisheries** | | | |
| 1758 | Giant tiger prawn (Penaeus monodon); Marine fishes nei (Osteichthyes); Marine shells nei (Ex Mollusca); Octopuses nei (Octopus spp); Rock lobsters nei (Jasus spp); Sea cucumbers nei (Holothuroidea); Snappers nei (Lutjanus spp); Spiny lobsters nei (Palinuridae); Swordfish (Xiphias gladius); Yellowfin tuna (Thunnus albacares) | Dropline, (Midwater),Gillnets and entangling nets (not specified), (Midwater),Hand collection, (Bottom),Longlines (not specified), (Pelagic),Spears, (Demersal),shrimp/prawn trawl, (Midwater) | High Seas,EEZ,(FAO:51 Indian Ocean Western),51.5,Indian Ocean inshore waters | IOTC |
| | **Liberia** | | | |
| | **Export Fisheries** | | | |
| 1781 | Atlantic sailfish (Istiophorus albicans); Bigeye tuna (Thunnus obesus); Croakers nei (Micropogonias spp); Demersal fishes nei (Osteichthyes); Giant trevally (Caranx ignobilis); Groundfishes nei (Osteichthyes); Herrings/sardines nei (Clupeidae); Jacks/crevalles nei (Caranx spp); Mackerels nei (Scombridae); Scorpionfishes/redfishes nei (Scorpaenidae); Yellowfin tuna (Thunnus albacares) | Set gillnets/set nets (anchored), (Bottom) | EEZ,(FAO:34 Atlantic Eastern Central),West Central Gulf and Guinea Region | |

**2025 Final Comparability Finding Denials**

| Fishery ID* | Target Species or Product | Gear Type | Area of Operation | RFMO |
|---|---|---|---|---|
| | **Madagascar** | | | |
| | **Export Fisheries** | | | |
| 1800 | Carangids nei (Carangidae); Emperors/Scavengers nei (Lethrinidae); Groupers nei (Epinephelus spp); Groupers/seabasses nei (Serranidae); Hairtails/scabbardfishes nei (Trichiuridae); Malabar grouper (Epinephelus malabaricus); Porgies/seabreams nei (Sparidae); Snappers nei (Lutjanus spp); Snappers/jobfishes nei (Lutjanidae); Spiny turbots nei (Psettodidae) | Gillnets and entangling nets (not specified), (Demersal),Handlines and hand-operated pole-and-lines, (Demersal),Handlines and hand-operated pole-and-lines, (Demersal),Longlines (not specified), (Demersal),Trawls (not specified), (Demersal) | EEZ,(FAO:51 Indian Ocean Western),51.6,within Madagascar territorial waters | |
| 1801 | Giant tiger prawn (Penaeus monodon); Green tiger prawn (Penaeus semisulcatus); Indian white prawn (Fenneropenaeus indicus); Kuruma prawn (Penaeus japonicus); Speckled shrimp (Metapenaeus monoceros) | Gillnets and entangling nets (not specified), (Demersal),Seine nets (not specified), (Demersal),Trawls (not specified), (Demersal) | EEZ,(FAO:51 Indian Ocean Western),51.6,northwest, southwest and northeast coast of Madagascar | |
| | **Malaysia** | | | |
| | **Export Fisheries** | | | |
| 1824 | Dolphinfishes nei (Coryphaenidae); Herrings/sardines nei (Clupeidae); Mackerels nei (Scombridae); Marine fishes nei (Osteichthyes); Tunas nei (Thunnini) | Driftnets, (Pelagic) | EEZ,(FAO:57 Indian Ocean Eastern, FAO:71 Pacific Western Central),Peninsular and East Malaysia | |
| | **Mauritania** | | | |
| | **Export Fisheries** | | | |
| 1705 | Atlantic bonito (Sarda sarda); Atlantic horse mackerel (Trachurus trachurus); Cunene horse mackerel (Trachurus trecae); Demersal fishes nei (Osteichthyes); European anchovy (Engraulis encrasicolus); European pilchard(=Sardine) (Sardina pilchardus); European pilchard(=Sardine) (Sardina pilchardus); Flatfishes nei (Pleuronectiformes); Flathead grey mullet (Mugil cephalus); Largehead hairtail (Trichiurus lepturus); Leaping African mullet (Mugil capurrii); Leaping African mullet (Mugil capurrii); Madeiran sardinella (Sardinella maderensis); Mullets nei (Mugilidae); Pacific chub mackerel (Scomber japonicus); Round sardinella (Sardinella aurita); Silver scabbardfish (Lepidopus caudatus); Soles nei (Soleidae); Turbot (Psetta maxima); West African Spanish mackerel (Scomberomorus tritor) | Trawls (not specified), (Demersal) | EEZ,(FAO:34 Atlantic Eastern Central),Atlantic Ocean EEZ | |
| | **Mexico** | | | |
| | **Export Fisheries** | | | |
| 1720 | Amberjacks nei (Seriola spp); Cynoscion reticulatus (Cynoscion reticulatus); Gulf weakfish(=Gulf corvina) (Cynoscion othonopterum); Orangemouth weakfish (Cynoscion xanthulum); Pacific sierra (Scomberomorus sierra); Shortfin weakfish (Cynoscion parvipinnis); White weakfish (Atractoscion nobilis) | Encircling gillnets, (Pelagic) | EEZ,(FAO:77 Pacific Eastern Central),Upper Gulf of California , Colorado River Delta and Gulf of Santa Clara | |
| 13084 | Californian anchovy (Engraulis mordax); Gulf weakfish(=Gulf corvina) (Cynoscion othonopterum); Herrings/sardines nei (Clupeidae); Leatherjackets nei (Oligoplites spp); Mackerels nei (Scombridae); Orangemouth weakfish (Cynoscion xanthulum); Pacific anchoveta (Cetengraulis mysticetus); Pacific chub mackerel (Scomber japonicus); Red-eye round herring (Etrumeus teres); Shortfin weakfish (Cynoscion parvipinnis); South American pilchard (Sardinops sagax); Thread herrings nei (Opisthonema spp) | Purse seines, (Pelagic) | EEZ,(FAO:77 Pacific Eastern Central),EXCEPT THE NORTHERN GULF OF CALIFORNIA. | |
| 13085 | Bigeye croaker (Micropogonias megalops); Tallfin croaker(=chano) (Micropogonias altipinnis) | Gillnets and entangling nets (not specified), (Pelagic) | EEZ,(FAO:77 Pacific Eastern Central),EXCEPT THE NORTHERN GULF OF CALIFORNIA. | |
| 13086 | California butterfly ray (Gymnura marmorata); Carcharhinus sharks nei (Carcharhinus spp); Hammerhead sharks nei (Sphyrna spp); Mobula nei (Mobula spp); Myliobatis spp (Myliobatis spp); Pacific angelshark (Squatina californica); Pacific cownose ray (Rhinoptera steindachneri); Pacific sharpnose shark (Rhizoprionodon longurio); Raja rays nei (Raja spp); Rays and skates nei (Rajidae); Shovelnose guitarfish (Rhinobatos productus); Smooth-hounds nei (Mustelus spp); Thresher sharks nei (Alopias spp); Various sharks nei (Selachimorpha (Pleurotremata)); Whiptail stingray (Dasyatis brevis) | Drifting longlines, (Pelagic),Gillnets and entangling nets (not specified), (Bottom),Other (Please Specify) Bottom longlines, (Bottom) | EEZ,(FAO:77 Pacific Eastern Central),EXCEPT THE NORTHERN GULF OF CALIFORNIA. | |
| 13104 | Barred sand bass (Paralabrax nebulifer); Orangemouth weakfish (Cynoscion xanthulum); Shortfin weakfish (Cynoscion parvipinnis); Soles nei (Soleidae) | Gillnets and entangling nets (not specified), (Demersal) | EEZ,(FAO:77 Pacific Eastern Central),EXCEPT THE NORTHERN GULF OF CALIFORNIA. | |
| 1903 | California butterfly ray (Gymnura marmorata); Carcharhinus sharks nei (Carcharhinus spp); Hammerhead sharks nei (Sphyrna spp); Mobula nei (Mobula spp); Myliobatis spp (Myliobatis spp); Pacific angelshark (Squatina californica); Pacific cownose ray (Rhinoptera steindachneri); Pacific sharpnose shark (Rhizoprionodon longurio); Raja rays nei (Raja spp); Rays and skates nei (Rajidae); Shovelnose guitarfish (Rhinobatos productus); Smooth-hounds nei (Mustelus spp); Thresher sharks nei (Alopias spp); Various sharks nei (Selachimorpha (Pleurotremata)); Whiptail stingray (Dasyatis brevis) | Drifting longlines, (Pelagic),Gillnets and entangling nets (not specified), (Bottom),Other (Please Specify) Bottom longlines, (Bottom) | EEZ,(FAO:77 Pacific Eastern Central),Western coast of Baja California and Northern Gulf of California (artisanal fishery) | |
| 1905 | Carcharhinus sharks nei (Carcharhinus spp); Hammerhead sharks nei (Sphyrna spp); Myliobatis spp (Myliobatis spp); Smooth-hounds nei (Mustelus spp); Stingrays nei (Dasyatis spp); Various sharks nei (Selachimorpha (Pleurotremata)) | Gillnets and entangling nets (not specified), (Bottom) | EEZ,(FAO:77 Pacific Eastern Central),Baja Sur: Mexican EEZ | |
| 1907 | Cobia (Rachycentron canadum); Various sharks nei (Selachimorpha (Pleurotremata)) | Gillnets and entangling nets (not specified), (Pelagic) | EEZ,(FAO:31 Atlantic Western Central),Gulf of Mexico: Mexican EEZ | |
| 1908 | California flounder (Paralichthys californicus); Flatfishes nei (Pleuronectiformes); Soles nei (Soleidae); Speckled flounder (Paralichthys woolmani) | Gillnets and entangling nets (not specified), (Demersal) | EEZ,(FAO:77 Pacific Eastern Central),Pacific Ocean | |
| 1912 | North Pacific hake (Merluccius productus) | Trawls (not specified), (Demersal) | EEZ,(FAO:77 Pacific Eastern Central), Gulf of California | |
| 1913 | Barred sand bass (Paralabrax nebulifer); Orangemouth weakfish (Cynoscion xanthulum); Shortfin weakfish (Cynoscion parvipinnis); Soles nei (Soleidae) | Gillnets and entangling nets (not specified), (Demersal) | EEZ,(FAO:77 Pacific Eastern Central),Western coast of the Baja California peninsula and Gulf of California | |

**2025 Final Comparability Finding Denials**

| Fishery ID* | Target Species or Product | Gear Type | Area of Operation | RFMO |
|---|---|---|---|---|
| 1915 | Barred sand bass (Paralabrax nebulifer); California sheephead (Semicossyphus pulcher); Ocean whitefish (Caulolatilus princeps); Orangemouth weakfish (Cynoscion xanthulum); Paralabrax spp (Paralabrax spp); Shortfin weakfish (Cynoscion parvipinnis); Soles nei (Soleidae) | Pots/traps, (Demersal) | EEZ,(FAO:77 Pacific Eastern Central),Western coast of the Baja California peninsula | |
| 1725 | Blue spiny lobster (Panulirus inflatus); Green spiny lobster (Panulirus gracilis); Mexican spiny loster (Panulirus interruptus); Pronghorn spiny lobster (Panulirus penicillatus) | lobster traps, (Demersal) | EEZ,(FAO:77 Pacific Eastern Central),Western Coast of the Baja California Peninsula | |
| 1859 | Amberjacks nei (Seriola spp); Cynoscion reticulatus (Cynoscion reticulatus); Gulf weakfish(=Gulf corvina) (Cynoscion othonopterum); Orangemouth weakfish (Cynoscion xanthulum); Pacific sierra (Scomberomorus sierra); Shortfin weakfish (Cynoscion parvipinnis); White weakfish (Atractoscion nobilis) | Encircling gillnets, (Pelagic),Hooks and lines (not specified), (Pelagic) | EEZ,(FAO:77 Pacific Eastern Central),Upper Gulf of California , Colorado River Delta and  Gulf of Santa Clara | |
| 1860 | Amberjacks nei (Seriola spp); Cynoscion reticulatus (Cynoscion reticulatus); Gulf weakfish(=Gulf corvina) (Cynoscion othonopterum); Orangemouth weakfish (Cynoscion xanthulum); Pacific sierra (Scomberomorus sierra); Shortfin weakfish (Cynoscion parvipinnis); White weakfish (Atractoscion nobilis) | Encircling gillnets, (Pelagic),Hooks and lines (not specified), (Pelagic) | EEZ,(FAO:77 Pacific Eastern Central),Upper Gulf of California , Colorado River Delta and  Gulf of Santa Clara | |
| 1861 | Californian anchovy (Engraulis mordax); Gulf weakfish(=Gulf corvina) (Cynoscion othonopterum); Herrings/sardines nei (Clupeidae); Leatherjackets nei (Oligoplites spp); Mackerels nei (Scombridae); Orangemouth weakfish (Cynoscion xanthulum); Pacific anchoveta (Cetengraulis mysticetus); Pacific chub mackerel (Scomber japonicus); Red-eye round herring (Etrumeus teres); Shortfin weakfish (Cynoscion parvipinnis); South American pilchard (Sardinops sagax); Thread herrings nei (Opisthonema spp) | Purse seines, (Pelagic) | EEZ,(FAO:77 Pacific Eastern Central),Northern Gulf of California | |
| 1869 | Blue shrimp (Penaeus stylirostris); Yellowleg shrimp (Penaeus californiensis) | Bottom trawls (not specified), (Demersal),suripera, (Demersal) | High Seas,EEZ,(FAO:77 Pacific Eastern Central),Northern Gulf of California | |
| 1870 | Bigeye croaker (Micropogonias megalops); Tallfin croaker(=chano) (Micropogonias altipinnis) | Gillnets and entangling nets (not specified), (Pelagic) | EEZ,(FAO:77 Pacific Eastern Central),Northern Gulf of California | |
| 1871 | California two-spot octopus (Octopus bimaculoides); Octopuses nei (Octopus spp) | Traps (not specified), (Bottom) | EEZ,(FAO:77 Pacific Eastern Central),Lagoons and systems on the western coast of the Baja California peninsula and the Gulf of California | |
| 12045 | Bonefish (Albula vulpes); Flathead grey mullet (Mugil cephalus); White mullet (Mugil curema) | Gillnets and entangling nets (not specified), (Surface) | EEZ,(FAO:77 Pacific Eastern Central) | |
| 12046 | Black snook (Centropomus nigrescens); Bonefish (Albula vulpes); Drums nei (Umbrina spp); Snooks(=Robalos) nei (Centropomus spp); Yellowfin snook (Centropomus robalito) | Gillnets and entangling nets (not specified), (Benthic) | EEZ,(FAO:77 Pacific Eastern Central) | |
| | **Mozambique** | | | |
| | **Export Fisheries** | | | |
| 1938 | Gulper sharks nei (Centrophorus spp) | Gillnets and entangling nets (not specified), (Demersal) | EEZ,(FAO:51 Indian Ocean Western),51.6, 51.8 | |
| 1932 | Emperors/Scavengers nei (Lethrinidae); Groupers nei (Epinephelus spp); Lobsters nei (Reptantia); Marine crustaceans nei (Crustacea); Marine fishes nei (Osteichthyes); Painted spiny lobster (Panulirus versicolor); Porgies/seabreams nei (Sparidae); Rock lobsters nei (Jasus spp); Snappers nei (Lutjanus spp); Various squids nei (Loliginidae, Ommastrephidae); marine shrimps nei | Gillnets and entangling nets (not specified), (Demersal) | EEZ,(FAO:51 Indian Ocean Western),Sofala bank, Delagoa bight, Mozambique channel | |
| 1934 | Demersal fishes nei (Osteichthyes); Pelagic fishes nei (Osteichthyes); marine shrimps nei | Gillnets and entangling nets (not specified), (Surface) | EEZ,(FAO:51 Indian Ocean Western),nearshore Mozambique,  provinces of Nampula, Zambezia, Sofala, Inhambane and Maputo | |
| | **Myanmar (Burma)** | | | |
| | **Export Fisheries** | | | |
| 1943 | Black pomfret (Parastromateus niger); Brushtooth lizardfish (Saurida undosquamis); Greater lizardfish (Saurida tumbil); Indian anchovy (Stolephorus indicus); Indo-Pacific king mackerel (Scomberomorus guttatus); Long tongue sole (Cynoglossus lingua); Narrow-barred Spanish mackerel (Scomberomorus commerson); Silver pomfret (Pampus argenteus); Yellowfin tuna (Thunnus albacares) | Bottom trawls (not specified), (Demersal),Drift gillnets, (Surface),Seine nets (not specified), (Surface),Stow nets, (Bottom),Surrounding nets (not specified), (Surface) | EEZ,(FAO:57 Indian Ocean Eastern),No | BOBP-IGO |
| | **Namibia** | | | |
| | **Exempt Fisheries** | | | |
| 1966 | Mullets nei (Mugilidae) | Beach seines, (Surface) | EEZ,(FAO:47 Atlantic Southeast),FAO Area 47 | |
| 1950 | Sea mussels nei (Mytilidae) | Aquaculture (basket), (Midwater) | EEZ,(FAO:47 Atlantic Southeast),Luderitz sea lagoons | |
| 1954 | toothfishes nei (Dissostichus spp) | Longlines (not specified), (Demersal) | High Seas,(FAO:48 Atlantic Antarctic),Subarea 58.4.3b | CCAMLR |
| 1953 | toothfishes nei (Dissostichus spp) | Longlines (not specified), (Demersal) | High Seas,(FAO:48 Atlantic Antarctic),Subarea 58.4.2 | CCAMLR |
| 1952 | toothfishes nei (Dissostichus spp) | Longlines (not specified), (Demersal) | High Seas,(FAO:48 Atlantic Antarctic),Subarea 58.4.1 (East Antarctica) | CCAMLR |
| 1951 | Bigeye tuna (Thunnus obesus); Dolphinfishes nei (Coryphaenidae); Swordfish (Xiphias gladius); Tunas nei (Thunnini); Various sharks nei (Selachimorpha (Pleurotremata)); Yellowfin tuna (Thunnus albacares) | Pole and Lines, (Midwater) | High Seas,(FAO:47 Atlantic Southeast),South Atlantic, International Convention for the Conservation of Atlantic Tuna Convention Area | ICCAT |
| | **Export Fisheries** | | | |
| 1956 | Groundfishes nei (Osteichthyes); Hakes nei (Merluccius nei) | Longlines (not specified), (Demersal) | EEZ,(FAO:47 Atlantic Southeast),Atlantic Southeast (FAO Area 47) | |
| 1955 | West African geryon (Chaceon maritae) | Pots/traps, (Benthic) | EEZ,Angola,(FAO:47 Atlantic Southeast),Atlantic Southeast (FAO Area 47) | |
| 1961 | Jack and horse mackerels nei (Trachurus spp) | Midwater trawls (not specified), (Midwater) | EEZ,(FAO:47 Atlantic Southeast),Atlantic Southeast (FAO Area 47) | |

**2025 Final Comparability Finding Denials**

| Fishery ID* | Target Species or Product | Gear Type | Area of Operation | RFMO |
|---|---|---|---|---|
| 1960 | Red crab (Chaceon quinquedens) | Pots/traps, (Bottom) | High Seas,(FAO:47 Atlantic Southeast),Atlantic Southeast (FAO Area 47), SEAFO convention area | SEAFO |
| 1959 | Patagonian toothfish (Dissostichus eleginoides); Various sharks nei (Selachimorpha (Pleurotremata)) | Longlines (not specified), (Demersal) | High Seas,(FAO:47 Atlantic Southeast),Atlantic Southeast (FAO Area 47), SEAFO convention area | SEAFO |
| 1958 | Alfonsino (Beryx decadactylus); Demersal fishes nei (Osteichthyes); Orange roughy (Hoplostethus atlanticus); Oreo dories nei (Oreosomatidae); Patagonian toothfish (Dissostichus eleginoides); Pelagic armourheads nei (Pseudopentaceros spp); Various sharks nei (Selachimorpha (Pleurotremata)) | Midwater trawls (not specified), (Midwater) | High Seas,(FAO:47 Atlantic Southeast),Atlantic Southeast (FAO Area 47), SEAFO convention area | SEAFO |
| 1963 | Rock lobsters nei (Jasus spp) | Pots/traps, (Bottom) | EEZ,(FAO:47 Atlantic Southeast),Southern port of Luderitz | |
| 1957 | Groundfishes nei (Osteichthyes); Hakes nei (Merluccius spp); Monkfishes nei (Lophius spp) | Trawls (not specified), (Bottom) | EEZ,(FAO:47 Atlantic Southeast),Atlantic Southeast (FAO Area 47) | |

| | | | | |
|---|---|---|---|---|
| | **New Caledonia** | | | |
| | **Export Fisheries** | | | |
| 1880 | Albacore (Thunnus alalunga); Bigeye tuna (Thunnus obesus); Skipjack tuna (Katsuwonus pelamis); Yellowfin tuna (Thunnus albacares) | Longlines (not specified), (Pelagic) | EEZ,(FAO:71 Pacific Western Central),New Caledonia EEZ | WCPFC |

| | | | | |
|---|---|---|---|---|
| | **Nigeria** | | | |
| | **Export Fisheries** | | | |
| 2003 | African red snapper (Lutjanus agennes); Barracudas nei (Sphyraena spp); Boe drum (Pteroscion peli); Bonga shad (Ethmalosa fimbriata); Demersal fishes nei (Osteichthyes); Giant sea catfish (Arius gigas); Guinean sea catfish (Arius parkii); Rough-head sea catfish (Arius latiscutatus); Smoothmouth sea catfish (Arius heudelotii); Soles nei (Soleidae); Spotted catfish (Arius maculatus); Threadfins/tasselfishes nei (Polynemidae); Various sharks nei (Selachimorpha (Pleurotremata)); West African croakers nei (Pseudotolithus spp); White grouper (Epinephelus aeneus) | Gillnets and entangling nets (not specified), (Demersal) | EEZ,(FAO:34 Atlantic Eastern Central),34.3.5,Nigeria EEZ | |

| | | | | |
|---|---|---|---|---|
| | **Oman** | | | |
| | **Export Fisheries** | | | |
| 10787 | Herrings/sardines nei (Clupeidae) | Encircling gillnets, (Surface),Purse seines, (Surface) | Oman sea and Arabian sea | |
| 10788 | Groupers nei (Epinephelus spp); Snappers nei (Lutjanus spp) | Longlines (not specified), (Demersal),Set gillnets/set nets (anchored), (Demersal),Vertical lines, (Demersal) | Oman sea and Arabian sea | |
| 2105 | Common squids nei (Loligo spp); Hooded cuttlefish (Sepia prashadi); Pharaoh cuttlefish (Sepia pharaonis) | Jig, (Demersal),Traps (not specified), (Bottom) | Arabian Sea Off Oman Coast | |
| 2106 | Common dolphinfish (Coryphaena hippurus); Pompano dolphinfish (Coryphaena equiselis) | Driftnets, (Surface),Trolling lines (Surface) | Arabian Sea of Oman | |
| 2111 | Croakers nei (Micropogonias spp); Demersal fishes nei (Osteichthyes); Flatfishes nei (Pleuronectiformes); Groundfishes nei (Osteichthyes); Grunts nei (Haemulon spp); Mullets nei (Mugilidae) | Longlines (not specified), (Demersal),Set gillnets/set nets (anchored), (Demersal),Traps (not specified), (Demersal),Vertical lines, (Demersal) | Oman sea and Arabian sea | |
| 2115 | Albacore (Thunnus alalunga); Yellowfin tuna (Thunnus albacares) | Driftnets, (Surface),Longlines (not specified), (Surface),Vertical lines, (Surface) | Coastal fisheries, Oman Sea and Arabian Sea | |
| 5159 | Lesser slipper lobster (Scyllarus arctus); Painted spiny lobster (Panulirus versicolor); Scalloped spiny lobster (Panulirus homarus) | Traps (not specified), (Demersal) | Arabian sea off oman coast | |
| 2027 | Porgies/seabreams nei (Sparidae) | Set gillnets/set nets (anchored), (Demersal),trap nets/stationary nets, (Demersal) | EEZ,(FAO:51 Indian Ocean Western),Oman Sea, Arabian Sea of Oman | |
| 10786 | Bigeye tuna (Thunnus obesus); Tunas nei (Thunnini) | Driftnets, (Surface),Longlines (not specified), (Surface),Vertical lines, (Midwater) | Arabian sea and Oman sea | |
| 2109 | Pelagic fishes nei (Osteichthyes); Porgies/seabreams nei (Sparidae) | Encircling gillnets, (Surface),Seine nets (not specified), (Surface) | Oman Sea, Arabian Sea of Oman | |

| | | | | |
|---|---|---|---|---|
| | **Peru** | | | |
| | **Export Fisheries** | | | |
| 2201 | Blue shark (Prionace glauca); Hammerhead sharks nei (Sphyrna spp); Shortfin mako (Isurus oxyrinchus) | Other (Please Specify) red de enmalle, (Surface) | EEZ,(FAO:87 Pacific Southeast),Artisanal: Peru EEZ all provinces and on high seas | |
| 2203 | Angelsharks/sand devils nei (Squatinidae); Blue shark (Prionace glauca); Bonitos nei (Sarda spp); Dolphinfishes nei (Coryphaenidae); Hammerhead sharks nei (Sphyrna spp); Rays and skates nei (Rajidae); Shortfin mako (Isurus oxyrinchus); Thresher (Alopias vulpinus) | Other (Please Specify) red de deriva, (Surface) | EEZ,(FAO:87 Pacific Southeast),Artisanal: Peru EEZ all provinces and on high seas | |
| 2199 | Chilean silverside (Odontesthes regia) | Gillnets and entangling nets (not specified), (Pelagic) | EEZ,(FAO:87 Pacific Southeast),Artisanal: Peru EEZ all provinces | |
| 2196 | Pacific harvestfish (Peprilus medius) | Gillnets and entangling nets (not specified), (Pelagic) | EEZ,(FAO:87 Pacific Southeast),Peru EEZ primarily northern provinces | |

| | | | | |
|---|---|---|---|---|
| | **Philippines** | | | |
| | **Export Fisheries** | | | |
| 2134 | Demersal fishes nei (Osteichthyes) | Set gillnets/set nets (anchored), (Surface) | EEZ,(FAO:71 Pacific Western Central),municipal waters; nationwide | |
| 2129 | Blue swimming crab (Portunus pelagicus) | Pots/traps, (Bottom) | EEZ,(FAO:71 Pacific Western Central),Major areas: Visayan Sea, Samar Sea, San Miguel Bay; Bays/Gulfs | |

**2025 Final Comparability Finding Denials**

| Fishery ID* | Target Species or Product | Gear Type | Area of Operation | RFMO |
|---|---|---|---|---|
| 2130 | Blue swimming crab (Portunus pelagicus) | Gillnets and entangling nets (not specified), (Surface) | EEZ,(FAO:71 Pacific Western Central),Major areas: Visayan Sea, Samar Sea, San Miguel Bay; Bays/Gulfs nationwide | |
| 2133 | Skipjack tuna (Katsuwonus pelamis) | Drift gillnets, (Surface) | EEZ,(FAO:71 Pacific Western Central),municipal waters; nationwide | |

<table>
<tr><td colspan="5" style="background:black;"> </td></tr>
</table>

| | **Russian Federation** | | | |
|---|---|---|---|---|
| | **Exempt Fisheries** | | | |
| 2257 | Cucumaria japonica (Cucumaria japonica) | Dredges (not specified), (Bottom) | EEZ,(FAO:61 Pacific Northwest),Sea of Japan, Sea of Okhotsk, Kuril Islands | |
| 2251 | Seaweeds nei (Algae) | Dredges (not specified), (Bottom) | EEZ,(FAO:27 Atlantic Northeast),White Sea - Barents Sea | |
| 2242 | Scallop (Chlamys livida) | Dredges (not specified), (Bottom) | EEZ,(FAO:27 Atlantic Northeast),White Sea - Barents | |
| 2240 | Northern prawn (Pandalus borealis) | Bottom trawls (not specified), (Bottom) | EEZ,(FAO:27 Atlantic Northeast),White Sea - Barents | |
| 2221 | Buccinum spp (Buccinum spp); Kaga whelk (Buccinum bayani) | Towed dredges, (Bottom) | EEZ,(FAO:61 Pacific Northwest),Far East, Sea of Okhotsk, Sea of Japan | |
| 2220 | Clams/etc. nei (Bivalvia); Flat and cupped oysters nei (Ostreidae); Gaper nei (Mya spp); Pacific geoduck (Panopea generosa); Razor clams/knife clams nei (Solenidae); Sea mussels nei (Mytilidae); Surf clams nei (Spisula spp) | Diving (not specified), (Bottom) | EEZ,(FAO:61 Pacific Northwest),Far East, Sea of Japan, Sea of Okhotsk | |
| 2215 | Swordfish (Xiphias gladius); Tunas nei (Thunnini) | Purse seines, (Midwater) | EEZ,(FAO:58 Antarctic and Southern Indian Ocean , FAO:57 Indian Ocean Eastern, FAO:51 Indian Ocean Western),Western Indian Ocean | IOTC |
| 2353 | Demersal fishes nei (Osteichthyes); Haddock (Melanogrammus aeglefinus); Redfish (Centroberyx affinis) | Hooks and lines (not specified), (Demersal) | EEZ,(FAO:27 Atlantic Northeast),North-East Atlantic Fisheries Commission Regulatory Area, FAO 27 | NEAFC |
| 2372 | Chlamys spp (Chlamys spp) | Towed dredges, (Bottom) | EEZ,(FAO:61 Pacific Northwest),Kurile Islands & Sea of Japan | |
| 2373 | Sea urchins nei (Strongylocentrotus spp) | Diving (not specified), (Bottom) | EEZ,(FAO:61 Pacific Northwest),Kurile Islands & Sea of Japan | |
| 2351 | Antarctic krill (Euphausia superba) | Midwater trawls (not specified), (Midwater) | High Seas,EEZ,(FAO:48 Atlantic Antarctic),Antarctic Peninsula Subareas 48.1-4 | CCAMLR |
| 2352 | toothfishes nei (Dissostichus spp) | Longlines (not specified), (Demersal) | High Seas,EEZ,(FAO:88 Pacific Antarctic),Subarea 88.1-2 | CCAMLR |
| | **Export Fisheries** | | | |
| 2369 | Pacific salmons nei (Oncorhynchus spp) | Set gillnets/set nets (anchored), (Bottom) | EEZ,(FAO:61 Pacific Northwest),Russian Far East | |
| 2370 | Pacific salmons nei (Oncorhynchus spp) | Gillnets and entangling nets (not specified), (Bottom) | EEZ,(FAO:61 Pacific Northwest),Russian Far East | |
| 2371 | Pacific salmons nei (Oncorhynchus spp) | Fixed gillnets (on stakes), (Bottom) | EEZ,(FAO:61 Pacific Northwest),Russian Far East | |
| 2374 | Pacific saury (Cololabis saira) | Purse seines, (Surface),dip nets, (Surface) | EEZ,Japan,(FAO:61 Pacific Northwest),Sea of Japan & western North Pacific | NPFC |
| 2375 | Demersal fishes nei (Osteichthyes); Haddock (Melanogrammus aeglefinus) | Bottom trawls (not specified), (Demersal) | EEZ,(FAO:27 Atlantic Northeast),North-East Atlantic Fisheries Commission Regulatory Area, FAO 27 | NEAFC |
| 2376 | Blue whiting(=Poutassou) (Micromesistius poutassou); Herrings/sardines nei (Clupeidae); Mackerels nei (Scombridae); Redfish (Centroberyx affinis) | Midwater trawls (not specified), (Pelagic) | EEZ,(FAO:27 Atlantic Northeast),North-East Atlantic Fisheries Commission Regulatory Area, FAO 27 | NEAFC |
| 2377 | Blue whiting(=Poutassou) (Micromesistius poutassou); Demersal fishes nei (Osteichthyes); Haddock (Melanogrammus aeglefinus); Herrings/sardines nei (Clupeidae); Mackerels nei (Scombridae); Redfish (Centroberyx affinis) | Purse seines, (Demersal) | EEZ,(FAO:27 Atlantic Northeast) | NEAFC |
| 2378 | Blue whiting(=Poutassou) (Micromesistius poutassou); Demersal fishes nei (Osteichthyes); Haddock (Melanogrammus aeglefinus); Herrings/sardines nei (Clupeidae); Mackerels nei (Scombridae); Redfish (Centroberyx affinis) | Scottish seines, (Demersal) | EEZ,(FAO:27 Atlantic Northeast),North-East Atlantic Fisheries Commission Regulatory Area, FAO 27 | NEAFC |
| 2211 | Blue whiting(=Poutassou) (Micromesistius poutassou); Demersal fishes nei (Osteichthyes); Haddock (Melanogrammus aeglefinus); Herrings/sardines nei (Clupeidae); Mackerels nei (Scombridae); Redfish (Centroberyx affinis) | Gillnets and entangling nets (not specified), (Midwater) | EEZ,(FAO:27 Atlantic Northeast) | NEAFC |
| 2212 | Blue whiting(=Poutassou) (Micromesistius poutassou); Demersal fishes nei (Osteichthyes); Haddock (Melanogrammus aeglefinus); Herrings/sardines nei (Clupeidae); Mackerels nei (Scombridae); Redfish (Centroberyx affinis) | tangle nets, (Midwater) | EEZ,(FAO:27 Atlantic Northeast) | NEAFC |
| 2213 | Blue whiting(=Poutassou) (Micromesistius poutassou); Demersal fishes nei (Osteichthyes); Haddock (Melanogrammus aeglefinus); Herrings/sardines nei (Clupeidae); Mackerels nei (Scombridae); Redfish (Centroberyx affinis) | Driftnets, (Surface) | EEZ,(FAO:27 Atlantic Northeast) | NEAFC |
| 2214 | Atlantic halibut (Hippoglossus hippoglossus); Groundfishes nei (Osteichthyes); Hakes nei (Merluccius spp); Northern cods nei (Gadus spp); Rays and skates nei (Rajidae); Redfish (Centroberyx affinis); Various squids nei (Loliginidae, Ommastrephidae); Witch flounder (Glyptocephalus cynoglossus) | Bottom trawls (not specified), (Bottom) | EEZ,(FAO:21 Atlantic Northwest) | NAFO |
| 2216 | Pelagic armourhead (Pseudopentaceros richardsoni); Splendid alfonsino (Beryx splendens) | Bottom trawls (not specified), (Bottom) | High Seas,(FAO:77 Pacific Eastern Central, FAO:67 Pacific Northeast, FAO:61 Pacific Northwest, FAO:71 Pacific Western Central),high seas North Pacific | CPPS, NPFC |
| 2217 | Sablefish (Anoplopoma fimbria) | Longlines (not specified), (Demersal) | High Seas,(FAO:77 Pacific Eastern Central, FAO:67 Pacific Northeast, FAO:61 Pacific Northwest, FAO:71 Pacific Western Central),high seas North Pacific | NPFC |
| 2218 | Flatfishes nei (Pleuronectiformes); Herrings/sardines nei (Clupeidae); Northern cods nei (Gadus spp) | Gillnets and entangling nets (not specified), (Midwater) | EEZ,(FAO:27 Atlantic Northeast),Baltic | |

**2025 Final Comparability Finding Denials**

| Fishery ID* | Target Species or Product | Gear Type | Area of Operation | RFMO |
|---|---|---|---|---|
| 2219 | Flatfishes nei (Pleuronectiformes); Herrings/sardines nei (Clupeidae); Northern cods nei (Gadus spp) | Trawls (not specified), (Demersal) | EEZ,(FAO:27 Atlantic Northeast),Baltic | |
| 2222 | Siberian sturgeon (Acipenser baerii); Sturgeon (caviar/roe) | Other (Please Specify) nets, (Midwater) | Siberian rivers, Lake Baikal | |
| 2223 | Sheefish (Stenodus leucichthys) | Unknown/Gear not known/Not provided, (Midwater) | EEZ,(FAO:51 Indian Ocean Western),Caspian Sea & Volga River | |
| 2235 | Herrings/sardines nei (Clupeidae) | Midwater trawls (not specified), (Midwater) | EEZ,(FAO:51 Indian Ocean Western),Caspian Sea & Volga River | |
| 2236 | Marine crustaceans nei (Crustacea) | Pots/traps, (Bottom) | EEZ,(FAO:37 Mediterranean and Black Sea),Caspian Sea & Volga River | |
| 2237 | Pike-perch (Sander lucioperca) | Trawls (not specified), (Bottom) | EEZ,(FAO:37 Mediterranean and Black Sea),Caspian Sea & Volga River | |
| 2238 | Atlantic halibut (Hippoglossus hippoglossus); Haddock (Melanogrammus aeglefinus); Northern cods nei (Gadus spp) | Longlines (not specified), (Midwater) | EEZ,(FAO:27 Atlantic Northeast),White Sea - Barents | |
| 2239 | Capelin (Mallotus villosus); Herrings/sardines nei (Clupeidae) | Trawls (not specified), (Midwater) | EEZ,(FAO:27 Atlantic Northeast),White Sea - Barents | |
| 2241 | Arctic flounder (Pleuronectes glacialis); Flatfishes nei (Pleuronectiformes) | Trawls (not specified), (Bottom) | EEZ,(FAO:27 Atlantic Northeast),White Sea - Barents | |
| 2243 | Pink(=Humpback) salmon (Oncorhynchus gorbuscha); Salmonids nei (Salmonidae) | Other (Please Specify) nets, (Midwater) | EEZ,(FAO:27 Atlantic Northeast),White Sea - Barents | |
| 2244 | Atlantic salmon (Salmo salar) | Other (Please Specify) nets, (Midwater) | EEZ,(FAO:27 Atlantic Northeast),White Sea - Barents | |
| 2245 | Whitefishes nei (Coregonus spp) | Other (Please Specify) nets, (Midwater) | EEZ,(FAO:27 Atlantic Northeast),White Sea - Barents | |
| 2246 | Barbel steed (Hemibarbus labeo); Common carp (Cyprinus carpio) | Gillnets and entangling nets (not specified), (Midwater) | Lake Baikal | |
| 2250 | Groundfishes nei (Osteichthyes); Herrings/sardines nei (Clupeidae); Jack and horse mackerels nei (Trachurus spp); Mackerels nei (Scombridae); Porgies/seabreams nei (Sparidae); Sardinellas nei (Sardinella spp) | Trawls (not specified), (Pelagic) | EEZ,Mauritania,(FAO:34 Atlantic Eastern Central),FAO Area 34, Mauritania EEZ | |
| 2252 | Japanese flying squid (Todarodes pacificus) | Midwater trawls (not specified), (Midwater) | EEZ,(FAO:61 Pacific Northwest),Sea of Japan, Southern Kuriles | |
| 2253 | Japanese pilchard (Sardinops melanostictus); Pacific chub mackerel (Scomber japonicus) | Trawls (not specified), (Midwater) | EEZ,Japan,(FAO:61 Pacific Northwest),Kuril Islands | NPFC |
| 2254 | Trouts nei (Salmo spp) | Unknown/Gear not known/Not provided, (Pelagic) | EEZ,(FAO:27 Atlantic Northeast),White Sea | |
| 2255 | Atka mackerel (Pleurogrammus monopterygius); Pacific ocean perch (Sebastes alutus) | Bottom trawls (not specified), (Bottom) | EEZ,(FAO:61 Pacific Northwest),Northern Kuril Islands | |
| 2258 | Atlantic redfishes nei (Sebastes spp) | Bottom trawls (not specified), (Bottom) | EEZ,(FAO:21 Atlantic Northwest),none provided | NAFO |
| 2259 | Tusk(=Cusk) (Brosme brosme) | Unknown/Gear not known/Not provided, (Bottom) | EEZ,(FAO:27 Atlantic Northeast),Barents Sea | |
| 2260 | Coonstripe shrimp (Pandalus hypsinotus); Humpy shrimp (Pandalus goniurus); Northern prawn (Pandalus borealis); marine shrimps nei | Bottom trawls (not specified), (Bottom) | EEZ,(FAO:61 Pacific Northwest),Far East | |
| 2261 | Red snow crab (Chionoecetes japonicus) | Pots/traps, (Bottom) | EEZ,(FAO:61 Pacific Northwest),The Sea of Japan | |
| 2354 | Antarctic stone crab (Paralomis spinosissima) | Pots/traps, (Bottom) | High Seas,Antarctica,(FAO:58 Antarctic and Southern Indian Ocean , FAO:48 Atlantic Antarctic, FAO:88 Pacific Antarctic),Subarea 48.2 (South Orkney Is.) | CCAMLR |
| 2355 | Antarctic stone crab (Paralomis spinosissima) | Pots/traps, (Bottom) | High Seas,Antarctica,(FAO:58 Antarctic and Southern Indian Ocean , FAO:48 Atlantic Antarctic, FAO:88 Pacific Antarctic),Subarea 48.3 (South Georgia Is.) | CCAMLR |
| 2356 | Alaska pollock(=Walleye poll.) (Theragra chalcogramma) | Midwater trawls (not specified), (Pelagic) | EEZ,(FAO:61 Pacific Northwest),Karaginsky, Russian Far East | |
| 2357 | Alaska pollock(=Walleye poll.) (Theragra chalcogramma) | Midwater trawls (not specified), (Pelagic) | EEZ,(FAO:61 Pacific Northwest),West Bering Sea | |
| 2358 | Alaska pollock(=Walleye poll.) (Theragra chalcogramma) | Midwater trawls (not specified), (Pelagic) | EEZ,(FAO:61 Pacific Northwest),Sea of Okhotsk | |
| 2359 | Alaska pollock(=Walleye poll.) (Theragra chalcogramma) | Danish seines, (Demersal) | EEZ,(FAO:61 Pacific Northwest),Sea of Okhotsk | |
| 2360 | Red king crab (Paralithodes camtschaticus); Snow crab (Chionoecetes opilio) | Pots/traps, (Bottom) | EEZ,(FAO:27 Atlantic Northeast, FAO:21 Atlantic Northwest),Barents Sea (Atlantic) | |
| 2361 | Blue king crab (Paralithodes platypus); Red king crab (Paralithodes camtschaticus); Snow crab (Chionoecetes opilio); Tanner crab (Chionoecetes bairdi) | Pots/traps, (Bottom) | EEZ,(FAO:61 Pacific Northwest),West Bering Sea | |
| 2362 | Blue king crab (Paralithodes platypus); Hair crab (Erimacrus isenbeckii); King crab (Lithodes ferox); Red king crab (Paralithodes camtschaticus); Snow crab (Chionoecetes opilio) | Pots/traps, (Bottom) | EEZ,(FAO:61 Pacific Northwest),Sea of Okhotsk, Pacific Northwest (FAO Area 61) Kamchatka, Primorye, Kuril Islands harvest regions | |
| 2363 | Blue king crab (Paralithodes platypus); Brown king crab (Paralithodes brevipes); Red king crab (Paralithodes camtschaticus); Snow crab (Chionoecetes opilio); Tanner crab (Chionoecetes bairdi) | Pots/traps, (Bottom) | EEZ,(FAO:61 Pacific Northwest),Chuckch Sea - Far East | |
| 2364 | Atlantic redfishes nei (Sebastes spp); Greenland halibut (Reinhardtius hippoglossoides); Grenadiers/rattails nei (Macrouridae); Pacific cod (Gadus macrocephalus); Pacific halibut (Hippoglossus stenolepis); Rays/stingrays/mantas nei (Rajiformes) | Longlines (not specified), (Demersal) | EEZ,(FAO:61 Pacific Northwest),Sea of Okhotsk and Western Bering Sea, Russian Far East | |
| 2365 | Atka mackerel (Pleurogrammus monopterygius); Greenland halibut (Reinhardtius hippoglossoides); Grenadiers/rattails nei (Macrouridae); Pacific cod (Gadus macrocephalus); Pacific halibut (Hippoglossus stenolepis); Pacific ocean perch (Sebastes alutus); Righteye flounders nei (Pleuronectidae); Schoolmaster gonate squid (Berryteuthis magister); Sculpins nei (Cottidae) | Bottom trawls (not specified), (Demersal) | EEZ,(FAO:61 Pacific Northwest),Bering Sea, Sea of Okhotsk | |
| 2366 | Pacific cod (Gadus macrocephalus); Righteye flounders nei (Pleuronectidae); Sculpins nei (Cottidae) | Danish seines, (Demersal) | EEZ,(FAO:61 Pacific Northwest),Russian Far East | |

**2025 Final Comparability Finding Denials**

| Fishery ID* | Target Species or Product | Gear Type | Area of Operation | RFMO |
|---|---|---|---|---|
| 2367 | Pacific herring (Clupea pallasii) | Midwater trawls (not specified), (Pelagic) | EEZ,(FAO:61 Pacific Northwest),Western Bering Sea, Pacific Northwest (FAO Area 61) | |
| 2368 | Haddock (Melanogrammus aeglefinus); Northern cods nei (Gadus spp) | Bottom trawls (not specified), (Demersal) | EEZ,(FAO:21 Atlantic Northwest),Russian EEZ, Barents Sea | |
| | **Saudi Arabia** | | | |
| | **Export Fisheries** | | | |
| 2267 | Narrow-barred Spanish mackerel (Scomberomorus commerson) | Gillnets and entangling nets (not specified), (Midwater) | EEZ,(FAO:51 Indian Ocean Western),51.2 | RECOFI |
| 2543 | Dogtooth tuna (Gymnosarda unicolor); Longtail tuna (Thunnus tonggol); Mackerels nei (Scombridae); Tunas nei (Thunnini) | Gillnets and entangling nets (not specified), (Pelagic),Hooks and lines (not specified), (Pelagic),Trawls (not specified), (Pelagic) | EEZ,(FAO:51 Indian Ocean Western),51.1, 51.2,Red Sea, Arabian Sea, Indian Ocean, Persian Gulf | RECOFI |
| | **Senegal** | | | |
| | **Export Fisheries** | | | |
| 2555 | Various sharks nei (Selachimorpha (Pleurotremata)) | Gillnets and entangling nets (not specified), (Midwater) | EEZ,(FAO:34 Atlantic Eastern Central),34.3.11, 34.3.12,none provided | CECAF, COMHAFAT, SRFC |
| 2561 | Jack and horse mackerels nei (Trachurus spp); Madeiran sardinella (Sardinella maderensis); Round sardinella (Sardinella aurita) | Trammel nets, (Surface) | EEZ,(FAO:34 Atlantic Eastern Central),34.3.11, 34.3.12,none provided (EEZ Senegal) | CECAF, COMHAFAT, SRFC |
| 2551 | marine shrimps nei | Gillnets and entangling nets (not specified), (Bottom) | EEZ,(FAO:34 Atlantic Eastern Central),34.3.11, 34.3.12,Salty/Brackish waters of The Saloum river, The Senegal river, The Casamance river | CECAF, COMHAFAT, SRFC |
| 2548 | Herrings/sardines nei (Clupeidae); Jack and horse mackerels nei (Trachurus spp); Mackerels nei (Scombridae); Mullets nei (Mugilidae); Sardinellas nei (Sardinella spp) | Purse seines, (Surface) | EEZ,(FAO:34 Atlantic Eastern Central),coastal zones | CECAF, COMHAFAT, SRFC |
| 2547 | Jack and horse mackerels nei (Trachurus spp); Mackerels nei (Scombridae); Mullets nei (Mugilidae); Sardinellas nei (Sardinella spp) | Trawls (not specified), (Pelagic) | EEZ,The Gambia,(FAO:34 Atlantic Eastern Central),34.3.12,COASTAL fishery | CECAF, COMHAFAT, SRFC |
| 2559 | Marine fishes nei (liver) (Osteichthyes); Marine fishes nei (roe/milt) (Osteichthyes) | Driftnets, (Midwater) | EEZ,(FAO:34 Atlantic Eastern Central),34.3.11, 34.3.12,Senegal EEZ | CECAF, COMHAFAT, SRFC |
| | **Somalia** | | | |
| | **Export Fisheries** | | | |
| 7234 | Pelagic fishes nei (Osteichthyes); Tunas nei (Thunnini) | Gillnets and entangling nets (not specified), (Pelagic),Handlines and hand-operated pole- and-lines, (Pelagic) | EEZ,(FAO:51 Indian Ocean Western),coastal | IOTC |
| 10921 | Australian spotted mackerel (Scomberomorus munroi); Barracudas nei (Sphyraena spp); Carcharhinus sharks nei (Carcharhinus spp); Common squids nei (Loligo spp); Common stingray (Dasyatis pastinaca); Coralgroupers nei (Plectropomus spp); Emperors/Scavengers nei (Lethrinidae); Green mud crab (Scylla paramamosain); Groupers nei (Epinephelus spp); Groupers/seabasses nei (Serranidae); Heterobranchus catfish nei (Heterobranchus spp); Inshore squids nei (Loliginidae); Jacks/crevalles nei (Caranx spp); Marlins,sailfishes,etc. nei (Istiophoridae); Milkfish (Chanos chanos); Octopuses nei (Octopus spp); Parrotfishes nei (Scaridae); Sardinellas nei (Sardinella spp); Scomber mackerels nei (Scomber spp); Snappers nei (Lutjanus spp); Stingrays/butterfly rays nei (Dasyatidae); Sweetlips/rubberlips nei (Plectorhinchus spp); Swordfish (Xiphias gladius); Tropical spiny lobsters nei (Panulirus spp); True lobsters,lobsterettes nei (Nephropidae); Yellow-edged lyretail (Variola louti); marine shrimps nei | Beach seines, (Bottom),Diving (SCUBA and/or free-diving), (Bottom),Diving (not specified), (Bottom),Driftnets, (Surface),Hooks and lines (not specified), (Demersal),Jig, (Midwater),Pots/traps, (Bottom),Set gillnets/set nets (anchored), (Demersal),Set longlines, (Demersal),Set longlines, (Surface),Spears, (Bottom) | High Seas,EEZ,(FAO:57 Indian Ocean Eastern),All of the Somalia coast | IOTC |
| 7229 | Lobsters nei (Reptantia) | Diving (not specified), (Benthic),Gillnets and entangling nets (not specified), (Benthic),Traps (not specified), (Bottom) | EEZ,(FAO:51 Indian Ocean Western),shallow, nearshore, reefs | |
| 7231 | Various sharks nei (Selachimorpha (Pleurotremata)) | Gillnets and entangling nets (not specified), (Pelagic),Handlines and hand-operated pole- and-lines, (Pelagic),Longlines (not specified), (Pelagic) | EEZ,(FAO:51 Indian Ocean Western),coastal | |
| 7228 | marine shrimps nei | Gillnets and entangling nets (not specified), (Midwater),Seine nets (not specified), (Midwater),Trawls (not specified), (Midwater) | EEZ,(FAO:51 Indian Ocean Western),unknown | |
| | **South Korea** | | | |
| | **Export Fisheries** | | | |
| 3072 | Silver pomfret (Pampus argenteus) | Stow nets, (Midwater) | EEZ,(FAO:61 Pacific Northwest),West Sea | |
| 3074 | Anchovies nei (Engraulis spp); Bastard halibut (Paralichthys olivaceus); Blackmouth angler (Lophiomus setigerus); Common hairfin anchovy (Setipinna tenuifilis); Croakers nei (Micropogonias spp); Cuttlefishes nei (Sepia spp); Flatfishes nei (Pleuronectiformes); Hairtails nei (Trichiurus spp); Pacific sandlance (Ammodytes personatus); Swimming crabs/etc. nei (Portunidae); Yellow croaker (Larimichthys polyactis); marine shrimps nei | Stow nets, (Midwater) | EEZ,(FAO:61 Pacific Northwest),West Sea | |
| 3079 | Cuttlefishes nei (Sepia spp); Soles nei (Soleidae) | Trawls (not specified), (Bottom) | EEZ,(FAO:61 Pacific Northwest),South Sea | |
| 3080 | Silver pomfret (Pampus argenteus) | Trawls (not specified), (Bottom) | EEZ,(FAO:61 Pacific Northwest),South Sea | |
| 3082 | Japanese spiny lobster (Panulirus japonicus) | Trawls (not specified), (Bottom) | EEZ,(FAO:61 Pacific Northwest),South Sea | |
| 3083 | Thamnaconus modestus (Thamnaconus modestus); Threadsail filefish (Stephanolepis cirrhifer); Various squids nei (Loliginidae, Ommastrephidae) | Trawls (not specified), (Bottom) | EEZ,(FAO:61 Pacific Northwest),South Sea | |
| 3085 | Anchovies nei (Engraulis spp); Hairtails nei (Trichiurus spp); Japanese Spanish mackerel (Scomberomorus niphonius); Japanese seabream (Pagrus major); Mackerels nei (Scombridae); Mi-uy (brown) croaker (Miichthys miiuy) | Trawls (not specified), (Midwater) | EEZ,(FAO:61 Pacific Northwest),South Sea | |
| 2941 | Bastard halibut (Paralichthys olivaceus); Flatfishes nei (Pleuronectiformes) | Gillnets and entangling nets (not specified), (Bottom) | EEZ,(FAO:61 Pacific Northwest),East Sea/South Sea | |

**2025 Final Comparability Finding Denials**

| Fishery ID* | Target Species or Product | Gear Type | Area of Operation | RFMO |
|---|---|---|---|---|
| 2944 | Bastard halibut (Paralichthys olivaceus); Flathead grey mullet (Mugil cephalus); Japanese amberjack (Seriola quinqueradiata); Japanese seabass (Lateolabrax japonicus); Marine crabs nei (Brachyura); Pacific sandlance (Ammodytes personatus); Soles nei (Soleidae); Thamnaconus modestus (Thamnaconus modestus); Threadsail filefish (Stephanolepis cirrhifer) | Gillnets and entangling nets (not specified), (Midwater) | EEZ,(FAO:61 Pacific Northwest),South Sea | |
| 2945 | Bastard halibut (Paralichthys olivaceus); Croakers nei (Micropogonias spp); Flathead grey mullet (Mugil cephalus); Japanese amberjack (Seriola quinqueradiata); Japanese seabass (Lateolabrax japonicus); Marine crabs nei (Brachyura); Pacific cod (Gadus macrocephalus); Righteye flounders nei (Pleuronectidae); Soles nei (Soleidae); Thamnaconus modestus (Thamnaconus modestus); Threadsail filefish (Stephanolepis cirrhifer) | Gillnets and entangling nets (not specified), (Midwater) | EEZ,(FAO:61 Pacific Northwest),East Sea | |
| 2952 | Monkfishes nei (Lophius spp); Snow crab (Chionoecetes opilio); marine shrimps nei | Gillnets and entangling nets (not specified), (Bottom) | EEZ,(FAO:61 Pacific Northwest),South Sea | |
| 2953 | Monkfishes nei (Lophius spp); Snow crab (Chionoecetes opilio); marine shrimps nei | Gillnets and entangling nets (not specified), (Bottom) | EEZ,(FAO:61 Pacific Northwest),East Sea | |
| 2955 | Anchovies nei (Engraulis spp); Pacific herring (Clupea pallasii); Pacific sandlance (Ammodytes personatus); Righteye flounders nei (Pleuronectidae) | Gillnets and entangling nets (not specified), (Pelagic) | EEZ,(FAO:61 Pacific Northwest),East Sea | |
| 2995 | Anchovies nei (Engraulis spp); Dotted gizzard shad (Konosirus punctatus); Hairtails nei (Trichiurus spp); Mackerels nei (Scombridae); Pacific cod (Gadus macrocephalus); Righteye flounders nei (Pleuronectidae); Yellow croaker (Larimichthys polyactis) | Gillnets and entangling nets (not specified), (Pelagic) | EEZ,(FAO:61 Pacific Northwest),South Sea | |
| **Sri Lanka** | | | | |
| **Export Fisheries** | | | | |
| 2700 | Bigeye tuna (Thunnus obesus); Dolphinfishes nei (Coryphaenidae); Swordfish (Xiphias gladius); Yellowfin tuna (Thunnus albacares) | Drift gillnets, (Midwater) | High Seas,(FAO:57 Indian Ocean Eastern, FAO:51 Indian Ocean Western),High seas | BOBP-IGO |
| 2702 | Marine fishes nei (Osteichthyes) | Beach seines, (Benthic),Drift gillnets, (Pelagic),Ring nets, (Pelagic) | EEZ,(FAO:57 Indian Ocean Eastern),57.1,Continental shelf | |
| 2696 | Bigeye tuna (Thunnus obesus); Dolphinfishes nei (Coryphaenidae); Narrow-barred Spanish mackerel (Scomberomorus commerson); Swordfish (Xiphias gladius); Yellowfin tuna (Thunnus albacares) | Drift gillnets, (Pelagic) | EEZ,(FAO:57 Indian Ocean Eastern),57.1,EEZ | BOBP-IGO |
| 2705 | Blue swimming crab (Portunus pelagicus); Indo-Pacific swamp crab (Scylla serrata); Marine crabs nei (Brachyura); Threespot swimming crab (Portunus sanguinolentus) | Crab nets, (Bottom),Gillnets and entangling nets (not specified), (Bottom),Pots/traps, (Bottom) | EEZ,(FAO:57 Indian Ocean Eastern),57.1,Patchy distribution in shallow water | |
| **Saint Kitts and Nevis** | | | | |
| **Export Fisheries** | | | | |
| 12699 | Carangids nei (Carangidae); Flyingfishes nei (Exocoetidae); Needlefishes/etc. nei (Belonidae) | Falling nets, (Surface) | EEZ,(FAO:31 Atlantic Western Central),EEZ of St. Kitts and Nevis | |
| **Saint Lucia** | | | | |
| **Exempt Fisheries** | | | | |
| 2766 | Conch nei (Strombidae) | Diving (SCUBA and/or free-diving), (Bottom) | EEZ,(FAO:31 Atlantic Western Central),EEZ - nearshore | CRFM, WECAFC |
| 2770 | Eucheuma seaweeds nei (Eucheuma spp); Gracilaria seaweeds (Gracilaria spp); Seaweeds nei (Algae) | Aquaculture (lines), (Surface),Aquaculture (rafts, mats), (Surface),Diving (SCUBA and/or free-diving), (Bottom) | EEZ,(FAO:31 Atlantic Western Central),coastal | |
| 2767 | Rock lobsters nei (Jasus spp) | Fish pots/fish traps, (Bottom),Set gillnets/set nets (anchored), (Bottom) | EEZ,(FAO:31 Atlantic Western Central),reef and shelf EEZ areas | CRFM, WECAFC |
| **Suriname** | | | | |
| **Export Fisheries** | | | | |
| 2899 | Acoupa weakfish (Cynoscion acoupa); Bressou sea catfish (Aspistor quadriscutis); Carcharhinus sharks nei (Carcharhinus spp); Catfishes nei (Ictalurus spp); Cobia (Rachycentron canadum); Coco sea catfish (Bagre bagre); Couma sea catfish (Sciades couma); Croakers nei (Micropogonias spp); Crucifix sea catfish (Arius proops); Demersal fishes nei (Osteichthyes); Gillbacker sea catfish (Aspistor parkeri); Green weakfish (Cynoscion virescens); King weakfish (Macrodon ancylodon); Mackerels nei (Scombridae); Passany sea catfish (Sciades passany); Seerfishes nei (Scomberomorus spp); Smalleye croaker (Nebris microps); Smalltooth weakfish (Cynoscion steindachneri); Snooks(=Robalos) nei (Centropomus spp); Softhead sea catfish (Amphiarius rugispinis); Stingrays nei (Dasyatis spp); Tarpon (Megalops atlanticus); Tarpon (Megalops atlanticus); Tripletail (Lobotes surinamensis); Various sharks nei (Selachimorpha (Pleurotremata)); Weakfishes nei(=corvina/curvina) (Cynoscion spp); Whitemouth croaker (Micropogonias furnieri) | Drift gillnets, (Demersal) | EEZ,(FAO:31 Atlantic Western Central),Suriname coast, Atlantic, Western Central (FAO AREA 31) | |
| **Taiwan** | | | | |
| **Export Fisheries** | | | | |
| 890 | Cephalopods nei (Cephalopoda); Mullets nei (Mugilidae); Seerfishes nei (Scomberomorus spp); Snappers nei (Lutjanus spp) | Combined gillnets-trammel nets, (Midwater),Drift gillnets, (Midwater),Set gillnets/set nets (anchored), (Midwater) | EEZ,(FAO:61 Pacific Northwest),Surrounding waters of Taiwan; 15 out of 22 County/ City Governments have respectively established their local rules regarding area/ time closure on trammel nets and gillnets or restriction on the use of trammel nets and gillents. | |
| **The Gambia** | | | | |
| **Export Fisheries** | | | | |
| 10712 | Bonga shad (Ethmalosa fimbriata) | Boat seines, (Surface),Seine nets (not specified), (Surface),Surrounding nets without purse lines, (Surface) | EEZ,Senegal,(FAO:34 Atlantic Eastern Central) | CECAF, COMHAFAT, SRFC |

**2025 Final Comparability Finding Denials**

| Fishery ID* | Target Species or Product | Gear Type | Area of Operation | RFMO |
|---|---|---|---|---|
| 10713 | Madeiran sardinella (Sardinella maderensis); Round sardinella (Sardinella aurita) | Encircling gillnets, (Surface),Seine nets (not specified), (Surface),Surrounding nets (not specified), (Surface),Surrounding nets without purse lines, (Surface) | EEZ,Senegal,(FAO:34 Atlantic Eastern Central) | CECAF, COMHAFAT, SRFC |
| 10714 | Barracudas nei (Sphyraena spp); Barracudas/etc. nei (Sphyraenidae); Great barracuda (Sphyraena barracuda); Guinean barracuda (Sphyraena afra) | Drift gillnets, (Midwater) | EEZ,Senegal,(FAO:34 Atlantic Eastern Central) | CECAF, COMHAFAT, SRFC |
| 10721 | Bobo croaker (Pseudotolithus elongatus); Cassava croaker (Pseudotolithus senegalensis); Croakers/drums nei (Sciaenidae); Elephant's snout volute (Cymbium glans); Law croaker (Pseudotolithus senegalus); Longneck croaker (Pseudotolithus typus); Neptune's volute (Cymbium pepo); Pig's snout volute (Cymbium cymbium); Volutes nei (Cymbium spp); Volutes nei (Cymbium spp); West African croakers nei (Pseudotolithus spp) | Bottom trawls (not specified), (Bottom),Gillnets and entangling nets (not specified), (Demersal),Set gillnets/set nets (anchored), (Bottom) | EEZ,Senegal,(FAO:34 Atlantic Eastern Central) | CECAF, COMHAFAT, SRFC |
| 1298 | Atlantic redfishes nei (Sebastes spp); Groundfishes nei (Osteichthyes) | Bottom trawls (not specified), (Bottom),Trawls (not specified), (Bottom),Unknown/Gear not known/Not provided, (Bottom) | EEZ,(FAO:34 Atlantic Eastern Central),Atlantic Eastern Central, FAO Area 34, Mauritanian waters, Guinea Bissau waters, Guinean waters | CECAF, COMHAFAT, SRFC |
| 10723 | Angolan dentex (Dentex angolensis); Bastard grunt (Pomadasys incisus); Bigeye grunt (Brachydeuterus auritus); Canary dentex (Dentex canariensis); Congo dentex (Dentex congoensis); Dentex nei (Dentex spp); Large-eye dentex (Dentex macrophthalmus); Parrot grunt (Pomadasys perotaei); Pigsnout grunt (Pomadasys rogerii); Rubberlip grunt (Plectorhinchus mediterraneus); Sompat grunt (Pomadasys jubelini) | Gillnets and entangling nets (not specified), (Demersal),Purse seines, (Midwater),Purse seines, (Surface),shrimp/prawn trawl, (Demersal) | EEZ,Senegal,(FAO:34 Atlantic Eastern Central) | CECAF, COMHAFAT, SRFC |
| 10724 | Arius spp (Arius spp); Barracudas nei (Sphyraena spp); Barracudas/etc. nei (Sphyraenidae); Common sole (Solea solea); Giant tiger prawn (Penaeus monodon); Guinean sea catfish (Arius parkii); Guinean sole (Synaptura cadenati); Lesser African threadfin (Galeoides decadactylus); Penaeus shrimps nei (Penaeus spp); Royal threadfin (Pentanemus quinquarius); Senegalese tonguesole (Cynoglossus senegalensis); Southern pink shrimp (Penaeus notialis); Tonguesole nei (Cynoglossus spp) | Drift gillnets, (Surface),Fixed gillnets (on stakes), (Benthic),Set gillnets/set nets (anchored), (Bottom),Stow nets, (Bottom),shrimp/prawn trawl, (Benthic) | EEZ,Senegal,(FAO:34 Atlantic Eastern Central) | CECAF, COMHAFAT, SRFC |
| 10725 | Cephalopods nei (Cephalopoda); Common cuttlefish (Sepia officinalis); Cupped oysters nei (Crassostrea spp); Elegant cuttlefish (Sepia elegans); Octopuses/etc. nei (Octopodidae); Ommastrephidae squids nei (Ommastrephidae); Sea catfishes nei (Ariidae); marine shrimps nei | Stow nets, (Benthic),octopus pots, (Bottom) | EEZ,Senegal,(FAO:34 Atlantic Eastern Central),the fishing area extend to the estuary of river Gambia | CECAF, COMHAFAT, SRFC |
| 10711 | Giant African threadfin (Polydactylus quadrifilis); Guinean sea catfish (Arius parkii); Lesser African threadfin (Galeoides decadactylus); Rough-head sea catfish (Arius latiscutatus); Royal threadfin (Pentanemus quinquarius); Sea catfishes nei (Ariidae); Smoothmouth sea catfish (Arius heudelotii); Threadfins/tasselfishes nei (Polynemidae) | Boat seines, (Midwater),Gillnets and entangling nets (not specified), (Bottom),Hooks and lines (not specified), (Bottom),Seine nets (not specified), (Midwater) | EEZ,Senegal,(FAO:34 Atlantic Eastern Central) | CECAF, COMHAFAT, SRFC |
| 10707 | Guinean sole (Synaptura cadenati); Senegalese sole (Solea senegalensis); Senegalese tonguesole (Cynoglossus senegalensis); Soles nei (Soleidae); Spiny turbots nei (Psettodidae); Spottail tongue turbot (Psettodes belcheri) | Gillnets and entangling nets (not specified), (Bottom),Set gillnets/set nets (anchored), (Bottom) | EEZ,Senegal,(FAO:34 Atlantic Eastern Central) | CECAF, COMHAFAT, SRFC |
| 10722 | African brown snapper (Lutjanus dentatus); African forktail snapper (Apsilus fuscus); African red snapper (Lutjanus agennes); Axillary seabream (Pagellus acarne); Bluespotted seabream (Pagrus caeruleostictus); Dane seabream (Porcostoma dentata); Dungat grouper (Epinephelus goreensis); Dusky grouper (Epinephelus marginatus); Golden African snapper (Lutjanus fulgens); Gorean snapper (Lutjanus goreensis); Groupers nei (Epinephelus spp); Groupers/seabasses nei (Serranidae); Porgies/seabreams nei (Sparidae); Senegal seabream (Diplodus bellottii); Snappers/jobfishes nei (Lutjanidae); White grouper (Epinephelus aeneus); White seabream (Diplodus sargus); Zebra seabream (Diplodus cervinus) | Bottom trawls (not specified), (Bottom),Gillnets and entangling nets (not specified), (Bottom),Set gillnets/set nets (anchored), (Demersal) | EEZ,Senegal,(FAO:34 Atlantic Eastern Central) | CECAF, COMHAFAT, SRFC |

**Togo**

**Export Fisheries**

| Fishery ID* | Target Species or Product | Gear Type | Area of Operation | RFMO |
|---|---|---|---|---|
| 12844 | Barracudas nei (Sphyraena spp); Carcharhinus sharks nei (Carcharhinus spp); Giant African threadfin (Polydactylus quadrifilis); Groupers nei (Epinephelus spp); Snappers nei (Lutjanus spp) | Bottom pair trawls, (Demersal),Longlines (not specified), (Demersal) | High Seas,(FAO:34 Atlantic Eastern Central) | |
| 7314 | Callinectes swimcrabs nei (Callinectes spp); Cassava croaker (Pseudotolithus senegalensis); Cuttlefishes nei (Sepia spp); Deep-water sharks nei (Elasmobranchii); Giant African threadfin (Polydactylus quadrifilis); Groundfishes nei (Osteichthyes); Groupers nei (Epinephelus spp); Lethrinus spp (Lethrinus spp); Longneck croaker (Pseudotolithus typus); Royal spiny lobster (Panulirus regius); Turbans nei (Turbo spp) | Bottom trawls (not specified), (Demersal) | EEZ,(FAO:34 Atlantic Eastern Central),unknown | |

**Turkiye**

**Export Fisheries**

| Fishery ID* | Target Species or Product | Gear Type | Area of Operation | RFMO |
|---|---|---|---|---|
| 2507 | European lobster (Homarus gammarus); Marine crabs nei (Brachyura); Rock lobsters nei (Jasus spp) | Other (Please Specify) Traditional Traps , (Benthic),Set gillnets/set nets (anchored), (Benthic),Trammel nets, (Benthic) | EEZ,(FAO:37 Mediterranean and Black Sea),37.3.1,Aegean Sea | |
| 2499 | Cuttlefishes nei (Sepia spp); European plaice (Pleuronectes platessa); John dory (Zeus faber); Mullets nei (Mugilidae); Octopuses nei (Octopus spp); Picarels nei (Spicara spp); Red mullet (Mullus barbatus); Soles nei (Soleidae); Surmullet (Mullus surmuletus); Various squids nei (Loliginidae, Ommastrephidae); Whiting (Merlangius merlangus) | Gillnets and entangling nets (not specified), (Bottom) | EEZ,(FAO:37 Mediterranean and Black Sea),37.3.1,Aegean Sea | |
| 2492 | Atlantic bonito (Sarda sarda); Atlantic horse mackerel (Trachurus trachurus); European pilchard(=Sardine) (Sardina pilchardus); Mullets nei (Mugilidae); Whiting (Merlangius merlangus) | Trammel nets, (Bottom) | EEZ,(FAO:37 Mediterranean and Black Sea),37.4.1,Sea of Marmara | |
| 2491 | Mullets nei (Mugilidae); Penaeus shrimps nei (Penaeus spp); Whiting (Merlangius merlangus) | Gillnets and entangling nets (not specified), (Bottom) | EEZ,(FAO:37 Mediterranean and Black Sea),37.4.1,Sea of Marmara | |
| 2489 | Turbot (Psetta maxima) | Gillnets and entangling nets (not specified), (Bottom) | EEZ,(FAO:37 Mediterranean and Black Sea),37.4.2,Black Sea | GFCM |

**2025 Final Comparability Finding Denials**

| Fishery ID* | Target Species or Product | Gear Type | Area of Operation | RFMO |
|---|---|---|---|---|
| 2488 | European plaice (Pleuronectes platessa); Flatfishes nei (Pleuronectiformes); Mullets nei (Mugilidae); Red mullet (Mullus barbatus); Soles nei (Soleidae); Surmullet (Mullus surmuletus); Whiting (Merlangius merlangus) | Trammel nets, (Bottom) | EEZ,(FAO:37 Mediterranean and Black Sea),37.4.2,Black Sea | |
| 2484 | Atlantic bonito (Sarda sarda); Atlantic horse mackerel (Trachurus trachurus); Atlantic mackerel (Scomber scombrus); Bluefish (Pomatomus saltatrix); Garfish (Belone belone); Pacific chub mackerel (Scomber japonicus) | Gillnets and entangling nets (not specified), (Pelagic),Surrounding nets (not specified), (Pelagic) | EEZ,(FAO:37 Mediterranean and Black Sea),37.4.1,Marmara Sea | |
| 2483 | Atlantic horse mackerel (Trachurus trachurus); Bluefish (Pomatomus saltatrix); Bonitos nei (Sarda spp); Garfish (Belone belone) | Gillnets and entangling nets (not specified), (Pelagic),Surrounding nets (not specified), (Pelagic) | EEZ,(FAO:37 Mediterranean and Black Sea),37.4.2,Black Sea | |
| 2495 | Croakers nei (Micropogonias spp); Cuttlefishes nei (Sepia spp); Drums nei (Umbrina spp); European plaice (Pleuronectes platessa); Flatfishes nei (Pleuronectiformes); Mullets nei (Mugilidae); Octopuses nei (Octopus spp); Soles nei (Soleidae); Various squids nei (Loliginidae, Ommastrephidae); Whiting (Merlangius merlangus) | Gillnets and entangling nets (not specified), (Bottom) | EEZ,(FAO:37 Mediterranean and Black Sea),37.3.2,Mediterranean Sea | |

| | **United Arab Emirates** | | | |
|---|---|---|---|---|
| | **Export Fisheries** | | | |
| 2538 | Mackerels nei (Scombridae) | Gillnets and entangling nets (not specified), (Pelagic) | EEZ,(FAO:51 Indian Ocean Western),Across the UAE except the emirates of Dubai and Abu Dhabi which constitute more than 70% of the UAE Arabian Gulf water | RECOFI |
| 2585 | Albacore (Thunnus alalunga); Tunas nei (Thunnini); Yellowfin tuna (Thunnus albacares) | Gillnets and entangling nets (not specified), (Pelagic) | EEZ,(FAO:51 Indian Ocean Western),Across the UAE except the emirates of Dubai and Abu Dhabi which constitute more than 70% of the UAE Arabian Gulf water | RECOFI |

| | **Vietnam** | | | |
|---|---|---|---|---|
| | **Export Fisheries** | | | |
| 13125 | Marlins,sailfishes,etc. nei (Istiophoridae); Swordfish (Xiphias gladius) | Gillnets and entangling nets (not specified), (Midwater),Handlines and hand-operated pole-and-lines, (Midwater) | EEZ,(FAO:61 Pacific Northwest, FAO:71 Pacific Western Central),vietnam EEZ, north, central and south region | SEAFDEC, WCPFC |
| 2932 | Groupers nei (Epinephelus spp) | Gillnets and entangling nets (not specified), (Demersal),single and/or pair trawl, (Demersal) | EEZ,(FAO:61 Pacific Northwest, FAO:71 Pacific Western Central),Vietnam EEZ, north, central, and south regions | SEAFDEC, WCPFC |
| 2988 | Swimming crabs/etc. nei (Portunidae) | Gillnets and entangling nets (not specified), (Demersal),single and/or pair trawl, (Demersal),trap nets/stationary nets, (Demersal) | EEZ,(FAO:61 Pacific Northwest, FAO:71 Pacific Western Central),coastal areas central and south regions | SEAFDEC, WCPFC |
| 2990 | Cuttlefishes nei (Sepia spp); Demersal fishes nei (Osteichthyes); Flatfishes nei (Pleuronectiformes); Groupers nei (Epinephelus spp); Mullets nei (Mugilidae); Snappers nei (Lutjanus spp); Soles nei (Soleidae) | Gillnets and entangling nets (not specified), (Demersal),Longlines (not specified), (Demersal),single and/or pair trawl, (Demersal) | EEZ,(FAO:61 Pacific Northwest, FAO:71 Pacific Western Central),inshore and offshore areas, north, central, and south regions | SEAFDEC, WCPFC |
| 2991 | Dolphinfishes nei (Coryphaenidae) | Gillnets and entangling nets (not specified), (Pelagic),Longlines (not specified), (Pelagic) | EEZ,(FAO:61 Pacific Northwest, FAO:71 Pacific Western Central),offshore areas | SEAFDEC, WCPFC |
| 2992 | Lobsters nei (Reptantia) | Gillnets and entangling nets (not specified), (Bottom) | EEZ,(FAO:61 Pacific Northwest, FAO:71 Pacific Western Central),Coastal areas in central region | SEAFDEC, WCPFC |
| 2994 | Mackerels nei (Scombridae) | Gillnets and entangling nets (not specified), (Pelagic),Purse seines, (Pelagic) | EEZ,(FAO:61 Pacific Northwest, FAO:71 Pacific Western Central),Inshore and offshore areas, north, central, and south regions | SEAFDEC, WCPFC |
| 3051 | Mackerels nei (Scombridae) | Gillnets and entangling nets (not specified), (Pelagic),Purse seines, (Pelagic) | EEZ,(FAO:61 Pacific Northwest, FAO:71 Pacific Western Central),Inshore and offshore areas, north, central, and south regions | SEAFDEC, WCPFC |
| 3052 | Mullets nei (Mugilidae) | Gillnets and entangling nets (not specified), (Demersal) | EEZ,(FAO:61 Pacific Northwest, FAO:71 Pacific Western Central),coastal and inshore areas, north, central, and south regions | SEAFDEC, WCPFC |
| 3054 | Mackerels nei (Scombridae) | Gillnets and entangling nets (not specified), (Midwater) | EEZ,(FAO:61 Pacific Northwest, FAO:71 Pacific Western Central),offshore areas, north, central, and south regions, Vietnam EEZ | WCPFC |
| 3057 | Pelagic fishes nei (Osteichthyes); Tunas nei (Thunnini) | Gillnets and entangling nets (not specified), (Pelagic) | EEZ,(FAO:61 Pacific Northwest, FAO:71 Pacific Western Central),inshore, and offshore areas, north, central, and south regions | SEAFDEC, WCPFC |
| 13124 | Bigeye tuna (Thunnus obesus); Skipjack tuna (Katsuwonus pelamis); Yellowfin tuna (Thunnus albacares) | Gillnets and entangling nets (not specified), (Midwater),Purse seines, (Surface) | EEZ,(FAO:61 Pacific Northwest, FAO:71 Pacific Western Central),Vietnam EEZ, north, central and south region | SEAFDEC, WCPFC |

# EXHIBIT E



# Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report

# Vietnam

## Summary

Based on Vietnam's initial application, its responses to the clarification questions, and the information described below, NMFS has determined that the following fisheries are comparable in effectiveness to the U.S. regulatory program: Exempt Fishery IDs 2936, 2978, and 2993 and Export Fishery IDs: 2984, 2985, 2986, 2979, 2987, 2989, 3053, 3055, 3058, 3059, and 3061. The following Export fisheries are not comparable: Fishery IDs 2932, 2988, 2990, 2991, 2992, 2994, 3051, 3052, 3054, 3057, 13124, and 13125.

Vietnam prohibits the intentional killing of marine mammals in the course of commercial fishing operations. Vietnam licenses fishing vessels and is implementing a combination of observer programs, logbooks, dockside inspections, and fishermen interviews in its export fisheries. However, not all vessel size classes are monitored and not all are required to report marine mammal bycatch. 16 U.S.C. § 1387(f)(3) stocks, including the Irrawaddy dolphin, co-occur with fisheries using gear with a high risk of interaction with marine mammals and bycatch limits are likely exceeded. Vietnam has some mitigation measures and plans to phase-out some tuna drift gillnet vessels over time, but did not specify the implementation of specific measures on a fishery basis and their effectiveness in mitigating bycatch unknown.

### Fisheries that are not recommended for Comparability Finding

| Fishery ID[1] | Target Species | Gear Type | Area | Rationale for Denial |
|---|---|---|---|---|
| 2932 | Groupers nei* | Gillnets and entangling nets (not specified), (Demersal), single and/or pair trawl, (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Vietnam EEZ, north, central, and south regions | Presence of 16 U.S.C. § 1387(f)(3) stock(s) Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting Unknown if mitigation measures are likely to reduce |

---

[1] The Fishery ID number is NOAA's internal reference number from our IAICRS database and has no other independent meaning.

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Vietnam**

| | | | | marine mammal bycatch below the bycatch limit |
|---|---|---|---|---|
| 2988 | Swimming crabs/etc. nei | Gillnets and entangling nets (not specified), (Demersal), single and/or pair trawl, (Demersal), trap nets/stationary nets, (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), coastal areas central and south regions | Presence of 16 U.S.C. § 1387(f)(3) stock(s)<br><br>Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting<br><br>Unknown if mitigation measures are likely to reduce marine mammal bycatch below the bycatch limit |
| 2990 | Cuttlefishes nei, Demersal fishes nei, Flatfishes nei, Groupers nei, Mullets nei, Snappers nei, Soles nei | Gillnets and entangling nets (not specified), (Demersal), Longlines (not specified), (Demersal), single and/or pair trawl, (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), inshore and offshore areas, north, central, and south regions | Presence of 16 U.S.C. § 1387(f)(3) stock(s)<br><br>Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting<br><br>Unknown if mitigation measures are likely to reduce marine mammal bycatch below the bycatch limit |
| 2991 | Dolphinfishes nei | Gillnets and entangling nets (not specified), (Pelagic), Longlines (not specified), (Pelagic) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), offshore areas | Presence of 16 U.S.C. § 1387(f)(3) stock(s)<br><br>Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting<br><br>Unknown if mitigation measures are likely to reduce marine mammal bycatch below the bycatch limit |
| 2992 | Lobsters nei | Gillnets and entangling nets (not specified), (Bottom) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), | Presence of 16 U.S.C. § 1387(f)(3) stock(s) |

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Vietnam**

| | | | Coastal areas in central region | Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting |
| | | | | Unknown if mitigation measures are likely to reduce marine mammal bycatch below the bycatch limit |
| 2994 | Mackerels nei | Gillnets and entangling nets (not specified), (Pelagic), Purse seines, (Pelagic) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Inshore and offshore areas, north, central, and south regions | Presence of 16 U.S.C. § 1387(f)(3) stock(s) |
| | | | | Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting |
| | | | | Unknown if mitigation measures are likely to reduce marine mammal bycatch below the bycatch limit |
| 3051 | Mackerels nei | Gillnets and entangling nets (not specified), (Pelagic), Purse seines, (Pelagic) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Inshore and offshore areas, north, central, and south regions | Presence of 16 U.S.C. § 1387(f)(3) stock(s) |
| | | | | Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting |
| | | | | Unknown if mitigation measures are likely to reduce marine mammal bycatch below the bycatch limit |
| 3052 | Mullets nei | Gillnets and entangling nets (not specified), (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), coastal and inshore areas, north, central, and south regions | Presence of 16 U.S.C. § 1387(f)(3) stock(s) |
| | | | | Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting |
| | | | | Unknown if mitigation measures are likely to reduce |

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Vietnam**

| | | | | |
|---|---|---|---|---|
| | | | | marine mammal bycatch below the bycatch limit |
| 3054 | Mackerels nei | Gillnets and entangling nets (not specified), (Midwater) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), offshore areas, north, central, and south regions, Vietnam EEZ | Presence of 16 U.S.C. § 1387(f)(3) stock(s)<br><br>Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting<br><br>Unknown if mitigation measures are likely to reduce marine mammal bycatch below the bycatch limit |
| 3057 | Pelagic fishes nei, Tunas nei | Gillnets and entangling nets (not specified), (Pelagic) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), inshore, and offshore areas, north, central, and south regions | Presence of 16 U.S.C. § 1387(f)(3) stock(s)<br><br>Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting<br><br>Unknown if mitigation measures are likely to reduce marine mammal bycatch below the bycatch limit |
| 13124 | Big eye tuna, skipjack tuna, yellowfin tuna | Gillnets and entangling nets (not specified), (Midwater),<br>Purse seines, (Surface) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Vietnam EEZ, north, central and south region | Presence of 16 U.S.C. § 1387(f)(3) stock(s)<br><br>Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting<br><br>Unknown if mitigation measures are likely to reduce marine mammal bycatch below the bycatch limit |
| 13125 | Marlins, sailfishes, etc. nei,<br>Swordfish | Gillnets and entangling nets (not specified), (Midwater), | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Vietnam EEZ, | Presence of 16 U.S.C. § 1387(f)(3) stock(s) |

| | | Handlines and hand-operated pole-and-lines, (Midwater) | north, central and south region | Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting  Unknown if mitigation measures are likely to reduce marine mammal bycatch below the bycatch limit |
|---|---|---|---|---|

*Not elsewhere included (nei) - when the product is not specifically provided for in the Harmonized Trade System, the description covering such product is generally considered to be a "residual provision" by use of the phrase "not elsewhere included".

# Comparability Finding Analysis

1. **Does the nation have a prohibition on the intentional killing or serious injury of marine mammals in the course of commercial fishing operations? OR Does the nation have procedures to reliably certify that fish and fish products were not caught in association with the intentional killing or serious injury of marine mammals in the course of commercial fishing operations?**

Response: Yes. All marine mammal species distributed within Vietnam's territorial waters are classified under Group I of the list of endangered, precious, and rare aquatic species protected under Appendix II of *Decree No. 26/2019/ND-CP*, and as amended and supplemented by Appendix II of *Decree No. 37/2024/ND-CP*.

Clause 1, Article 8 of *Decree No. 26/2019/ND-CP* (as amended and supplemented by Clause 3, Article 1 of *Decree No. 37/2024/ND-CP*) stipulates: "1. It is strictly prohibited to exploit endangered, precious, and rare aquatic species classified under Group I, except in cases of exploitation for the purposes of conservation, scientific research, initial breeding studies, or international cooperation."

Permission for these purposes requires written approval by the Directorate of Fisheries Organizations for a special permit under the provisions of the Article 9 of the *Decree 26/2019/ND-CP*.

- Violations relating to marine mammals are subject to criminal prosecution and Article 244 of *2015 Penal Code 100/2015/QH13*. Other violations not serious enough to be prosecuted for penal liability are subject to administrative sanctions specified in the Article 8 of the *Government Decree No. 38/2024/ND-CP* dated April 5, 2024.

2. **Does the nation have a Marine Mammal Bycatch Reduction Program? A bycatch reduction program, for purposes of compliance with the import provisions, is defined as having the following components:**

   a. **The ability to control/monitor its fishing operations that may take marine mammals (e.g., authorizations, permits, licenses, and/or registrations for vessels)**

Response: Yes. The *Law on Fisheries (18/2017/QH4) Chapter IV - Commercial Fishing, Section 1, Articles 49-50* provides for issuing licenses for commercial marine fishing, while *Section 2 - Commercial Fishing outside Vietnamese Maritime Boundary, Arts. 53-54* provides for licenses and reference RFMO requirements. *Art. 71 - Registration of Commercial Fishing Vessels* sets forth requirements for inscription on the National Register of Commercial Fishing Vessels. *Decree No. 26/2019/ND-CP, Chapter IV Capture Fisheries, Articles 45-48* set forth additional requirements for fishing licenses, including for Vietnamese fishing vessels fishing outside of national waters and operating in RFMO Convention Areas.

### b. A program to monitor its fisheries for incidences of marine mammal mortality and serious injury in the course of commercial fishing operations

Response: Partially. Vietnam stated it has recently implemented monitoring programs including onboard observers, logbooks, fishing port inspections, and fishermen interviews. However, while Vietnam provided an overall description of the types of monitoring in its fisheries, Vietnam did not provide a fishery-by-fishery explanation and did not specify the type of monitoring required for all gear types, including gillnets, which has a high likelihood of interaction with marine mammals, in particular with small cetaceans like the Irrawaddy dolphin (16 U.S.C. § 1387(f)(3) stock).

Monitoring requirements as described by Vietnam are summarized below:

Observer Program: Tuna-targeted purse seine (3–5% observer coverage, ~28–47 fishing trips/year)

Purse seine, trawl net, and tuna handline (1-5% coverage ~10 fishing trips/year)

Fishing logbook program: 75% to 100% coverage (100% coverage vessels 12 meters or larger)

Fishing port inspection program: 100% coverage vessels 24 meters or larger and less coverage (5-20%) for smaller vessels

Fishermen interviews: 1-5% coverage as part of a 2025-2027 marine mammal survey study

Vietnam also provided the vessel logbook form that includes reporting of marine mammal bycatch, but did not provide the observer reporting form. From the information provided, there was no indication if or how vessels less than 12 meters (not required to use logbooks), which include gillnet fisheries, would report marine mammal bycatch.

**Table 1. Vietnam Export Fisheries**

| Fishery ID | Target species | Gear type | Area of operation |
|---|---|---|---|
| 2932 | Groupers nei | Gillnets and entangling nets (not specified), (Demersal), <br><br>single and/or pair trawl, (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Vietnam EEZ, north, central, and south regions |
| 2979 | Various squids nei | Falling nets, (Surface), <br><br>single and/or pair trawl, (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), coastal, inshore, and offshore areas, north and central regions |

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Vietnam**

| 2984 | Anchovies nei, Herrings/sardines nei | Purse seines, (Surface) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), South Long Chau, North Hon Me, Tonkin Gulf Mouth, north and central regions |
|---|---|---|---|
| 2985 | Bigeye tuna, Yellowfin tuna | Handlines and hand-operated pole-and-lines, (Midwater) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), offshore areas, Vietnam EEZ |
| 2986 | Octopuses nei | Octopus pots, (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), coastal, Inshore areas |
| 2987 | Anchovies nei, Herrings/sardines nei | Purse seines, (Pelagic) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Coastal, Inshore areas |
| 2988 | Swimming crabs/etc. nei | Gillnets and entangling nets (not specified), (Demersal), single and/or pair trawl, (Demersal), trap nets/stationary nets, (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), coastal areas central and south regions |
| 2989 | Conger eels/etc. nei | Single and/or pair trawl, (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Inshore areas |
| 2990 | Cuttlefishes nei, Demersal fishes nei, Flatfishes nei, Groupers nei, Mullets nei, Snappers nei, Soles nei | Gillnets and entangling nets (not specified), (Demersal), Longlines (not specified), (Demersal), single and/or pair trawl, (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), inshore and offshore areas, north, central, and south regions |
| 2991 | Dolphinfishes nei | Gillnets and entangling nets (not specified), (Pelagic), Longlines (not specified), (Pelagic) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), offshore areas |

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Vietnam**

| 2992 | Lobsters nei | Gillnets and entangling nets (not specified), (Bottom) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Coastal areas in central region |
|------|--------------|--------------------------------------------------------|------------------------------------------------------------------------------------------------|
| 2994 | Mackerels nei | Gillnets and entangling nets (not specified), (Pelagic), Purse seines, (Pelagic) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Inshore and offshore areas, north, central, and south regions |
| 3051 | Mackerels nei | Gillnets and entangling nets (not specified), (Pelagic), Purse seines, (Pelagic) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Inshore and offshore areas, north, central, and south regions |
| 3052 | Mullets nei | Gillnets and entangling nets (not specified), (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), coastal and inshore areas, north, central, and south regions |
| 3053 | Bigeye tuna, Pacific bluefin tuna, Skipjack tuna, Swordfish, Yellowfin tuna | Handlines and hand-operated pole-and-lines, (Midwater), Longlines (not specified), (Midwater) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), offshore areas, central provinces, Vietnam EEZ |
| 3054 | Mackerels nei | Gillnets and entangling nets (not specified), (Midwater) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), offshore areas, north, central, and south regions, Vietnam EEZ |
| 3055 | Marine shrimps nei | Otter trawls (not specified), (Bottom) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Inshore area |
| 3057 | Pelagic fishes nei, Tunas nei | Gillnets and entangling nets (not specified), (Pelagic) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), inshore, and offshore areas, north, central, and south regions |
| 3058 | Mackerels nei, Tunas nei | Purse seines, (Pelagic) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), inshore, and offshore |

| | | | areas (north, central, and south regions) |
|---|---|---|---|
| 3059 | Various squids nei | Handlines and hand-operated pole-and-lines, (Midwater), Purse seines, (Pelagic), single and/or pair trawl, (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Inshore and Offshore areas |
| 3061 | Orange roughy | Single and/or pair trawl, (Bottom) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), none provided |
| 13124[2] | Bigeye tuna, skipjack tuna, yellowfin tuna | Gillnets and entangling nets (not specified), (Midwater), Purse seines, (Surface) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Vietnam EEZ, north, central and south region |
| 13125[2] | Marlins, sailfishes, etc. nei, Swordfish | Gillnets and entangling nets (not specified), (Midwater), Handlines and hand-operated pole-and-lines, (Midwater) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Vietnam EEZ, north, central and south region |

### c. A requirement to report all marine mammal mortality and serious injury in the course of commercial fishing operations

Response: Partially. Vietnam requires reporting marine mammal bycatch in fishing logbooks; however, logbooks are only required for vessels greater than 12 meters. Clause 9, Article 8 of *Decree 26/2019/ND-CP* dated March 8, 2019 (amended and supplemented in Clause 3, Article 1 of *Decree 37/2024*) stipulates that "Organizations and individuals in fishing operation that encounter or unintentionally capture endangered, precious and rare marine species are responsible for recording information in the fishing logbook".

### d. Prioritization of fisheries for mitigation of unsustainable marine mammal bycatch as described in 16 U.S.C. § 1387(f)(3) (in particular those over the bycatch limit, of small population size, or declining rapidly, based on available financial resources) in response to reported bycatch occurring in fishing operations. Prioritization of fisheries should be similar to U.S. take reduction teams and development of take reduction plans and including an evaluation of whether the nation has provided a bycatch limit and whether that bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stock(s), and whether any mitigation is effective or reconsidered if not effective.

---

[2] Fishery added by Vietnam to the LOFF in 2025.

Response: Unknown. Vietnam recently assessed marine mammals in its waters and the updated population abundance estimates suggest that the bycatch for Bryde's whales, Chinese humpback dolphin, Indo-Pacific bottlenose dolphin, Indo-Pacific finless porpoise, and pantropical spotted dolphin may have exceeded their bycatch limits. Vietnam determined that two marine mammals previously thought to be present, blue and fin whales, are not located in Vietnam waters. Irrawaddy dolphins (16 U.S.C. § 1387(f)(3) stock) are also located in Vietnam waters (See Question 6).

Vietnam has a number of mitigation measures listed in its fisheries that may benefit marine mammals but did not provide supporting documentation requiring their use. Vietnam has been developing a Dolphin Deterrent Device (DDD), although it was not clear if or how often DDDs have been installed on fishing gear. Although Vietnam is pursuing some measures to reduce marine mammal bycatch, it is unknown if mitigation is reducing bycatch levels of 16 U.S.C. § 1387(f)(3) stocks.

Vietnam also has conducted various marine mammal awareness programs including fishermen education and training programs, created marine mammal identification materials, and established a volunteer network to report marine mammal sightings.

Vietnam also aims to phase-out 300 tuna drift gillnet vessels, with a transition to more selective and ecologically responsible gear types and prohibits the reclassification or licensing of vessels into high-impact gear types, such as trawling and tuna drift gillnets. It also sets a gradual reduction target for the number of drift gillnet vessels operating in the offshore area.

### 3. Does the nation ban the use of large-scale high seas drift gillnet gear or other gear prohibited for use by U.S. fishermen?

Response: While it does not appear that Vietnam prohibits the use of large-scale driftnet fishing, none of Vietnam's fisheries use large-scale drift gillnet gear, and no other information submitted suggests it uses gear prohibited by the United States.

### 4. Does the nation implement marine mammal bycatch reduction measures in fisheries regulated under a regional fishery management organization (RFMO), which are required for U.S. fishermen by that RFMO?

Response: No. Vietnam incorrectly reported nearly all of its fisheries as operating under the Western and Central Pacific Fisheries Commission (WCPFC), including some non-tuna fisheries that are not covered by WCPFC: Fishery IDs 2932, 2979, 2984, 2985, 2986, 2987, 2989, 2988, 2990, 2991, 2994, 3051, 3052, 3053, 3054, 3057, 3058, 3059, 13124, and 13125). Vietnam also incorrectly indicated that these WCPFC fisheries operating exclusively within its EEZ, including for tuna species, are not operating within the WCPFC Convention Area. However, WCPFC's Convention Area includes nations' EEZs and relevant management measures adopted by WCPFC apply to highly migratory fisheries operating within the Convention Area, including the EEZ, unless otherwise specified. Vietnam stated it does not implement the conservation and management measures of WCPFC. WCPFC's CMM 2011-03 prohibits the intentional encirclement of cetaceans in purse seine fisheries on the high seas and within the EEZ. This measure applies to Fishery ID 13124 that uses purse seine gear to target bigeye, skipjack, and yellowfin tunas. WCPFC does not have any binding marine mammal bycatch reduction requirements for gear types besides purse seine.

5. **In cases where a U.S. Take Reduction Team has implemented marine mammal bycatch reduction measures for transboundary stocks shared with the United States, are the nation's measures similar or comparable in effectiveness? (Include in the response if the nation has provided a bycatch limit and if the bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stocks, either in one fishery or cumulatively over a number of fisheries)**

Response: N/A. Vietnam and the United States do not share any transboundary stocks.

6. **For marine mammal stocks that are not transboundary but are considered at high risk of extinction, does the nation implement mitigation/risk reduction measures comparable to what is or would be required in the United States? (Include in the response if the nation has provided a bycatch limit and if the bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stocks, either in one fishery or cumulatively over a number of fisheries)**

Response: Irrawaddy dolphins are considered a 16 U.S.C. § 1387(f)(3) stock at high-risk of extinction in Vietnam. Vietnam conducted a boat-based survey using photo-ID method on two populations of Irrawaddy dolphins in the Kien Giang province and Can Gio area and determined the abundance of Irrawaddy dolphins in Kien Giang and Can Gio were 72 (CV=16%) and 48 (CV=14.28%), respectively, but did not provide a bycatch limit. A large majority of fishermen interviewed reported encountering Irrawaddy dolphins and there was one reported incident of entanglement. Although Vietnam did not provide a bycatch limit, due to the extremely small population size of these stocks, the bycatch limit has likely been exceeded. Vietnam stated that there has not been a record of Irrawaddy dolphin in the Mekong River since 1990. Vietnam has implemented mitigation measures and has future mitigation plans that could benefit Irrawaddy dolphins; however, these measures are not specifically designed for mitigating bycatch of Irrawaddy dolphins and thus their effectiveness in reducing bycatch of Irrawaddy dolphins is unknown.

# Additional Considerations

In reviewing a nation's fisheries and marine mammals stocks, how do they compare to:

1. **U.S. implementation of its regulatory program for similar marine mammal stocks and similar fisheries (e.g., considering gear or target species), including transboundary stocks governed by regulations implementing a take reduction plan (50 CFR § 229.2), and any other relevant information received during consultations**

Response: Not applicable.

2. **The extent to which the harvesting nation has successfully implemented measures in the export fishery to reduce the incidental mortality and serious injury of marine mammals caused by the harvesting nation's export fisheries to levels below the bycatch limit**

Response: Not applicable.

3. **Whether the measures adopted by the harvesting nation for its export fishery have reduced or will likely reduce the cumulative incidental mortality and serious injury of each**

**marine mammal stock below the bycatch limit, and the progress of the regulatory program toward achieving its objectives**

Response: See response to Questions 2d and 6.

4. **Other relevant facts and circumstances, which may include the history and nature of interactions with marine mammals in this export fishery, whether the level of incidental mortality and serious injury resulting from the fishery or fisheries exceeds the bycatch limit for a marine mammal stock, the population size and trend of the marine mammal stock, and the population level impacts of the incidental mortality or serious injury of marine mammals in a harvesting nation's export fisheries and the conservation status of those marine mammal stocks where available**

Response: Not applicable.

5. **The record of consultations under 50 CFR § 216.24(h)(5) of this section with the harvesting nation, results of these consultations, and actions taken by the harvesting nation and under any applicable intergovernmental agreement or regional fishery management organization to reduce the incidental mortality and serious injury of marine mammals in its export fisheries**

Response: NMFS has had numerous meetings and discussions with Vietnam. Vietnam participated in several Association of Southeast Asian Nations and Southeast Asian Fisheries Development Center meetings where the MMPA Import Provisions were discussed. The last technical consultations with Vietnam were in May and November 2021.

6. **Information gathered during onsite inspection by U.S. government officials of a fishery's operations**

Response: Not applicable.

7. **For export fisheries operating on the high seas under an applicable intergovernmental agreement or regional fishery management organization to which the United States is a party, the harvesting nation's record of implementation of, or compliance with, measures adopted by that regional fishery management organization or intergovernmental agreement for data collection, incidental mortality and serious injury mitigation or the conservation and management of marine mammals; whether the harvesting nation is a party or cooperating non-party to such intergovernmental agreement or regional fishery management organization; the record of United States implementation of such measures; and whether the United States has imposed additional measures on its fleet not required by an intergovernmental agreement or regional fishery management organization**

Response: See Question 4.

8. **For export fisheries operating on the high seas under an applicable intergovernmental agreement or regional fisheries management organization to which the United States is not a party, the harvesting nation's implementation of and compliance with measures, adopted by that regional fisheries management organization or intergovernmental**

**agreement, and any additional measures implemented by the harvesting nation for data collection, incidental mortality and serious injury mitigation or the conservation and management of marine mammals and the extent to which such measures are comparable in effectiveness to the U.S. regulatory program for similar fisheries**

Response: Not applicable.

**Overall Summary for Additional Considerations**

The additional considerations were not pertinent to determining whether the nation's marine mammal bycatch reduction program is comparable in effectiveness to the U.S. regulatory program.

# Engagement History

NMFS engaged in numerous technical consultations as well as numerous email exchanges of information with Vietnam. Vietnam responded to clarifying questions concerning its application in August 2022 and provided new information in 2025. Vietnam has been very responsive to emails.

# EXHIBIT F

# Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report

# Indonesia

## Summary

Based on Indonesia's initial application, its responses to the clarification questions, and the information described below, NMFS has determined that the following fisheries are comparable in effectiveness to the U.S. regulatory program: Exempt Fishery IDs 1517, 1518, 1520, 1521, 1522, 1528, 1530, 1533, 1534, 1537, 1538, 1539, 1540, 12680, 12681, and 12764 and Export Fishery IDs 1370, 1371, 1374, 1523, 1525, 1531, 1532, 1542, 12390, 12678, 12679, and 12682.

For the reasons described below, the remaining fisheries 1373, 1375, 1376, 12391, and 12567 are not comparable in effectiveness to the U.S. regulatory program. For example, these fisheries utilize gillnets and trammel nets that have a high likelihood of entangling marine mammals, including potentially 16 U.S.C. § 1387(f)(3) stocks. The bycatch limit for the Irrawaddy dolphins (considered a 16 U.S.C. § 1387(f)(3) stock at high risk of extinction in Indonesia) is likely being exceeded by gillnet fishery interactions.

Indonesia has a prohibition on the intentional killing of marine mammals; licenses vessels; requires reporting marine mammal bycatch in logbooks; and to some degree, monitors bycatch through fishermen interviews, port inspections, and reports on marine mammal strandings. However, bycatch monitoring data and marine mammal abundance data are lacking. Indonesia has not yet finalized the *Ministerial Decree Concerning National Plan of Action of Marine Mammals Conservation*, which Indonesia states will address marine mammal bycatch in commercial fishing activities.

**Fisheries that are not recommended for Comparability Finding**

| Fishery ID[1] | Target Species | Gear Type | Area | Rationale for Denial |
|---|---|---|---|---|
| 1373 | Coral groupers nei\*, Flatfishes nei, Groupers nei, Humpback grouper, Jobfishes nei, Pinjalo, Snappers nei, Tomato hind | Gillnets and entangling nets (not specified), (Demersal) | EEZ, (FAO:57 Indian Ocean Eastern, FAO:71 Pacific Western Central), also operate in territorial and | Gear with high-risk of entanglement risk of 16 U.S.C. § 1387(f)(3) stock(s). Inadequate data collection on marine mammal bycatch. |

---

[1] The Fishery ID number is NOAA's internal reference number from our IAICRS database and has no other independent meaning.

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Indonesia**

| | | | archipelagic waters | Bycatch limit of 16 U.S.C. § 1387(f)(3) stock(s) likely exceeded. Mitigation measures are not likely to reduce bycatch below the bycatch limit. |
|---|---|---|---|---|
| 1375 | Bigeye tuna, Dolphinfishes nei, Skipjack tuna, True tunas nei, Yellowfin tuna | Gillnets and entangling nets (not specified), (Pelagic) | High Seas, EEZ, (FAO:57 Indian Ocean Eastern, FAO:71 Pacific Western Central), also operates in territorial and archipelagic waters | Gear with high-risk of entanglement risk of 16 U.S.C. § 1387(f)(3) stock(s). Inadequate data collection on marine mammal bycatch. Bycatch limit of 16 U.S.C. § 1387(f)(3) stock(s) likely exceeded. Mitigation measures are not likely to reduce bycatch below the bycatch limit. |
| 1376 | Arius spp, Cobia, Marine fishes nei, Thinspine sea catfish | Gillnets and entangling nets (not specified), (Demersal) | High Seas, EEZ, (FAO:57 Indian Ocean Eastern, FAO:71 Pacific Western Central), also operates in territorial and archipelagic waters | Gear with high-risk of entanglement risk of 16 U.S.C. § 1387(f)(3) stock(s). Inadequate data collection on marine mammal bycatch. Bycatch limit of 16 U.S.C. § 1387(f)(3) stock(s) likely exceeded. Mitigation measures are not likely to reduce bycatch below the bycatch limit. |
| 12391 | Swimming crabs/etc. nei | Gillnets and entangling nets (not specified), (Bottom) | EEZ, (FAO:57 Indian Ocean Eastern, FAO:71 Pacific Western Central), also operates in territorial and archipelagic waters | Gear with high-risk of entanglement risk of 16 U.S.C. § 1387(f)(3) stock(s). Inadequate data collection on marine mammal bycatch. Bycatch limit of 16 U.S.C. § 1387(f)(3) stock(s) likely exceeded. Mitigation measures are not likely to reduce bycatch below the bycatch limit. |
| 12567 | Metapenaeus shrimps nei, Parapenaeopsis shrimps nei, Penaeus shrimps nei | Trammel nets, (Bottom) | EEZ, (FAO:57 Indian Ocean Eastern, FAO:71 Pacific Western Central) | Gear with high-risk of entanglement risk of 16 U.S.C. § 1387(f)(3) stock(s). Inadequate data collection on marine mammal bycatch. Bycatch limit of 16 U.S.C. § 1387(f)(3) stock(s) likely exceeded. Mitigation measures are not likely to reduce bycatch below the bycatch limit. |

*Not elsewhere included (nei) - when the product is not specifically provided for in the Harmonized Trade System, the description covering such product is generally considered to be a "residual provision" by use of the phrase "not elsewhere included".

# Comparability Finding Analysis

**1. Does the nation have a prohibition on the intentional killing or serious injury of marine mammals in the course of commercial fishing operations? OR Does the nation have procedures to reliably certify that fish and fish products were not caught in association with the intentional killing or serious injury of marine mammals in the course of commercial fishing operations?**

Response: Yes. All marine mammal species that are found within Indonesian waters are protected by law. Under *Law No. 5 Year 1990 on Conservation Biodiversity and its Ecosystems, Article 21 (2),* no one may:

*(a) catch, injure, kill, keep, possess, keep, transport, and trade protected animals alive;*
*(b) store, process, maintain, transport, and trade protected animals that are dead;*
*(c) releasing protected animals from one place in Indonesia to another in Indonesia or outside Indonesia;*
*(d) trade, keep or own the skin, body, or other parts of protected animals or goods made from these parts or release them from one place in Indonesia to another inside or outside Indonesia;*
*(e) take, destroy, trade, store or possess eggs and or protected animal nests*

*Regulation Decree Number P.20 Year 2018* and the amendment *Decree P.92 Year 2018 P.106 Year 2018 on Plant and Wild Animals* list the species of plants and animals protected by the Indonesian Ministry of Environment and Forestry, which includes the marine mammal species found in Indonesia's waters.

**2. Does the nation have a Marine Mammal Bycatch Reduction Program? A bycatch reduction program, for purposes of compliance with the import provisions, is defined as having the following components:**

**a. The ability to control/monitor its fishing operations that may take marine mammals (e.g., authorizations, permits, licenses, and/or registrations for vessels)**

Response: Yes. Indonesia has regulations that license fishing in Indonesian waters and outside territorial waters. Relevant sections of the *Regulation of the Minister of Marine and Fisheries of the Republic of Indonesia No. 10 Year 2021* includes "Standards of Business Activities and Products on the Implementation of Risk-Based Business Licenses Marine and Fishery Sector" and the "Standard for Registration of Fishing Vessels to Regional Fisheries Management Organizations."

**b. A program to monitor its fisheries for incidences of marine mammal mortality and serious injury in the course of commercial fishing operations**

Response: Indonesia states it has a monitoring program for marine mammal bycatch that includes logbooks, observers, data collection at port, fishermen interviews and other monitoring initiatives (see Table 1) and provided some bycatch data. Indonesia conducts special marine mammal monitoring and mitigation work for the blue swimming crab fishery, Fishery IDs 12391 and 1532.

**Table 1. Indonesia Export Fisheries**

| Gear type | Target species | Fishery ID | Monitoring programs | Percentage coverage |
|---|---|---|---|---|

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Indonesia**

| Gillnet | Swimming crabs/etc. nei | 12391 | Vessel logbooks | <1% |
| | | | Landing collection | 25-50% |
| | | | Blue swimming crab monitoring | 10-25% |
| | | | Blue swimming crab logbook | 10-25% |
| | Coral groupers nei, Flatfishes nei, Groupers nei, Humpback grouper, Jobfishes nei, Pinjalo, Snappers nei, Tomato hind | 1373 | Vessel logbooks | <1% |
| | | | Landing collection | 25-50% |
| | | | Stakeholder's report | 77-99% |
| | Arius spp, Cobia, Marine fishes nei, Thinspine sea catfish | 1376 | Vessel logbooks | <1% |
| | | | Landing collection | 25-50% |
| | | | Stakeholder's report | 75-99% |
| | | | Observer program | <1% |
| | Bigeye tuna, Dolphinfishes nei, Skipjack tuna, True tunas nei, Yellowfin tuna | 1375 | Landing collection | <1% |
| | | | Vessel logbooks | 25-50% |
| | | | Stakeholder's report | 77-99% |
| Longline | Cobia, Coral groupers nei, Groupers nei, Humpback grouper, Jobfishes nei, Pinjalo, Snappers nei, Tomato hind | 12679 | Vessel logbooks | <1% |
| | | | Landing collection | 25-50% |
| | | | Voluntary observer | Unknown |
| | Albacore, Bigeye tuna, Marlins, sailfishes, etc. nei, Sharks/rays/skates/etc. nei, Sharks/rays/skates/etc. nei, Skipjack tuna, Swordfish, True tunas nei, Various sharks nei, Yellowfin tuna (IOTC) | 1370 | Observer program | 50-75% |
| | | | Vessel logbooks | 10-25% |
| | | | Landing collection | 25-50% |
| | | | Voluntary observer | Unknown |
| | Albacore, Bigeye tuna, Marlins, sailfishes, etc. nei, Pacific bluefin tuna, Sharks/rays/skates/etc. nei, Skipjack tuna, Swordfish, True tunas nei, True tunas nei, Various sharks nei, Yellowfin tuna | 1371 | Observer program | 50-75% |
| | | | Vessel logbooks | 10-25% |
| | | | Landing collection | 25-50% |
| | | | Voluntary observer | Unknown |
| | Southern bluefin tuna (CCSBT) | 12390 | Observer program | 50-75% |
| | | | Vessel logbooks | 10-25% |
| | | | Landing collection | 25-50% |

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Indonesia**

| | | | Voluntary observer | Unknown |
|---|---|---|---|---|
| | Dolphinfishes nei, Escolar, Opahs nei, Wahoo | 12678 | Observer program | 50-75% |
| | | | Vessel logbooks | 10-25% |
| | | | Landing collection | 25-50% |
| | | | Voluntary observer | Unknown |
| Pots/Traps | Marine crabs nei | 1531 | Vessel logbooks | <1% |
| | | | Landing collection | 25-50% |
| | Swimming crabs/etc. nei | 1532 | Blue swimming crab monitoring | 10-25% |
| | | | Vessel logbooks | 1-5% |
| | | | Blue swimming crab logbook | 10-25% |
| | | | Landing collection | 25-50% |
| | Groundfishes nei | 1523 | Landing collection | 25-50% |
| | | | Vessel logbooks | <1% |
| | Coral groupers nei, Groupers nei, Humpback grouper, Pinjalo, Seabasses nei, Snappers nei, Tomato hind | 1525 | Landing collection | 25-50% |
| | | | Vessel logbooks | <1% |
| Trammel nets | Metapenaeus shrimps nei, Parapenaeopsis shrimps nei, Penaeus shrimps nei | 12567 | Landing collection | 25-50% |
| | | | Vessel logbooks | 1-5% Coverage |
| Purse Seine | Mackerels nei (IOTC) | 1374 | Observer program | 50-75% |
| | | | Vessel logbooks | 10-25% |
| | | | Landing collection | 25-50% |
| | Albacore, Bigeye tuna, Bonitos nei, Frigate and bullet tunas, Kawakawa/mackerel tuna, Longtail tuna, Mackerels nei, Skipjack tuna, True tunas nei, Yellowfin tuna (WCPFC) | 1542 | Observer program | 10-25% |
| | | | Vessel logbooks | 25-50% |
| | | | Landing collection | 25-50% |
| | Sardinellas nei | 12682 | Observer program | 50-75% |
| | | | Vessel logbooks | 10-25% |
| | | | Landing collection | 25-50% |

### c.  A requirement to report all marine mammal mortality and serious injury in the course of commercial fishing operations

Response: Yes. *Ministerial Regulation No. 33* (2021) requires all vessels to record marine mammal bycatch in logbooks. Indonesia states that every vessel is required to record their fishing activities in logbooks, electronically or manually, and submit it to port authorities. The logbook contains bycatch reporting, including for marine mammals.

### d.  Prioritization of fisheries for mitigation of unsustainable marine mammal bycatch as described in 16 U.S.C. § 1387(f)(3) (in particular those over the bycatch limit, of small population size, or declining rapidly, based on available financial resources) in response to reported bycatch occurring in fishing operations. Prioritization of fisheries should be similar to U.S. take reduction teams and development of take reduction plans and including an evaluation of whether the nation has provided a bycatch limit and whether that bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stock(s), and whether any mitigation is effective or reconsidered if not effective.

Response: Indonesia identified specific marine mammals occurring in its waters based on fishermen interviews but provided few marine mammal population abundance estimates or bycatch limits. Blue swimming crab fishermen noted the presence of the following marine mammals: the pantropical spotted dolphin, long-snouted spinner dolphins, short-beaked common dolphin, Indo-Pacific humpbacked dolphin, Indo-Pacific finless porpoise, short-finned pilot whale, killer whale, Indo-Pacific bottlenose dolphins, and rough-toothed dolphin. In Muara Jawa in 2023,  fishermen identified the following species occurring in fishing areas: Irrawaddy dolphin, finless porpoise, Risso's dolphin, Fraser's dolphin and spinner dolphin. Some of these species likely have low population numbers and could potentially be considered 16 U.S.C. § 1387(f)(3) stock(s). For Irrawaddy dolphins, see response to Question 6.

In its 2021 application, Indonesia provided a summary document with the best available marine mammal bycatch data it possessed at that time. These data were obtained from observer monitoring programs, logbooks, landing collection, stakeholder reports, and fishermen interviews. The stakeholder report data included documented strandings likely due to gillnet gear interactions, including finless porpoise, Indo-Pacific bottlenose dolphin, and Indo-Pacific humpback dolphin. Indonesia also stated that some fisheries co-occur with sperm whales but there is no documented bycatch.

Although Indonesia has some monitoring and requires reporting of marine mammal bycatch, comprehensive marine mammal bycatch data are not available for all export fisheries. Stranded animals often do not bear evidence definitively linking them to specific fisheries and underrepresent total serious injury and mortality as not all bycatch incidents are observed and documented. Indonesia also has fisheries that utilize fishing gear, including gillnets, that are known to present a high entanglement risk for marine mammals. Research indicates unsustainable levels of marine mammal bycatch in Indonesian gillnet fisheries; in particular, small cetacean mortality in the Indonesian tuna gillnet fishery was estimated at around 10,000 cetaceans/year for 2012 to 2016 (Anderson et al. 2020).[2]

Although reliable estimates of bycatch for export fisheries are unknown, bycatch limits, particularly in fisheries with a high-risk gear, such as gillnets, are likely exceeded for some stocks, including potential

---

[2] Anderson, R.C. et al. 2020. Cetacean bycatch in Indian Ocean tuna gillnet fisheries. Endangered Species Research 41: 39-53.

16 U.S.C. § 1387(f)(3) stocks in Indonesia. The effectiveness of mitigation measures such as protected areas in reducing bycatch is also unknown.

### 3.  Does the nation ban the use of large-scale high seas drift gillnet gear or other gear prohibited for use by U.S. fishermen?

Response: While it does not appear that Indonesia prohibits large-scale driftnet fishing, none of Indonesia's fisheries use large-scale drift gillnet gear, and no other information submitted suggests it uses gear prohibited by the United States.

### 4.  Does the nation implement marine mammal bycatch reduction measures in fisheries regulated under a regional fishery management organization (RFMO), which are required for U.S. fishermen by that RFMO?

Response: Yes. The United States and Indonesia are both parties of the Western and Central Pacific Fisheries Commission (WCPFC). The United States is a party to the Inter-American Tropical Tuna Commission (IATTC) while Indonesia is a cooperating non-member. Indonesia, but not the United States, is also a party to the Indian Ocean Tuna Commission (IOTC) and the Commission for the Conservation of Southern Bluefin Tuna (CCSBT).

WCPFC requires observer coverage, marine mammal bycatch reporting, and no intentional encirclement of cetaceans in the purse seine fishery under *CMM 2011-03*. A 2024 WCPFC compliance report for 2023 stated Indonesia needed capacity assistance with purse seine coverage and has implementation gaps on the requirement under CMM 2011-03 to prohibit purse seine setting on cetaceans, if the animal is sighted prior to commencement of the set.[3]

IATTC requires marine mammal bycatch reporting and *Resolution C-19-08* requires 5% observer coverage on vessels greater than 20 m long.

 The IOTC has requirements for gear restrictions, observer coverage, and bycatch reporting. IOTC *Resolution 23/06,* which does not apply to artisanal vessels only operating in their EEZ, requires reporting marine mammal bycatch by observers or in logbooks and taking all reasonable steps to ensure the safe release of any entangled cetaceans. It also requires no intentional encirclement of cetaceans in purse seine fisheries. The 2021 IOTC compliance report for Indonesia indicated it is compliant with cetacean CMMs. *Resolution 17/07* prohibits the use of large-scale driftnets within the IOTC area of competence. Under *Resolution 21/01*, member nations with gillnet fisheries shall set their gillnets at 2m depth from the surface by 2023 to mitigate ecological impacts of gillnets and encourages increasing observer coverage or field sampling in gillnet fisheries by ten percent; however, as Indonesia objected to this resolution this requirement does not apply to them.

Fisheries operating under CCSBT are required to collect and report data on marine mammal bycatch.

### 5.  In cases where a U.S. Take Reduction Team has implemented marine mammal bycatch reduction measures for transboundary stocks shared with the United States, are the nation's measures similar or comparable in effectiveness? (Include in the response if the

---

[3] WCPFC. 2024. 2024 Final compliance monitoring report (covering 2023 activities).

nation has provided a bycatch limit and if the bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stocks, either in one fishery or cumulatively over a number of fisheries)

Response: Not applicable. The United States and Indonesia do not share any transboundary stocks.

6. **For marine mammal stocks that are not transboundary but are considered at high risk of extinction, does the nation implement mitigation/risk reduction measures comparable to what is or would be required in the United States? (Include in the response if the nation has provided a bycatch limit and if the bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stocks, either in one fishery or cumulatively over a number of fisheries)**

Response: Irrawaddy dolphin stocks in Indonesia may be at a high risk of extinction and stranding data attributed to gillnet entanglement indicate that the bycatch limit is likely exceeded for Irrawaddy dolphins. Stranding data from 2000 to 2019 suggests 18 Irrawaddy dolphins died of potential gillnet fishing-related activities, although it is not possible to attribute mortalities to specific gillnet fisheries (Table 2). In addition to these stranding data, Indonesia also separately reported that an Irrawaddy dolphin was caught in gillnet gear in 2020.

**Table 2. Irrawaddy dolphin stranding data (2000-2019) attributed to gillnets**

| Year | Dead | Alive |
|------|------|-------|
| 2000 | 1 | 1 |
| 2013 | 1 | 0 |
| 2014 | 1 | 0 |
| 2015 | 2 | 0 |
| 2016 | 4 | 0 |
| 2017 | 3 | 0 |
| 2018 | 5 | 0 |
| 2019 | 1 | 0 |

In the Mahakam River delta, Balikpapan Bay, and Muara Jawa, the bycatch limits for Irrawaddy dolphin stocks are likely exceeded from gillnet fishery entanglements. In March 2025, Indonesia provided updated information on Irrawaddy dolphins following three surveys conducted in 2023 that indicated an estimated population size of 67 dolphins in the Mahakam River delta with a bycatch limit of 0.13 (recovery factor 0.1). Indonesia stated that the bycatch mortality rate based on strandings attributed to gillnet entanglement has been reduced from an average of two dolphins/year (1995 to 2021) to one dolphin in three years, yielding an average known mortality of 0.14 from 2022 to 2024.

In Balikpapan Bay and Muara Jawa, three surveys conducted in 2023 indicated an estimated population size of 59 individuals with a bycatch limit of 0.12 (recovery factor 0.1). Prior to 2023, the last study conducted in Balikpapan Bay in 2015 indicated an estimated population of 73 Irrawaddy dolphins, suggesting the population may have declined. Between 2011 and 2021, four Irrawaddy dolphin strandings in Balikpapan Bay and Muara Jawa have been attributed to gillnet entanglement, resulting in an average known mortality rate of 0.36.

Ministerial Decree *No. 83 Year 2022 Concerning Blue Swimming Crabs Fisheries Management Plan* established targets and indicators for blue swimming crabs fisheries to minimize endangered, threatened, and protected species bycatch, including marine mammals. Mitigation measures for gillnet and trammel fisheries include temporal-based fishery closures (closed October to December in FMA 714 (*Minister Regulation No. 26/2020*) and area-based fishery closures (*Ministerial Regulation No. 18/2021* article 8 (2)). Indonesia stated that crab fishermen groups have committed not to operate in designated protected areas based on village regulations.

Indonesia has been conducting additional research on pingers including in the Mahakam River in 2020 and 2021, which showed that pingers were effective in reducing the risk of Irrawaddy dolphin entanglements in gillnets without disrupting their feeding activities. Since July 2020, fishermen have installed 266 pingers in 172 gillnets in the delta of Mahakam, and as a part of another initiative, around 70 pingers and batteries have been distributed to fishermen. Indonesia states that based on interviews with fishermen, some fishermen agreed to switch their fishing gear from gillnets to pots and longlines. Despite these initiatives, the bycatch limit for Irrawaddy dolphins is likely continuing to be exceeded by gillnet fishery. According to Indonesia, additional research and mitigation trials aimed at driving bycatch rates below the limit will continue into the future.

Indonesia states it is in the process of revitalizing the *Ministerial Decree Concerning National Plan of Action of Marine Mammals Conservation*, which will address marine mammal bycatch in commercial fishing activities.

# Additional Considerations

In reviewing a nation's fisheries and marine mammals stocks, how do they compare to:

1. **U.S. implementation of its regulatory program for similar marine mammal stocks and similar fisheries (e.g., considering gear or target species), including transboundary stocks governed by regulations implementing a take reduction plan (50 CFR § 229.2), and any other relevant information received during consultations**

Response: Not applicable.

2. **The extent to which the harvesting nation has successfully implemented measures in the export fishery to reduce the incidental mortality and serious injury of marine mammals caused by the harvesting nation's export fisheries to levels below the bycatch limit**

Response: Not applicable.

3. **Whether the measures adopted by the harvesting nation for its export fishery have reduced or will likely reduce the cumulative incidental mortality and serious injury of each marine mammal stock below the bycatch limit, and the progress of the regulatory program toward achieving its objectives**

Response: Not applicable.

4. **Other relevant facts and circumstances, which may include the history and nature of interactions with marine mammals in this export fishery, whether the level of incidental**

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Indonesia**

**mortality and serious injury resulting from the fishery or fisheries exceeds the bycatch limit for a marine mammal stock, the population size and trend of the marine mammal stock, and the population level impacts of the incidental mortality or serious injury of marine mammals in a harvesting nation's export fisheries and the conservation status of those marine mammal stocks where available**

Response: Not applicable.

**5. The record of consultations under 50 CFR § 216.24(h)(5) of this section with the harvesting nation, results of these consultations, and actions taken by the harvesting nation and under any applicable intergovernmental agreement or regional fishery management organization to reduce the incidental mortality and serious injury of marine mammals in its export fisheries**

Response: NMFS had technical consultations with Indonesia in March and November 2021.

**6. Information gathered during onsite inspection by U.S. government officials of a fishery's operations**

Response: Not applicable.

**7. For export fisheries operating on the high seas under an applicable intergovernmental agreement or regional fishery management organization to which the United States is a party, the harvesting nation's record of implementation of, or compliance with, measures adopted by that regional fishery management organization or intergovernmental agreement for data collection, incidental mortality and serious injury mitigation or the conservation and management of marine mammals; whether the harvesting nation is a party or cooperating non-party to such intergovernmental agreement or regional fishery management organization; the record of United States implementation of such measures; and whether the United States has imposed additional measures on its fleet not required by an intergovernmental agreement or regional fishery management organization**

Response: The United States and Indonesia are both members of WCPFC. See response to Question 4.

**8. For export fisheries operating on the high seas under an applicable intergovernmental agreement or regional fisheries management organization to which the United States is not a party, the harvesting nation's implementation of and compliance with measures, adopted by that regional fisheries management organization or intergovernmental agreement, and any additional measures implemented by the harvesting nation for data collection, incidental mortality and serious injury mitigation or the conservation and management of marine mammals and the extent to which such measures are comparable in effectiveness to the U.S. regulatory program for similar fisheries**

Response: Indonesia has two tuna fisheries operating under IOTC and CCSBT. See response to Question 4.

**Overall Summary for Additional Considerations**

The additional considerations were not pertinent to determining whether the nation's marine mammal bycatch reduction program is comparable in effectiveness to the U.S. regulatory program.

The Center for Biological Diversity, the Natural Resources Defense Council, and the Animal Welfare Institute jointly submitted information to NMFS on Indonesia's fisheries. NMFS has taken the information into consideration, as appropriate, in our evaluations.

# Engagement History

NMFS engaged in two technical consultations with Indonesia in March and November 2021 as well as numerous email exchanges of information. Indonesia was responsive to emails.

# EXHIBIT G



# Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report

# Sri Lanka

## Summary

Based on Sri Lanka's initial application, its responses to the clarification questions, and the information described below, NMFS has determined that the following fisheries are comparable in effectiveness to the U.S. regulatory program: Fishery IDs 2646, 2647, 2648, 2649, 2650, 2695, 2699, 2701, 2704, 2709 and 12700. The remaining Sri Lankan fisheries: Fishery IDs 2696, 2700, 2702, and 2705 are not comparable due to the use of high-risk gear with demonstrated levels of high bycatch, inadequate reporting of bycatch, and a lack of mitigation measures that have or are likely to reduce high levels of marine mammal bycatch for stocks interacting with the export fisheries.

Sri Lanka prohibits the intentional killing or serious injury of marine mammals in commercial fishing and requires the registration of vessels and licenses for commercial fishing. Sri Lanka has some type of marine mammal bycatch self-reporting or monitoring (primarily landing inspections and fishermen interviews) for all of its export fisheries except its pot/trap fishery (Fishery ID 12700). Sri Lanka requires fishermen to keep logbooks and record the number of marine mammals per set released alive or released dead.

The following fisheries are not comparable: Fishery IDs 2696, 2700, 2702, and 2705. In its application, Sri Lanka provided records of reported bycatch for its drift gillnet fisheries operating in its EEZ and on the high seas. The bycatch numbers are not reflective of the high levels of bycatch reported in primary literature and indicate a significant level of underreporting. Additionally, Sri Lanka reported it implements mitigation measures including a reduction in net length, safe handling/release practices, no setting when marine mammals are sighted in the area, fishermen education programs, captain/crew training, and marine mammal identification guides. Bycatch in these fisheries has been a significant issue for decades and the mitigation measures have not proven sufficient to reduce the high levels of bycatch. Given the well-established bycatch in this fishery, use of a high-risk gear type, and lack of effective reporting and mitigation measures, the drift gillnet fisheries are not comparable nor are Sri Lanka's three other fisheries that utilize gillnets.

In terms of managing bycatch of 16 U.S.C. § 1387(f)(3) species, Sri Lanka states that it implements mitigation measures, but cannot confirm that the measures are required by regulations and thus would be considered to be voluntary. It is not clear that the measures could achieve the levels of bycatch reduction needed. These measures are not comparable in effectiveness to the U.S. regulatory program.

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Sri Lanka**

**Fisheries that are not recommended for Comparability Finding**

| Fishery ID[1] | Target Species | Gear Type | Area | Rationale for Denial |
|---|---|---|---|---|
| 2696 | Bigeye tuna, dolphinfishes nei*, etc. | Drift gillnets (Pelagic) | EEZ (FAO 57 Indian Ocean Eastern) 57.1 EEZ | Not implementing sufficient bycatch reporting or mitigation measures that have or are likely to reduce unsustainable bycatch |
| 2700 | Bigeye tuna, Dolphinfishes nei, etc. | Drift gillnets (Mid-water) | High Seas (FAO: 57 Indian Ocean Eastern, FAO 51 Indian Ocean Western) High Seas | Not implementing sufficient bycatch reporting or mitigation measures that have or are likely to reduce unsustainable bycatch |
| 2702 | Marine fishes nei | Beach seines (Benthic), Drift gillnets (Pelagic), Ring nets (Pelagic) | EEZ (Indian Ocean Eastern) - 57.1 (Continental shelf) | Not implementing sufficient bycatch reporting or mitigation measures that have or are likely to reduce unsustainable bycatch |
| 2705 | Blue swimming crab, Indo-Pacific swamp crab, Etc. | Crabs nets, (Bottom), Gillnets and entangling nets (Bottom), Pots/traps (Bottom) | EEZ (Indian Ocean Eastern) - 57.1 (patchy distribution in shallow water) | Not implementing sufficient bycatch reporting or mitigation measures that have or are likely to reduce unsustainable bycatch |

* not elsewhere included (nei) - when the product is not specifically provided for in the Harmonized Trade System, the description covering such product is generally considered to be a "residual provision" by use of the phrase "not elsewhere included"

# Comparability Finding Analysis

**1. Does the nation have a prohibition on the intentional killing or serious injury of marine mammals in the course of commercial fishing operations? OR Does the nation have procedures to reliably certify that fish and fish products were not caught in association with the intentional killing or serious injury of marine mammals in the course of commercial fishing operations?**

Response: Yes. Sri Lanka prohibits the intentional killing or serious injury of marine mammals in commercial fishing according to the *Fishing Operations Regulations (1996)* and *High Seas Fishing Operations Regulations 2014*:

---

[1] The Fishery ID number is NOAA's internal reference number from our IAICRS database and has no other independent meaning.

*The Fishing Operations Regulations (1996)*

Article (2)(a) stipulates that no person shall catch, land, transport, sell, buy, receive or have in possession any marine mammals or turtles.

*High Seas Fishing Operations Regulations 2014*

Article 4 (vi) stipulates that a boat shall not catch, land, transport, trans ship, receive or keep in possession any prohibited species "such as Marine Mammals, Turtles, Thresher Shark species or Sea Birds and Tag species."

In addition to the above regulations, Sri Lanka states that the Department of Wildlife Conservation is in the process of declaring a marine sanctuary for the south coast, which is identified as one of the marine mammal hot spots of Sri Lanka. However, NMFS was not able to confirm the designation of the marine sanctuary because Sri Landa did not provide any other information regarding binding or voluntary measures for marine mammals within this sanctuary.

**2. Does the nation have a Marine Mammal Bycatch Reduction Program? A bycatch reduction program, for purposes of compliance with the import provisions, is defined as having the following components:**

**a. The ability to control/monitor its fishing operations that may take marine mammals (e.g., authorizations, permits, licenses, and/or registrations for vessels)**

Response:  Yes. Sri Lanka requires the registration of vessels and licenses for commercial fishing according to the *Registration of Fishing Boats Regulations,* 1980 published in the Gazette Extraordinary No. 109 of October 3, 1980; *Fisheries and Aquatic Resources Act, No. 2 of 1996*; *High Seas Fishing Operations Regulation No. 1 of 2014*; and *The Compendium of High Seas Fishing Legislations in Sri Lanka (compiled in March 2016)*:

*Registration of Fishing Boats Regulations, 1980 published in the Gazette Extraordinary No. 109 of October 3, 1980*

Article 2: No person shall use or operate within Sri Lanka waters any fishing boat for the purpose of fishing unless a certificate of registration in respect of such fishing boat has been issued under these regulations by the Director of Fisheries or any officer authorized by him on that behalf.

*Fisheries and Aquatic Resources Act, No. 2 of 1996*

Article 3: No person shall engage in, or cause any other person to engage in, any fishing operation specified in Part I of the Schedule hereto, in the sea, estuaries or coastal lagoons of Sri Lanka except under the authority of a license issued under these regulations and otherwise than in accordance with the terms and conditions attached to such license.

*High Seas Fishing Operations Regulation No. 1 of 2014*

Article 2: No person shall engage in any fishing operation specified in the Schedule I hereto in the High Seas except under the authority of a valid license granted by the Director-General.

*The Compendium of High Seas Fishing Legislations in Sri Lanka (compiled in March 2016)*

PART II, Article 1: No person shall engage in, or cause any other person to engage in any prescribed fishing operation in Sri Lanka Waters except under the authority, and otherwise than to accordance with the terms and conditions, of a license issued by the Director.

PART II A, Article 14A: No person shall engage in any prescribed fishing operations in the High Seas, except under the authority, and otherwise than in accordance with the terms and conditions, of a license granted by the Director-General.

PART III, Article 15:

(1) The Director shall cause to is maintained a register of local fishing boats

(2) Every owner of a local fishing boat used for the purpose of taking fish in Sri Lanka Waters or the High Seas shall apply to the Director for the registration of such boat and of the name of such owner.

### b. A program to monitor its fisheries for incidences of marine mammal mortality and serious injury in the course of commercial fishing operations

Response: Yes. Sri Lanka has some type of marine mammal bycatch self-reporting or monitoring program for all of its export fisheries except its pot/trap fishery (Fishery ID 12700).

Most of Sri Lanka's monitoring program is self-reporting using vessel logbooks, random and targeted landing inspections, and fishermen interviews. The landing inspections occur prior to departure and upon arrival from 24 designated fishing ports. Sri Lanka has an observer program for its high seas longline fishery (Fishery ID 2699). Its high seas gillnet fishery (Fishery ID 2700) is piloting an electronic monitoring system (unknown levels) (Table 1 below).

For its drift gillnet fishery (Fishery ID 2696), Sri Lanka reported the bycatch of one blue whale and an average annual mortality of 43 unspecified dolphins. Sri Lanka reported 33 incidental catches of cetaceans in 2021, 95 in 2022, and 160 in 2023. Sri Lanka indicates there were no reported deaths and all the animals were released alive. For its high seas gillnet fishery (Fishery ID 2700), Sri Lanka reported an average annual mortality of six unspecified dolphins.

According to readily available scientific literature, bycatch in these fisheries is significantly higher, ranging between 4,586-13,759 cetaceans annually between 2012 and 2016.[2] Due to multiple factors, including historically limited national-level bycatch monitoring, these estimates contain uncertainties, but may demonstrate that the magnitude of the bycatch in Sri Lanka's gillnet fisheries may be underestimated.

Sri Lanka provided several regulations as evidence it requires monitoring for incidences of marine mammal mortality and serious injury in the course of commercial fishing operations. The regulations require fishermen to report using logbooks, but they do not specify marine mammal bycatch reporting is required. However, the example logbook Sri Lanka sent includes space to record the number of marine mammals per set released alive or released dead.

---

[2] Anderson, R., Herrera, M., Ilangakoon, A., Koya, K., Moazzam, M., Mustika, P., & Sutaria, D. (2020). Cetacean bycatch in Indian Ocean tuna gillnet fisheries. Endangered Species Research, 41, 39–53. https://doi.org/10.3354/esr01008

*Fish Catch Data Collection Regulations, 2014*:

Article 2: Every person who uses mechanized fishing boat registered under the Registration of Fishing Boats Regulations (1980) published in the Gazette Extraordinary No. 109 of October 3, 1980 for fishing in Sri Lanka waters or high seas, shall carry onboard a log book issued by the Department of Fisheries and Aquatic Resources during each fish trip.

Article 3: Every person who engages in fishing, in terms of these regulations shall maintain a record of the catch in the logbook, relating to each fishing trip. The logbook shall be produced for inspection to any authorized officer, if so required by such officer.

Article 4: Every person who engages in fishing in terms of these regulations shall submit the logbook to the authorized officer. The authorized officer shall check and certify such logbook at the end of every three months.

*Fisheries and Aquatic Resources Act, No. 2 OF 1996's supplement on High Seas Fishing Operations Regulations No. 1 of 2014*:

Article 4(vii)(viii): The holder of a license granted for fishing operations in the High Seas shall comply with the following conditions imposed by the Director-General for fishing operations in the High Seas under the conservation and management measures adopted in keeping with the United Nations Convention on the Law of the Sea of December 10, 1982, Indian Ocean Tuna Commission and Fish Stocks Agreement 1995 and United Nations Food and Agriculture Organization (FAO) Agreement on Port State Measures to Prevent, Deter, and Eliminate Illegal, Unreported and Unregulated Fishing 2009: the skipper/Master shall keep in possession and maintain an updated logbook at all times and the skipper/Master shall certify that the information contained in the log book maintained under paragraph (vii) to be accurate, complete and correct and shall submit original of the relevant logbook sheet to an Officer nominated by the Director-General or any other authorized officer on reaching the fishery harbor.

In addition, Sri Lanka provided the following information on its National Aquatic Resources Research and Development Agency Act, No. 54 of 1981:

Article 4(b)(v) and (c): The objects and functions of the Agency shall be to promote and conduct research activities directed towards the identification, assessment, management and development of aquatic resources, and in particular in the following fields: the development, management and conservation of aquatic resources in the inland waters, coastal wetlands and off-shore areas. To provide advisory and consultancy services on scientific, technological and legal matters relating to the exploitation, management and development of aquatic resources.

Article 5(j): The Agency shall have the power to advise and make recommendations to any Ministry, any Government department or branch thereof, or any public corporation or any other person on research, management, development and regulation, including the conservation and utilization, of the aquatic resources of Sri Lanka and the formulation of national policies relating to the management and development of the national aquatic resources of Sri Lanka.

Sri Lanka reported its current marine mammal research activities are focused on population assessments; mitigation of the marine mammal interaction with fisheries, molecular based species identification and monitoring of standings, which can in instances be an indicator of fishery interactions.

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Sri Lanka**

**Table 1. Sri Lanka's fisheries, gear, area of operation, and monitoring programs**

| Fishery ID | Target Species | Gear Type | Area | Monitoring |
|---|---|---|---|---|
| 2695 | Bigeye tuna, Marlins nei*, Etc. | Longlines (Midwater) | EEZ (Indian Ocean Eastern) | Vessel Log Books (75-99% Coverage) |
| 2696 | Bigeye tuna, Dolphinfishes nei, Etc. | Drift gillnets, (Pelagic) | EEZ (Indian Ocean Eastern) - 57.1 | Vessel Log Books (75-99%) Random & targeted landing inspections and fishermen interviews at data collection and surveys (1-5% coverage) |
| 2699 | Bigeye tuna, Black marlin, Etc. | Longlines (Midwater) | High Seas (Indian Ocean Eastern and Indian Ocean Western) | Observer Program (11% Coverage); Vessel Log Books (75-99 % coverage); Random & targeted landing inspections and fishermen interviews at data collection and surveys (<1% coverage) |
| 2700 | Bigeye tuna, Dolphinfishes nei, Etc. | Drift gillnets, (Midwater) | High Seas (Indian Ocean Eastern and Indian Ocean Western) | Vessel Log Books (75-99%); Pilot project of an electronic monitoring system (UNKNOWN) Random & targeted landing inspections and fishermen interviews at data collection and surveys (< 1% coverage) |
| 2701 | Groundfishes nei | Longlines - set (Bottom) | EEZ (Indian Ocean Eastern) - patchy distribution in shallow water | Random & targeted landing inspections and fishermen interviews at data collection and surveys (<1% coverage) |
| 2702 | Marine fishes nei | Beach seines, (Benthic), Drift gillnets, (Pelagic), Ring nets, (Pelagic) | EEZ (Indian Ocean Eastern) - 57.1 (Continental shelf) | Random & targeted landing inspections and fishermen interviews at data collection and surveys (< 1 % coverage) |
| 2705 | Blue swimming crab, Indo-Pacific swamp crab, Etc. | Crab nets, (Bottom), Gillnets and entangling nets (Bottom), | EEZ (Indian Ocean Eastern) - 57.1 (patchy distribution in shallow water) | Yes - Random and targeted inspections and fishermen interviews at data collection & surveys (< 1 % coverage) |

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Sri Lanka**

|  |  | Pots/traps (Bottom) |  |  |
|---|---|---|---|---|
| 2709 | Groupers nei, Snappers nei | Diving (SCUBA and/or free-diving (Bottom), Handlines and hand-operated pole-and-lines, (Bottom), Pots/traps, (Benthic), Set gillnets/set nets - anchored (Bottom) | EEZ (Indian Ocean Eastern) - 57.1 (patchy distribution in shallow water) | Random & targeted landing inspections and fishermen interviews at data collection and surveys (< 1 % coverage) |
| 12700 | Common octopus, Sandbird octopus | Pots/traps, (Bottom) | EEZ (Indian Ocean Eastern) - 57.1 (shallow coastal areas) | None - planning to implement Fishermen interviews of (10-25% coverage) in the future |

### c. A requirement to report all marine mammal mortality and serious injury in the course of commercial fishing operations

Response: Yes. The Fish Catch Data Collection Regulations of 2014 requires fishermen to keep logbooks:

Article 2: Every person who uses mechanized fishing boat registered under the Registration of Fishing Boats Regulations (1980) published in the Gazette Extraordinary No. 109 of October 3, 1980 for fishing in Sri Lanka waters or high seas, shall carry onboard a log book issued by the Department of Fisheries and Aquatic Resources during each fish trip.

Article 3: Every person who engages in fishing, in terms of these regulations shall maintain a record of the catch in the logbook relating to each fishing trip.

The example logbook Sri Lanka provided includes space to record the number of marine mammals per set released alive or released dead.

The Department of Fisheries and Aquatic Resources also developed a platform where fishers can upload bycatch data, including recently released marine mammals. The goal is to encourage fisheries officers, researchers, and other stakeholders to document and report any incidental capture or entanglement of marine mammals in fishing operations.

### d. Prioritization of fisheries for mitigation of unsustainable marine mammal bycatch as described in 16 U.S.C. § 1387(f)(3) (in particular those over the bycatch limit, of small population size, or declining rapidly, based on available financial resources) in response to reported bycatch occurring in fishing operations. Prioritization of fisheries should be similar to U.S. take reduction teams and development of take reduction plans and including an evaluation of whether the nation has provided a bycatch limit and whether that bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stock(s), and whether any mitigation is effective or reconsidered if not effective.

Response: Yes. Sri Lanka implements mitigation measures in fisheries with reported bycatch of 16 U.S.C. § 1387(f)(3) species. However, the bycatch mitigation measures cannot be confirmed to be required by regulations, so they would be considered voluntary and it is not clear if the mitigation measures in place would reduce bycatch to sustainable levels. This approach to managing marine mammal bycatch is not comparable in effectiveness to the U.S. regulatory program.

Sri Lanka provided a report for a population assessment of cetaceans in the Bay of Bengal. Sri Lanka listed 30 species of marine mammals in its waters. Five of them are 16 U.S.C. § 1387(f)(3) species: blue whale, fin whale, humpback whale, Indo-Pacific humpback dolphin (which Sri Lanka later confirmed is the Indian Ocean humpback dolphin), and sperm whale.

The blue whale is the only 16 U.S.C. § 1387(f)(3) species that Sri Lanka indicates interacts with its drift gillnet fisheries (Fishery ID 2696 and Fishery ID 2700). Sri Lanka reported bycatch of one blue whale in its drift gillnet fishery and reported its bycatch limit was 2.916.

Sri Lanka also reported its multi-gear fisheries using gillnets to catch marine fishes (Fishery ID 2702), blue swimming crab and Indo-Pacific swamp crab (Fishery ID 2705), and groupers and snappers (Fishery ID 2709) as interacting with the Indian Ocean humpback dolphin.

Sri Lanka indicated "dolphin unspecified" as interacting with five of their nine export fisheries. The dolphin unspecified could also be the Indian Ocean humpback dolphin. Based on very low numbers, this species would be listed as 16 U.S.C. § 1387(f)(3) in the United States. Any bycatch of this species would be unsustainable.

Table 2 outlines the mitigation measures in place for fisheries with bycatch. Of specific concern is the bycatch of a blue whale in a drift gillnet fishery for tuna. For its drift gillnet fisheries, Sri Lanka's mitigation measures include a reduction in net length (for large-scale pelagic driftnets), safe handling/release practices, no setting when marine mammals are sighted in the area, fishermen education programs, captain/crew training, and marine mammal identification guides. NMFS was unable to verify these measures are required by regulation. Based on existing literature, Sri Lanka's drift gillnet fisheries still experience high levels of cetacean bycatch. Given the lack of data on the populations of cetacean species inhabiting Sri Lanka's waters, it is not possible to understand the impact of the bycatch at the population level, but given the suspected persistent high levels of bycatch in this fishery due to use of a high-risk gear type, and lack of effective mitigation measures, the drift gillnet fisheries are not comparable.

Sri Lanka reported that the Department of Fisheries and Aquatic Resources conducted an awareness program to set drift gillnets about 3m below the surface to reduce marine mammal entanglement. Sri Lanka reported 5400 vessels fished using drift gillnets in 2024 with the majority being less than 15m. Subsurface setting of gillnets has been shown to meaningfully reduce cetacean bycatch in other fisheries and Sri Lanka is highly encouraged to transition to this practice.[3]

---

[3] Kiszka, J. J., Moazzam, M., Boussarie, G., Shahid, U., Khan, B., & Nawaz, R. (2021). Setting the net lower: A potential low-cost mitigation method to reduce cetacean bycatch in drift gillnet fisheries. Aquatic Conservation: Marine and Freshwater Ecosystems, 31, 3111–3119. https://doi.org/10.1002/aqc.3706

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Sri Lanka**

For the longline fisheries (Fishery IDs 2695 and 2699), NMFS could not confirm that circle hooks, weak rope/line, change in bait, or move on rules are required. The regulations Sri Lanka provided did not stipulate these requirements.

**Table 2: Bycatch mitigation measures by fishery ID and 16 U.S.C. § 1387(f)(3) species**

| Fishery ID | 2695 (longline) | 2699 (longline) | 2696 (drift gillnet) | 2700 (drift gillnet) | 2702 (beach seines, drift gillnets, ring nets) |
|---|---|---|---|---|---|
| **Species** | dolphin unspecified | Dolphin unspecified | Blue whale; dolphin unspecified | Dolphin unspecified | Dolphin unspecified |
| Mitigation Measures | | | | | |
| Circle hooks | x | x | | | |
| Weak rope/line | x | | | | |
| Change in bait type | x | x | | | |
| Move on rule | x | | | | |
| Reduction in net length (applicable to line gear) | | | | x | |
| No setting when marine mammals are in the area | x | x | x | x | |
| Safe handling and release practices | x | x | x | x | |
| Fishermen education programs | x | x | x | x | x |
| Captain/crew training | x | x | x | x | x |
| Marine mammal ID guides | x | x | x | x | x |

3. **Does the nation ban the use of large-scale high seas drift gillnet gear or other gear prohibited for use by U.S. fishermen?**

Response: Yes. Sri Lanka bans the use of large-scale drift gillnets according to the Fisheries and Aquatic Resources Act No. 2 of 1996 supplement on High Seas Fishing Operations Regulations No. 1 of 2014.

Article 4(ix): The holder of a license granted for fishing operations in the High Seas shall comply with the following conditions imposed by the Director-General for fishing operations in the High Seas under the conservation and management measures adopted in keeping with the United Nations Convention on the Law of the Sea of December 10, 1982, Indian Ocean Tuna Commission and Fish Stocks Agreement 1995 and United Nations Food and Agriculture Organization (FAO) Agreement on Port State Measures to Prevent, Deter and Eliminate Illegal, Unreported and Unregulated Fishing 2009: The maximum length of such gill nets shall be less than two point five kilometers where the fishing operations in the High Seas are carried out by using Gill nets.

4. **Does the nation implement marine mammal bycatch reduction measures in fisheries regulated under a regional fishery management organization (RFMO), which are required for U.S. fishermen by that RFMO?**

Response: Sri Lanka and the United States are not parties to the same RFMOs.

5. **In cases where a U.S. Take Reduction Team has implemented marine mammal bycatch reduction measures for transboundary stocks shared with the United States, are the nation's measures similar or comparable in effectiveness? (Include in the response if the nation has provided a bycatch limit and if the bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stocks, either in one fishery or cumulatively over a number of fisheries)**

Response: Sri Lanka and the United States do not share any transboundary stocks.

6. **For marine mammal stocks that are not transboundary but are considered at high risk of extinction, does the nation implement mitigation/risk reduction measures comparable to what is or would be required in the United States? (Include in the response if the nation has provided a bycatch limit and if the bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stocks, either in one fishery or cumulatively over a number of fisheries)**

Response: Yes. Sri Lanka prioritizes fisheries for mitigation in response to reported bycatch of 16 U.S.C. § 1387(f)(3) species. However, the bycatch mitigation measures cannot be confirmed to be in its regulations so they are considered to be voluntary and it is not clear they could achieve the levels of bycatch reduction needed. This is not considered to be comparable in effectiveness to the U.S. regulatory program. See above in question 2d for the details on the 16 U.S.C. § 1387(f)(3) species.

# Additional Considerations

In reviewing a nation's fisheries and marine mammals stocks, how do they compare to:

1. **U.S. implementation of its regulatory program for similar marine mammal stocks and similar fisheries (e.g., considering gear or target species), including transboundary stocks**

**governed by regulations implementing a take reduction plan (50 CFR § 229.2), and any other relevant information received during consultations**

Response: Not applicable.

**2. The extent to which the harvesting nation has successfully implemented measures in the export fishery to reduce the incidental mortality and serious injury of marine mammals caused by the harvesting nation's export fisheries to levels below the bycatch limit**

Response: Not applicable.

**3. Whether the measures adopted by the harvesting nation for its export fishery have reduced or will likely reduce the cumulative incidental mortality and serious injury of each marine mammal stock below the bycatch limit, and the progress of the regulatory program toward achieving its objectives**

Response: Not applicable.

**4. Other relevant facts and circumstances, which may include the history and nature of interactions with marine mammals in this export fishery, whether the level of incidental mortality and serious injury resulting from the fishery or fisheries exceeds the bycatch limit for a marine mammal stock, the population size and trend of the marine mammal stock, and the population level impacts of the incidental mortality or serious injury of marine mammals in a harvesting nation's export fisheries and the conservation status of those marine mammal stocks where available**

Response: Not applicable.

**5. The record of consultations under 50 CFR § 216.24(h)(5) of this section with the harvesting nation, results of these consultations, and actions taken by the harvesting nation and under any applicable intergovernmental agreement or regional fishery management organization to reduce the incidental mortality and serious injury of marine mammals in its export fisheries**

Response: Sri Lanka participated in a technical consultation in November 2021.

**6. Information gathered during onsite inspection by U.S. government officials of a fishery's operations**

Response: Not applicable.

**7. For export fisheries operating on the high seas under an applicable intergovernmental agreement or regional fishery management organization to which the United States is a party, the harvesting nation's record of implementation of, or compliance with, measures adopted by that regional fishery management organization or intergovernmental agreement for data collection, incidental mortality and serious injury mitigation or the conservation and management of marine mammals; whether the harvesting nation is a party or cooperating non-party to such intergovernmental agreement or regional fishery management organization; the record of United States implementation of such measures;**

**and whether the United States has imposed additional measures on its fleet not required by an intergovernmental agreement or regional fishery management organization**

Response: Not applicable.

8. **For export fisheries operating on the high seas under an applicable intergovernmental agreement or regional fisheries management organization to which the United States is not a party, the harvesting nation's implementation of and compliance with measures, adopted by that regional fisheries management organization or intergovernmental agreement, and any additional measures implemented by the harvesting nation for data collection, incidental mortality and serious injury mitigation or the conservation and management of marine mammals and the extent to which such measures are comparable in effectiveness to the U.S. regulatory program for similar fisheries**

Response: Sri Lanka has three fisheries that are part of the Indian Ocean Tuna Commission (IOTC) - two longline fisheries (Fishery IDs 2695 and 2699) and a drift gillnet fishery (Fishery ID 2696).

The two longline fisheries may use similar mitigation measures that are used by U.S. fishermen; however, NMFS cannot confirm the requirement to use these mitigation measures in Sri Lanka's regulations.

Resolution 17/07 prohibits the use of large-scale driftnets in the IOTC Area of Competence, including the high seas and EEZs. Resolution 11/04 requires 5% observer coverage for longline and purse seine vessels greater than 24m fishing in the IOTC area. The requirement does not apply for the majority of the artisanal gillnet vessels (less than 24m) operating within their respective EEZs.

Resolution 23/06 requires no intentional encirclement of cetaceans in purse seine fisheries, safe handling and release if cetaceans are captured, and reporting of cetacean interactions. Resolution 21/01 is an interim measure requiring subsurface setting of gillnets. However, both of these resolutions do not apply to artisanal vessels (<24m) and thus these measures are not applicable to the majority of the drift gillnet vessels.

Sri Lanka reported it is planning to implement an observer program for its high seas vessels that are less than 24m. Utilizing observers to collect bycatch data is the standard method for quantifying bycatch rates and would help address the deficiencies with Sri Lanka's cetacean bycatch monitoring. Sri Lanka is highly encouraged to pursue this action.

**Overall Summary for Additional Considerations**

The additional considerations were not pertinent to determining whether the nation's marine mammal bycatch reduction program is comparable in effectiveness to the U.S. regulatory program.

# Engagement History

NMFS engaged in one virtual technical consultation with Sri Lanka during the Comparability Finding application period in November 2021. Sri Lanka provided additional information to inform its application via email.

# EXHIBIT H

# International Trade Data

## Latest Releases and Highlights

- **Latest U.S. International Trade in Goods and Services Report (FT900): PDF | ZIP (XLSX)**

- **Latest Advance Economic Indicators Report**

- **Trade Highlights: Monthly | Annual**

- **Top Trading Partners: Monthly | Year-to-Date**

- **Other Press Releases**

## Prior FT900 Releases

Note: Historical releases reflect the data available when the release was published and is not further revised. For the latest revised data, please see the historical data below.

## Statistical Corrections

The U.S. Census Bureau issues commodity-specific corrections in response to investigations initiated by the community of data-users.

## Historical Data

### Data Resources

<u>USA Trade Online</u>: Create your own custom reports and download them to excel. Completely free to use and sign up!

<u>International Trade API</u>: Allows programmers and non programmers alike to get custom data at a moments notice. All for free.

<u>International Trade API Query Builder Tool:</u> Allows for an easy building of API calls. Effective shortcut for API users.

<u>U.S. Trade with U.S. Territories</u>: Allows for custom creation of data tables and graphs of shipments between the U.S. and the U.S. territories.

### Seasonally Adjusted Data

Real Data (Chained 2017 Dollar)

Nominal Data

### Not Seasonally Adjusted Data, Census-Basis (Nominal)

**Totals**

Monthly and annual goods (Census basis) balance, exports and imports 1987-present

**By Classification System**

End-Use

Harmonized System (HS)

NAICS: North American Industrial Classification System

SITC: Standard International Trade Classification

Advance Technology Products

USDA Agricultural Products (via International Trade API)

**By Geography**

Trading partner (country) total balance, exports, and imports

State

Port data is available monthly through <u>USA Trade Online</u> 2003-present, the <u>International Trade API</u> 2013-present, as well as our data products.

Metropolitan Area

**Other**

Related Party Trade

### Data Products

**Note: All international trade data products previously available via subscription are now available to the public at no cost and accessible on our site.**

Data Products

Catalog

Record layouts and sample files