## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before:**

| | |
|---|---|
| NATIONAL FISHERIES INSTITUTE, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, *et al.*, <br><br> Defendants. | Case No. 1:25-cv-00223 <br><br> MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW <br><br> **Non-Confidential Version** <br> Business Proprietary Information Removed from Brackets at Exhibit G at 2-5, 8; Exhibit H at 2-7, 9-10; Exhibit I at 2-7; Exhibit J at 2-6. |

## <u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

Pursuant to United States Court of International Trade Rule 65, Plaintiffs National Fisheries Institute; Restaurant Law Center; Phillips Foods, Inc.; Heron Point Seafood, LLC; Newport International of Tierra Verde, Inc.; 3Fish, Inc.; Handy Seafood Inc.; Shaw's Southern Belle Frozen Foods, Inc.; Supreme Crab & Seafood, Inc.; Cebu Pacific LLC; Byrd International Inc., and Crustacea Seafood Company, Inc. (collectively, "Plaintiffs") hereby move this Court to: (1) enjoin enforcement of the import prohibitions scheduled to take effect January 1, 2026, arising from the National Marine Fisheries Service's ("NMFS") September 2, 2025 determinations denying Marine Mammal Protection Act ("MMPA") comparability findings to 240 commercial fisheries across 46 nations; (2) declare unlawful and enjoin enforcement of the NMFS's restriction prohibiting harvesting nations from reapplying until after January 1, 2026; and (3) grant such other and further relief as the Court deems just and proper.

In support, Plaintiffs rely upon their Complaint, the accompanying Memorandum of Law, and the declarations attached as Exhibits F through J. Plaintiffs respectfully request oral argument and an expedited review of this motion at the Court's earliest convenience.

Respectfully submitted,

Dated: October 14, 2025

Ashley Akers
Rafe Petersen (Pro Hac Vice)
Andrew McAllister
Kamran Mohiuddin (Pro Hac Vice)
Maggie Pahl (Pro Hac Vice)
HOLLAND & KNIGHT LLP
800 17th Street N.W., Suite 1100
Washington, D.C. 20006
Tele: 202-441-5870
Ashley.Akers@hklaw.com
Rafe.Petersen@hklaw.com
Andrew.Mcallister@hklaw.com
Kamran.Mohiuddin@hklaw.com
Maggie.Pahl@hklaw.com

*Attorneys for Plaintiffs*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. 5

MEMORANDUM OF LAW ............................................................................................... 8

I.    INTRODUCTION .................................................................................................... 8

II.   LEGAL BACKGROUND ...................................................................................... 10

  A.   Statutory Framework ......................................................................................... 10

  B.   The 2016 Implementing Rule ............................................................................ 12

  C.   Procedural Background and the 2025 Determinations ....................................... 14

III.  FACTUAL BACKGROUND ................................................................................. 17

  A.   Industry Reliance and Investments During the Exemption Period..................... 17

  B.   The September 2, 2025 Determinations.............................................................. 19

  C.   Economic Impact and Compressed Timeline ..................................................... 20

IV.   LEGAL STANDARD ............................................................................................ 21

V.    ARGUMENT.......................................................................................................... 23

  A.   Plaintiffs are Likely to Succeed on the Merits .................................................. 24

    1.    The Determinations Exceed Statutory Authority Under the MMPA........................... 24

    2.    NMFS Arbitrarily Restricted the Evidentiary Record in Violation of Its Own
          Regulations and the MMPA's "Best Scientific Evidence Available" Requirement..... 27

    3.    NMFS's Restriction on Reapplication Violates Both the Regulation and the APA..... 29

    4.    NMFS Arbitrarily Failed to Assess or Address Substantial Reliance Interests........... 31

  B.   Plaintiffs will Suffer Irreparable Harm .............................................................. 33

    1.    Immediate and Existing Harm ................................................................................ 34

    2.    Existential Economic Harm .................................................................................... 35

    3.    No Adequate Substitute Exists................................................................................ 35

    4.    Destruction of Business Relationships and Reputation ............................................. 35

    5.    Permanent Loss of Skilled Workforce and Processing Infrastructure ........................ 36

    6.    Credit, Financing, and Cascading Failures ............................................................. 36

    7.    Environmental and Conservation Harm (Loss of FIP Gains) ..................................... 36

  C.   The Equities and Public Interest Weigh Heavily in Favor of an Injunction .................... 37

    1.    Minimal, Self-Inflicted Harm to the Government From Preserving the Status Quo .... 37

    2.    No Public Interest in Enforcing Likely Unlawful Action ........................................... 38

    3.    Public Interest in Access to Affordable, Sustainable Seafood ................................... 38

    4.    Public Interest in Jobs, Economic Stability, and Communities .................................. 39

5.   Public Interest in Effective Marine-Mammal Conservation (not Performative Process) ........................................................................................................39

6.   Public Interest in the Rule of Law and Orderly Administration ................................... 39

VI.   CONCLUSION.................................................................................................. 40

## TABLE OF AUTHORITIES

### CASES

*Aamer v. Obama*,
742 F.3d 1023 (D.C. Cir. 2014) .......................................................................38

*Aluminum Extrusions Fair Trade Comm. v. United States*,
607 F. Supp. 3d 1332 (Ct. Int'l Trade 2022) .......................................22, 36, 37

*Amoco Production Co. v. Village of Gambell*,
480 U.S. 531 (1987) ............................................................................36, 39

*Bell Helicopter Textron, Inc. v. Airbus Helicopters*,
78 F. Supp. 3d 253 (D.D.C. 2015) .....................................................34, 36

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) .......................................................................33

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) .......................................................................................30

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ................................................................................31, 33, 38

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ...........................................................................…….31

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......................................................................................31

*F.T.C. v. Dean Foods Co.*,
384 U.S. 597 (1966) .......................................................................................34

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) .......................................................................38

*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ........... .............................................................38

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) .......................................................................................22

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*,
463 U.S. 29 (1983) ...........................................................................22, 29, 33

*Nken v. Holder*,
      556 U.S. 418 (2009) ..................................................................................21, 23, 37

*NRDC v. Raimondo, No*.
      1:24-cv-00148 (Ct. Int'l Trade) .........................................................................15

*Perez v. Mortgage Bankers Association*,
      575 U.S. 92 (2015) ...............................................................................................30

*Qingdao Taifa Group Co. v. United States*,
      581 F.3d 1375 (Fed. Cir. 2009) .........................................................................22

*Retractable Technologies, Inc. v. United States*,
      739 F. Supp. 3d 1330 (Ct. Int'l Trade 2024) ...................................................21

*Smoking Everywhere, Inc. v. FDA, 680 F. Supp. 2d 62 (D.D.C. 2010), aff'd sub nom. Sottera,
Inc. v. FDA*,
      627 F.3d 891 (D.C. Cir. 2010) ...........................................................................34

*Thomas Jefferson University v. Shalala*,
      512 U.S. 504 (1994) ..............................................................................................30

*Utility Air Regulatory Group v. EPA*,
      573 U.S. 302 (2014) ..............................................................................................26

*West Virginia v. EPA*,
      597 U.S. 697 (2022) ..............................................................................................26

*Winter v. Natural Resources Defense Council, Inc.*,
      555 U.S. 7 (2008) .............................................................................................21, 37

*In re Section 301 Cases, 524 F. Supp.*
      1355 (Ct. Int'l Trade 2021) .................................................................................22

## Statutes

5 U.S.C. § 706 ....................................................................22, 24, 26, 29, 30, 31, 33

16 U.S.C. § 1361 ..............................................................................................10, 11

16 U.S.C. § 1371 .............................................................9, 11, 16, 24, 26, 28, 30

16 U.S.C. § 1373 .................................................................................9, 11, 28, 29

16 U.S.C. § 1376 .........................................................................................................16

16 U.S.C. § 1377 ........................................................................................................ 16

28 U.S.C. § 1581(i) ................................................................................................... 22

28 U.S.C. § 2640(e) ..................................................................................................22

**Regulations**

50 C.F.R. § 216.24(h)(1)(i) ................................................................................. 12

50 C.F.R. § 216.24(h)(1)(ii) ................................................................................ 12

50 C.F.R. § 216.24(h)(3) ...........................................................................12, 27, 28

50 C.F.R. § 216.24(h)(5)(i) ................................................................................. 12

50 C.F.R. § 216.24(h)(6) ...................................................9, 12, 13, 24, 26, 27, 29, 38

50 C.F.R. § 216.24(h)(7) ...........................................................................14, 25, 29

50 C.F.R. § 216.24(h)(8)(iv) ............................................................................... 14

50 C.F.R. § 216.24(h)(9) ............................................... 14, 15, 24, 29, 30, 31, 38, 40

**Federal Register Notices**

81 Fed. Reg. 54,390 (Aug. 15, 2016) ............................................................. 12, 14, 32

85 Fed. Reg. 69,515 (Nov. 3, 2020) ................................................................15, 32, 37

87 Fed. Reg. 63,955 (Oct. 21, 2022)………………...............................................15, 32, 37

88 Fed. Reg. 80,193 (Nov. 17, 2023) ...............................................................15, 32, 37

90 Fed. Reg. 42,395, 42,398 (Sept. 2, 2025) .......................................................15, 19, 30, 39-40

**MEMORANDUM OF LAW**

## I.    INTRODUCTION

This case challenges the National Marine Fisheries Service's ("NMFS") September 2, 2025 determinations denying Marine Mammal Protection Act ("MMPA") comparability findings to 240 commercial fisheries across 46 foreign nations. Absent judicial relief, those denials will trigger an import ban on all affected fish and fish products beginning January 1, 2026—sweeping in fisheries that supply nearly the entire U.S. market for blue swimming crab ("BSC") and disrupting billions of dollars in annual seafood trade. The result will be the closure of small and mid-sized businesses, mass layoffs of American workers, and cascading harm throughout the restaurant and foodservice sectors that depend on seafood availability.

Plaintiffs are the National Fisheries Institute and the Restaurant Law Center—trade associations representing hundreds of U.S. seafood importers, processors, distributors, and restaurants—together with ten seafood companies that collectively rely on the affected fisheries for most of the crab that they process and sell. Over decades, Plaintiffs and their members have built international sourcing networks, invested heavily in overseas processing facilities, and created thousands of American jobs—all in reliance on NMFS's prior representation that foreign fisheries demonstrating effective marine-mammal protections could obtain comparability findings and maintain access to the U.S. market. These companies have committed hundreds of millions of dollars in capital, equipment, and long-term supply contracts now jeopardized by the pending import ban.

The economic and operational consequences of NMFS's determinations are immediate and severe. The import prohibitions will eliminate approximately 89% of the blue swimming crab available to the U.S. market, leaving no viable substitute: domestic production supplies only 0.05% of demand. With ocean transit times of eight to ten weeks from Southeast Asia, products now

being shipped will arrive after the ban's effective date and face seizure at entry. Plaintiffs are already curtailing operations, cancelling orders, and reducing staff to avoid stranded inventory in transit. The four-month window between NMFS's determinations and the effective date is shorter than the global supply chain cycle, making compliance without catastrophic loss impossible.

Plaintiffs seek a preliminary injunction enjoining enforcement of the import prohibitions and declaring unlawful NMFS's new restriction prohibiting reapplication until after January 1, 2026, despite the regulation's clear provision that nations may reapply "at any time." NMFS's refusal to allow immediate reapplication has foreclosed the regulatory safety valve that the agency and Congress designed to prevent precisely this kind of trade disruption. This prevents Plaintiffs from working with foreign governments to cure alleged deficiencies before the ban takes effect.

Plaintiffs satisfy the four elements for a preliminary injunction. First, Plaintiffs are likely to prevail on the merits. The MMPA authorizes import restrictions when foreign fishing "results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." 16 U.S.C. § 1371(a)(2). NMFS's determinations, however, never made that finding. Instead, NMFS denied comparability findings based on the absence of U.S.-style forms, documentation, and administrative structures, demanding regulatory mimicry rather than evaluating conservation outcomes. This process-first approach exceeds statutory authority, disregards mandatory factors, and contravenes the agency's own results-oriented standard at 50 C.F.R. § 216.24(h)(6)(iii)(B). It also violates the MMPA's best scientific evidence available requirement under 16 U.S.C. § 1373(a), and unlawfully amends the reapplication timeline without rulemaking. Each is an independent violation of the APA.

Second, unless the Court intervenes, Plaintiffs will suffer immediate and irreparable harm. This includes plant shutdowns and facility closures, permanent loss of supply chains and customer

relationships, stranded inventory, contract breaches, reputational harm, workforce layoffs, and elimination of approximately 89% of the U.S. blue swimming crab supply for which no substitute exists.

Third, the balance of equities and the public interest favor an injunction pending further litigation. The federal government has no legitimate interest in keeping unlawful and destructive determinations in place that undermine both trade stability and conservation progress while this suit proceeds. Indeed, maintaining the long-standing exemption regime prevents immediate economic collapse and protects ongoing conservation programs, while imposing at most a minimal delay on the government—one it has voluntarily extended three times since 2016.

For these reasons, and those set forth below, Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction to preserve the status quo while adjudicating the legality of NMFS's determinations.

## II.    LEGAL BACKGROUND

The challenged determinations turn on how NMFS interpreted both its statutory authority and its own regulations. To evaluate whether NMFS acted lawfully, it is important to understand the statutory framework, the regulatory standard NMFS promulgated in 2016, and the procedural history leading to the September 2, 2025, determinations.

### A.  Statutory Framework

Congress enacted the MMPA in 1972 to protect and restore marine mammal populations that "are, or may be, in danger of extinction or depletion as a result of man's activities." 16 U.S.C. § 1361(1). Congress sought to ensure that marine mammal species and populations are not "permitted to diminish beyond the point at which they cease to be a significant functioning element

in the ecosystem of which they are a part, and, consistent with this major objective, [are not] permitted to diminish below their optimum sustainable population." *Id.* § 1361(2).

To achieve certain objectives internationally, the MMPA empowers the Secretary of the Treasury to "ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals ***in excess of United States standards***." 16 U.S.C. § 1371(a)(2) (emphasis added). In determining whether to impose such a ban, the Secretary of Commerce "shall insist on reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing technology in use for such fish or fish products exported from such nation to the United States." *Id.* § 1371(a)(2)(A).

The MMPA does not define "reasonable proof" or "United States standards." However, any determination by the Secretary must be made "on the basis of the best scientific evidence available . . . ." *Id.* § 1373(a).

Prior to the September 2, 2025, determinations, NMFS interpreted "United States standards" as setting performance benchmarks—measured by the ***effectiveness*** of conservation outcomes—rather than requiring foreign fisheries to adopt identical regulatory frameworks. This approach recognized that comparability under the MMPA could be achieved through alternative measures that are equally effective, rather than through strict replication of U.S. regulatory mechanisms. This reflects Congress's recognition that foreign nations may employ different processes and approaches to reduce marine mammal bycatch, and that the MMPA does not and could not require sovereign entities to adopt identical policies or management measures.

**B. The 2016 Implementing Rule**

In 2016, NMFS promulgated regulations implementing the MMPA's import provisions. Fish and Fish Product Import Provisions of the Marine Mammal Protection Act, 81 Fed. Reg. 54,390 (Aug. 15, 2016) (codified at 50 C.F.R. § 216.24(h)). Under the rule, fish or fish products from a fishery lacking a valid comparability finding are treated as harvested "in excess of U.S. standards," and their importation is unlawful. 50 C.F.R. § 216.24(h)(1)(i)–(ii). Thus, the focus of the process is on the "comparability finding" made by NMFS.

NMFS maintains a List of Foreign Fisheries ("LOFF") that classifies fisheries as either "Exempt," indicating a remote likelihood or no known incidental mortality or serious injury of marine mammals, or "Export,"indicating more than a remote likelihood of such interactions or insufficient information. *Id*. § 216.24(h)(3)–(5). Only Export fisheries must obtain comparability findings. *Id*. § 216.24(h)(5)(i).

Harvesting nations with Export fisheries must apply for comparability findings by submitting "reasonable proof of the effects of the relevant fisheries on marine mammals" and documentary evidence that regulatory conditions are met. *Id*. § 216.24(h)(6)(i)–(ii). NMFS "shall consider documentary evidence provided by the harvesting nation and relevant information readily available from other sources." *Id*. § 216.24(h)(6)(ii). Where submissions are incomplete, NMFS "shall draw reasonable conclusions regarding the fishery based on ***readily available and relevant information from other sources***," including information about analogous fisheries. *Id*. (emphasis added). Thus, while countries seeking comparability findings must provide "reasonable proof" of the effects of fishing technology on marine mammals, NMFS is not limited to relying solely on that information.

To issue a comparability finding, NMFS must first determine that the harvesting nation (1) prohibits the intentional mortality or serious injury of marine mammals in commercial fishing operations, and (2) has procedures to certify reliably that exports to the United States are not products of an intentional killing or serious injury. *Id*. § 216.24(h)(6)(iii)(A).

Second, and central to this case, NMFS must find that the harvesting nation "maintains a regulatory program with respect to the fishery that is ***comparable in effectiveness*** to the U.S. regulatory program with respect to incidental mortality and serious injury of marine mammals in the course of commercial fishing operations." *Id*. § 216.24(h)(6)(iii)(B) (emphasis added).

For the harvesting nation to qualify as "comparable in effectiveness," the regulation specifies that its regulatory program must "provide[] for, or effectively achieve[] comparable results as" U.S. programs with respect to:

1) marine mammal stock assessments estimating population abundance for stocks incidentally killed or seriously injured in the export fishery;

2) the vessels fishing, the area of operations and the type of gear for the target species;

3) regulatory requirements that include reporting incidental mortality or injury, implementation of measures to reduce mortality and serious injury;

4) monitoring procedures—implementation of monitoring designed to estimate incidental mortality or serious injury, "including an indication of the statistical reliability of those estimates";

5) calculation of bycatch limits—defined as potential biological removal ("PBR") or a comparable scientific metric—for affected stocks; and

6) comparison to bycatch limits—a comparison showing the fishery does not exceed the limit.

50 C.F.R. § 216.24(h)(6)(iii)(C)(1)-(6).

The regulation's repeated emphasis on "comparable results" and "effectively achieve" establishes a results-oriented standard focused on conservation outcomes, not regulatory process or structure. Beyond the required findings, NMFS must consider: (1) U.S. implementation for similar stocks or fisheries; (2) the extent to which the harvesting nation has reduced incidental mortality and serious injury below the bycatch limit; (3) whether measures have reduced or will likely reduce cumulative take for each stock below the bycatch limit; and (4) other relevant facts and circumstances (including interaction history, whether take exceeds limits, population size and trends, population-level impacts, and conservation status). *Id*. § 216.24(h)(7). Under these factors, the test for comparability findings is results-oriented: the agency assesses whether the harvesting nation's program is comparable in effectiveness to U.S. requirements, considering the (h)(6)(iii) conditions and the (h)(7) additional considerations collectively—none of which is independently dispositive.

A comparability finding remains valid for four years. *Id*. § 216.24(h)(8)(iv). If a comparability finding "expired, was denied or terminated," the harvesting nation "may re-apply for a comparability finding at any time." *Id*. § 216.24(h)(9)(ii)(B)-(D). NMFS must decide a reapplication "within 90 days from the submission of complete information," and, if granted, must remove an import prohibition effective upon publication in the Federal Register.

## C. Procedural Background and the 2025 Determinations

The 2016 Final Rule established an initial five-year exemption period ending December 31, 2021, during which Export fisheries could continue exporting while nations developed the required regulatory frameworks. 81 Fed. Reg. at 54,391. NMFS subsequently extended this exemption three times—to December 31, 2022; to December 31, 2023; and finally, to December 31, 2025—citing the COVID-19 pandemic, application volume, and practical evaluation

difficulties. *See* 85 Fed. Reg. 69,515 (Nov. 3, 2020); 87 Fed. Reg. 63,955 (Oct. 21, 2022); 88 Fed. Reg. 80,193 (Nov. 17, 2023).

These actions occurred alongside litigation by conservation groups seeking to compel implementation. In *NRDC v. Raimondo*, No. 1:24-cv-00148 (Ct. Int'l Trade), the parties reached a stipulated settlement under which NMFS agreed to issue preliminary certifications by January 2025 and final comparability determinations by early September 2025, with the Court retaining jurisdiction to oversee compliance with non-monetary terms. The settlement did not alter NMFS's substantive obligations under 50 C.F.R. § 216.24(h) or authorize any departure from the regulation's requirements.

On September 2, 2025, NMFS issued a comprehensive set of final determinations denying comparability findings to 240 fisheries across 46 nations and establishing import prohibitions effective January 1, 2026. *See* "Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection Act," 90 Fed. Reg. 42,395, 42,398 (Sept. 2, 2025). In that notice, NMFS stated that nations denied findings "may reapply . . . at any time after January 1, 2026" — a restriction not found in, and directly contrary to, § 216.24(h)(9)(ii)(B), which allows reapplication "at any time." *See* 90 Fed. Reg. at 42,398; *but c.f.* 50 C.F.R. § 216.24(h)(9)(ii)(B).

The rationale for these determinations is set forth in a July 2, 2025 Decision Memorandum titled "Issuance of Marine Mammal Protection Act (MMPA) Comparability Findings–Decision Memorandum" (**Exhibit A**) and in country-specific comparability reports for each harvesting nation (collectively, the "2025 Comparability Findings" or "Determinations").[1] In these

---

[1] For purposes of this motion, we have limited our examples to the Philippines Final Determination, attached as **Exhibit B**; Indonesia Final Determination, attached as **Exhibit C**; and Vietnam Final Determination, attached as **Exhibit D**. A complete list of Final Determinations related to the Determinations for all nations is available at

documents, NMFS concluded that the denied fisheries failed to meet U.S. standards for marine mammal protection.

The Decision Memorandum describes NMFS's analytical approach as employing: (1) standardized report templates, (2) tiered risk screens keyed to gear type and protected stocks, (3) default PBR values where nation-specific limits were unavailable, and (4) a conservative classification of fisheries as "Export" when information was limited. Decision Memorandum at 7. The memorandum acknowledges that "the Final Rule explains that NMFS was aware that harvesting nations would experience difficulty providing documentary evidence of 'sufficient detail, quality, and reliability,' particularly because data would be incomplete, lacking, or unquantifiable." *Id.* at 8. Nevertheless, when information did not align with NMFS's expectations, the agency provided a default negative determination rather than drawing reasonable conclusions from available sources.

The Decision Memorandum further states that "[t]he MMPA neither defines 'U.S. standards' nor does it identify any specific measures that NMFS must consider in the context of evaluating a foreign nation's commercial fishing operations pursuant to section 1371(a)(2)(A)." Decision Memorandum at 8. In light of this, NMFS determined that, for purposes of implementing section 1371(a)(2), "'U.S. standards' were those set out for domestic fisheries under sections 1376 and 1377 of the MMPA." *Id.* at 14. This approach effectively engrafted domestic regulatory requirements onto foreign fisheries without accounting for differences in governance structures or capacity.

---

https://www.fisheries.noaa.gov/international-affairs/2025-marine-mammal-protection-act-comparability-finding-determinations, **Exhibit E**.

Moreover, NMFS narrowed the scope of information it considered to data provided by harvesting nations or information already contained within NMFS's own files. As stated in the Decision Memorandum, NMFS defined "readily available" information as materials "physically held by any office within NMFS (i.e., hard-copy format) and any information stored electronically in databases routinely consulted by NMFS in the ordinary course of its work." *Id.* at 8 n. 16. Information submitted outside public comment periods—unless provided by a harvesting nation in response to a specific request—was excluded. *Id.* This definition precluded consideration of scientific and industry data from other reliable sources, including information maintained by Plaintiffs and the Crab Council.

### III.    FACTUAL BACKGROUND

The facts demonstrate three critical points: (1) the substantial, good-faith investments Plaintiffs made in reliance on the regulatory framework NMFS established and repeatedly extended; (2) the flawed methodology NMFS applied in issuing the September 2, 2025 determinations; and (3) the immediate, irreparable harm those determinations will cause absent judicial relief.

### A. Industry Reliance and Investments During the Exemption Period

From 2016 through 2025, NMFS maintained an exemption period during which foreign export fisheries were permitted to continue shipping seafood to the United States while their governments pursued MMPA comparability findings. Throughout this nine-year period, U.S. seafood companies and industry organizations maintained and expanded their global supply chains in reliance on the governing regulatory framework—and on NMFS's repeated extensions of the exemption period. Decl. of L. Picard (NFI) at ¶¶ 9-10 (hereinafter "Picard Decl. (NFI)") (**Exhibit F**); Decl. of B. Phillips (Phillips Food, Inc.) at ¶¶ 46-49 (hereinafter "Phillips Decl. (Phillips

Seafood)") (**Exhibit G**); Decl. of T. Weir (Heron Point) at ¶ 17 (hereinafter "Weir Decl. (Heron Point)"), (**Exhibit H**); Decl. of T. Turkin (Supreme) ¶¶ 7-8 ("hereinafter "Turkin Decl. (Supreme)"), (**Exhibit I**). Indeed, the National Fisheries Institute's Crab Council—comprising approximately 30 member companies representing roughly 85% of all blue swimming crab imported into the United States—has invested heavily in maintaining sustainable, compliant supply chains during the exemption period. *See* Picard Decl. (NFI) at ¶¶ 8-10. Collectively, these investments total hundreds of millions of dollars.

Beyond commercial investment, Plaintiffs have undertaken extensive voluntary conservation and sustainability initiatives aligned with the goals of the MMPA. Since 2009, the Crab Council has funded Fishery Improvement Projects ("FIPs") in Indonesia, the Philippines, Vietnam, India, Thailand, and Sri Lanka. *Id*. at ¶¶ 7-9. The FIPs were designed to promote swimming crab sustainability while strengthening monitoring, data collection, stock assessments, and advance best fishing practices, all of which benefit the goals of the MMPA. *Id*. at ¶¶ 10-17.

Individual Plaintiffs likewise made long-standing, substantial capital commitments tied to the affected fisheries. Phillips Foods has sourced BSC and related products from Indonesia, the Philippines, and Vietnam since 1989, with approximately $180 million in annual revenue tied to the affected fisheries and $14.6 million in property, plant, and equipment devoted to those supply chains. Phillips Decl. (Phillips Seafood) at ¶¶ 16-17, 48. Companies such as Shaw's purchase raw crabmeat from U.S.-based importers, which is then used to manufacture value-added fresh and frozen food products. Decl. of J. Shaw, III (Shaw's) at ¶ 3 (hereinafter "Shaw Decl. (Shaw's)") (**Exhibit J**). For decades, Shaw's has sourced crabmeat from multiple countries, including Sri Lanka, Indonesia, the Philippines, Vietnam, Thailand, India, and China. *Id*. at ¶¶ 7, 14. Crabmeat from these sources represents approximately 50% of Shaw's total retail volume. *Id*. ¶ 9. Heron

Point Seafood derives a substantial portion of its annual revenue from the denied fisheries and maintains exclusive supply arrangements with major processors in Vietnam and Indonesia, with approximately 75% of its business dedicated to those suppliers. Weir Decl. at ¶¶ 15, 50. Other Plaintiffs, including Supreme Crab & Seafood, report comparable exposure and dependency. *See* Turkin Decl. (Supreme) at ¶ 9.

These collective investments—spanning infrastructure, workforce, contractual relationships, and conservation programs—were made in good-faith reliance on NMFS's nine-year phased implementation and repeated assurances that fisheries demonstrating effective protections for marine mammals would retain U.S. market access.

### B. The September 2, 2025 Determinations

On September 2, 2025, NMFS issued final decisions under the MMPA's import provisions, denying comparability findings to 240 fisheries across 46 nations and establishing import prohibitions effective January 1, 2026. *See* Implementation of Fish and Fish Product Import Provisions of the Marine Mammal Protection Act, 90 Fed. Reg. 42,395, 42,398 (Sept. 2, 2025). NMFS described this as the first issuance of final comparability findings across all harvesting nations and fisheries seeking to export to the United States (135 nations, approximately 2,500 fisheries). *Id*. at 42,395.

In addition to the Decision Memorandum discussed above, NMFS's methodology is set forth in country-specific reports. *See, e.g.*, Exs. B-D (Philippines Final Report, Indonesia Final Report, Vietnam Final Report.). These reports determine which fisheries will be subject to the import restrictions.

For the Philippines, NMFS denied BSC pot/trap and gillnet fisheries, citing high-risk gear, inadequate data, and likely exceedance of bycatch limits, without a gear-specific effectiveness

analysis distinguishing different entanglement risk profiles. *See* Ex. B, Philippines Final Report at 1.[2] For Indonesia, NMFS denied BSC gillnet fisheries while acknowledging BSC-specific monitoring measures (*e.g.*, logbooks and port sampling) and stated that certain "additional considerations" were "not pertinent." *See* Ex. C, Indonesia Final Report at 4-5, 11. For Vietnam, NMFS denied a multi-gear fishery (gillnets, trawls, traps, stationary nets) based on high risk, monitoring and reporting gaps, and unknown mitigation outcomes, without evaluating gear-specific results. [3] *See* Ex. D, Vietnam Final Report at 1-4.

**C. Economic Impact and Compressed Timeline**

The import prohibitions will affect approximately $3.89 billion in annual U.S. seafood imports—about 13% of import value (about $27.5 billion) and 16% of volume (about 1.09 of 6.8 billion pounds) of BSC. Compl. at ¶¶ 87-88. For BSC, the denials encompass roughly 89% of global supply (around 45.3 of 51.1 million pounds). Weir Decl. (Heron Point) at ¶ 41; *see also* Picard Decl. (NFI) at ¶ 30. The domestic production of canned crabmeat totals about 29,000 pounds (<0.05% of import volume). Thus, substitution at scale is not feasible on the available timeline and likely not feasible at all. *See* Phillips Decl. (Phillips Seafood) at ¶¶ 8, 41-45 (explaining an "increase is not feasible based on U.S. biological limits and labor constraints. Domestic fisheries are already operating at or near sustainable harvest limits.").

The four-month window between the determinations (September 2, 2025) and the effective date (January 1, 2026) is insufficient to restructure supply chains. Typical ocean transit times from

---

[2] As explained by Phillips Seafood, "pot fishing for crab in particular is a sustainable method that avoids entanglement, minimizes harm and reduces bycatch to almost zero." Phillips Decl. (Phillips Seafood) at ¶ 57.

[3] While Plaintiffs' claims center on the impacts to blue swimming crab fisheries, other fisheries are subject to similar determinations. Our arguments challenge the agency's methodological approach, which applies uniformly across all denials. *See* Ex. E (list of all denied nations).

Southeast Asia are eight to ten weeks; shipments departing after mid-October 2025 risk arrival after the effective date and being refused entry. Weir Decl. (Heron Point) at ¶¶ 25, 27; Phillips Decl. (Phillips Seafood) at ¶¶ 21, 28. Plaintiffs have already curtailed orders and production to avoid stranded inventory, triggering immediate and cascading harm. Phillips Decl. (Phillips Seafood) at ¶ 27; Shaw Decl. (Shaw's) at ¶ 22.

Phillips Foods anticipates shutting down certain operations by October 15, 2025, to avoid inventory that cannot clear customs, resulting in overseas facility closures, layoffs of U.S. and Canadian employees, loss of financing tied to affected product lines, and erosion of market share. Phillips Decl. (Phillips Seafood) at ¶¶ 21-23. Heron Point faces more than $10 million in potentially stranded inventory, risks to credit lines, and nonperformance under customer contracts. Weir Decl. (Heron Point) at ¶¶ 24-28. Other Plaintiffs report similar harm, including shutdowns, layoffs, stranded inventory, breaches of supply contracts, risks to financing, and permanent loss of market share and customer relationships. *E.g.*, Shaw Decl. (Shaw's) at ¶ 22; Turkin Decl. (Supreme) at ¶ 17.

## IV.    LEGAL STANDARD

To obtain a preliminary injunction a plaintiff must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm absent relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Retractable Techs., Inc. v. United States*, 739 F. Supp. 3d 1330, 1336–1337 (Ct. Int'l Trade 2024). When the Government is the opposing party, the third and fourth factors "merge." *Nken v. Holder*, 556 U.S. 418, 434 (2009). In applying these factors, courts "balance the competing claims of injury" and consider the effect of granting or withholding relief. *Winter*, 555 U.S. at 24. While the plaintiff must show at least a

"fair chance of success on the merits," "the more the balance of irreparable harm inclines in the plaintiff's favor, the smaller the likelihood of prevailing on the merits he need show in order to get the injunction." *Aluminum Extrusions Fair Trade Comm. v. United States*, 607 F. Supp. 3d 1332, 1339 (Ct. Int'l Trade 2022) (internal quotation marks omitted); *Qingdao Taifa Grp. Co. v. United States*, 581 F.3d 1375, 1378-79, 1381 (Fed. Cir. 2009); *see In re Section 301 Cases*, 524 F. Supp. 1355, 1367 n.13 (Ct. Int'l Trade 2021) ("Other circuit courts have stated that a fair chance is less than 50%.").

This action arises under the Court's residual jurisdiction, 28 U.S.C. § 1581(i). In such cases, "the Court of International Trade shall review the matter as provided in section 706 of title 5." *See* 28 U.S.C. § 2640(e). Under the Administrative Procedure Act ("APA"), the Court must "hold unlawful and set aside" agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," among other defects. 5 U.S.C. § 706(2). Arbitrary and capricious review requires that the agency examine relevant data and articulate a satisfactory explanation connecting the facts found to the choices made. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Questions of law are for the Court. *See* 5 U.S.C. § 706. After *Loper Bright*, courts do not apply *Chevron* deference to an agency's interpretation of a statute; instead, courts exercise independent judgment using the traditional tools of interpretation. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). To the extent the dispute turns on the agency's interpretation of its own regulation (*e.g.*, 50 C.F.R. § 216.24(h)), the Court should resolve the question independently, consistent with *Loper Bright*.

Plaintiffs seek (1) a preliminary injunction under U.S. Court of International Trade Rule 65 enjoining enforcement of the import prohibitions, and (2) in the alternative, a stay under 5

U.S.C. § 705 postponing the effective date of the determinations. Section 705 authorizes a court to "postpone the effective date of an agency action" when "necessary to prevent irreparable injury." 5 U.S.C. § 705. Courts apply the same four-factor framework when considering a § 705 stay. *See Nken*, 556 U.S. at 434 (stay factors mirror preliminary-injunction factors). A § 705 stay preserves the status quo by preventing the challenged action from taking effect pending review—particularly apt where, as here, a fixed effective date is itself the imminent source of irreparable harm. *Id*. at 429.

## V.    ARGUMENT

Plaintiffs satisfy all four requirements for a preliminary injunction. They are likely to succeed on the merits because NMFS's determinations exceed statutory authority, violate the agency's own regulations, and are arbitrary and capricious. Plaintiffs will suffer immediate and irreparable harm—including existential threats to their businesses—that cannot be remedied through monetary damages. The balance of equities strongly favors Plaintiffs, who face permanent destruction of supply chains, customer relationships, and ongoing conservation programs, while the government suffers minimal harm from a brief continuation of the status quo it has maintained for nine years. Finally, the public interest favors preventing enforcement of likely unlawful agency action, preserving access to affordable seafood, protecting thousands of jobs, and maintaining voluntary marine-mammal conservation efforts. Each factor is addressed in turn.

## A.  Plaintiffs are Likely to Succeed on the Merits

Plaintiffs are likely to succeed on the merits because the challenged determinations violate both the MMPA and the APA. On their face, the determinations are unlawful on multiple, independent grounds.

First, NMFS exceeded its statutory authority under 16 U.S.C. § 1371(a)(2) by conditioning market access on regulatory replication rather than assessing actual marine-mammal mortality to U.S. standards. Second, NMFS arbitrarily restricted the evidentiary record in violation of its own regulation at 50 C.F.R. § 216.24(h)(6)(ii) and the MMPA's "best scientific evidence available" requirement. Third, NMFS unlawfully amended the reapplication timing provision at 50 C.F.R. § 216.24(h)(9)(ii)(B) without notice-and-comment rulemaking. Fourth, NMFS failed to consider substantial reliance interests created by nearly a decade of phase implementation and industry investment, rendering the determinations arbitrary and capricious. Each defect independently, and certainly cumulatively, requires that the determinations be set aside under 5 U.S.C. § 706(2).

### 1.  The Determinations Exceed Statutory Authority Under the MMPA

NMFS's 2025 comparability findings exceed the statutory authority of the MMPA by imposing import bans based on procedural deficiencies rather than actual marine mammal mortality. The MMPA's import provision directs the Secretary to determine whether foreign commercial fishing "results in the incidental kill or incidental serious injury of ocean [marine] mammals in excess of United States standards." 16 U.S.C. § 1371(a)(2). In making that determination, the Secretary must "insist on reasonable proof" from exporting nations "of the effects on ocean [marine] mammals of the commercial fishing technology in use." *Id.* § 1371(a)(2)(A). Congress thus tied the ban to outcomes—actual mortality or serious injury relative to U.S. standards—supported by reasonable proof of effects. Nothing in § 1371(a)(2)

authorizes conditioning market access on adopting U.S.-style regulatory forms, processes, monitoring templates, or documentation requirements.

Nevertheless, the 2025 determinations condition access for a vast segment of the global seafood market—240 fisheries across 46 nations, affecting around $3.89 billion in annual U.S. imports (13% by value; 16% by volume)—on adherence to NMFS-selected regulatory forms rather than assessing whether specific export fisheries actually cause marine mammal mortality or serious injury above U.S. standards. Compl. at ¶¶ 87-94. NMFS denied comparability for BSC fisheries while ignoring evidence relevant to outcomes, focusing instead on paperwork gaps and the absence of U.S.-style documentation.

For example, the Philippines reported 75-99% dockside inspection coverage, and pot and trap gear presents lower entanglement risk for marine mammals than gillnets—a distinction reflected in U.S. fishery classifications and supported by approvals of analogous fisheries. *See* Ex. B, Philippines Final Report at 4; Ex. C, Indonesia Final Report at 1-2. Yet NMFS denied the finding without a gear-specific effectiveness analysis, citing insufficient "monitoring forms or other documentation" for bycatch reporting.[4] *See* Ex. B, Philippines Final Report at 3-4. Similarly, Indonesia's BSC gillnet fisheries were denied despite acknowledged "BSC-specific monitoring (including logbooks and port sampling)"; NMFS deemed additional considerations "not pertinent" due to limited institutional data, ignoring mandatory factors like whether measures reduce mortality below bycatch limits. Ex. C, Indonesia Final Report at 11; *see* 50 C.F.R. § 216.24(h)(7) (listing mandatory additional considerations, including whether measures have reduced or will

---

[4] As discussed in the NFI's declaration, this style of crab fishing, small pots on the surface of the seabed being tended by small boats, is extremely unlikely to have any interaction with marine mammals, much less to cause mortality or serious injury. *See* Picard Decl. (NFI) at ¶¶ 24-25; *see also* Phillips Decl. (Phillips Seafood) at ¶ 57 (discussing the low risk of entanglement from crab pots).

likely reduce mortality below bycatch limits). And Vietnam's multi-gear fisheries were denied for monitoring and reporting gaps and "unknown" outcomes, lumping pots, traps, gillnets, and trawls together despite different interaction profiles. *See* Ex. D, Vietnam Final Report at 1-5.

In each case, NMFS imposed bans based on procedural deficiencies rather than demonstrated excess mortality. This process-centric approach not only exceeds the statute's outcomes focus but also claims unheralded power over significant economic activity. Courts "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021); *see West Virginia v. EPA*, 597 U.S. 697, 723–24 (2022); *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014) (plurality) ("When an agency claims to discover in a long extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism.").

NMFS's approach also contravenes its own regulation, which mirrors the statute's emphasis on results: a foreign program must be "comparable in effectiveness," meaning it "provides for, or effectively achieves comparable results as" the U.S. program. 50 C.F.R. § 216.24(h)(6)(iii)(B)-(C). But the determinations elevated procedural alignment over outcome evidence and declined to draw reasonable inferences from monitoring data, analogous fisheries, or gear-specific risk assessments.

Because NMFS applied § 1371(a)(2) to require U.S.-style regulatory forms rather than evaluating actual marine mammal mortality, it exceeded its statutory authority. The determinations are therefore "in excess of statutory . . . authority" and must be set aside under 5 U.S.C. § 706(2)(C).

## 2. NMFS Arbitrarily Restricted the Evidentiary Record in Violation of Its Own Regulations and the MMPA's "Best Scientific Evidence Available" Requirement

The governing regulations require NMFS to look beyond government submissions and draw reasonable conclusions about marine mammal impacts from all information available. NMFS ignored these mandates.

When evaluating comparability, NMFS "shall consider" documentary evidence provided by the harvesting nation and relevant information readily available from other sources. 50 C.F.R. § 216.24(h)(6)(ii). Where submissions are incomplete, NMFS "shall draw reasonable conclusions regarding the fishery based on readily available and relevant information from other sources," including analogous fisheries. *Id*. Separately, when compiling the List of Foreign Fisheries, NMFS "shall consider" information from published literature, regional fishery management organizations, nongovernmental and industry organizations, academic institutions, and citizens. *Id*. § 216.24(h)(3)(iv). Read together, these provisions require NMFS to incorporate scientific and industry sources to fill evidentiary gaps and conduct a reasoned, outcomes-based assessment.

Yet in its 2025 Decision Memorandum, NMFS confined "readily available" information to materials already in its files or databases it "routinely" consults, generally declining to consider submissions outside formal comment periods unless solicited from a harvesting nation. Decision Memorandum at 8 n. 16. This self-imposed limitation excluded the very categories of information the rule identifies—peer-reviewed literature, fishery-improvement-project datasets, observer reports, studies from NGOs and academic institutions, and industry organizations—based on source or timing rather than scientific merit. An agency cannot nullify regulatory commands by narrowing them through internal policy.

This restriction also produces untenable asymmetry: the regulation permits use of industry or academic data to identify export fisheries but not to evaluate their comparability. 50 C.F.R.

§ 216.24(h)(3)(iv). And it violates the MMPA's best-science requirement, which mandates that determinations be based "on the basis of the best scientific evidence available." 16 U.S.C. § 1373(a). Comparability findings under § 1371(a)(2) fall within this mandate, as they assess whether foreign fishing results in marine mammal take "in excess of United States standards." NMFS cannot satisfy this obligation by prioritizing administrative custody over scientific quality; it may reject outside information on merit grounds but cannot refuse to consider relevant data based on who submitted it.

As explained in the NFI declaration, the NFI Crab Council has invested approximately $1 million annually since 2009 to sponsor blue swimming crab FIPs in Indonesia, the Philippines, Vietnam, India, Thailand, and Sri Lanka. These projects promote sustainability through bycatch reduction, improved monitoring/traceability, stock assessments, and best practices that directly support MMPA goals. Picard Decl. (NFI) at ¶¶ 10-17. Crab Council representatives work daily on docks, in the processing facilities, and in the fishing communities to implement and verify these measures, providing in-depth knowledge of fishery operations and marine mamma interactions. *See* Picard Decl. (NFI) at ¶ 11. Companies like Phillips have engaged in similar efforts to achieve compliance but have been rebuffed. Phillips Decl. (Phillips Seafood) at ¶¶ 50-52. Yet NMFS's evidentiary restriction sidelined this outcomes-relevant information if not already in its files, calling into question every comparability finding.

The agency's reports confirm it was aware of such information but disregarded it. For example, the Indonesia Final Report acknowledges BSC-specific monitoring (logbooks, port inspections, interviews, stranding reports) and peer-reviewed literature like Anderson et al. (2020) on small-cetacean bycatch in Indian Ocean gillnet fisheries. *See* Ex. C, Indonesia Final Report at 6. Rather than using these to draw reasonable conclusions tailored to the export fishery and gear

(as § 216.24(h)(6)(ii) requires), NMFS defaulted to "insufficient information," inferred exceedances from regional estimates, and declared "additional considerations" (*e.g.*, whether measures reduce mortality below limits) "not pertinent." *Id.* at 11; *see also* 50 C.F.R. § 216.24(h)(7).

Similar errors yielded unexplained disparities across fisheries. NMFS approved certain Indonesian pot/trap operations on limited monitoring but denied comparable Philippine pot/trap fisheries reporting 75-99% dockside inspection coverage—without explaining why Indonesian outcomes could not inform reasonable conclusions about Philippine fisheries using similar gear. Ex. B, Philippines Final Report at 4. Vietnam's multi-gear fisheries were denied based on "unknown" outcomes, as NMFS lumped pots, traps, gillnets, and trawls together despite their differing interaction risks with marine mammals. Ex. D, Vietnam Final Report at 1-5. In each instance, NMFS elevated procedural alignment over outcome evidence and failed to integrate gear-specific risks or analogous-fishery data, as required.

This failure to consider relevant information is arbitrary, capricious, and contrary to law. An agency acts arbitrarily when it "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. By redefining "readily available" to exclude requires sources, NMFS violated 50 C.F.R. § 216.24(h)(6)(ii), (h)(7), and 16 U.S.C. § 1373(a). The determinations must be set aside under 5 U.S.C. § 706(2)(A) and (C).

### 3. NMFS's Restriction on Reapplication Violates Both the Regulation and the APA

The 2016 rule—adopted through notice-and-comment rulemaking—provides that a harvesting nation whose fisheries are denied a comparability finding "may re-apply . . . ***at any time***" by submitting documentary evidence demonstrating compliance. 50 C.F.R. § 216.24(h)(9)(ii)(B) (emphasis added). NMFS must decide a reapplication within 90 days of

receiving complete information, *id*. § 216.24(h)(9)(ii)(C), and, if granted, must remove the import prohibition effective upon publication in the Federal Register. *Id*. § 216.24(h)(9)(ii)(D). This design serves as a deliberate safety valve allowing prompt corrections of deficiencies and minimizing unnecessary trade disruption.

The 2025 notice rewrites the 2016 rule by stating that denied nations "may reapply . . . at any time ***after*** January 1, 2026." 90 Fed. Reg. 42,395, 42,398 (emphasis added). This waiting period bars reapplication until after the import ban takes effect, directly contradicting the unqualified "at any time" in § 216.24(h)(9)(ii)(B).

Two independent APA defects follow. First, the restriction is contrary to law and in excess of statutory authority. *See* 5 U.S.C. § 706 (A), (C). Agencies must follow their own regulations. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (stating that an agency is bound by the plain language of its regulation); *see also United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267-68 (1954). By imposing a temporal bar irreconcilable with "at any time," NMFS acted "not in accordance with law" and "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A), (C). Nothing in the MMPA authorizes NMFS to restrict when a nation may submit "reasonable proof . . . of the effects on [marine] mammals." 16 U.S.C. § 1371(a)(2)(A).

Second, this restriction constitutes a procedural violation. *See* 5 U.S.C. § 706(D). This new prohibition substantively amends a promulgated rule but was imposed through a notice announcing adjudicatory outcomes, without notice-and-comment rulemaking. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302-03 (1979); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) (noting an agency may not use an interpretive statement to alter rights or obligations fixed by regulation).

The immediate-reapplication and 90-day-decision provisions were designed to prevent unnecessary trade disruption when curative evidence is available. By imposing a four-month

blackout, NMFS ensures that even compliant reapplications submitted between September and December 2025 cannot be decided before the ban takes effect—contrary to § 216.24(h)(9)(ii)(C)-(D)'s "90 days" and "effective upon publication" commands. NMFS also ignored reasonable reliance interests on this process, created by nearly a decade of regulatory assurances and phased implementation. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913-15 (2020); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222-24 (2016).

Plaintiffs have attempted to work with affected nations to address NMFS's concerns, but those efforts have been rebuffed. *See* Picard Decl. at ¶¶ 50-51 ("If given the opportunity to provide additional information, clarification, and evidence of ongoing reforms before the January 1st deadline, several countries believe they could address NOAA's concerns and obtain comparability findings.").

The reapplication restriction conflicts with the regulation's plain text, frustrates its remedial design, and was imposed without notice-and-comment. It is therefore unlawful under 5 U.S.C. § 706(2)(A), (C), and (D).

### 4. NMFS Arbitrarily Failed to Assess or Address Substantial Reliance Interests

When an agency changes course in a way that disrupts reasonable reliance, it must identify those interests, evaluate their significance, and weigh them against competing policy concerns. *Regents*, 591 U.S. at 29-33; *Encino Motorcars*, 579 U.S. at 222-24; *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Failure to undertake this analysis is arbitrary and capricious. *Regents*, 591 U.S. at 29-33.

The 2016 rule and subsequent extensions reasonably induced reliance**.** Through notice-and-comment, NMFS adopted 50 C.F.R. § 216.24(h), establishing a results-oriented framework: foreign programs must be "comparable in effectiveness," meaning they provide for, or effectively

achieve comparable results to, U.S. programs. 50 C.F.R. § 216.24(h). The rule introduced a five-year exemption period to allow nations to build capacity and provided that NMFS would consider information from any source. NMFS then extended that period three times (to December 31, 2025). 81 Fed. Reg. 54,390 (Aug. 15, 2016); 85 Fed. Reg. 69,515 (Nov. 3, 2020); 87 Fed. Reg. 63,955 (Oct. 21, 2022); 88 Fed. Reg. 80,193 (Nov. 17, 2023). This framework reasonably signaled that demonstrating conservation outcomes—even via different regulatory means—would satisfy the rule.

Plaintiffs acted in substantial, good-faith reliance on that outcomes-based approach. The NFI Crab Council invested roughly $1 million annually since 2009 to fund blue swimming crab Fishery Improvement Projects across Southeast Asia designed to improve monitoring, traceability, and advance sustainability outcomes. Picard Decl. (NFI) at ¶¶ 7-17. Individual Plaintiffs made significant capital and supply-chain commitments—building facilities, establishing exclusive processing arrangements, and entering long-term customer contracts—based on the expectation that outcomes-based compliance would be recognized, representing hundreds of millions in annual revenue and thousands of jobs. *See, e.g.*, Phillips Decl. (Phillips Seafood) at ¶¶ 46-49; *see also* Turkin Decl. (Supreme) at ¶¶ 29-31.

The 2025 determinations abandoned that understanding and imposed a process-centric approach without acknowledging these reliance interests. In denying comparability findings, NMFS focused on documentary and procedural gaps rather than evaluating whether foreign measures effectively achieved comparable results. Compl. at ¶¶ 4-5, 108-111, 137-138. The agency never addressed Plaintiffs' decade-long FIP investments, capital expenditures, or the industry's reliance on the nine-year phased implementation regime. Nor did it consider transitional tools—such as phased implementation, conditional approvals, or interim measures—to mitigate

disruption while maintaining conservation progress. Instead, NMFS issued blanket import bans and announced that no corrective action would be considered for months. That silence on reliance is precisely what *Regents* condemns.

The resulting disruption is both substantial and foreseeable. The denials affect approximately $3.89 billion in annual seafood imports (13% by value; 16% by volume). For blue swimming crab alone, they eliminate 89% of supply (45.3 of 51.1 million pounds), while domestic production (29,000 pounds) is de minimis and cannot substitute. Weir Decl. (Heron Point) at ¶ 41; Phillips Decl. (Phillips Seafood) at ¶¶ 41-45. Plaintiffs face plant shutdowns, layoffs, stranded inventory, contracts breaches, and lasting loss of market share and goodwill. Weir Decl. (Heron Point) at ¶¶ 33-39 45-40; Phillips Decl. (Phillips Seafood) at ¶¶ 16-40; Shaw Decl. (Shaw's) at ¶¶ 22-39. *Regents* requires the agency to grapple with such reliance and disruption; NMFS did not.

This omission renders the determinations arbitrary and capricious. An agency acts arbitrarily when it "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. By failing to identify, assess, or weigh substantial reliance interests created by the 2016 rule and reinforced by subsequent extensions, NMFS violated the APA. 5 U.S.C. § 706(2)(A).

### B. Plaintiffs will Suffer Irreparable Harm

The 2025 comparability findings and resulting import bans pose an existential threat to an irreplaceable segment of the U.S. seafood supply chain. The harm is immediate and irreparable— companies will become insolvent, workers will lose their jobs, and the market may never recover.

Irreparable harm exists where no adequate remedy at law is available. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The named Plaintiffs and several NFI member companies derive most of their revenue from products sourced from the denied

fisheries. If they cannot import crab, the consequences will be immediate—affecting operations, employees, customers, and consumers. Irreparable harm includes loss of customers, market share, and goodwill. *See F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 600 (1966) (recognizing irreparable injury where there is destruction of a business entity or its competitive position that render it extremely difficult and very probably impossible to restore the status quo thereby justifying injunctive relief). Courts also recognize reputational injury and loss of intangible assets that defy valuation as irreparable. *Bell Helicopter Textron, Inc. v. Airbus Helicopters*, 78 F. Supp. 3d 253, 274-75 (D.D.C. 2015) (also recognizing loss of customer and sales as irreparable harm). And purely financial losses are irreparable where they threaten a company's existence. *See, e.g.*, *Smoking Everywhere, Inc. v. FDA*, 680 F. Supp. 2d 62, 76-77 (D.D.C. 2010), *aff'd sub nom. Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010).

### 1. Immediate and Existing Harm

Although the import bans do not take effect until January 1, 2026, they are already disrupting existing operations. It takes roughly eight to ten weeks to ship processed crab from Southeast Asia to the United States. Thus, crab leaving the docks this week will likely arrive after January 1, 2026, and be barred from entry. Turkin Decl. (Supreme) at ¶¶ 16-17; Weir Decl. (Heron Point) at ¶ 24. Plaintiffs must now make multi-million-dollar commitments knowing that shipments may be refused, and several already face stranded inventory in early 2026. Weir Decl. (Heron Point) at ¶¶ 24-28; Turkin Decl. (Supreme) ¶ 19. To avoid that trap, companies will have to start curtailing operations now—causing immediate layoffs, facility closures, and contract cancellations. *See, e.g.*, Phillips Decl. (Phillips Seafood) at ¶ 21 (ceasing certain operations by mid-October). The September to January window is shorter than the supply chain cycle; each day without relief compounds irreparable harm.

### 2. Existential Economic Harm

For several Plaintiffs, the denied fisheries constitute their core revenue and asset base. *E.g.*, Phillips Decl. (Phillips Seafood) at ¶¶ 16-17 (Phillips: $179,986,956 annual revenue; $14,682,353 in dedicated PP&E); *see also* Weir Decl. (Heron Point) at ¶ 50. These are not ordinary lost profits but permanent losses of going-concern value, supply relationships, processing capacity, and market position—injuries no monetary award can repair.

### 3. No Adequate Substitute Exists

The denied fisheries supply roughly 89% of U.S. blue swimming crab imports (about 45.3 of 51.1 million pounds), while domestic canned crabmeat production totals only about 29,000 pounds, which is less than 0.05% of import volume. *See* Compl. at ¶ 142; Weir Decl. (Heron Point) at ¶ 41. Because crab is a wild-caught resource with inherent supply limitations, approved fisheries cannot simply increase production to meet displaced demand. Shaw Decl. (Shaw's) at ¶ 19. Other international sources cannot match the required volume, quality, or form. Phillips Decl. (Phillips Seafood) at ¶¶ 41-45. Once Plaintiffs lose supply chains and placements, those losses are permanent—even if the ban is later lifted. Shaw Decl. (Shaw's) at ¶¶ 28-31; Weir Decl. (Heron Point) at ¶ 47; Phillips Decl. (Phillips Seafood) at ¶¶ 31-37.

### 4. Destruction of Business Relationships and Reputation

The ban will force breaches with distributors, restaurants, retailers, and foodservice operators—many of whom rely exclusively on Plaintiffs for blue swimming crab. Weir Decl. (Heron Point) at ¶¶ 14-15; Turkin Decl. (Supreme) at ¶ 23, Phillips Decl. (Phillips Seafood) at ¶¶ 24-26. Longstanding relationships and goodwill built over decades will be destroyed. *Id.* If blue crab disappears from menus and grocery stores, it will be replaced by substitutes, and customers will not return. Shaw Decl. (Shaw's) at ¶¶ 28-31. Plaintiffs are reasonably concerned with the

inevitable damage to customer relationships built over generations. *Id.* at ¶ 39. These are classic, non-quantifiable harms. *Aluminum Extrusions*, 607 F. Supp. 3d at 1340-41; *Bell Helicopter*, 78 F. Supp. 3d at 274–75.

### 5. Permanent Loss of Skilled Workforce and Processing Infrastructure

Immediate shutdowns will lead to layoffs of specialized workers and closures of dedicated facilities. These losses of expertise and relationship-specific assets cannot be recreated. Phillips Decl. (Phillips Seafood) at ¶¶ 28-30. Exclusive packing arrangements and capital investments exchanged for production rights will vanish once unwound. Weir Decl. (Heron Point) at. ¶ 29.

### 6. Credit, Financing, and Cascading Failures

Plaintiffs' credit facilities depend on inventory valuations and covenants premised on continued operations in the denied fisheries. The sudden loss of supply threatens covenant defaults, withdrawal of financing, and cascading business failure—harms distinct from and compounding the import ban. Weir Decl. (Heron Point) at ¶¶ 36-39; Phillips Decl. (Phillips Seafood) at ¶¶ 31-33 ("As our inventory and receivables decrease due to the shutdown of imports, our bank will dramatically reduce or eliminate our credit line, accelerating our financial collapse.").

### 7. Environmental and Conservation Harm (Loss of FIP Gains)

The comparability findings will also undermine environmental progress. Environmental injuries are inherently irreparable. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Since 2009, NFI's Crab Council has invested roughly $1 million annually to fund FIPs reducing marine-mammal bycatch, improving monitoring and traceability, supporting stock assessments, and implementing bycatch-reduction measures. Picard Decl. (NFI) at ¶ 9. "The Crab Council maintains a permanent staff presence on the ground in the major BSC producing countries, including Indonesia, Philippines, Vietnam, Thailand, and India. This includes full-time personnel

based in Jakarta and throughout the region who work directly with processors, fishermen, and government officials." *Id.* at ¶ 10. By closing these fisheries to U.S. companies, NMFS will collapse these voluntary projects by removing the U.S.-market incentive, halting data collection and species protection efforts.[5] Maintaining the status quo pending review preserves these ongoing conservation gains; allowing the ban to take effect would set them back years.

Plaintiffs face immediate, compounding harms that are not compensable and are permanent: existential threats to business survival; loss of customers, goodwill, and market share; destruction of skilled workforces and specialized facilities; cascading credit defaults; and collapse of long-running conservation programs. No monetary remedy can make Plaintiffs whole. Preliminary relief is necessary to preserve the status quo while the Court adjudicates the merits.

### C. The Equities and Public Interest Weigh Heavily in Favor of an Injunction

When the government is the opposing party, the balance-of-equities and public-interest factors merge. *Nken*, 556 U.S. at 434. The question is whether the public interest is better served by granting or denying interim relief. *Winter*, 555 U.S. at 24; *see Aluminum Extrusions*, 607 F. Supp. 3d at 1339-41. Both factors strongly favor maintaining the status quo here.

### 1. Minimal, Self-Inflicted Harm to the Government From Preserving the Status Quo

Preserving the 2016-2025 exemption regime—extended three times through December 31, 2025—imposes at most minimal harm on the government, which has already deferred implementation for nine years. 85 Fed. Reg. 69,515 (Nov. 3, 2020); 87 Fed. Reg. 63,955 (Oct. 21, 2022); 88 Fed. Reg. 80,193 (Nov. 17, 2023). A short stay pending judicial review simply pauses implementation while the Court determines lawfulness. If Defendants prevail, they may enforce

---

[5] Individual companies such as Phillips Seafood have made clear that their "business depends on long-term healthy fisheries and marine ecosystems, and we partner with our suppliers to ensure that they live up to these principles." Phillips Decl. (Phillips Seafood) at ¶ 56.

the determinations then; if not, an injunction will have prevented irreversible disruption to the market, workforce, and conservation programs. *See Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014) (injunction preserves the controversy "in its then existing condition").

### 2. No Public Interest in Enforcing Likely Unlawful Action

"There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (finding the trial court did not abuse its discretion in "determining where the public interest lies when it concluded that enforcement of a potentially unconstitutional law that would also have severe economic effects is not in the public interest). Plaintiffs are likely to succeed on the merits: NMFS exceeded its statutory authority; applied a process-centric test inconsistent with the regulation's "comparable results" mandate; unlawfully restricted evidence contrary to 50 C.F.R. § 216.24(h)(6)(ii) and the MMPA's "best scientific information available" requirement; imposed a reapplication prohibition that contradicts § 216.24(h)(9)(ii)(B); and ignored reliance interests under *Regents*. Moreover, NMFS has stated it will not even consider corrective submissions until after the harm has already occurred. The public interest therefore favors preventing enforcement of likely unlawful determinations during review.

### 3. Public Interest in Access to Affordable, Sustainable Seafood

The prohibitions would remove approximately 89% of blue swimming crab from the U.S. market—effectively eliminating this product from American commerce. Weir Decl. (Heron Point) at ¶ 41. Without imports from the denied fisheries, the domestic market for blue swimming crab will collapse, erasing an affordable and widely used protein from restaurants, retailers, and foodservice. *See, e.g.*, Shaw Decl. (Shaw's) at ¶ 31. Preventing an unnecessary supply shock during judicial review benefits consumers and the broader public.

### 4.  Public Interest in Jobs, Economic Stability, and Communities

The determinations impact roughly $3.89 billion in annual imports (13% by value; 16% by volume). Picard Decl. (NFI) at ¶ 30. The import restriction threatens thousands of U.S. jobs in processing, distribution, logistics, retail, and restaurants. The Restaurant Law Center's members alone employ 16 million workers—about 10% of the U.S. workforce. These are not merely private losses; they represent cascading effects on local economies, small businesses, and interstate commerce.

### 5.  Public Interest in Effective Marine-Mammal Conservation (not Performative Process)

Environmental protection is compelling to public interest. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). But the relevant question is whether NMFS's action advances that goal. Plaintiffs have shown the denials are not based on evidence of mortality in excess of U.S. standards; a paperwork-driven embargo does not advance conservation. Worse, allowing the ban to take effect would collapse ongoing Fishery Improvement Projects that reduce bycatch and improve monitoring, halting on-the-ground mitigation, conservation, and other mammal protection initiatives conducted by industry members to maintain sustainable supply. Picard Decl. (NFI) at ¶¶ 37-39. The result is perverse: removing the U.S. market incentive eliminates voluntary conservation while providing no evidence of excess marine mammal mortality. Maintaining the status quo preserves conservation gains; enforcing the ban would set them back years.

### 6.  Public Interest in the Rule of Law and Orderly Administration

The public benefits when agencies follow their own regulations and refrain from amending them through adjudicatory notice. Here, NMFS's "reapply after January 1, 2026" limitation, 90 Fed. Reg. 42,398, directly contradicts the rule's plain-text right to "re-apply" at any time. 50 C.F.R. § 216.24(h)(9)(ii)(B). Preserving the regulatory entitlement to immediate reapplication—and the

associated 90-day decision and removal-upon-publication framework—serves rule-of-law values and administrative regularity.

On one side: preserving a nine-year status quo, ongoing conservation programs, and the public's access to food and jobs. On the other: a brief delay in implementing determinations that are likely unlawful and can be imposed later if upheld. Allowing the ban to take effect would cause immediate, irreversible harm; staying it preserves the status quo while the Court decides legality. The equities and public interest decisively favor preliminary relief.

## VI.    CONCLUSION

NMFS's determinations impose an import ban on 240 fisheries across 46 nations—not because those fisheries demonstrably cause marine-mammal mortality in excess of U.S. standards, but because they fail to replicate U.S.-style regulatory structures. This approach ignores statutory authority, violates the agency's regulations, disregards the best available scientific evidence, and ignores nearly a decade of reasonable industry reliance.

The consequences are immediate and irreversible: the permanent destruction of supply chains and customer relationships built over decades; the elimination of 89% of the U.S. blue swimming crab supply with no viable substitute; plant shutdowns and mass layoffs; and the collapse of voluntary conservation programs that have successfully reduced marine-mammal bycatch for years. All of this will occur within the four-month window before the ban takes effect— a timeline shorter than the ocean transit time from Southeast Asia.

By contrast, the government faces minimal harm from a brief continuation of the exemption regime it has maintained since 2016 and extended three times, most recently through December 31, 2025. Preserving the status quo pending judicial review allows the Court to assess the legality of NMFS's determinations without triggering irreversible economic and environmental harm. There is no public interest in enforcing agency action that exceeds statutory authority,

contradicts regulatory mandates, and ignores the evidence the agency was required to consider. Preliminary relief is necessary, appropriate, and fully supported by law and equity.

For these reasons, Plaintiffs respectfully request that the Court grant a preliminary injunction enjoining enforcement of the import prohibitions and the unlawful reapplication restriction, and preserving the status quo pending resolution of this action.

Respectfully submitted,

Dated: October 14, 2025

Ashley Akers
Rafe Petersen (Pro Hac Vice)
Andrew McAllister
Kamran Mohiuddin (Pro Hac Vice)
Maggie Pahl (Pro Hac Vice)
HOLLAND & KNIGHT LLP
800 17th Street N.W., Suite 1100
Washington, D.C. 20006
Tele: 202-441-5870
Ashley.Akers@hklaw.com
Rafe.Petersen@hklaw.com
Andrew.Mcallister@hklaw.com
Kamran.Mohiuddin@hklaw.com
Maggie.Pahl@hklaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I, Ashley Akers, hereby certify that this brief complies with the 14,000 word limitation of the United States Court of International Trade set forth in Standard Chambers Procedure § 2(B)(1) because this brief contains 9,178 words. In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.

/s/ Ashley Akers
Ashley Akers

*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Ashley Akers, one of the attorneys for Plaintiffs, certify that the foregoing document was filed electronically with the Court's Case Management/Electronic Case Filing (CM/ECF) system on October 14, 2025. The Court and/or Clerk of the Court may serve and give notice to counsel by CM/ECF electronic transmission.

/s/ Ashley Akers
Ashley Akers

*Attorney for Plaintiffs*

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| NATIONAL FISHERIES INSTITUTE, *et al.*,<br><br>                    Plaintiffs,<br><br>v.<br><br>UNITED STATES, *et al.*,<br><br>                    Defendants. | Case No. 1:25-cv-00223<br><br>ORDER ON MOTION FOR PRELIMINARY INJUNCTION |

**PROPOSED ORDER**

Upon consideration of Plaintiffs' Application for Motion for Preliminary Injunction, and after due deliberation, it is hereby:

ORDERED that Plaintiffs' Motion Preliminary Injunction is GRANTED; and it is further

ORDERED that Defendants are enjoined pending resolution of this matter from enforcing the import prohibitions that are set to take effect January 1, 2026, related to the September 2, 2025 comparability findings issued by the National Marine Fisheries Service.

_____
JUDGE, United States Court of International Trade

Dated: _____
          New York, New York

# EXHIBIT A

UNITED STATES DEPARTMENT OF COMMERCE
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
Silver Spring, MD 20910

July 3, 2025

MEMORANDUM FOR:    Eugenio Piñeiro Soler
                   Assistant Administrator
                     for Fisheries

THROUGH:           Emily Menashes
                   Deputy Assistant Administrator
                     for Operations

                   MENASHES.EMILY.HANSON.136582122 0
                   Digitally signed by MENASHES.EMILY.HANSON.1365821220
                   Date: 2025.07.09 17:16:59 -04'00'

FROM:              Alexa Cole
                   Director, Office of International Affairs,
                     Trade, and Commerce

                   COLE.ALEXA.ANNE.1365825030
                   Digitally signed by COLE.ALEXA.ANNE.1365825030
                   Date: 2025.07.03 09:18:14 -04'00'

SUBJECT:           Issuance of Marine Mammal Protection Act (MMPA)
                   Comparability Findings – **DECISION MEMORANDUM**

**SUMMARY**

The Marine Mammal Protection Act (MMPA) precludes the import into the United States of fish and fish products taken in foreign commercial fisheries that have serious injury and mortality of marine mammals in excess of U.S. standards. Regulations issued to implement the MMPA fish import provisions require exporting nations to receive a finding that their regulatory program for marine mammal bycatch mitigation in each fishery is comparable in effectiveness to the U.S. program. Over 130 nations have applied for comparability findings for over 2500 foreign fisheries. Under our regulations, NMFS must finalize our comparability findings no later than November 30, 2025; however, per the terms of a recent settlement agreement, we must issue our final determinations by September 1, 2025. Comparability determinations are made on a fishery-by-fishery basis, not on a nation-basis. Any fishery that does not receive a comparability finding will be subject to import restrictions on the fish and fish products from that foreign fishery. These import restrictions will go into effect on January 1, 2026.

**BACKGROUND**

**A.    MMPA Provisions Governing the Importation of Fish and Fish Products into the United States**

The MMPA requires the United States to ban the importation of fish or fish products that have been caught with commercial fishing technology that results in the incidental kill or incidental serious injury of marine mammals in excess of U.S. standards. *See* 16 U.S.C. § 1371(a)(2). For

purposes of applying Section 1371(a)(2) of the MMPA, the Secretary of Commerce shall insist on reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on marine mammals of the commercial fishing technology in use for such fish or fish products exported from such nation to the United States. *Id.* at § 1371(a)(2)(A). The MMPA also states it is unlawful to import into the United States any fish if such fish was caught in a manner which the Secretary of Commerce has proscribed for persons subject to the jurisdiction of the United States, whether or not any marine mammals were in fact taken incidental to the catching of the fish. *Id.* at §1372(c)(3). The prohibition includes, among other things, the intentional killing or serious injury of marine mammals in the course of commercial fishing. *Id.* at § 1378(a)(5); 50 C.F.R. § 229.3(f).

In 2008, the Center for Biological Diversity and Turtle Island Restoration Network filed a petition for rulemaking requesting that NMFS and other relevant federal agencies exercise their authority under the MMPA to ban the imports of swordfish and swordfish products from nations that had failed to provide reliable information regarding the incidental mortality and serious injury of marine mammals in foreign fishing gear used to catch swordfish. NMFS initiated a new rulemaking process in response to the petition. The U.S. commercial fishing industry supported the rulemaking because it wanted fisheries in other nations to be subject to the same standards of marine mammal conservation as U.S. commercial fisheries. In addition, in 2011 and 2012, non-governmental organizations urged NMFS to ban the importation of Canadian and Scottish farmed salmon into the United States due to intentional killing of seals, which is prohibited under the MMPA. NMFS issued a proposed rule in 2015 that addressed the incidental and intentional killing and serious injury of marine mammals and the importation of fish and fish products into the United States; however, the rule applied to a substantially larger universe of nations and fisheries than the petitioners requested originally.[1]

The MMPA Import Provisions Final Rule ("Final Rule") was published in 2016.[2] The Final Rule established a process to evaluate a harvesting nation's regulatory program concerning the incidental and intentional mortality and serious injury of marine mammals in fisheries operated by nations that export fish and fish products to the United States. Harvesting nation's commercial fisheries are required to be classified by NMFS as either "Exempt"[3] or "Export"[4] fisheries based on the risk of marine mammal bycatch (i.e., entanglement or capture) in fishing gear. This list of Exempt and Export fisheries, known as the List of Foreign Fisheries (LOFF), was last updated in 2020 and currently consists of approximately 1,400 Export fisheries and 1,100 Exempt fisheries totaling approximately 2,500 fisheries across 135 nations.[5] Despite the

---

[1] NMFS received public comment on the petition over the course of nearly seven years, including requests to ban additional fish and fish products from other harvesting nations. NMFS determined that the rulemaking would be broader in scope than the 2008 petition and not limited in application to swordfish fisheries.

[2] *See* 81 Fed Reg. 54390 (August 15, 2016).

[3] An "Exempt" fishery is a foreign commercial fishery determined by NMFS to have a remote likelihood of, or no known, incidental mortality and serious injury of marine mammals in the course of commercial fishing operation. Exempt fisheries are considered to be the functional equivalent to Category III fisheries under the U.S. regulatory program.

[4] An "Export" fishery is a foreign commercial fishery determined by NMFS to have more than a remote likelihood of incidental mortality and serious injury of marine mammals in the course of commercial fishing operations. Export fisheries are considered to be the functional equivalent to Category I and II fisheries under the U.S. regulatory program.

[5] NMFS expects to update the LOFF in late 2025.

name, Exempt fisheries are still subject to the import provisions – they are, however, subjected to more limited conditions for comparability evaluation, namely demonstrating a prohibition on intentional mortality and serious injury of marine mammals in the course of commercial fishing operations or demonstrating it has procedures to reliably certify that exports of fish and fish products to the United States are not the product of an intentional killing or serious injury of a marine mammal.

Fish and fish products from fisheries identified on the LOFF may only be imported into the United States if the harvesting nation has applied for, and NMFS has issued, a comparability finding. A comparability finding means the harvesting nations' Export and/or Exempt fisheries meet the applicable conditions specified in the Final Rule.[6] Comparability findings are fishery-specific, not nation-specific, so nations receiving a partial denial will be able to continue exporting fish or fish products to the United States from any fishery that receives a comparability finding. All final comparability findings will be published in the *Federal Register* and, in cases where NMFS denies or terminates a comparability finding for a fishery, it will coordinate with the Secretaries of Treasury and Homeland Security to identify and prohibit the importation of fish and fish products into the United States. The Final Rule also established a five-year exemption period before imports would be subject to trade restrictions. The exemption period has been extended three times and ends on December 31, 2025.

Pursuant to a settlement agreement in *NRDC, et al. v. Raimondo, et al.,* and consistent with the Final Rule, in December 2024 and January 2025 NMFS issued letters informing nations that it was preliminarily denying comparability findings for one or more of the nations' fisheries, along with the reasons for the preliminary denial, and offered an opportunity for nations to supply reliable information to refute the preliminary denial[7]. Also pursuant to the settlement agreement, NMFS is required to issue final comparability findings for all harvesting nations and submit the findings to the *Federal Register* for publication on or before September 1, 2025. On January 1, 2026, NMFS, in cooperation with the Secretaries of Treasury and Homeland Security, will implement the prohibition on the importation of fish and fish products into the United States from all harvesting nations' fisheries for which NMFS has denied a comparability finding.

Additional details regarding the Final Rule, its applicability to the 2025 final comparability findings, and NMFS's process and methodology for making the findings are provided below.

## B.    Litigation History

Litigation involving 16 U.S.C. § 1371(a)(2) increased significantly following the publication of the Final Rule. Environmental NGOs filed several lawsuits claiming the U.S. Government has violated its non-discretionary duty under the MMPA to impose import bans on foreign nations' fish and fish products that have been harvested in violation of the MMPA's standards. The cases and their status are summarized below.

- *Natural Resources Defense Council, Inc., et al. v. Ross, et al.*, Case 18-00055 (CIT) – On March 21, 2018, Plaintiffs initiated a lawsuit in the Court of International Trade alleging

---

[6] The applicable regulatory conditions are contained in 50 CFR §§ 216.24(h)(6) & (7).

[7] NMFS issued a preliminary denial letter to Namibia in June 2025 upon further review of relevant information.

that NMFS's failure to ban imports of fish and shrimp from gillnet fisheries in the northern Gulf of California violated the MMPA and Administrative Procedure Act (APA). The Plaintiffs were concerned that the Mexican commercial gillnet fisheries resulted in the incidental mortality and serious injury of the critically-endangered vaquita porpoise. On July 16, 2018, the court granted Plaintiff's request for a preliminary injunction and ordered the United States to ban the importation of all fish and fish products from four specified Mexican commercial fisheries – shrimp, curvina, chano, and sierra – that use gillnets in the vaquita's range. During the pendency of the litigation, NMFS published a Federal Register notice on March 9, 2020, stating that the Government of Mexico lacked a regulatory program comparable in effectiveness to the U.S. regulatory program. An import ban was immediately executed for all shrimp, curvina, sierra, chano and certain other fish and their products that are caught with gillnets inside the vaquita's range. Thereafter, the court lifted its preliminary injunction and entered an order of voluntary dismissal on April 22, 2020.

- *Sea Shepherd New Zealand and Sea Shepherd Conservation Society v. United States, et al.*, Case 1:20-cv-00112 (CIT) – On May 21, 2020, Plaintiffs initiated a suit in the Court of International Trade alleging NMFS's failure to ban imports from New Zealand's North Island West Coast set net and trawl fisheries and its denial of their petition for rulemaking violated the MMPA and APA. The Plaintiffs were concerned about the threats these fisheries pose to endangered Māui dolphins and moved for a preliminary injunction to ban imports of seafood into the United States from New Zealand's set net and trawl fisheries. The court granted a preliminary injunction and imposed import restrictions for the export fisheries operating on the West Coast North Island within the Māui dolphin's range. The court's order effectively removed the operative exemption period protections for these fisheries. In January 2024, and in response to the Government of New Zealand's renewed request for comparability findings, NMFS concluded that New Zealand met the requirements under the MMPA and the Final Rule and issued a comparability finding for the West coast, North Island multi-species set-net and trawl fisheries and lifted the embargo on fish and fish products from these fisheries.

- *Natural Resources Defense Council, et al. v. National Marine Fisheries Service, et al.*, 1:24-cv-00148 (CIT) – On August 8, 2024, Plaintiffs initiated a suit in the Court of International Trade alleging the United States violated the MMPA and APA when it failed to ban the importation of fish and fish products from a number of gillnet fisheries in Canada, Ecuador, France, Indonesia, India, Mexico, South Africa, the United Kingdom and commercial fisheries in South Korea; failed to insist on "reasonable proof" from such nations on the effects of their export fisheries on marine mammals; and failed to provide notice and comment on the last extension of the final rule's exemption period. The parties executed a Settlement Agreement on January 15, 2025, which required the United States to implement the MMPA Import Provisions pursuant to an agreed-upon schedule. The court issued a Stipulation of Dismissal of the case on March 25, 2025, but retained jurisdiction to oversee the compliance with the schedule for issuing the final comparability findings.

- *Māui and Hector's Dolphin Defenders NZ Inc. v. National Marine Fisheries Service, et al.,* 1:24-cv-00218 (CIT).  On December 4, 2024, Plaintiffs initiated a suit in the Court of International Trade challenging NMFS's 2024 comparability findings for New Zealand's West Coast North Island set-net and trawl fisheries.  Plaintiffs assert that NMFS's comparability findings and its failure to ban imports from these fisheries violated the MMPA and APA.  The parties have briefed the case and are awaiting a decision from the court.

## COMPARABILITY FINDING APPLICATION PROCESS

The current action is the first time that NMFS has evaluated and will be issuing final comparability findings for the entire group of harvesting nations (135 nations covering approximately 2,500 fisheries) seeking to export fish and fish products to the United States.  NMFS's Final Rule and the implementation of the import provisions program under 16 U.S.C. § 1371(a)(2) was designed to be an iterative process based on the fact that harvesting nations would be at different stages in their efforts to regulate commercial fisheries interactions with marine mammals and would need time and support to build capacity.  In addition, NMFS expected that the quality and quantity of data about the harvesting nations' efforts would vary considerably.  These factors led NMFS to concentrate its efforts on this initial set of findings on developing a baseline of knowledge for all nations identified on the LOFF.

The first round of comparability findings proved to be a significantly more complex and time-intensive undertaking than NMFS had anticipated at the time the Final Rule was promulgated.  The practical challenges and differences associated with a diverse group of nations became clear early in the process.  Many of the harvesting nations had never confronted the problem of commercial fisheries' interactions with marine mammals and it was unrealistic to expect that 135 nations would address the issue in the same way.[8]  Despite these challenges, NMFS applied the framework established by the Final Rule and proceeded to develop an understanding about whether the harvesting nations had laws, regulations, and processes in place to address incidental mortality and serious injury of marine mammals in the course of their commercial fisheries operations and whether their regulatory programs were comparable in effectiveness to the United States' regulatory program.  NMFS has, since enacting the Final Rule, coordinated closely with harvesting nations, the U.S. Department of State, the Office of the U.S. Trade Representative, the U.S. Department of Homeland Security, and other experts to gather as much information as possible to make informed decisions about whether a harvesting nation's fisheries would qualify for a comparability finding.

## A.     Classifying Fisheries in the List of Foreign Fisheries

As described in the Background section, foreign commercial fishing operations were classified as either "Exempt" or "Export" based on their frequency of marine mammal interactions.  NMFS reviewed import trade data of fish and fish products to identify harvesting nations and their commercial fisheries and coordinated with each of the harvesting nations prior to finalizing the

---

[8] NMFS explained in its Final Rule that the MMPA prioritizes action for those stocks defined as "strategic" and expressed hope that nations would also prioritize their actions for threatened and endangered species and those for which bycatch is unsustainable.  *See* 81 Fed Reg. 54390, *supra,* note 1 at 54397 (Response to Comment 11).

LOFF.  Harvesting nations were asked to provide information about their commercial fisheries, including for example, the number of participants involved in a fishery, number of vessels, gear type, target species, the geographic area of operation, fishing season, frequency of and measures to reduce incidental mortality and serious injury of marine mammals in those fisheries, whether the harvesting nation had any programs to assess marine mammal populations, and whether any laws, decrees, regulations, or measures existed to reduce incidental mortality and serious injury of marine mammals or prohibit the intentional killing or serious injury of marine mammals in the course of commercial fishing operations.

If a harvesting nation did not provide enough information to allow NMFS to precisely classify a fishery, NMFS erred on the side of caution and classified the fishery as an "Export" fishery until such time as the harvesting nation could demonstrate otherwise.  This approach is comparable to how NMFS manages domestic commercial fisheries pursuant to 16 U.S.C. §§ 1386 and 1387.  Essentially, where data are lacking for a domestic fishery, the MMPA regulations at 50 CFR § 229.2 (definition of "Category II" fishery) indicate that the fishery should be classified as Category II.[9]  Also, in response to harvesting nations' concerns about the inadequacy or unavailability of marine mammal abundance estimates, NMFS stated it would treat such situations similarly to the United States' implementation of its stock assessment program, which is guided by the "best scientific information available" standard.[10]   NMFS evaluated all readily available information to classify the fisheries and published the LOFF in the *Federal Register*.[11]

## B.    The International Affairs Information Capture and Reporting System (IAICRS) Served as the Primary Mechanism for Gathering Information from Harvesting Nations

In 2019, NMFS launched a web-based information and data collection system, IAICRS, as a way to facilitate implementation of the Final Rule and achieve maximum consistency and standardization in how data were reported by harvesting nations and the type of data reported.  IAICRS Users are foreign government agencies of harvesting nations that provided data to NMFS in accordance with guidance provided by NMFS to demonstrate that they met the Final Rule's requirements.  In particular, NMFS required that harvesting nations provide the following information for all of its fisheries on the LOFF, including but not limited to: (1) fishery target species; (2) gear types; (3) area of fishing operations; (4) existing fisheries; (5) lists of all marine mammals in the nations' waters and/or that overlap with its fisheries, including stock abundance estimates, recent and planned abundance survey dates and bycatch limits; (6) timing of the fishery(ies); (7) annual mortality rates of marine mammal interactions in fisheries that export fish and fish products to the United States; (8) marine mammal monitoring programs; (9) bycatch reduction measures; and (10) copies of relevant laws, decrees, and implementing regulations or

---

[9] *See* 80 Fed. Reg. 48172, 48176 (August 11, 2015).
[10] *See* 16 U.S.C. § 1386(a)*; see also, supra* note 12 at 54400 (Response to Comment 31) ("NMFS will consider all data, including abundance estimates, provided in a harvesting nation's application for a comparability finding for an export fish in light of the U.S. implementation of its stock assessment program for the same or similar marine mammal stocks and its bycatch mitigation measures for similar fisheries."); *see also,* 89 Fed. Reg. 12257 (February 16, 2024) (NMFS's List of Fisheries for 2024).
[11] *See* 85 Fed. Reg. 63527 (October 8, 2020).

measures related to commercial fisheries and marine mammal interactions.[12]  Harvesting nations submitted their 2019 Progress Reports[13] through IAICRS, provided information about their fisheries for updated LOFF determinations, and submitted their applications for comparability findings through IAICRS in 2021.

NMFS understood that performing stock assessments is a technical and resource-intensive activity and that some harvesting nations were unlikely to have the capacity to conduct such assessments given their limited financial and staffing resources and technical expertise, and lack of data, among other limitations.[14]  To address this, NMFS created a tool within IAICRS – the "Lookup Table" – to assist nations that lacked the necessary tools, resources, or expertise to estimate marine mammal population abundance in their waters.  The "Lookup Table" is a compilation of known information about extant marine mammal species and stocks from available scientific literature, including peer-reviewed research articles, NMFS Stock Assessment Reports, International Whaling Commission reports, International Union for Conservation of Nature reports, ICES studies and reports, and technical memoranda, among others.  A nation could browse this table to select marine mammal species or stocks present in its waters or interacting with its fisheries and information about the stock status for that species or stock would automatically populate within the nation's application.

NMFS asked nations to provide bycatch limits for all marine mammal species and stocks interacting with its fisheries in IAICRS.  A nation could list the bycatch limit as "unknown" if the species was not identified (such as "Dolphin unspecified") or if it had not calculated a bycatch limit based on population abundance survey data.  A nation could also provide bycatch limits that it calculated based on its domestic stock surveys and using its own methods for calculation that may not be the same as the calculations for Potential Biological Removal (PBR). For nations that selected marine mammal species or stocks from the "Lookup Table" or nations that had not calculated a bycatch limit but provided information about population abundance, IAICRS automatically generated a bycatch limit using the calculation for PBR.

Nations provided information about marine mammal fishery interactions including co-occurrence, annual estimates of incidental injury, and annual estimates of incidental mortality, for each individual fishery on the LOFF.  Annual estimates of injury and mortality for a given species or stock were averaged to determine a fishery's average annual estimated mortality.  The nation could provide the average estimated mortality value or IAICRS could calculate the average value from the annual data provided by the nation.  IAICRS links the fishery information

---

[12] The IAICRS tool User Guide was provided to all harvesting nations and contains instructions for completing applications for comparability findings.  In many cases, harvesting nations' laws, decrees, and implementing regulations needed to be translated into English and there may have been changes in meaning during the translation process. NMFS evaluated the information provided by the harvesting nation and made determinations based on its best understanding of the nation's laws, decrees, and regulations. However, NMFS ultimately deferred to a nation's interpretation of its own laws, decrees, and regulations and the representations made about such.

[13] Progress reports consist of information describing a harvesting nation's update on actions it has taken over the previous two years to develop, adopt, and implement its regulatory program, as well as information on the performance of its export fisheries in reducing incidental mortality and serious injury of marine mammals.

[14] The United States faces similar challenges in its pursuit of conducting stock assessments of marine mammal stocks found in its waters.  *See* NMFS Guidelines for Preparing Stock Assessment Reports Pursuant to the Marine Mammal Protection Act, NMFS Instruction 02-204-01. (February 7, 2023) ("sometimes the data necessary to conduct such an assessment are not available.").

with the marine mammal species or stock information provided or selected by the nation. Where multiple fisheries interact with a given marine mammal species or stock, IAICRS sums the average annual estimated mortality for each fishery interacting with that marine mammal species or stock and generates a total average annual mortality for that species or stock. This total average annual mortality for any given marine mammal species or stock was assessed against the bycatch limit for that marine mammal species or stock in IAICRS. IAICRS compiles this information and displays whether the bycatch limit is exceeded for any given marine mammal species or stock.

In addition to the information provided by the harvesting nations through IAICRS, NMFS reviewed fisheries individually to assess details about each fishery including marine mammal interactions, monitoring programs, and bycatch reduction measures. NMFS also reviewed all marine mammals listed in the nation's application as co-occurring with that nation's fisheries as well as any marine mammals for which NMFS had readily available information or scientific expertise to determine which species or stocks may occur in that nation's waters to fully assess the nation's fisheries and to identify which fisheries may be contributing to exceedance of a bycatch limit, as appropriate.

### C.    NMFS Applied the "Best Scientific Information Available" Standard to Classify Fisheries and Issue Final Comparability Findings for Harvesting Nations.

The MMPA states that the Secretary "shall insist on reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing technology in use for such fish or fish products exported from such nation to the United States." 16 U.S.C. § 1371(a)(2)(A). The term "reasonable proof" is not defined by the MMPA; therefore, NMFS explained in its Final Rule that it will, "as a matter of practice, use the best scientific information available" to evaluate a harvesting nation's regulatory program for a given export fishery and that harvesting nations must provide NMFS with documentary evidence of "sufficient detail, quality, and reliability."[15] NMFS also stated that it would take into consideration the uncertainty of any scientific information provided by a harvesting nation or that is otherwise readily available.[16]

The Final Rule explains that NMFS was aware that harvesting nations would experience difficulty providing documentary evidence of "sufficient detail, quality, and reliability", particularly because data would be incomplete, lacking, or unquantifiable. Many of the harvesting nations faced challenges providing NMFS with marine mammal and commercial fisheries' data, largely because they lacked the resources, expertise, or funding to acquire the data to fully support their application for a comparability finding. As discussed above, NMFS created a database to ensure that it sought consistent information from all exporting nations and

---

[15] See 81 Fed. Reg. 54390, 54406 (August 15, 2016) (Response to Comment 56).

[16] See id. (Response to Comment 55) ("NMFS will only make its comparability finding determinations based on the information provided by the nation, and any other readily available information, taking into consideration scientific uncertainty."). Information that was "readily available" to NMFS during the comparability finding process included the information physically held by any office within NMFS (i.e., hard copy format) and any information stored electronically in databases routinely consulted by NMFS in the ordinary course of its work. It did not include information provided to NMFS outside public notice and comment periods unless the information was from one of the harvesting nations and was required by NMFS in making its findings.

to standardize, to the greatest extent possible, the information received and how it would be interpreted. However, the information received from all harvesting nations was uneven in its volume, scope, and detail. Ultimately, NMFS evaluated each application based on the best scientific information available and exercised reasonable judgment when faced with uncertainty, a lack of data, or imperfect data.[17]

**The U.S. Regulatory Program Governing the Incidental Mortality and Serious Injury of Marine Mammals Informed the Comparability Findings**

Historically, the United States has applied an iterative process to address the incidental take of marine mammals in the context of its domestic commercial fisheries.[18] Despite numerous successes across a range of fisheries, NMFS has acknowledged over the years that more work is needed to reduce marine mammal bycatch within its domestic fisheries. This section describes the current process governing the incidental take of marine mammals in domestic commercial fisheries, the challenges NMFS has experienced in addressing incidental take under the MMPA within its domestic commercial fisheries, and why NMFS concluded that "U.S. standards" for purposes of section 1371(a)(2) of the MMPA are defined to be the regulatory measures required of U.S. commercial fishing operations.

**A.      The "U.S. Standards" for Regulating Incidental Mortality and Serious Injury in Domestic Commercial Fisheries**

NMFS may authorized the take of marine mammals incidental to commercial fisheries in accordance with 16 U.S.C. §§ 1386 and 1387 of the MMPA. NMFS is required to prepare Stock Assessment Reports (SAR) for marine mammal stocks that occur in waters under the jurisdiction of the United States and may also prepare such reports for stocks present on the high seas. A SAR must be based on the best scientific information available and include, among other things, a description of the stock's range, its status, a description of the commercial fisheries that interact with each marine mammal stock, a minimum population estimate, "potential biological removal" (PBR) levels[19], and estimates of human-caused mortality and serious injury by source. *See* 16 U.S.C. § 1386(a). The information included in a SAR is used by NMFS to regulate and reduce the incidental mortality and serious injury of marine mammals in U.S. commercial fisheries.

---

[17] Specifically, NMFS is required to "draw reasonable conclusions regarding the fishery based on readily available information" in those cases where a harvesting nation provides insufficient documentary evidence in support of its application. *See* 50 CFR 216.24(h)(6)(ii); *see also,* 80 Fed. Reg. 48172, 48178 (August 11, 2015) (noting that the Assistant Administrator may rely on other information such as indirect evidence of bycatch in the fishery or information from analogous fisheries if a harvesting nation does not provide sufficient relevant information).

[18] *See* 81 Fed Reg. 54390, *supra* note 9, at 48173-48174 (describing the history of the United States' implementation of the MMPA's import provisions and amendments to the MMPA's provisions governing the incidental take of marine mammals in U.S. commercial fisheries).

[19] The Potential Biological Removal level is defined by the MMPA as the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population (16 U.S.C. §1362(20). PBR is calculated using the minimum population abundance estimate (Nmin), times the population recovery factor (RF), times one-half the maximum or estimated net reproductive rate (Rmax) (Bycatch Limit = Nmin x RF x (0.5Rmax)).

NMFS classifies commercial fisheries according to their levels of incidental marine mammal mortality and serious injury (e.g., List of Fisheries (<u>Category I</u> (frequent), <u>Category II</u> (occasional), and <u>Category III</u> (remote likelihood)).[20]  The classification system consists of a two-tiered, stock-specific approach that first addresses the total impact of all fisheries on each marine mammal stock and then addresses the impact of the individual fisheries on each stock.[21]  This approach is based on the rate, in numbers of animals per year, of incidental mortalities and serious injuries of marine mammals due to commercial fishing operations relative to a stock's PBR.  Importantly, the tier analysis requires a minimum amount of data and NMFS does not always have sufficient data to perform a tier analysis on certain fisheries.  In cases where NMFS does not have reliable data, NMFS determines whether the incidental mortality and serious injury is "occasional" by evaluating other factors (e.g., fishing techniques, gear used, qualitative data from logbooks, etc.).[22]  Following the classification process, NMFS issues marine mammal authorizations for Category I and II fisheries and prescribes, as appropriate, one or more regulatory measures for the fishery.  *See id.* at § 1387.  Any regulatory requirements pertaining to a fishery will be based on a number of factors, including but not limited to the fishery's classification in the List of Fisheries, the status of the affected marine mammal species or stock, and rates of human-caused mortality and serious injury.  For example, Category I and II fisheries typically require owners of vessels to register with the Marine Mammal Authorization Program, accommodate an onboard observer upon request, and comply with any applicable take reduction plans.

NMFS also has responsibilities where marine mammals from species or stocks designated as depleted on the basis of their listing as threatened or endangered pursuant to the Endangered Species Act (ESA) are potentially impacted by commercial fisheries.  *See* 16 U.S.C. 1387(f)(2).  Where a depleted marine mammal species or stock is affected, the MMPA provides that NMFS shall allow the incidental taking of such species or stock if the incidental mortality or serious injury from commercial fisheries will have (i) a negligible impact on such species or stock; (ii) a recovery plan has been developed or is being developed for a species or stock under the ESA; and, (iii) where it is required under Section 1387 of the MMPA, a monitoring program has been established, vessels engaged in the fisheries are registered, and a take reduction plan has been developed or is being developed for the species or stock.  *See id.* at § 1371(a)(5)(E).  Once NMFS determines that each requirement has been met, the agency publishes a list of those fisheries for which it has made a determination and issues an appropriate permit for each authorization granted.  The process described above focuses on affirmatively providing permits for incidental take, and to the best of NMFS's knowledge is a statutory construct that is unique to the United States' regulatory scheme involving commercial fisheries interactions with marine mammals.

---

[20] Category I:  annual mortality and serious injury of a stock in a given fishery is greater than or equal to 50 percent of the PBR level; Category II:  annual mortality and serious injury of a stock in a given fishery is greater than 1 percent and less than 50 percent of the PBR level; Category III:  annual mortality and serious injury of a stock in a given fishery is less than or equal to 1 percent of the PBR level.

[21] *See, e.g.,* 89 Fed. Reg. 12257 (February 16, 2024).

[22] *See id.* at 12258.

B.    **MMMPA Section 1387 Take Reduction Process and Take Reduction Teams**

In accordance with the MMPA, NMFS *must* develop and implement a Take Reduction Plan (TRP) for each strategic stock[23] that interacts with a Category I or II fishery. In addition, NMFS *may* develop a TRP for other marine mammal stocks that interact with a Category I fishery and if the agency determines that the fishery has a high level of serious injury and mortality across a number of marine mammal stocks. *See id.* at § 1387(f)(1). The long-term goal of a TRP is to reduce, within five years, the incidental mortality and serious injury to insignificant levels approaching a zero mortality and serious injury rate, taking into account the economics of the fishery, the availability of existing technology, and the existing state or regional fishery management plans. This long-term goal is often referred to as the zero mortality rate goal or ZMRG. NMFS has defined "insignificant levels approaching a zero mortality and serious injury rate" as 10% of a stock's PBR level. The rationale for 10% of a stock's PBR is that this small amount of mortality and serious injury will not significantly delay the time to recovery for most stocks and therefore still allows for the MMPA's overarching goal of recovering all stocks to their optimum sustainable population levels to be met. ZMRG is ultimately a goal that commercial fisheries should approach.[24]

TRPs are developed by a Take Reduction Team (TRT) whose purpose is to assist NMFS in the development of a draft TRP and provide recommendations to reduce marine mammal bycatch in particular commercial fisheries. The TRT process is an iterative one, whereby initial recommendations and plans are refined over time to ensure they are meeting their goals. A TRT's recommendations may be included by NMFS in a final TRP and implementing regulations. *See id.* at §§ 1387(f)(6) – (f)(9). TRPs, however, are not required for Category III fisheries. *Id.* at § 1387(f). A TRP includes a variety of regulatory and non-regulatory measures designed to reduce the incidental mortality and serious injury of certain marine mammal stocks incidental to the fishery or fisheries subject to the TRP. *See id.* at §§ 1387(f)(2) and (f)(4). TRPs include measures like time/area closures and gear modifications to reduce marine mammal bycatch in commercial fishing gear. Such measures may be time bound or indefinite depending on whether the amount of mortality and serious injury exceeds a stock's PBR level and/or whether a particular TRP includes a limit or cap on the number of animals killed or seriously injured in a given fishery. Importantly, however, the MMPA does not require NMFS to close (i.e., a complete shutdown) a fishery if a stock's PBR is exceeded. In such a situation, NMFS usually reconvenes a TRT to consider additional regulatory measures to further reduce bycatch below the PBR.[25]

---

[23] A "strategic" stock is defined as one for which the level of direct human-caused mortality exceeds the potential biological removal level; (B) is declining and likely to be listed as threatened under the Endangered Species Act (ESA); or (C) which is listed under the ESA or is designated as depleted under the MMPA. *See* 16 U.S.C. § 1362(19).

[24] The House Conference Report that accompanied the original inclusion of ZMRG stated ". . . the objective of regulation would be to approach as closely as is feasible the goal of zero mortality and injury to marine mammals . . . [i]t may never be possible to achieve this goal, human fallibility being what it is, but the objective remains clear." H.R. Conf. Rep. No. 92-1488.

[25] NMFS's 2004 final rule establishing the agency's insignificance threshold as 10 percent of the PBR of a stock of marine mammals supports this position. *See* 69 Fed. Reg. 43338, 43340 & 43344 (July 20, 2004) ("Appropriate" action is to be taken when NMFS determines the established target level of mortality and serious injury of marine mammals incidental to commercial fisheries has been exceeded. NMFS also explained that the ZMRG threshold is

TRPs may also recommend specific levels of monitoring for a fishery to account for any incidental mortality and serious injury of marine mammals during the course of commercial fishing operations. *See id.* at §§ 1387(d)(1) & (f)(9). Examples of monitoring methods include at-sea monitoring through observers, electronic monitoring using onboard video cameras, and self-reporting of any incidental mortality and injury of marine mammals. *See id.* at §§ 1387(d) & (e). Observers and electronic monitoring systems collect data on the catch and discards caught by U.S. commercial fishing vessels and document bycatch of marine mammals. These data are used primarily to monitor federal commercial fisheries and some state fisheries and inform sustainable fisheries management. Observers also collect data to support compliance monitoring with fishing and safety regulations.

### C.    The Practical Challenges of Managing U.S. Commercial Fisheries Interactions with Marine Mammals under the MMPA

The MMPA is not unlike many other environmental laws that seek to balance the protection and conservation of natural resources with the needs of humans. In the case of U.S. commercial fisheries, NMFS must follow specific procedures and consider standards prior to making a final decision whether to authorize the incidental mortality and serious injury of marine mammals, the level of taking, in what manner, and any measures necessary to reduce such interactions. Of course, NMFS must take steps to reduce incidental mortality and serious injury of marine mammals in commercial fisheries to insignificant levels approaching a zero mortality and serious injury rate within statutory timeframes but in so doing, it must also take into account a variety of factors. *Compare* §§ 16 U.S.C. 1387(a)(1) and 1387(f)(2).

TRTs (and ultimately, NMFS) must consider the economics of the fishery, the availability of existing technology, and existing fishery management plans when deciding whether take reduction measures are needed to achieve the long-term goal of a TRP. The economics of the fishery influence whether, and if so how, a commercial fishery is regulated, including the specific measures (e.g., bycatch reduction gear, time/area closures, etc.) imposed by NMFS under the MMPA. In some cases, the lowest cost option may be selected as a component of a TRP so long as it is expected to achieve the short-term goal of a TRP (this may be the case even though the measure(s) would not provide the maximum conservation value). Also, the availability of existing technology influences decision-making. For instance, if new gear technology is unavailable for a fishery, not applicable across a broad range of fisheries, too costly for the fishery, or the technology has not yet been demonstrated to be effective in reducing bycatch of marine mammals, a TRT could recommend that the TRP has met the long-term goal even if mortality and serious injury exceeds 10% of a stock's PBR.

The MMPA also allows NMFS to prioritize the development of TRPs based on the availability of funding. *See id.* at §1387(f)(3). Where funding is insufficient, NMFS must give highest priority to the development and implementation of TRPs for marine mammal species or stocks whose level of incidental mortality and serious injury exceeds the PBR level, those that have a small population size, and those which are declining most rapidly. *Id.; see also,* Memorandum Addressing NMFS' Priorities for Convening Take Reduction Teams (May 30, 2024). In

---

not defined in such a manner to shut-down or significantly curtail the activities of commercial fishing simply because a fishery exceeds the threshold.).

practice, therefore, NMFS usually focuses its efforts on those fisheries that pose the greatest risk to marine mammal species or stocks, with particular consideration given to gear type, conservation status of the species or stock, frequency of interaction, and numbers of marine mammals affected by the fishery.[26]

Other practical challenges make it difficult for NMFS to address incidental mortality and serious injury of marine mammals.  For example, lack of the necessary marine mammal abundance data to estimate population size for an individual species or stock precludes a calculation of the stock's or species' PBR level; lack of mortality and serious injury data complicates efforts to assess the effects of certain fisheries on marine mammal species or stocks that might overlap with such fisheries; the type of bycatch reduction measures and how and when they are deployed could create significant safety concerns for fishermen; and the levels and types of observer coverage (i.e., humans v. electronic monitoring) vary considerably across fisheries with some benefiting from higher levels of coverage, while others may not have any observer requirements.[27]

Today, among the hundreds of fisheries operating in waters under the jurisdiction of the United States and on the high seas, there are six TRPs addressing 32 marine mammal stocks.[28]  The progress that has been made through these existing TRPs has not happened overnight; instead, it is the result of many years of dedicated work through the TRT process.  Ultimately, efforts to address incidental mortality and serious injury of marine mammals across all U.S. commercial fisheries, whether through the TRP/TRT process or otherwise, vary considerably.  Every fishery is regulated to one degree or another based on the specifics of the fishery, status of the affected marine mammal species or stocks, availability of funding, data availability, the impact of regulations on the economics of the fishery, and other factors prescribed by the MMPA.  Some fisheries are subjected to more restrictive MMPA regulatory measures while others are subjected to more limited measures, if any.[29]  It is clear, therefore, that the U.S. domestic program for managing marine mammal interactions with commercial fisheries is not a "one-size fits all" approach and is constantly evolving to meet the needs of fishermen and marine mammals.

---

[26] *See, e.g.,* Wade, *et al.* (2021), "Best Practices for Assessing and Managing Bycatch of Marine Mammals". Frontiers in Marine Science 8:757330. doi: 10.3389/fmars.2021.757330.

[27] *See id.*

[28] *See supra note 3* at 12280-81 (list of U.S. fisheries currently being managed under the TRP/TRT process).  Of course, there are certainly more Category I and II fisheries identified in the U.S. that are not currently subject to the TRP/TRT process; however, as discussed in more detail in Section III.C of this memorandum, the MMPA provides NMFS with authority to give highest TRP/TRT priority to species or stocks whose level of incidental mortality and serious injury exceeds the PBR, those that have a small population size, and those that are declining most rapidly. Efforts to address incidental mortality and serious injury continue across all fisheries subject to the priorities of the agency.

[29] For example, all vessel owners or operators in Category I – III fisheries are required to report incidental mortality and serious injuries of marine mammals within 48 hours of the end of the fishing trip (50 CFR § 229.6), but vessel owners or operators in Category III fisheries are not required to register with NMFS, accommodate observers aboard vessels, or obtain a marine mammal authorization due to the remote likelihood of mortality and serious injury of marine mammals during fishing operations.  *See* 89 Fed. Reg. 77789 (Sept. 24, 2024); *see also,* https://www.fisheries.noaa.gov/national/marine-mammal-protection/marine-mammal-protection-act-list-fisheries.

**D**.    **"Comparable in Effectiveness" is Based on the MMPA's U.S. Standards for Regulating the Incidental Take of Marine Mammals in Commercial Fisheries**

The MMPA neither defines "U.S. standards" nor does it identify any specific measures that NMFS must consider in the context of evaluating a foreign nation's commercial fishing operations pursuant to section 1371(a)(2)(A). In light of this fact, NMFS determined that, for purposes of implementing section 1371(a)(2), "U.S. standards" were those set out for domestic fisheries under sections 1376 and 1377 of the MMPA."[30]

The MMPA and the Final Rule take a results-oriented approach as it relates to NMFS' determination as to: (1) what constitutes a regulatory program that is "comparable in effectiveness"; and (2) whether to allow the importation of fish and fish products from harvesting nations. NMFS explained that it did not intend to regulate marine mammals within a harvesting nation's coastal waters; instead, NMFS would evaluate whether a harvesting nation that seeks to export fish and fish products to the United States maintains a regulatory program that is "comparable in effectiveness" (*not identical*), to the U.S. regulatory program, meaning that the regulatory program effectively achieves comparable results to the U.S. regulatory program.[31] (emphasis added). And as described earlier, NMFS' intention was to make comparability finding determinations based on the "reasonable proof" provided by a nation and any other readily available information, taking into consideration scientific uncertainty.[32]

NMFS evaluated each harvesting nation's application for a comparability finding against a suite of regulatory conditions.[33] For both Export and Exempt fisheries, the harvesting nation was first required to demonstrate that it prohibits the intentional mortality and serious injury of marine mammals in the course of commercial fishing operations; or that it had procedures to reliably certify that exports of fish and fish products to the United States are not the product of an intentional killing or serious injury of a marine mammal.[34] Next, and specific to an Export fishery, the harvesting nation was required to demonstrate that it maintained a regulatory program with respect to the fishery that is comparable in effectiveness to the U.S. regulatory

---

[30] *See* 81 Fed. Reg. 54390, *supra* note 1 at 54410 (describing NMFS's Preferred Alternative).

[31] *See* 80 Fed Reg. 48172, 48175 (August 11, 2015) ("NMFS is not proposing to require that a harvesting nation match every aspect of the U.S. regulatory program to obtain a comparability finding for an export fishery. Instead, the conditions allow for flexibility in granting a comparability finding to programs that effectively achieve comparable results to the U.S. regulatory program even where they use different mechanisms to do so."); 81 Fed. Reg. 54390, 54401 (August 15, 2016)(Response to Comment 36 "In using the terms 'comparable in effectiveness' NMFS means that the regulatory program effectively achieves comparable results to the U.S. regulatory program. This approach gives harvesting nations flexibility to implement the same type of regulatory program as the United States or a program that is completely different but achieves the same results."); and 81 Fed. Reg. 54390, 54410 (describing NMFS's Preferred Alternative 2).

[32] *See* 81 Fed. Reg. at 54406 (Response to Comment 55).

[33] *See* 50 CFR §§ 216.24(h)(6) & (7). All of the regulatory conditions were considered by NMFS in one form or another. As NMFS stated in its Final Rule, ". . . NMFS will examine whether the harvesting nation maintains a regulatory program that includes, or effectively achieves comparable results, as certain conditions specified in paragraph (h)(6)(iii) of the rule, subject to additional considerations specified in paragraph (h)(7) of the rule. The conditions specified in paragraph (h)(6)(iii) are features of the U.S. regulatory program." *See* 81 Fed. Red. 54390, 54391-92 (August 15, 2016).

[34] The MMPA prohibits the intentional killing or serious injury of a marine mammal unless the intentional mortality or serious injury is imminently necessary in self-defense or to save the life of a person in immediate danger. *See* 16 U.S.C. 1371(c).

program and that it met the conditions related to intentional killing and serious injury of marine mammals in the course of commercial fisheries. In this case, Export fisheries were subjected to greater scrutiny and held to higher standards.[35]

Ultimately, the approach NMFS followed, as prescribed in the Final Rule, is consistent with the U.S. program for managing domestic fisheries under the MMPA, as described above, and its implementing regulations, and takes into account the practical realities of issuing comparability findings to various foreign sovereign nations, each of which has its own regulatory scheme governing marine mammal interactions with its commercial fisheries.

E.     **Achieving Consistency in Comparability Finding Determinations Across 135 Harvesting Nations' Disparate Regulatory Programs**

To achieve consistency across the array of nations and fisheries that NMFS had to consider, NMFS created a standardized decision-making process that tiered off the Final Rule's framework. The first round of comparability findings utilized a template report entitled "Marine Mammal Protection Act Import Provisions Comparability Finding Application Report" ("Report"). The Report template was generated based on a series of questions NMFS posed to harvesting nations through its IAICRS database. Each question related to one or more of the regulatory conditions in 50 CFR §§ 216.24(h)(6) & (7) and, to the extent a harvesting nation was able, the nation populated the IAICRS database with responsive information.

Although the Reports do not explicitly identify each and every regulatory condition, all were considered by NMFS before final comparability decisions were issued. In the case of the "Additional Considerations" found at 50 CFR § 216.24(h)(7), for example, NMFS responded to each consideration where documentary evidence was produced by a nation or the information was otherwise readily available. The first consideration is captured above and, where possible, in one or more portions of each Report. The second, third, and fourth considerations query topics that are similar and related. These pertain to, in large part, a harvesting nation's efforts to reduce bycatch, whether the measures have proven effective in reducing bycatch levels (including below known bycatch limits), the history of fisheries interactions with marine mammals, population abundance estimates, and marine mammal conservation status. These topics were also addressed throughout each Report and NMFS's administrative record as a whole. Information pertaining to the fifth and sixth considerations was included in NMFS's IAICRS database and/or other portions of the administrative record. Finally, the seventh and eighth considerations focus on the execution of a harvesting nation's commercial fisheries under RFMOs or other inter-governmental agreements and the effectiveness of the nation's bycatch reduction program. Again, these considerations were addressed in each Report, e.g. response to questions 3 and 4, and NMFS's administrative record as a whole.[36]

---

[35] Because Exempt fisheries, like Category III fisheries in the U.S., are considered to have a remote likelihood of bycatch of marine mammals, they are subject to a lesser standard, as are Category III fisheries. These fisheries are not required to have a regulatory program for incidental mortality and serious injury that is comparable in effectiveness to the U.S. regulatory program applicable to Category I and II fisheries but they must still meet the requirements in 50 CFR § 216.24(h)(6)(iii)(A)(1) or 216.24(h)(6)(iii)(A)(2).

[36] The Report template includes a separate section for the Additional Considerations identified in subsection (h)(7). To the extent NMFS had information relevant to the Additional Considerations that was not discussed elsewhere in the individual nations' reports, it was discussed in that section. Where NMFS noted "N/A" for one or

NMFS considered all marine mammals that the nations included in their applications as well as any additional marine mammals for which NMFS had readily available information or scientific expertise to indicate that those additional stocks or species occurred in the nations' waters. Using the information submitted through IAICRS, NMFS prepared Reports for every harvesting nation that submitted a comparability finding application. All of the Reports included the same set of questions, which effectively were a subset of the topics that NMFS determined to be most aligned with, and most relevant to, the U.S. regulatory program.[37] First, every Report addressed whether harvesting nations had a prohibition on intentional killing or serious injury of marine mammals in the course of commercial fishing operations and whether they had elements of a bycatch reduction program (e.g., monitoring, reporting, and/or mitigation). The intentional prohibition provision, in and of itself, was a threshold issue for NMFS. Failure to demonstrate a prohibition, or alternative measures such as licensing conditions that in their totality served as a prohibition, resulted in a denial of a comparability finding. NMFS then asked whether Export nations prioritized individual fisheries based on their relative risk to marine mammals.

The U.S. domestic regulatory program prioritizes action based on the risks presented to marine mammals by different fisheries. As explained above, the MMPA establishes a process for prioritizing the development and implementation of regulations to address marine mammal incidental mortality and serious injury in those fisheries that carry specific risks to strategic stocks that interact with Category I or II fisheries. Accordingly, NMFS developed a step-wise process designed to review the harvesting nations' regulatory programs in light of a comparable prioritization scheme. Specifically, NMFS evaluated whether the harvesting nation maintained a regulatory program for its Export fisheries that provided for, or effectively achieved comparable results to the U.S. regulatory program. *See id.* at § 216.24(h)(6)(iii)(B).

A harvesting nation's regulatory program was scrutinized largely based on the relative risk presented to marine mammals by the Export fishery. In particular, NMFS focused heavily on the type of gear used in the fishery and the status of the potentially affected marine mammal species/stock. For example, NMFS was especially concerned with fisheries using high-risk gear (e.g., gillnets) that overlap with what NMFS referred to as a "16 U.S.C. § 1387(f)(3)" marine mammal stock/species, and without other mitigation measures in place.[38] NMFS exercised considerable judgment based on the available data, the differences among harvesting nations' regulatory programs and the resources at their disposal, and the specific facts and circumstances surrounding their Export fisheries. Again, the U.S. domestic program, as described above, weighed heavily in NMFS's evaluation of the Export fisheries, the applicable regulatory conditions, and whether NMFS would have expected a harvesting nation to have established a "like for like" regulatory program for Export fisheries that interact with marine mammal stocks/species in a manner similar to U.S. commercial fisheries.

---

more responses, "N/A" was meant to convey that information related to the question could be found elsewhere in the Report or administrative record.

[37] These were effectively the regulatory conditions specified in 50 CFR § 216.24(h)(6)(iii).

[38] A 16 U.S.C. § 1387(f)(3) stock/species is one that is considered to be either an endangered marine mammal species/stock <u>or</u> a species/stock that (a) experiences a level of incidental mortality and serious injury that exceeds the PBR level, (b) has a small population size, and (c) is declining most rapidly.

Finally, in the case of a marine mammal stock/species listed under the ESA, NMFS considered whether a harvesting nation must satisfy the same standards set forth in 16 U.S.C. § 1371(a)(5)(E) of the MMPA (e.g., demonstrate that incidental take would be negligible).  As explained earlier, 16 U.S.C. § 1371(a)(5)(E) is a permitting scheme that affirmatively authorizes incidental take of marine mammal stocks/species listed under the ESA if certain statutory criteria are met.  The negligible impact standard is a unique construct of the MMPA and the process of making such determinations is complex.[39]  The term "negligible impact", as defined in regulation, focuses on whether the impact resulting from a specified activity ultimately affects the stock/species annual rates of recruitment or survival.[40]  In practice, the individual regulatory measures (e.g., mitigation) applicable to the specified activity are key in determining whether the taking will be negligible.  NMFS's responsibility under the Final Rule was to determine whether a harvesting nation's regulatory program was comparable in effectiveness to the U.S. regulatory program, irrespective of the status of a particular marine mammal stock/species.  There is no requirement that harvesting nations maintain the exact same regulatory scheme as prescribed under the MMPA, section 101(a)(5)(E) included.  NMFS's focus was on whether the harvesting nation's strategy, including its management measures, was ultimately comparable in effectiveness to the U.S. regulatory program, including in those cases where ESA-listed stocks/species were affected.

## IV.    Comparability Finding Recommendations

The final rule requires that comparability finding determinations be issued on a fishery-by-fishery basis (i.e., for each individual fishery on the LOFF).  The following information and attached tables represent the results and recommendations of the evaluation process.

After review of the marine mammal bycatch monitoring and mitigation programs described in their respective applications, **I recommend that 89 nations receive comparability findings for all of their export and exempt fisheries on the LOFF** (Table 1).  Seafood exports to the United States from these nations amounted to about $13 billion or approximately 52% of the recent average annual imports of edible seafood in 2024.  Included in these 89 nations are four of our top ten largest seafood trading partners.

The 34 nations listed in Table 2 received a comparability finding for some but not all of their export fisheries having failed to meet the MMPA's import provisions requirements in some fisheries.  **I recommend that these 34 nations receive a comparability finding for some of their fisheries and a denial of a comparability finding for at least one fishery.**  Table 2 includes a summary of the basis of denial of some comparability findings and indicates the number of fisheries recommended for denial, which is explained more fully in the individual reports for these nations.  For many of the nations in Table 2, their marine mammal bycatch regulatory programs for certain fisheries lack sufficient marine mammal monitoring and mitigation for high risk gear and/or high risk species.

---

[39] *See* NMFS, Criteria for Determining Negligible Impact under MMPA Section 101(a)(5)(E), Procedural Directive 02-204-02 at 2 (June 17, 2020).

[40] *See* 50 CFR § 216.103.  (negligible impact is "an impact resulting from the specified activity that cannot be reasonably expected to, and is not reasonably likely to, adversely affect the species or stock through effects on annual rates of recruitment or survival.").

Based on our analysis, the 8 nations listed in Table 3 failed to meet the MMPA's import provisions requirements to receive a comparability finding for any of their exempt and export fisheries. **Therefore, I recommend that these 8 nations receive a denial of a comparability finding for all of their fisheries.** Table 3 includes a brief summary of the basis of denial of comparability findings, which is explained more fully in the individual reports for these nations. For most of these nations, intentional take of marine mammals is allowed in some or all of their exempt and export fisheries, which is not consistent with the standards applicable to U.S. fisheries.

Four nations did not submit applications for comparability findings (Table 4), either because they did not respond to NMFS' requests for information and offers of assistance or because diplomatic communications with those nations are constrained. **All of the export and exempt fisheries on the LOFF for these four nations are denied a comparability finding given their failure to submit an application for comparability.** Three nations submitted applications that were not reviewed because they only export products as an intermediary for the harvesting nation or were not currently exporting to the United States (Table 5). No comparability determinations were made for these nations.

The estimated value of seafood that may be affected by denial of comparability findings is also indicated in Tables 2, 3, and 4. For those nations recommended for denials of comparability findings for all of their fisheries (Table 3), exports to the United States amounted to about $12.8 million in 2024, or approximately 0.05% of U.S. edible seafood imports. Russia, previously among the top 10 exporters of seafood to the United States, is among the nations recommended for a denial of all fisheries; however, U.S. seafood imports from Russia in 2024 were nil because Russia is currently banned from exporting seafood to the United States through executive order. Of the countries on Table 4, Venezuela is the only significant exporter, and accounts for 0.4% of seafood exports to the United States in 2024.

For those nations recommended for denials of comparability findings for only some of their fisheries (Table 2), their total seafood exports to the United States amounted to about $11.8 billion in 2024, or approximately 47% of U.S. edible seafood imports. For the nations listed in Table 2, it is difficult to estimate precisely the amount of trade to be prohibited (non-comparable fisheries) relative to trade allowed based on available trade data.[41] After mapping fishery IDs as closely as possible to Harmonized Tariff Schedule (HTS) codes, NMFS estimates the value of 2024 trade that relates to fisheries subject to a partial denial is approximately $3.6 billion. Import prohibitions could affect some but not all of the current trade from the nations listed in

---

[41] NMFS compared fisheries to potentially relevant Harmonized Tariff Schedule (HTS) codes to calculate as nearly as possible the import values for denied fisheries. Fish and fish products harvested from individual fisheries could be imported under a range of HTS codes and trade under a given HTS code from a nation receiving a partial denial could include some products subject to denial of comparability findings while other trade in those products is allowed. Some fisheries' target species include generic categories of species and the HTS codes subject to enforcement of import prohibitions may be refined and narrowed. The actual volume and value of trade affected could decrease if further analysis indicates some HTS codes included in these calculations could not be used to import product from denied fisheries. Nations may also be able to export individual fish or fish products under covered HTS codes if they demonstrate that they were not harvested in a fishery subject to an import prohibition through a Certification of Admissibility.

Table 2 and entry documentation and other trade program requirements could affect other trade flows from those nations.

**RECOMMENDATION**

I recommend that you concur with the comparability finding determinations for all nations as described above, in the attached tables, and the individual country reports.

_____

I concur                          I do not concur                          Let's discuss

Attachments - Country Reports

# EXHIBIT B

# Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report

# Philippines

## Summary

Based on the Philippines' initial application, its responses to the clarification questions, and the information described below, NMFS has determined that the following Philippines' fisheries are comparable in effectiveness to the U.S. regulatory program: Exempt Fishery IDs 2126, 2204, 2205, 2206, 2208, 12660 and Export Fishery IDs 2124, 2125, 2127, 2131, 2132, 2207, 2209, 2210, 12658, and 12659. The following longline fisheries are excluded from the comparability finding determination as they are currently not operational and the Philippines would need to apply for comparability for these fisheries if they become active: Fishery ID 2128, 12485, and 12486. The remaining fisheries 2129, 2130, 2133, and 2134 are not comparable as they are using gear (gillnets and crab pots) that has a high likelihood of entangling marine mammals, including potentially 16 U.S.C. § 1387(f)(3) stocks, including the Irrawaddy dolphin, which is at a high risk of extinction. The bycatch limit for the Irrawaddy dolphins has likely been exceeded by gillnet and crab pot fishery interactions.

Philippines has a prohibition on the intentional killing of marine mammals; licenses vessels; and has marine mammal bycatch monitoring for purse seine vessels under the Western and Central Pacific Fisheries Commission (WCPFC) and a marine mammal stranding network that includes procedures for responding and reporting strandings. Bycatch monitoring data and marine mammal abundance data are lacking in Philippines fisheries that include gear with a high-risk of interaction with marine mammals, and to-date mitigation measures are not likely to reduce the bycatch of Irrawaddy dolphins below the bycatch limit.

**Fisheries that are not recommended for Comparability Finding**

| Fishery ID[1] | Target Species | Gear Type | Area | Rationale for Denial |
|---|---|---|---|---|
| 2129 | Blue swimming crab | Pots/traps, (Bottom) | EEZ, (FAO:71 Pacific Western Central), Major areas: Visayan Sea, Samar Sea, San Miguel Bay; Bays/Gulfs | Gear with high-risk of entanglement with 16 U.S.C. § 1387(f)(3) stock. Inadequate data collection on marine mammal bycatch. Bycatch limit of 16 U.S.C. § 1387(f)(3) stock likely exceeded. |

---

[1] The Fishery ID number is NOAA's internal reference number from our IAICRS database and has no other independent meaning.

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Philippines**

| | | | | Mitigation measures are not likely to reduce bycatch below the bycatch limit. |
|---|---|---|---|---|
| 2130 | Blue swimming crab | Gillnets and entangling nets (not specified), (Surface) | EEZ, (FAO:71 Pacific Western Central), Major areas: Visayan Sea, Samar Sea, San Miguel Bay; Bays/Gulfs nationwide | Gear with high-risk of entanglement with 16 U.S.C. § 1387(f)(3) stock.

Inadequate data collection on marine mammal bycatch.

Bycatch limit of 16 U.S.C. § 1387(f)(3) stock likely exceeded.

Mitigation measures are not likely to reduce bycatch below the bycatch limit. |
| 2133 | Skipjack tuna | Drift gillnets, (Surface) | EEZ, (FAO:71 Pacific Western Central), municipal waters; nationwide | Gear with high-risk of entanglement with 16 U.S.C. § 1387(f)(3) stock.

Inadequate data collection on marine mammal bycatch.

Bycatch limit of 16 U.S.C. § 1387(f)(3) stock likely exceeded.

Mitigation measures are not likely to reduce bycatch below the bycatch limit. |
| 2134 | Demersal fishes nei* | Set gillnets/set nets (anchored), (Surface) | EEZ, (FAO:71 Pacific Western Central), municipal waters; nationwide | Gear with high-risk of entanglement with 16 U.S.C. § 1387(f)(3) stock.

Inadequate data collection on marine mammal bycatch.

Bycatch limit of 16 U.S.C. § 1387(f)(3) stock likely exceeded.

Mitigation measures are not likely to reduce bycatch below the bycatch limit. |

*Not elsewhere included (nei) - when the product is not specifically provided for in the Harmonized Trade System, the description covering such product is generally considered to be a "residual provision" by use of the phrase "not elsewhere included".

The Philippines submitted information for three longline fisheries that are not currently operational and the Philippines will need to reapply for a comparability finding for these fisheries when the relevant information on the marine mammal bycatch monitoring and reporting for this fishery is available, and in the event that it is seeking to export this fishery to the United States. See Question 4.

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Philippines**

| Fishery ID | Target species | Gear | Area of Operation |
|---|---|---|---|
| 2128 | Bigeye tuna, Skipjack tuna, Yellowfin tuna | Longlines (not specified), (Pelagic) | High Seas, (FAO:71 Pacific Western Central), International waters |
| 12485 | Bigeye tuna, Skipjack tuna, Yellowfin tuna | Longlines (not specified), (Pelagic) | High Seas, (FAO:34 Atlantic Eastern Central, FAO:31 Atlantic Western Central), ICCAT |
| 12486 | Bigeye tuna, Skipjack tuna, Yellowfin tuna | Longlines (not specified), (Pelagic) | High Seas, (FAO:57 Indian Ocean Eastern, FAO:51 Indian Ocean Western), IOTC |

# Comparability Finding Analysis

1. **Does the nation have a prohibition on the intentional killing or serious injury of marine mammals in the course of commercial fishing operations? OR Does the nation have procedures to reliably certify that fish and fish products were not caught in association with the intentional killing or serious injury of marine mammals in the course of commercial fishing operations?**

Response: Yes, *Fisheries Administrative Order (FAO) No. 185* prohibits take and capture of dolphins in Philippines' waters, as well as sale, purchase, possession, transport or export of dead or live dolphins in any form, whether raw or processed. FAO No. 185 also declares it illegal to wound or kill dolphins in the course of fishing and requires that any dolphins accidentally caught be immediately released unharmed. The *Revised FAO Order No. 185-1* expanded these prohibitions to whales and porpoises.

2. **Does the nation have a Marine Mammal Bycatch Reduction Program? A bycatch reduction program, for purposes of compliance with the import provisions, is defined as having the following components:**

   a. **The ability to control/monitor its fishing operations that may take marine mammals (e.g., authorizations, permits, licenses, and/or registrations for vessels)**

Response: Yes. The *Philippine Fisheries Code of Republic Act No. 10654 series of 2015*, "An Act to Prevent, Deter and Eliminate Illegal, Unreported, and Unregulated Fishing amending Republic Act No. 8550;", Section 7 - Access to Fishery Resources states that the: "Department shall issue such number of licenses and permits for the conduct of fishery activities subject to harvest control rules and reference points as determined by scientific studies or best available evidence. Preference shall be given to resource users in the local communities adjacent or nearest to the municipal waters." The *Fisheries Administrative Order No. 198-1 series of 2018* under Chapter II Section 5 requires registration of fishing gears used for commercial fishing purposes.

   b. **A program to monitor its fisheries for incidences of marine mammal mortality and serious injury in the course of commercial fishing operations**

Response: Besides the ring net and purse seine fisheries operating under WCPFC, the Philippines currently does not have a program to monitor its fisheries for incidences of marine mammal mortality

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Philippines**

and serious injury in the course of commercial fishing operations. Philippines stated that Fishery ID 2129 (blue swimming crab, pot fishery) has dockside inspection reporting (75-99% coverage) but did not provide any monitoring forms or other documentation to suggest that there is marine mammal bycatch reporting. In 2020, the Philippines implemented voluntary guidelines on a municipal catch documentation and traceability system for local government units to manage fishery resources; however, these guidelines and the catch reporting form do not include marine mammal reporting. The Philippines has stated that it is developing a fishermen interview process covering 5-10% of most of its fisheries but did not provide any further information or documentation of implementation. The Philippines has a well-established stranding network that includes procedures for responding to and reporting marine mammal strandings. Philippine export fisheries are listed in Table 1.

**Table 1. Philippine Export Fisheries**

| Fishery ID | Target Species | Gear | Area of Operation | Monitoring Program |
|---|---|---|---|---|
| 2124 | Bonitos nei, Herrings/sardines nei, Mackerels nei, Round scad, Various squids nei | Ring nets, (Surface) | EEZ, (FAO:71 Pacific Western Central), EEZ, (FAO:81 Pacific Southwest, FAO:71 Pacific Western Central), Coastal waters, Nationwide, Major Areas - Zamboanga Peninsula, Basilan, Sulu, Tawi-Tawi, Palawan, Visayan Sea and Ticao Pass/San Bernardino Strait, Palawan, Iloilo | None for the fishery, strandings network |
| 2125 | Bigeye tuna, Skipjack tuna, Yellowfin tuna | Purse seines, (Pelagic) | High Seas, (FAO:71 Pacific Western Central), High Seas Pocket 1 | Observer Program (75-99% coverage) Logbook |
| 2127 | Bigeye tuna, Skipjack tuna, Yellowfin tuna | Purse seines, (Pelagic) | High Seas, (FAO:71 Pacific Western Central), High Seas Pocket 1 | Observer Program (100% Coverage) Logbook |
| 2129 | Blue swimming crab | Pots/traps (Bottom) | EEZ, (FAO:71 Pacific Western Central), Major areas: Visayan Sea, Samar Sea, San Miguel Bay; Bays/Gulfs | Dockside inspection but no marine mammal monitoring (75-99% coverage) |
| 2130 | Blue swimming crab | Gillnets and entangling nets (not specified), (Surface) | EEZ, (FAO:71 Pacific Western Central), Major areas: Visayan Sea, Samar Sea, San Miguel Bay; Bays/Gulfs nationwide | None for the fishery, strandings network |
| 2131 | Octopuses nei | Pots/traps (Bottom) | EEZ, (FAO:71 Pacific Western Central), Major areas: South Sulu Sea, Tawi-tawi, Jolo, Basilan, Palawan, Caraga | None for the fishery, strandings network |

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Philippines**

| 2132 | Various squids nei | Trawls (not specified), (Surface) | EEZ, (FAO:71 Pacific Western Central), year-round; nationwide | None for the fishery, strandings network |
|------|--------------------|-----------------------------------|--------------------------------------------------------------|------------------------------------------|
| 2133 | Skipjack tuna | Drift gillnets, (Surface) | EEZ, (FAO:71 Pacific Western Central), municipal waters; nationwide | None for the fishery, strandings network |
| 2134 | Demersal fishes nei | Set gillnets/set nets (anchored), (Surface) | EEZ, (FAO:71 Pacific Western Central), municipal waters; nationwide | None for the fishery, strandings network |
| 2207 | Herring/sardine nei, Various squids nei | Fyke nets, (Surface) | EEZ, (FAO:71 Pacific Western Central), nationwide | None for the fishery, strandings network |
| 2209 | Dolphinfishes nei, Tunas nei | Trolling lines, (Surface) | EEZ, (FAO:71 Pacific Western Central), municipal waters; offshore | None for the fishery, strandings network |
| 2210 | Bonitos nei, Herrings/sardines nei, Mackerels nei, Round scad, Various squids nei | Purse seines, (Surface) | EEZ, (FAO:71 Pacific Western Central), EEZ, (FAO:81 Pacific Southwest, FAO:71 Pacific Western Central),Coastal waters, Nationwide, Major Areas - Zamboanga Peninsula, Basilan, Sulu, Tawi-Tawi, Palawan, Visayan Sea and Ticao Pass/San Bernardino Strait, Palawan, Iloilo | None for the fishery, strandings network |
| 12658 | Bigeye tuna, Skipjack tuna, Yellowfin tuna | Purse seines, (Pelagic) | EEZ, Papua New Guinea, (FAO:71 Pacific Western Central), Parties to the Nauru Agreement | Observer program (75-99% coverage)  Logbook |
| 12659 | Bigeye tuna, Skipjack tuna, Yellowfin tuna | Ring nets, (Pelagic) | High Seas, (FAO:71 Pacific Western Central), High Seas Pocket 1 | Observer program (75-99% coverage)  Logbook |

**c.  A requirement to report all marine mammal mortality and serious injury in the course of commercial fishing operations**

Response: The Philippines does not have a requirement to report all marine mammal mortality and serious injury in the course of commercial fishing operations although there is some degree of marine mammal bycatch monitoring, see response to Question 2b.

**d.  Prioritization of fisheries for mitigation of unsustainable marine mammal bycatch as described in 16 U.S.C. § 1387(f)(3) (in particular those over the bycatch limit, of small population size, or declining rapidly, based on available financial resources) in response to reported bycatch occurring in fishing operations. Prioritization of fisheries**

**should be similar to U.S. take reduction teams and development of take reduction plans and including an evaluation of whether the nation has provided a bycatch limit and whether that bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stock(s), and whether any mitigation is effective or reconsidered if not effective.**

Response: The Philippines provided a list of marine mammal species co-occurring with its export fisheries and provided population abundance estimates and bycatch limits for some species. Philippines indicated injury or mortality of certain species, primarily from its WCPFC fisheries, including Bryde's whale (stock: unknown), common bottlenose dolphin (stock: Philippines), false killer whale (stock: global), long-beaked common dolphin (stock not specified), melon-headed whale (stock: Sula Sea, Philippines), pantropical spotted dolphin (stock: Philippines), rough-toothed dolphin (stock: global), sperm whale (stock: global), and spinner dolphin (stock: Southern Tañon Strait). Of these stocks, the total injury and mortality of common bottlenose dolphin (13.70) exceeded the bycatch limit (2.1).

These bycatch estimates are likely under-representations as a whole as there is no marine mammal bycatch monitoring program outside of the WCPFC fisheries. A report from the Philippine Marine Mammal Stranding Network of strandings from 2005 to 2016 indicated that the most frequent species that stranded was the spinner dolphin (115), followed by the Fraser's dolphin (67), Risso's dolphin (52), melon-headed whale (45), pantropical spotted dolphin (37), and dwarf sperm whale (36) (Aragones et al. 2017). [2]

Mitigation measures for the WCPFC purse and ring net fisheries include a prohibition on intentional encirclement of marine mammals and no setting of gear when marine mammals are sighted in the area. For the other export fisheries, the Philippines indicated there were safe handling and release practices, no setting when marine mammals were present, reduction in net length for gillnet (Fishery ID 2133), and reduction in main line length (Fishery ID 2131), as well as fishermen education programs and marine mammal identification guides.

The Philippines, primarily at the local level, has also designated marine protected areas (MPAs). The Philippines stated that the Scientific Advisory Group and the Management Board of Fisheries Management Area have prioritized implementing regulations to establish spatial closures, and Local Government Units have full jurisdiction over the municipal waters and the ability to adopt closures identified as hotspots as mitigation measures. In Fishery Management Area 11, for Fishery IDs 2130 and 2131, the Philippines indicated area-based closures as per the Bago City Municipal Ordinance and a proposed conservation area in Malampaya Sound under Malampaya Sound Protected Landscape and Seascape.

Due to limitations in data, the actual bycatch numbers and unsustainable bycatch of potential 16 U.S.C. § 1387(f)(3) stocks particularly in fisheries with a high-risk gear, such as gillnets, is unknown. It is unknown if mitigation measures including MPAs are effective in reducing bycatch.

Philippines also indicated bycatch of Irrawaddy dolphin (stock: Malampaya Sound) in Fishery IDs 2133 and 2130. See response to Question 6.

---

[2] Aragones, L.V., Laggui, H.L.M., Amor, A.K.S. 2017. The Philippine Marine Mammal Strandings from 2005 to 2016. A PMMSN Publication. Technical Report No.1. Quezon City, Philippines.

3. **Does the nation ban the use of large-scale high seas drift gillnet gear or other gear prohibited for use by U.S. fishermen?**

Response: While no information in the Philippines application materials suggests that it prohibits the use of large-scale driftnet fishing, none of its fisheries utilize large-scale drift gillnet gear, and no other information submitted suggests it uses gear prohibited by the United States.

4. **Does the nation implement marine mammal bycatch reduction measures in fisheries regulated under a regional fishery management organization (RFMO), which are required for U.S. fishermen by that RFMO?**

Response: The United States and the Philippines are both members of WCPFC and ICCAT. The United States is not a member of IOTC. For WCPFC, IOTC, and ICCAT observer coverage and marine mammal bycatch reporting are required for longline and purse seine fisheries.

The Philippines confirmed that it does not have any longline fisheries operating pursuant to any RFMO and as a result, is not implementing any RFMO longline data collection and monitoring requirements. Should the Philippines seek to develop a longline fishery that becomes the source of fish and/or fish products exported to the United States, the Philippines must apply for and receive a comparability finding for its longline fisheries to export those products to the United States (see Table 2).

**Table 2. Inactive Philippine Export Fisheries under RFMOs**

| Fishery ID | Target species | Gear | Area of Operation |
|---|---|---|---|
| 2128 | Bigeye tuna, Skipjack tuna, Yellowfin tuna | Longlines (not specified), (Pelagic) | High Seas, (FAO:71 Pacific Western Central), International waters |
| 12485 | Bigeye tuna, Skipjack tuna, Yellowfin tuna | Longlines (not specified), (Pelagic) | High Seas, (FAO:34 Atlantic Eastern Central, FAO:31 Atlantic Western Central), ICCAT |
| 12486 | Bigeye tuna, Skipjack tuna, Yellowfin tuna | Longlines (not specified), (Pelagic) | High Seas, (FAO:57 Indian Ocean Eastern, FAO:51 Indian Ocean Western), IOTC |

The Philippines has four purse seine or ring net fisheries under WCPFC (see Table 1). For purse seine vessels, WCPFC requires member states to comply with CMM 2011-03 that prohibits vessels from setting a purse seine net on a school of tuna associated with a cetacean in the high seas and exclusive economic zones of the Convention Area. Under the *Fisheries Administrative Order No. 271 Series of 2023,* the Philippines prohibits the intentional encirclement or setting by purse seine and ring net fisheries on cetaceans and prohibits the onboard retention of cetaceans.

5. **In cases where a U.S. Take Reduction Team has implemented marine mammal bycatch reduction measures for transboundary stocks shared with the United States, are the nation's measures similar or comparable in effectiveness? (Include in the response if the nation has provided a bycatch limit and if the bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stocks, either in one fishery or cumulatively over a number of fisheries)**

Response: Not applicable. The Philippines and the United States do not share any transboundary stocks.

**6. For marine mammal stocks that are not transboundary but are considered at high risk of extinction, does the nation implement mitigation/risk reduction measures comparable to what is or would be required in the United States? (Include in the response if the nation has provided a bycatch limit and if the bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stocks, either in one fishery or cumulatively over a number of fisheries)**

Response: The Philippines has two known populations of Irrawaddy dolphins, Malampaya Sound, Palawan and in the coastal waters of Bago and Pulupandan, Negros Occidental, and these stocks could be considered at high risk of extinction. There are an estimated 35 Irrawaddy dolphins in Malampaya and 6 -13 mature individuals in the Iloilo-Guimaras Strait population. [3,4] In particular, the gillnet fisheries, including the blue swimming crab fisheries, co-occur with Irrawaddy dolphins and have a high-risk of interactions based on gear type.

Currently, the Philippines lacks a comprehensive monitoring program for marine mammal bycatch and has limited information on Irrawaddy dolphin bycatch. The Philippines indicated injury of Irrawaddy dolphins in the blue swimming crab gillnet fishery (Fishery ID 2130) and the skipjack tuna drift gillnet fishery (Fishery ID 2133). The Iloilo-Guimaras Strait and Malampaya populations of Irrawaddy dolphins are small and the bycatch limits have likely been exceeded by gillnet as well as crab pot fishery interactions (Fishery ID 2129). [5]

Municipalities in Fisheries Management Area No. 11, which cover the Malampaya Sound, Palawan and Bago and Pulupandan, Negros Occidental areas, have implemented measures that include:

- Designation of past protected areas in the Provinces of Negros Occidental and Iloilo (1990, 1995, 1998, 2002)
- Permits and gear restrictions for crab fishing in Ajuy, Iloilo (2023)
- Prohibitions enacted from 1998 to 2023 in multiple municipalities on fishing or taking protected species.

There is no evidence that existing mitigation measures have successfully reduced the bycatch of Irrawaddy dolphins below the bycatch limit.

Philippines described on-going and upcoming efforts that may be assessed by NMFS as part of future comparability finding determinations. These include developing a multi-sectoral plan to eliminate bycatch of threatened wildlife; establishing a National Technical Working Group to assess and develop conservation measures in critical areas; implementing a proposed conservation area Malampaya Sound; and planning to strengthen collaborative networks with institutions for marine mammal monitoring and reporting.

---

[3] Dolar, M., de la Paz, M. & Sabater, E. 2018. Orcaella brevirostris (Iloilo-Guimaras Subpopulation). The IUCN Red List of Threatened Species 2018: e.T123095978A123095988.

[4] Whitty, T. 2016. Multi-methods approach to characterizing the magnitude, impact, and spatial risk of Irrawaddy dolphin (*Orcaella brevirostris*) bycatch in small-scale fisheries in Malampaya Sound, Philippines. Marine Mammal Science. 32:3, 1022-1043

[5] Whitty, T. 2016. Multi-methods approach to characterizing the magnitude, impact, and spatial risk of Irrawaddy dolphin (*Orcaella brevirostris*) bycatch in small-scale fisheries in Malampaya Sound, Philippines. Marine Mammal Science. 32:3, 1022-1043

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Philippines**

# Additional Considerations

In reviewing a nation's fisheries and marine mammals stocks, how do they compare to:

1. **U.S. implementation of its regulatory program for similar marine mammal stocks and similar fisheries (e.g., considering gear or target species), including transboundary stocks governed by regulations implementing a take reduction plan (50 CFR § 229.2), and any other relevant information received during consultations**

Response: Not applicable.

2. **The extent to which the harvesting nation has successfully implemented measures in the export fishery to reduce the incidental mortality and serious injury of marine mammals caused by the harvesting nation's export fisheries to levels below the bycatch limit**

Response: Not applicable.

3. **Whether the measures adopted by the harvesting nation for its export fishery have reduced or will likely reduce the cumulative incidental mortality and serious injury of each marine mammal stock below the bycatch limit, and the progress of the regulatory program toward achieving its objectives**

Response: Not applicable.

4. **Other relevant facts and circumstances, which may include the history and nature of interactions with marine mammals in this export fishery, whether the level of incidental mortality and serious injury resulting from the fishery or fisheries exceeds the bycatch limit for a marine mammal stock, the population size and trend of the marine mammal stock, and the population level impacts of the incidental mortality or serious injury of marine mammals in a harvesting nation's export fisheries and the conservation status of those marine mammal stocks where available**

Response: Not applicable.

5. **The record of consultations under 50 CFR § 216.24(h)(5) of this section with the harvesting nation, results of these consultations, and actions taken by the harvesting nation and under any applicable intergovernmental agreement or regional fishery management organization to reduce the incidental mortality and serious injury of marine mammals in its export fisheries**

Response: NMFS and the Philippines held two technical consultations in February 2020 and March 2021.

6. **Information gathered during onsite inspection by U.S. government officials of a fishery's operations**

Response: Not applicable.

7. **For export fisheries operating on the high seas under an applicable intergovernmental agreement or regional fishery management organization to which the United States is a party, the harvesting nation's record of implementation of, or compliance with, measures adopted by that regional fishery management organization or intergovernmental agreement for data collection, incidental mortality and serious injury mitigation or the conservation and management of marine mammals; whether the harvesting nation is a party or cooperating non-party to such intergovernmental agreement or regional fishery management organization; the record of United States implementation of such measures; and whether the United States has imposed additional measures on its fleet not required by an intergovernmental agreement or regional fishery management organization**

Response: See response to Question 4. The United States and Philippines are members of ICCAT and WCPFC.

8. **For export fisheries operating on the high seas under an applicable intergovernmental agreement or regional fisheries management organization to which the United States is not a party, the harvesting nation's implementation of and compliance with measures, adopted by that regional fisheries management organization or intergovernmental agreement, and any additional measures implemented by the harvesting nation for data collection, incidental mortality and serious injury mitigation or the conservation and management of marine mammals and the extent to which such measures are comparable in effectiveness to the U.S. regulatory program for similar fisheries**

Response: See response to Question 4. The United States is not a member of IOTC.

**Overall Summary for Additional Considerations**

The additional considerations were not pertinent to determining whether the nation's marine mammal bycatch reduction program is comparable in effectiveness to the U.S. regulatory program.

# Engagement History

NMFS engaged in two technical consultations in February 2020 and March 2021 as well as numerous email exchanges of information with the Philippines. The Philippines has been responsive to emails.

# EXHIBIT C



## Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report

# Indonesia

## Summary

Based on Indonesia's initial application, its responses to the clarification questions, and the information described below, NMFS has determined that the following fisheries are comparable in effectiveness to the U.S. regulatory program: Exempt Fishery IDs 1517, 1518, 1520, 1521, 1522, 1528, 1530, 1533, 1534, 1537, 1538, 1539, 1540, 12680, 12681, and 12764 and Export Fishery IDs 1370, 1371, 1374, 1523, 1525, 1531, 1532, 1542, 12390, 12678, 12679, and 12682.

For the reasons described below, the remaining fisheries 1373, 1375, 1376, 12391, and 12567 are not comparable in effectiveness to the U.S. regulatory program. For example, these fisheries utilize gillnets and trammel nets that have a high likelihood of entangling marine mammals, including potentially 16 U.S.C. § 1387(f)(3) stocks. The bycatch limit for the Irrawaddy dolphins (considered a 16 U.S.C. § 1387(f)(3) stock at high risk of extinction in Indonesia) is likely being exceeded by gillnet fishery interactions.

Indonesia has a prohibition on the intentional killing of marine mammals; licenses vessels; requires reporting marine mammal bycatch in logbooks; and to some degree, monitors bycatch through fishermen interviews, port inspections, and reports on marine mammal strandings. However, bycatch monitoring data and marine mammal abundance data are lacking. Indonesia has not yet finalized the *Ministerial Decree Concerning National Plan of Action of Marine Mammals Conservation*, which Indonesia states will address marine mammal bycatch in commercial fishing activities.

### Fisheries that are not recommended for Comparability Finding

| Fishery ID[1] | Target Species | Gear Type | Area | Rationale for Denial |
|---|---|---|---|---|
| 1373 | Coral groupers nei\*, Flatfishes nei, Groupers nei, Humpback grouper, Jobfishes nei, Pinjalo, Snappers nei, Tomato hind | Gillnets and entangling nets (not specified), (Demersal) | EEZ, (FAO:57 Indian Ocean Eastern, FAO:71 Pacific Western Central), also operate in territorial and | Gear with high-risk of entanglement risk of 16 U.S.C. § 1387(f)(3) stock(s). Inadequate data collection on marine mammal bycatch. |

---

[1] The Fishery ID number is NOAA's internal reference number from our IAICRS database and has no other independent meaning.

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Indonesia**

| | | | archipelagic waters | Bycatch limit of 16 U.S.C. § 1387(f)(3) stock(s) likely exceeded. Mitigation measures are not likely to reduce bycatch below the bycatch limit. |
|---|---|---|---|---|
| 1375 | Bigeye tuna, Dolphinfishes nei, Skipjack tuna, True tunas nei, Yellowfin tuna | Gillnets and entangling nets (not specified), (Pelagic) | High Seas, EEZ, (FAO:57 Indian Ocean Eastern, FAO:71 Pacific Western Central),also operates in territorial and archipelagic waters | Gear with high-risk of entanglement risk of 16 U.S.C. § 1387(f)(3) stock(s). Inadequate data collection on marine mammal bycatch. Bycatch limit of 16 U.S.C. § 1387(f)(3) stock(s) likely exceeded. Mitigation measures are not likely to reduce bycatch below the bycatch limit. |
| 1376 | Arius spp, Cobia, Marine fishes nei, Thinspine sea catfish | Gillnets and entangling nets (not specified), (Demersal) | High Seas, EEZ, (FAO:57 Indian Ocean Eastern, FAO:71 Pacific Western Central), also operates in territorial and archipelagic waters | Gear with high-risk of entanglement risk of 16 U.S.C. § 1387(f)(3) stock(s). Inadequate data collection on marine mammal bycatch. Bycatch limit of 16 U.S.C. § 1387(f)(3) stock(s) likely exceeded. Mitigation measures are not likely to reduce bycatch below the bycatch limit. |
| 12391 | Swimming crabs/etc. nei | Gillnets and entangling nets (not specified), (Bottom) | EEZ, (FAO:57 Indian Ocean Eastern, FAO:71 Pacific Western Central), also operates in territorial and archipelagic waters | Gear with high-risk of entanglement risk of 16 U.S.C. § 1387(f)(3) stock(s). Inadequate data collection on marine mammal bycatch. Bycatch limit of 16 U.S.C. § 1387(f)(3) stock(s) likely exceeded. Mitigation measures are not likely to reduce bycatch below the bycatch limit. |
| 12567 | Metapenaeus shrimps nei, Parapenaeopsis shrimps nei, Penaeus shrimps nei | Trammel nets, (Bottom) | EEZ, (FAO:57 Indian Ocean Eastern, FAO:71 Pacific Western Central) | Gear with high-risk of entanglement risk of 16 U.S.C. § 1387(f)(3) stock(s). Inadequate data collection on marine mammal bycatch. Bycatch limit of 16 U.S.C. § 1387(f)(3) stock(s) likely exceeded. Mitigation measures are not likely to reduce bycatch below the bycatch limit. |

*Not elsewhere included (nei) - when the product is not specifically provided for in the Harmonized Trade System, the description covering such product is generally considered to be a "residual provision" by use of the phrase "not elsewhere included".

# Comparability Finding Analysis

**1. Does the nation have a prohibition on the intentional killing or serious injury of marine mammals in the course of commercial fishing operations? OR Does the nation have procedures to reliably certify that fish and fish products were not caught in association with the intentional killing or serious injury of marine mammals in the course of commercial fishing operations?**

Response: Yes. All marine mammal species that are found within Indonesian waters are protected by law. Under *Law No. 5 Year 1990 on Conservation Biodiversity and its Ecosystems, Article 21 (2),* no one may:

*(a) catch, injure, kill, keep, possess, keep, transport, and trade protected animals alive;*
*(b) store, process, maintain, transport, and trade protected animals that are dead;*
*(c) releasing protected animals from one place in Indonesia to another in Indonesia or outside Indonesia;*
*(d) trade, keep or own the skin, body, or other parts of protected animals or goods made from these parts or release them from one place in Indonesia to another inside or outside Indonesia;*
*(e) take, destroy, trade, store or possess eggs and or protected animal nests*

*Regulation Decree Number P.20 Year 2018* and the amendment *Decree P.92 Year 2018 P.106 Year 2018 on Plant and Wild Animals* list the species of plants and animals protected by the Indonesian Ministry of Environment and Forestry, which includes the marine mammal species found in Indonesia's waters.

**2. Does the nation have a Marine Mammal Bycatch Reduction Program? A bycatch reduction program, for purposes of compliance with the import provisions, is defined as having the following components:**

**a. The ability to control/monitor its fishing operations that may take marine mammals (e.g., authorizations, permits, licenses, and/or registrations for vessels)**

Response: Yes. Indonesia has regulations that license fishing in Indonesian waters and outside territorial waters. Relevant sections of the *Regulation of the Minister of Marine and Fisheries of the Republic of Indonesia No. 10 Year 2021* includes "Standards of Business Activities and Products on the Implementation of Risk-Based Business Licenses Marine and Fishery Sector" and the "Standard for Registration of Fishing Vessels to Regional Fisheries Management Organizations."

**b. A program to monitor its fisheries for incidences of marine mammal mortality and serious injury in the course of commercial fishing operations**

Response: Indonesia states it has a monitoring program for marine mammal bycatch that includes logbooks, observers, data collection at port, fishermen interviews and other monitoring initiatives (see Table 1) and provided some bycatch data. Indonesia conducts special marine mammal monitoring and mitigation work for the blue swimming crab fishery, Fishery IDs 12391 and 1532.

**Table 1. Indonesia Export Fisheries**

| Gear type | Target species | Fishery ID | Monitoring programs | Percentage coverage |
|---|---|---|---|---|
| | | | | |

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Indonesia**

| | | | | |
|---|---|---|---|---|
| Gillnet | Swimming crabs/etc. nei | 12391 | Vessel logbooks | <1% |
| | | | Landing collection | 25-50% |
| | | | Blue swimming crab monitoring | 10-25% |
| | | | Blue swimming crab logbook | 10-25% |
| | Coral groupers nei, Flatfishes nei, Groupers nei, Humpback grouper, Jobfishes nei, Pinjalo, Snappers nei, Tomato hind | 1373 | Vessel logbooks | <1% |
| | | | Landing collection | 25-50% |
| | | | Stakeholder's report | 77-99% |
| | Arius spp, Cobia, Marine fishes nei, Thinspine sea catfish | 1376 | Vessel logbooks | <1% |
| | | | Landing collection | 25-50% |
| | | | Stakeholder's report | 75-99% |
| | | | Observer program | <1% |
| | Bigeye tuna, Dolphinfishes nei, Skipjack tuna, True tunas nei, Yellowfin tuna | 1375 | Landing collection | <1% |
| | | | Vessel logbooks | 25-50% |
| | | | Stakeholder's report | 77-99% |
| Longline | Cobia, Coral groupers nei, Groupers nei, Humpback grouper, Jobfishes nei, Pinjalo, Snappers nei, Tomato hind | 12679 | Vessel logbooks | <1% |
| | | | Landing collection | 25-50% |
| | | | Voluntary observer | Unknown |
| | Albacore, Bigeye tuna, Marlins,sailfishes,etc. nei, Sharks/rays/skates/etc. nei, Sharks/rays/skates/etc. nei, Skipjack tuna, Swordfish, True tunas nei, Various sharks nei, Yellowfin tuna (IOTC) | 1370 | Observer program | 50-75% |
| | | | Vessel logbooks | 10-25% |
| | | | Landing collection | 25-50% |
| | | | Voluntary observer | Unknown |
| | Albacore, Bigeye tuna, Marlins,sailfishes,etc. nei, Pacific bluefin tuna, Sharks/rays/skates/etc. nei, Skipjack tuna, Swordfish, True tunas nei, True tunas nei, Various sharks nei, Yellowfin tuna | 1371 | Observer program | 50-75% |
| | | | Vessel logbooks | 10-25% |
| | | | Landing collection | 25-50% |
| | | | Voluntary observer | Unknown |
| | Southern bluefin tuna (CCSBT) | 12390 | Observer program | 50-75% |
| | | | Vessel logbooks | 10-25% |
| | | | Landing collection | 25-50% |

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Indonesia**

| | | | Voluntary observer | Unknown |
|---|---|---|---|---|
| | Dolphinfishes nei, Escolar, Opahs nei, Wahoo | 12678 | Observer program | 50-75% |
| | | | Vessel logbooks | 10-25% |
| | | | Landing collection | 25-50% |
| | | | Voluntary observer | Unknown |
| Pots/Traps | Marine crabs nei | 1531 | Vessel logbooks | <1% |
| | | | Landing collection | 25-50% |
| | Swimming crabs/etc. nei | 1532 | Blue swimming crab monitoring | 10-25% |
| | | | Vessel logbooks | 1-5% |
| | | | Blue swimming crab logbook | 10-25% |
| | | | Landing collection | 25-50% |
| | Groundfishes nei | 1523 | Landing collection | 25-50% |
| | | | Vessel logbooks | <1% |
| | Coral groupers nei, Groupers nei, Humpback grouper, Pinjalo, Seabasses nei, Snappers nei, Tomato hind | 1525 | Landing collection | 25-50% |
| | | | Vessel logbooks | <1% |
| Trammel nets | Metapenaeus shrimps nei, Parapenaeopsis shrimps nei, Penaeus shrimps nei | 12567 | Landing collection | 25-50% |
| | | | Vessel logbooks | 1-5% Coverage |
| Purse Seine | Mackerels nei (IOTC) | 1374 | Observer program | 50-75% |
| | | | Vessel logbooks | 10-25% |
| | | | Landing collection | 25-50% |
| | Albacore, Bigeye tuna, Bonitos nei, Frigate and bullet tunas, Kawakawa/mackerel tuna, Longtail tuna, Mackerels nei, Skipjack tuna, True tunas nei, Yellowfin tuna (WCPFC) | 1542 | Observer program | 10-25% |
| | | | Vessel logbooks | 25-50% |
| | | | Landing collection | 25-50% |
| | Sardinellas nei | 12682 | Observer program | 50-75% |
| | | | Vessel logbooks | 10-25% |
| | | | Landing collection | 25-50% |

c. **A requirement to report all marine mammal mortality and serious injury in the course of commercial fishing operations**

Response: Yes. *Ministerial Regulation No. 33* (2021) requires all vessels to record marine mammal bycatch in logbooks. Indonesia states that every vessel is required to record their fishing activities in logbooks, electronically or manually, and submit it to port authorities. The logbook contains bycatch reporting, including for marine mammals.

d. **Prioritization of fisheries for mitigation of unsustainable marine mammal bycatch as described in 16 U.S.C. § 1387(f)(3) (in particular those over the bycatch limit, of small population size, or declining rapidly, based on available financial resources) in response to reported bycatch occurring in fishing operations. Prioritization of fisheries should be similar to U.S. take reduction teams and development of take reduction plans and including an evaluation of whether the nation has provided a bycatch limit and whether that bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stock(s), and whether any mitigation is effective or reconsidered if not effective.**

Response: Indonesia identified specific marine mammals occurring in its waters based on fishermen interviews but provided few marine mammal population abundance estimates or bycatch limits. Blue swimming crab fishermen noted the presence of the following marine mammals: the pantropical spotted dolphin, long-snouted spinner dolphins, short-beaked common dolphin, Indo-Pacific humpbacked dolphin, Indo-Pacific finless porpoise, short-finned pilot whale, killer whale, Indo-Pacific bottlenose dolphins, and rough-toothed dolphin. In Muara Jawa in 2023, fishermen identified the following species occurring in fishing areas: Irrawaddy dolphin, finless porpoise, Risso's dolphin, Fraser's dolphin and spinner dolphin. Some of these species likely have low population numbers and could potentially be considered 16 U.S.C. § 1387(f)(3) stock(s). For Irrawaddy dolphins, see response to Question 6.

In its 2021 application, Indonesia provided a summary document with the best available marine mammal bycatch data it possessed at that time. These data were obtained from observer monitoring programs, logbooks, landing collection, stakeholder reports, and fishermen interviews. The stakeholder report data included documented strandings likely due to gillnet gear interactions, including finless porpoise, Indo-Pacific bottlenose dolphin, and Indo-Pacific humpback dolphin. Indonesia also stated that some fisheries co-occur with sperm whales but there is no documented bycatch.

Although Indonesia has some monitoring and requires reporting of marine mammal bycatch, comprehensive marine mammal bycatch data are not available for all export fisheries. Stranded animals often do not bear evidence definitively linking them to specific fisheries and underrepresent total serious injury and mortality as not all bycatch incidents are observed and documented. Indonesia also has fisheries that utilize fishing gear, including gillnets, that are known to present a high entanglement risk for marine mammals. Research indicates unsustainable levels of marine mammal bycatch in Indonesian gillnet fisheries; in particular, small cetacean mortality in the Indonesian tuna gillnet fishery was estimated at around 10,000 cetaceans/year for 2012 to 2016 (Anderson et al. 2020).[2]

Although reliable estimates of bycatch for export fisheries are unknown, bycatch limits, particularly in fisheries with a high-risk gear, such as gillnets, are likely exceeded for some stocks, including potential

---

[2] Anderson, R.C. et al. 2020. Cetacean bycatch in Indian Ocean tuna gillnet fisheries. Endangered Species Research 41: 39-53.

16 U.S.C. § 1387(f)(3) stocks in Indonesia. The effectiveness of mitigation measures such as protected areas in reducing bycatch is also unknown.

### 3.  Does the nation ban the use of large-scale high seas drift gillnet gear or other gear prohibited for use by U.S. fishermen?

Response: While it does not appear that Indonesia prohibits large-scale driftnet fishing, none of Indonesia's fisheries use large-scale drift gillnet gear, and no other information submitted suggests it uses gear prohibited by the United States.

### 4.  Does the nation implement marine mammal bycatch reduction measures in fisheries regulated under a regional fishery management organization (RFMO), which are required for U.S. fishermen by that RFMO?

Response: Yes. The United States and Indonesia are both parties of the Western and Central Pacific Fisheries Commission (WCPFC). The United States is a party to the Inter-American Tropical Tuna Commission (IATTC) while Indonesia is a cooperating non-member. Indonesia, but not the United States, is also a party to the Indian Ocean Tuna Commission (IOTC) and the Commission for the Conservation of Southern Bluefin Tuna (CCSBT).

WCPFC requires observer coverage, marine mammal bycatch reporting, and no intentional encirclement of cetaceans in the purse seine fishery under *CMM 2011-03*. A 2024 WCPFC compliance report for 2023 stated Indonesia needed capacity assistance with purse seine coverage and has implementation gaps on the requirement under CMM 2011-03 to prohibit purse seine setting on cetaceans, if the animal is sighted prior to commencement of the set.[3]

IATTC requires marine mammal bycatch reporting and *Resolution C-19-08* requires 5% observer coverage on vessels greater than 20 m long.

The IOTC has requirements for gear restrictions, observer coverage, and bycatch reporting. IOTC *Resolution 23/06*, which does not apply to artisanal vessels only operating in their EEZ, requires reporting marine mammal bycatch by observers or in logbooks and taking all reasonable steps to ensure the safe release of any entangled cetaceans. It also requires no intentional encirclement of cetaceans in purse seine fisheries. The 2021 IOTC compliance report for Indonesia indicated it is compliant with cetacean CMMs. *Resolution 17/07* prohibits the use of large-scale driftnets within the IOTC area of competence. Under *Resolution 21/01*, member nations with gillnet fisheries shall set their gillnets at 2m depth from the surface by 2023 to mitigate ecological impacts of gillnets and encourages increasing observer coverage or field sampling in gillnet fisheries by ten percent; however, as Indonesia objected to this resolution this requirement does not apply to them.

Fisheries operating under CCSBT are required to collect and report data on marine mammal bycatch.

### 5.  In cases where a U.S. Take Reduction Team has implemented marine mammal bycatch reduction measures for transboundary stocks shared with the United States, are the nation's measures similar or comparable in effectiveness? (Include in the response if the

---

[3] WCPFC. 2024. 2024 Final compliance monitoring report (covering 2023 activities).

nation has provided a bycatch limit and if the bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stocks, either in one fishery or cumulatively over a number of fisheries)

Response: Not applicable. The United States and Indonesia do not share any transboundary stocks.

6. **For marine mammal stocks that are not transboundary but are considered at high risk of extinction, does the nation implement mitigation/risk reduction measures comparable to what is or would be required in the United States? (Include in the response if the nation has provided a bycatch limit and if the bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stocks, either in one fishery or cumulatively over a number of fisheries)**

Response: Irrawaddy dolphin stocks in Indonesia may be at a high risk of extinction and stranding data attributed to gillnet entanglement indicate that the bycatch limit is likely exceeded for Irrawaddy dolphins. Stranding data from 2000 to 2019 suggests 18 Irrawaddy dolphins died of potential gillnet fishing-related activities, although it is not possible to attribute mortalities to specific gillnet fisheries (Table 2). In addition to these stranding data, Indonesia also separately reported that an Irrawaddy dolphin was caught in gillnet gear in 2020.

**Table 2. Irrawaddy dolphin stranding data (2000-2019) attributed to gillnets**

| Year | Dead | Alive |
|------|------|-------|
| 2000 | 1 | 1 |
| 2013 | 1 | 0 |
| 2014 | 1 | 0 |
| 2015 | 2 | 0 |
| 2016 | 4 | 0 |
| 2017 | 3 | 0 |
| 2018 | 5 | 0 |
| 2019 | 1 | 0 |

In the Mahakam River delta, Balikpapan Bay, and Muara Jawa, the bycatch limits for Irrawaddy dolphin stocks are likely exceeded from gillnet fishery entanglements. In March 2025, Indonesia provided updated information on Irrawaddy dolphins following three surveys conducted in 2023 that indicated an estimated population size of 67 dolphins in the Mahakam River delta with a bycatch limit of 0.13 (recovery factor 0.1). Indonesia stated that the bycatch mortality rate based on strandings attributed to gillnet entanglement has been reduced from an average of two dolphins/year (1995 to 2021) to one dolphin in three years, yielding an average known mortality of 0.14 from 2022 to 2024.

In Balikpapan Bay and Muara Jawa, three surveys conducted in 2023 indicated an estimated population size of 59 individuals with a bycatch limit of 0.12 (recovery factor 0.1). Prior to 2023, the last study conducted in Balikpapan Bay in 2015 indicated an estimated population of 73 Irrawaddy dolphins, suggesting the population may have declined. Between 2011 and 2021, four Irrawaddy dolphin strandings in Balikpapan Bay and Muara Jawa have been attributed to gillnet entanglement, resulting in an average known mortality rate of 0.36.

Ministerial Decree *No. 83 Year 2022 Concerning Blue Swimming Crabs Fisheries Management Plan* established targets and indicators for blue swimming crabs fisheries to minimize endangered, threatened, and protected species bycatch, including marine mammals. Mitigation measures for gillnet and trammel fisheries include temporal-based fishery closures (closed October to December in FMA 714 (*Minister Regulation No. 26/2020*) and area-based fishery closures (*Ministerial Regulation No. 18/2021* article 8 (2)). Indonesia stated that crab fishermen groups have committed not to operate in designated protected areas based on village regulations.

Indonesia has been conducting additional research on pingers including in the Mahakam River in 2020 and 2021, which showed that pingers were effective in reducing the risk of Irrawaddy dolphin entanglements in gillnets without disrupting their feeding activities. Since July 2020, fishermen have installed 266 pingers in 172 gillnets in the delta of Mahakam, and as a part of another initiative, around 70 pingers and batteries have been distributed to fishermen. Indonesia states that based on interviews with fishermen, some fishermen agreed to switch their fishing gear from gillnets to pots and longlines. Despite these initiatives, the bycatch limit for Irrawaddy dolphins is likely continuing to be exceeded by gillnet fishery. According to Indonesia, additional research and mitigation trials aimed at driving bycatch rates below the limit will continue into the future.

Indonesia states it is in the process of revitalizing the *Ministerial Decree Concerning National Plan of Action of Marine Mammals Conservation*, which will address marine mammal bycatch in commercial fishing activities.

# Additional Considerations

In reviewing a nation's fisheries and marine mammals stocks, how do they compare to:

1. **U.S. implementation of its regulatory program for similar marine mammal stocks and similar fisheries (e.g., considering gear or target species), including transboundary stocks governed by regulations implementing a take reduction plan (50 CFR § 229.2), and any other relevant information received during consultations**

Response: Not applicable.

2. **The extent to which the harvesting nation has successfully implemented measures in the export fishery to reduce the incidental mortality and serious injury of marine mammals caused by the harvesting nation's export fisheries to levels below the bycatch limit**

Response: Not applicable.

3. **Whether the measures adopted by the harvesting nation for its export fishery have reduced or will likely reduce the cumulative incidental mortality and serious injury of each marine mammal stock below the bycatch limit, and the progress of the regulatory program toward achieving its objectives**

Response: Not applicable.

4. **Other relevant facts and circumstances, which may include the history and nature of interactions with marine mammals in this export fishery, whether the level of incidental**

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Indonesia**

**mortality and serious injury resulting from the fishery or fisheries exceeds the bycatch limit for a marine mammal stock, the population size and trend of the marine mammal stock, and the population level impacts of the incidental mortality or serious injury of marine mammals in a harvesting nation's export fisheries and the conservation status of those marine mammal stocks where available**

Response: Not applicable.

**5. The record of consultations under 50 CFR § 216.24(h)(5) of this section with the harvesting nation, results of these consultations, and actions taken by the harvesting nation and under any applicable intergovernmental agreement or regional fishery management organization to reduce the incidental mortality and serious injury of marine mammals in its export fisheries**

Response: NMFS had technical consultations with Indonesia in March and November 2021.

**6. Information gathered during onsite inspection by U.S. government officials of a fishery's operations**

Response: Not applicable.

**7. For export fisheries operating on the high seas under an applicable intergovernmental agreement or regional fishery management organization to which the United States is a party, the harvesting nation's record of implementation of, or compliance with, measures adopted by that regional fishery management organization or intergovernmental agreement for data collection, incidental mortality and serious injury mitigation or the conservation and management of marine mammals; whether the harvesting nation is a party or cooperating non-party to such intergovernmental agreement or regional fishery management organization; the record of United States implementation of such measures; and whether the United States has imposed additional measures on its fleet not required by an intergovernmental agreement or regional fishery management organization**

Response: The United States and Indonesia are both members of WCPFC. See response to Question 4.

**8. For export fisheries operating on the high seas under an applicable intergovernmental agreement or regional fisheries management organization to which the United States is not a party, the harvesting nation's implementation of and compliance with measures, adopted by that regional fisheries management organization or intergovernmental agreement, and any additional measures implemented by the harvesting nation for data collection, incidental mortality and serious injury mitigation or the conservation and management of marine mammals and the extent to which such measures are comparable in effectiveness to the U.S. regulatory program for similar fisheries**

Response: Indonesia has two tuna fisheries operating under IOTC and CCSBT. See response to Question 4.

**Overall Summary for Additional Considerations**

The additional considerations were not pertinent to determining whether the nation's marine mammal bycatch reduction program is comparable in effectiveness to the U.S. regulatory program.

The Center for Biological Diversity, the Natural Resources Defense Council, and the Animal Welfare Institute jointly submitted information to NMFS on Indonesia's fisheries. NMFS has taken the information into consideration, as appropriate, in our evaluations.

# Engagement History

NMFS engaged in two technical consultations with Indonesia in March and November 2021 as well as numerous email exchanges of information. Indonesia was responsive to emails.

# EXHIBIT D

# Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report

# Vietnam

## Summary

Based on Vietnam's initial application, its responses to the clarification questions, and the information described below, NMFS has determined that the following fisheries are comparable in effectiveness to the U.S. regulatory program: Exempt Fishery IDs 2936, 2978, and 2993 and Export Fishery IDs: 2984, 2985, 2986, 2979, 2987, 2989, 3053, 3055, 3058, 3059, and 3061. The following Export fisheries are not comparable: Fishery IDs 2932, 2988, 2990, 2991, 2992, 2994, 3051, 3052, 3054, 3057, 13124, and 13125.

Vietnam prohibits the intentional killing of marine mammals in the course of commercial fishing operations. Vietnam licenses fishing vessels and is implementing a combination of observer programs, logbooks, dockside inspections, and fishermen interviews in its export fisheries. However, not all vessel size classes are monitored and not all are required to report marine mammal bycatch. 16 U.S.C. § 1387(f)(3) stocks, including the Irrawaddy dolphin, co-occur with fisheries using gear with a high risk of interaction with marine mammals and bycatch limits are likely exceeded. Vietnam has some mitigation measures and plans to phase-out some tuna drift gillnet vessels over time, but did not specify the implementation of specific measures on a fishery basis and their effectiveness in mitigating bycatch unknown.

**Fisheries that are not recommended for Comparability Finding**

| Fishery ID[1] | Target Species | Gear Type | Area | Rationale for Denial |
|---|---|---|---|---|
| 2932 | Groupers nei* | Gillnets and entangling nets (not specified), (Demersal), <br><br>single and/or pair trawl, (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Vietnam EEZ, north, central, and south regions | Presence of 16 U.S.C. § 1387(f)(3) stock(s) <br><br>Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting <br><br>Unknown if mitigation measures are likely to reduce |

---

[1] The Fishery ID number is NOAA's internal reference number from our IAICRS database and has no other independent meaning.

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Vietnam**

| | | | | marine mammal bycatch below the bycatch limit |
|---|---|---|---|---|
| 2988 | Swimming crabs/etc. nei | Gillnets and entangling nets (not specified), (Demersal), single and/or pair trawl, (Demersal), trap nets/stationary nets, (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), coastal areas central and south regions | Presence of 16 U.S.C. § 1387(f)(3) stock(s)  Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting  Unknown if mitigation measures are likely to reduce marine mammal bycatch below the bycatch limit |
| 2990 | Cuttlefishes nei, Demersal fishes nei, Flatfishes nei, Groupers nei, Mullets nei, Snappers nei, Soles nei | Gillnets and entangling nets (not specified), (Demersal), Longlines (not specified), (Demersal), single and/or pair trawl, (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), inshore and offshore areas, north, central, and south regions | Presence of 16 U.S.C. § 1387(f)(3) stock(s)  Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting  Unknown if mitigation measures are likely to reduce marine mammal bycatch below the bycatch limit |
| 2991 | Dolphinfishes nei | Gillnets and entangling nets (not specified), (Pelagic), Longlines (not specified), (Pelagic) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), offshore areas | Presence of 16 U.S.C. § 1387(f)(3) stock(s)  Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting  Unknown if mitigation measures are likely to reduce marine mammal bycatch below the bycatch limit |
| 2992 | Lobsters nei | Gillnets and entangling nets (not specified), (Bottom) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), | Presence of 16 U.S.C. § 1387(f)(3) stock(s) |

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Vietnam**

| | | | Coastal areas in central region | Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting

Unknown if mitigation measures are likely to reduce marine mammal bycatch below the bycatch limit |
|---|---|---|---|---|
| 2994 | Mackerels nei | Gillnets and entangling nets (not specified), (Pelagic), Purse seines, (Pelagic) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Inshore and offshore areas, north, central, and south regions | Presence of 16 U.S.C. § 1387(f)(3) stock(s)

Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting

Unknown if mitigation measures are likely to reduce marine mammal bycatch below the bycatch limit |
| 3051 | Mackerels nei | Gillnets and entangling nets (not specified), (Pelagic), Purse seines, (Pelagic) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Inshore and offshore areas, north, central, and south regions | Presence of 16 U.S.C. § 1387(f)(3) stock(s)

Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting

Unknown if mitigation measures are likely to reduce marine mammal bycatch below the bycatch limit |
| 3052 | Mullets nei | Gillnets and entangling nets (not specified), (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), coastal and inshore areas, north, central, and south regions | Presence of 16 U.S.C. § 1387(f)(3) stock(s)

Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting

Unknown if mitigation measures are likely to reduce |

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Vietnam**

| | | | | marine mammal bycatch below the bycatch limit |
|---|---|---|---|---|
| 3054 | Mackerels nei | Gillnets and entangling nets (not specified), (Midwater) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), offshore areas, north, central, and south regions, Vietnam EEZ | Presence of 16 U.S.C. § 1387(f)(3) stock(s)<br><br>Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting<br><br>Unknown if mitigation measures are likely to reduce marine mammal bycatch below the bycatch limit |
| 3057 | Pelagic fishes nei, Tunas nei | Gillnets and entangling nets (not specified), (Pelagic) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), inshore, and offshore areas, north, central, and south regions | Presence of 16 U.S.C. § 1387(f)(3) stock(s)<br><br>Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting<br><br>Unknown if mitigation measures are likely to reduce marine mammal bycatch below the bycatch limit |
| 13124 | Big eye tuna, skipjack tuna, yellowfin tuna | Gillnets and entangling nets (not specified), (Midwater),<br><br>Purse seines, (Surface) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Vietnam EEZ, north, central and south region | Presence of 16 U.S.C. § 1387(f)(3) stock(s)<br><br>Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting<br><br>Unknown if mitigation measures are likely to reduce marine mammal bycatch below the bycatch limit |
| 13125 | Marlins, sailfishes, etc. nei,<br><br>Swordfish | Gillnets and entangling nets (not specified), (Midwater), | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Vietnam EEZ, | Presence of 16 U.S.C. § 1387(f)(3) stock(s) |

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Vietnam**

| | | Handlines and hand-operated pole-and-lines, (Midwater) | north, central and south region | Gear with high risk of marine mammal interaction and lack of marine mammal bycatch monitoring and reporting<br><br>Unknown if mitigation measures are likely to reduce marine mammal bycatch below the bycatch limit |
|---|---|---|---|---|

*Not elsewhere included (nei) - when the product is not specifically provided for in the Harmonized Trade System, the description covering such product is generally considered to be a "residual provision" by use of the phrase "not elsewhere included".

# Comparability Finding Analysis

1. **Does the nation have a prohibition on the intentional killing or serious injury of marine mammals in the course of commercial fishing operations? OR Does the nation have procedures to reliably certify that fish and fish products were not caught in association with the intentional killing or serious injury of marine mammals in the course of commercial fishing operations?**

Response: Yes. All marine mammal species distributed within Vietnam's territorial waters are classified under Group I of the list of endangered, precious, and rare aquatic species protected under Appendix II of *Decree No. 26/2019/ND-CP*, and as amended and supplemented by Appendix II of *Decree No. 37/2024/ND-CP*.

Clause 1, Article 8 of *Decree No. 26/2019/ND-CP* (as amended and supplemented by Clause 3, Article 1 of *Decree No. 37/2024/ND-CP*) stipulates: "1. It is strictly prohibited to exploit endangered, precious, and rare aquatic species classified under Group I, except in cases of exploitation for the purposes of conservation, scientific research, initial breeding studies, or international cooperation."

Permission for these purposes requires written approval by the Directorate of Fisheries Organizations for a special permit under the provisions of the Article 9 of the *Decree 26/2019/ND-CP*.

- Violations relating to marine mammals are subject to criminal prosecution and Article 244 of *2015 Penal Code 100/2015/QH13*. Other violations not serious enough to be prosecuted for penal liability are subject to administrative sanctions specified in the Article 8 of the *Government Decree No. 38/2024/ND-CP* dated April 5, 2024.

2. **Does the nation have a Marine Mammal Bycatch Reduction Program? A bycatch reduction program, for purposes of compliance with the import provisions, is defined as having the following components:**

   a. **The ability to control/monitor its fishing operations that may take marine mammals (e.g., authorizations, permits, licenses, and/or registrations for vessels)**

Response: Yes. The *Law on Fisheries (18/2017/QH4) Chapter IV - Commercial Fishing, Section 1, Articles 49-50* provides for issuing licenses for commercial marine fishing, while *Section 2- Commercial Fishing outside Vietnamese Maritime Boundary, Arts. 53-54* provides for licenses and reference RFMO requirements. *Art. 71 - Registration of Commercial Fishing Vessels* sets forth requirements for inscription on the National Register of Commercial Fishing Vessels. *Decree No. 26/2019/ND-CP, Chapter IV Capture Fisheries, Articles 45-48* set forth additional requirements for fishing licenses, including for Vietnamese fishing vessels fishing outside of national waters and operating in RFMO Convention Areas.

### b.  A program to monitor its fisheries for incidences of marine mammal mortality and serious injury in the course of commercial fishing operations

Response: Partially. Vietnam stated it has recently implemented monitoring programs including onboard observers, logbooks, fishing port inspections, and fishermen interviews. However, while Vietnam provided an overall description of the types of monitoring in its fisheries, Vietnam did not provide a fishery-by-fishery explanation and did not specify the type of monitoring required for all gear types, including gillnets, which has a high likelihood of interaction with marine mammals, in particular with small cetaceans like the Irrawaddy dolphin (16 U.S.C. § 1387(f)(3) stock).

Monitoring requirements as described by Vietnam are summarized below:

Observer Program: Tuna-targeted purse seine (3–5% observer coverage, ~28–47 fishing trips/year)

Purse seine, trawl net, and tuna handline (1-5% coverage ~10 fishing trips/year)

Fishing logbook program: 75% to 100% coverage (100% coverage vessels 12 meters or larger)

Fishing port inspection program: 100% coverage vessels 24 meters or larger and less coverage (5- 20%) for smaller vessels

Fishermen interviews: 1-5% coverage as part of a 2025-2027 marine mammal survey study

Vietnam also provided the vessel logbook form that includes reporting of marine mammal bycatch, but did not provide the observer reporting form. From the information provided, there was no indication if or how vessels less than 12 meters (not required to use logbooks), which include gillnet fisheries, would report marine mammal bycatch.

**Table 1. Vietnam Export Fisheries**

| Fishery ID | Target species | Gear type | Area of operation |
|---|---|---|---|
| 2932 | Groupers nei | Gillnets and entangling nets (not specified), (Demersal), <br><br> single and/or pair trawl, (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Vietnam EEZ, north, central, and south regions |
| 2979 | Various squids nei | Falling nets, (Surface), <br><br> single and/or pair trawl, (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), coastal, inshore, and offshore areas, north and central regions |

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Vietnam**

| 2984 | Anchovies nei, Herrings/sardines nei | Purse seines, (Surface) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), South Long Chau, North Hon Me, Tonkin Gulf Mouth, north and central regions |
|---|---|---|---|
| 2985 | Bigeye tuna, Yellowfin tuna | Handlines and hand-operated pole-and-lines, (Midwater) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), offshore areas, Vietnam EEZ |
| 2986 | Octopuses nei | Octopus pots, (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), coastal, Inshore areas |
| 2987 | Anchovies nei, Herrings/sardines nei | Purse seines, (Pelagic) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Coastal, Inshore areas |
| 2988 | Swimming crabs/etc. nei | Gillnets and entangling nets (not specified), (Demersal), single and/or pair trawl, (Demersal), trap nets/stationary nets, (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), coastal areas central and south regions |
| 2989 | Conger eels/etc. nei | Single and/or pair trawl, (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Inshore areas |
| 2990 | Cuttlefishes nei, Demersal fishes nei, Flatfishes nei, Groupers nei, Mullets nei, Snappers nei, Soles nei | Gillnets and entangling nets (not specified), (Demersal), Longlines (not specified), (Demersal), single and/or pair trawl, (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), inshore and offshore areas, north, central, and south regions |
| 2991 | Dolphinfishes nei | Gillnets and entangling nets (not specified), (Pelagic), Longlines (not specified), (Pelagic) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), offshore areas |

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Vietnam**

| 2992 | Lobsters nei | Gillnets and entangling nets (not specified), (Bottom) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Coastal areas in central region |
|---|---|---|---|
| 2994 | Mackerels nei | Gillnets and entangling nets (not specified), (Pelagic), Purse seines, (Pelagic) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Inshore and offshore areas, north, central, and south regions |
| 3051 | Mackerels nei | Gillnets and entangling nets (not specified), (Pelagic), Purse seines, (Pelagic) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Inshore and offshore areas, north, central, and south regions |
| 3052 | Mullets nei | Gillnets and entangling nets (not specified), (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), coastal and inshore areas, north, central, and south regions |
| 3053 | Bigeye tuna, Pacific bluefin tuna, Skipjack tuna, Swordfish, Yellowfin tuna | Handlines and hand-operated pole-and-lines, (Midwater), Longlines (not specified), (Midwater) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), offshore areas, central provinces, Vietnam EEZ |
| 3054 | Mackerels nei | Gillnets and entangling nets (not specified), (Midwater) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), offshore areas, north, central, and south regions, Vietnam EEZ |
| 3055 | Marine shrimps nei | Otter trawls (not specified), (Bottom) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Inshore area |
| 3057 | Pelagic fishes nei, Tunas nei | Gillnets and entangling nets (not specified), (Pelagic) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), inshore, and offshore areas, north, central, and south regions |
| 3058 | Mackerels nei, Tunas nei | Purse seines, (Pelagic) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), inshore, and offshore |

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Vietnam**

| | | | areas (north, central, and south regions) |
|---|---|---|---|
| 3059 | Various squids nei | Handlines and hand-operated pole-and-lines, (Midwater), Purse seines, (Pelagic), single and/or pair trawl, (Demersal) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Inshore and Offshore areas |
| 3061 | Orange roughy | Single and/or pair trawl, (Bottom) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), none provided |
| 13124[2] | Bigeye tuna, skipjack tuna, yellowfin tuna | Gillnets and entangling nets (not specified), (Midwater), Purse seines, (Surface) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Vietnam EEZ, north, central and south region |
| 13125[2] | Marlins, sailfishes, etc. nei, Swordfish | Gillnets and entangling nets (not specified), (Midwater), Handlines and hand-operated pole-and-lines, (Midwater) | EEZ, (FAO:61 Pacific Northwest, FAO:71 Pacific Western Central), Vietnam EEZ, north, central and south region |

### c. A requirement to report all marine mammal mortality and serious injury in the course of commercial fishing operations

Response: Partially. Vietnam requires reporting marine mammal bycatch in fishing logbooks; however, logbooks are only required for vessels greater than 12 meters. Clause 9, Article 8 of *Decree 26/2019/ND-CP* dated March 8, 2019 (amended and supplemented in Clause 3, Article 1 of *Decree 37/2024*) stipulates that "Organizations and individuals in fishing operation that encounter or unintentionally capture endangered, precious and rare marine species are responsible for recording information in the fishing logbook".

### d. Prioritization of fisheries for mitigation of unsustainable marine mammal bycatch as described in 16 U.S.C. § 1387(f)(3) (in particular those over the bycatch limit, of small population size, or declining rapidly, based on available financial resources) in response to reported bycatch occurring in fishing operations. Prioritization of fisheries should be similar to U.S. take reduction teams and development of take reduction plans and including an evaluation of whether the nation has provided a bycatch limit and whether that bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stock(s), and whether any mitigation is effective or reconsidered if not effective.

---

[2] Fishery added by Vietnam to the LOFF in 2025.

Response: Unknown. Vietnam recently assessed marine mammals in its waters and the updated population abundance estimates suggest that the bycatch for Bryde's whales, Chinese humpback dolphin, Indo-Pacific bottlenose dolphin, Indo-Pacific finless porpoise, and pantropical spotted dolphin may have exceeded their bycatch limits. Vietnam determined that two marine mammals previously thought to be present, blue and fin whales, are not located in Vietnam waters. Irrawaddy dolphins (16 U.S.C. § 1387(f)(3) stock) are also located in Vietnam waters (See Question 6).

Vietnam has a number of mitigation measures listed in its fisheries that may benefit marine mammals but did not provide supporting documentation requiring their use. Vietnam has been developing a Dolphin Deterrent Device (DDD), although it was not clear if or how often DDDs have been installed on fishing gear. Although Vietnam is pursuing some measures to reduce marine mammal bycatch, it is unknown if mitigation is reducing bycatch levels of 16 U.S.C. § 1387(f)(3) stocks.

Vietnam also has conducted various marine mammal awareness programs including fishermen education and training programs, created marine mammal identification materials, and established a volunteer network to report marine mammal sightings.

Vietnam also aims to phase-out 300 tuna drift gillnet vessels, with a transition to more selective and ecologically responsible gear types and prohibits the reclassification or licensing of vessels into high-impact gear types, such as trawling and tuna drift gillnets. It also sets a gradual reduction target for the number of drift gillnet vessels operating in the offshore area.

### 3. Does the nation ban the use of large-scale high seas drift gillnet gear or other gear prohibited for use by U.S. fishermen?

Response: While it does not appear that Vietnam prohibits the use of large-scale driftnet fishing, none of Vietnam's fisheries use large-scale drift gillnet gear, and no other information submitted suggests it uses gear prohibited by the United States.

### 4. Does the nation implement marine mammal bycatch reduction measures in fisheries regulated under a regional fishery management organization (RFMO), which are required for U.S. fishermen by that RFMO?

Response: No. Vietnam incorrectly reported nearly all of its fisheries as operating under the Western and Central Pacific Fisheries Commission (WCPFC), including some non-tuna fisheries that are not covered by WCPFC: Fishery IDs 2932, 2979, 2984, 2985, 2986, 2987, 2989, 2988, 2990, 2991, 2994, 3051, 3052, 3053, 3054, 3057, 3058, 3059, 13124, and 13125). Vietnam also incorrectly indicated that these WCPFC fisheries operating exclusively within its EEZ, including for tuna species, are not operating within the WCPFC Convention Area. However, WCPFC's Convention Area includes nations' EEZs and relevant management measures adopted by WCPFC apply to highly migratory fisheries operating within the Convention Area, including the EEZ, unless otherwise specified. Vietnam stated it does not implement the conservation and management measures of WCPFC. WCPFC's CMM 2011-03 prohibits the intentional encirclement of cetaceans in purse seine fisheries on the high seas and within the EEZ. This measure applies to Fishery ID 13124 that uses purse seine gear to target bigeye, skipjack, and yellowfin tunas. WCPFC does not have any binding marine mammal bycatch reduction requirements for gear types besides purse seine.

5. **In cases where a U.S. Take Reduction Team has implemented marine mammal bycatch reduction measures for transboundary stocks shared with the United States, are the nation's measures similar or comparable in effectiveness? (Include in the response if the nation has provided a bycatch limit and if the bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stocks, either in one fishery or cumulatively over a number of fisheries)**

Response: N/A. Vietnam and the United States do not share any transboundary stocks.

6. **For marine mammal stocks that are not transboundary but are considered at high risk of extinction, does the nation implement mitigation/risk reduction measures comparable to what is or would be required in the United States? (Include in the response if the nation has provided a bycatch limit and if the bycatch limit is exceeded for any 16 U.S.C. § 1387(f)(3) stocks, either in one fishery or cumulatively over a number of fisheries)**

Response: Irrawaddy dolphins are considered a 16 U.S.C. § 1387(f)(3) stock at high-risk of extinction in Vietnam. Vietnam conducted a boat-based survey using photo-ID method on two populations of Irrawaddy dolphins in the Kien Giang province and Can Gio area and determined the abundance of Irrawaddy dolphins in Kien Giang and Can Gio were 72 (CV=16%) and 48 (CV=14.28%), respectively, but did not provide a bycatch limit. A large majority of fishermen interviewed reported encountering Irrawaddy dolphins and there was one reported incident of entanglement. Although Vietnam did not provide a bycatch limit, due to the extremely small population size of these stocks, the bycatch limit has likely been exceeded. Vietnam stated that there has not been a record of Irrawaddy dolphin in the Mekong River since 1990. Vietnam has implemented mitigation measures and has future mitigation plans that could benefit Irrawaddy dolphins; however, these measures are not specifically designed for mitigating bycatch of Irrawaddy dolphins and thus their effectiveness in reducing bycatch of Irrawaddy dolphins is unknown.

# Additional Considerations

In reviewing a nation's fisheries and marine mammals stocks, how do they compare to:

1. **U.S. implementation of its regulatory program for similar marine mammal stocks and similar fisheries (e.g., considering gear or target species), including transboundary stocks governed by regulations implementing a take reduction plan (50 CFR § 229.2), and any other relevant information received during consultations**

Response: Not applicable.

2. **The extent to which the harvesting nation has successfully implemented measures in the export fishery to reduce the incidental mortality and serious injury of marine mammals caused by the harvesting nation's export fisheries to levels below the bycatch limit**

Response: Not applicable.

3. **Whether the measures adopted by the harvesting nation for its export fishery have reduced or will likely reduce the cumulative incidental mortality and serious injury of each**

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Vietnam**

**marine mammal stock below the bycatch limit, and the progress of the regulatory program toward achieving its objectives**

Response: See response to Questions 2d and 6.

4. **Other relevant facts and circumstances, which may include the history and nature of interactions with marine mammals in this export fishery, whether the level of incidental mortality and serious injury resulting from the fishery or fisheries exceeds the bycatch limit for a marine mammal stock, the population size and trend of the marine mammal stock, and the population level impacts of the incidental mortality or serious injury of marine mammals in a harvesting nation's export fisheries and the conservation status of those marine mammal stocks where available**

Response: Not applicable.

5. **The record of consultations under 50 CFR § 216.24(h)(5) of this section with the harvesting nation, results of these consultations, and actions taken by the harvesting nation and under any applicable intergovernmental agreement or regional fishery management organization to reduce the incidental mortality and serious injury of marine mammals in its export fisheries**

Response: NMFS has had numerous meetings and discussions with Vietnam. Vietnam participated in several Association of Southeast Asian Nations and Southeast Asian Fisheries Development Center meetings where the MMPA Import Provisions were discussed. The last technical consultations with Vietnam were in May and November 2021.

6. **Information gathered during onsite inspection by U.S. government officials of a fishery's operations**

Response: Not applicable.

7. **For export fisheries operating on the high seas under an applicable intergovernmental agreement or regional fishery management organization to which the United States is a party, the harvesting nation's record of implementation of, or compliance with, measures adopted by that regional fishery management organization or intergovernmental agreement for data collection, incidental mortality and serious injury mitigation or the conservation and management of marine mammals; whether the harvesting nation is a party or cooperating non-party to such intergovernmental agreement or regional fishery management organization; the record of United States implementation of such measures; and whether the United States has imposed additional measures on its fleet not required by an intergovernmental agreement or regional fishery management organization**

Response: See Question 4.

8. **For export fisheries operating on the high seas under an applicable intergovernmental agreement or regional fisheries management organization to which the United States is not a party, the harvesting nation's implementation of and compliance with measures, adopted by that regional fisheries management organization or intergovernmental**

Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report | **Vietnam**

**agreement, and any additional measures implemented by the harvesting nation for data collection, incidental mortality and serious injury mitigation or the conservation and management of marine mammals and the extent to which such measures are comparable in effectiveness to the U.S. regulatory program for similar fisheries**

Response: Not applicable.

**Overall Summary for Additional Considerations**

The additional considerations were not pertinent to determining whether the nation's marine mammal bycatch reduction program is comparable in effectiveness to the U.S. regulatory program.

# Engagement History

NMFS engaged in numerous technical consultations as well as numerous email exchanges of information with Vietnam. Vietnam responded to clarifying questions concerning its application in August 2022 and provided new information in 2025. Vietnam has been very responsive to emails.

# EXHIBIT E

Case 1:25-cv-00223-N/A   Document 17   Filed 10/14/25   Page 103 of 167

10/9/25, 9:33 AM   2025 Marine Mammal Protection Act Comparability Finding Determinations for Harvesting Nations | NOAA Fisheries

 An official website of the United States government   Here's how you know ⌄



**Notice:**

 The U.S. government is closed. This site will not be updated; however, NOAA websites and social media channels necessary to protect lives and property will be maintained. To learn more, visit **commerce.gov**.

For the latest forecasts and critical weather information, visit **weather.gov**.

*Please note: Some content on this site may be updated as limited tasks may continue.

# 2025 Marine Mammal Protection Act Comparability Finding Determinations for Harvesting Nations

NOAA Fisheries announced its Marine Mammal Protection Act comparability determinations in the Federal Register, covering about 2,500 fisheries across 135 nations. Of these, 240 fisheries from 46 nations were denied comparability findings, restricting their ability to export to the United States.

---

In August 2025, NOAA Fisheries announced its 2025 Marine Mammal Protection Act comparability finding determinations in the Federal Register. These determinations cover approximately 2,500 fisheries in 135 nations seeking to export fish and fish products to the United States. Comparability finding determinations are made for each nation on a fishery-by-fishery basis. A total of 240 fisheries from 46 nations were denied comparability findings.

NOAA Fisheries conducted a detailed analysis of each comparability finding application submitted by harvesting nations. Details regarding each nation's comparability finding determination are categorized in the lists below. Each harvesting nation's Comparability Finding Application Final Report can be accessed by clicking on the nation under Lists 1, 2, and 3 below. Additional documents detailing NOAA Fisheries' evaluation process, the fisheries denied and granted comparability findings for each nation, and the trade information associated with fishery denials (including Harmonized Tariff Codes) can be found at the bottom of this page.

Nations whose fisheries were denied comparability findings are prohibited from importing fish and fish product from those fisheries into the United States beginning January 1, 2026, and may reapply for a comparability finding for the affected fisheries at any time after January 1, 2026. More information on seafood import restrictions and how they will be implemented under this program, is available here.

For additional questions, please contact MMPA.LOFF@noaa.gov.

# List 1: Nations receiving comparability findings for all export/exempt fisheries

1. Albania
2. Antigua and Barbuda
3. Argentina
4. Australia
5. The Bahamas
6. Bahrain
7. Barbados
8. Belgium
9. Belize
10. Bermuda
11. Brunei
12. Bulgaria
13. Cambodia
14. Canada
15. Cape Verde
16. Cook Islands
17. Costa Rica
18. Côte d'Ivoire (Ivory Coast)
19. Croatia

20. Cyprus

21. Denmark

22. Dominican Republic

23. Egypt

24. Estonia

25. Falkland Islands

26. Faroe Islands

27. Federated States of Micronesia

28. Fiji

29. Finland

30. France

31. France – St. Pierre Miquelon

32. French Polynesia

33. French Southern & Antarctic Lands

34. Georgia

35. Germany

36. Greece

37. Greenland

38. Guatemala

39. Guyana

40. Honduras

41. Hong Kong

42. Iceland

43. India

44. Israel

45. Italy

46. Jamaica

47. Japan

48. Kiribati

49. Latvia

50. Lithuania

51. Maldives

52. Malta

53. Marshall Islands

54. Mauritius

55. Morocco
56. Nauru
57. The Netherlands
58. New Zealand
59. Nicaragua
60. Norway
61. Pakistan
62. Palau
63. Panama
64. Papua New Guinea
65. Poland
66. Portugal
67. Saint Helena/Tristan da Cunha (UK)
68. Samoa
69. Seychelles
70. Sierra Leone
71. Singapore
72. Slovenia
73. Solomon Islands
74. South Africa
75. Spain
76. St. Vincent and the Grenadines
77. Sweden
78. Tanzania
79. Thailand
80. Tonga
81. Trinidad and Tobago
82. Tunisia
83. Turks and Caicos
84. Tuvalu
85. Ukraine
86. United Kingdom
87. Uruguay
88. Vanuatu
89. Yemen

2025 Marine Mammal Protection Act Comparability Finding Determinations for Harvesting Nations | NOAA Fisheries

# List 2: Nations denied comparability findings for some fisheries

1. [Bangladesh](#)
2. [Brazil](#)
3. [Cameroon](#)
4. [Chile](#)
5. [China](#)
6. [Colombia](#)
7. [Ecuador](#)
8. [El Salvador](#)
9. [Ghana](#)
10. [Indonesia](#)
11. [Ireland](#)
12. [Kenya](#)
13. [Liberia](#)
14. [Madagascar](#)
15. [Malaysia](#)
16. [Mauritania](#)
17. [Mexico](#)
18. [Mozambique](#)
19. [Myanmar (Burma)](#)
20. [Nigeria](#)
21. [Oman](#)
22. [Peru](#)
23. [Philippines](#)
24. [Saudi Arabia](#)
25. [Senegal](#)
26. [Somalia](#)
27. [South Korea](#)
28. [Sri Lanka](#)
29. [St. Kitts and Nevis](#)
30. [Suriname](#)
31. [Taiwan](#)
32. [Türkiye](#)

33. [United Arab Emirates](#)
34. [Vietnam](#)

# List 3: Nations denied comparability findings for all fisheries

1. Benin*
2. [Grenada](#)
3. [Guinea](#)
4. Haiti*
5. Iran*
6. [Namibia](#)
7. [New Caledonia](#)
8. [Russia](#)
9. [Saint Lucia](#)
10. [The Gambia](#)
11. [Togo](#)
12. Venezuela*

*Nations that did not submit an application for a comparability finding, and therefore do not have a Comparability Finding Application Report.

# Additional 2025 Comparability Determination Documents:

[Decision Memorandum](#)

[2025 Final Comparability Finding Denials for Harvesting Nations' Fisheries](#)

[2025 Final Comparability Finding Approvals for Harvesting Nations' Fisheries](#)

[Harmonized Tariff Schedule Codes under the MMPA Import Prohibitions](#)

*Last updated by [Office of International Affairs, Trade, and Commerce](#) on 09/02/2025*

# EXHIBIT F

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NATIONAL FISHERIES INSTITUTE, *et al.*<br><br>　　　　Plaintiffs,<br><br>v.<br><br>UNITED STATES, *et al.*<br><br>　　　　Defendants. | Case No. 1:25-cv-223 |

## <u>DECLARATION OF LISA WALLENDA PICARD IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

I, Lisa Wallenda Picard, pursuant to 28 U.S.C. § 1746, declare as follows:

Background and Qualifications

1.　　My name is Lisa Wallenda Picard. I am the President and CEO of the National Fisheries Institute ("NFI"), a position I have held since 2022. I submit this declaration based on my personal knowledge of NFI's operations, the Crab Council's work, and the devastating impact that NOAA's September 2, 2025 comparability finding denials will have on the U.S. seafood industry and American consumers.

2.　　In my role at NFI, I oversee 20 employees based through the US, including direct involvement with the Crab Council described below. I work directly with NFI member companies, foreign governments, fisheries managers, and federal agencies including NOAA on matters related to seafood trade, sustainability, and regulatory compliance.

**NFI's Mission and Membership**

3.　　NFI is a non-profit trade association organized under Section 501(c)(6) of the Internal Revenue Code and headquartered in Reston, Virginia. NFI is dedicated to advancing seafood safety, responsible trade, sustainability, and nutrition education.

4.      NFI represents the entire seafood supply chain, from harvest to plate. Our membership includes wild-capture harvesters, vessel owners, processors, importers, exporters, distributors, cold storage and logistics providers, and retail and restaurant establishments that provide tens of millions of seafood meals to American consumers.

5.      Through policy engagements, market research, and industry collaboration, NFI promotes best practices in sustainability and resource stewardship, and works to ensure that seafood remains a vital, accessible, healthy, and sustainable protein for all Americans.

6.      NFI members collectively represent billions of dollars in seafood trade and participate in an industry that, according to the Department of Commerce, supports 1.6 million American workers throughout the United States.

**The Crab Council: Industry-Led Sustainability Initiative**

7.      In 2009, NFI established the Crab Council, an industry-led sustainability initiative focused specifically on blue swimming crab fisheries. The Crab Council represents the most successful industry-led, coordinated, crab sustainability initiative of this century.

8.      The Crab Council comprises approximately 30 member companies that collectively represent roughly 85% of all BSC meat imported into the United States.  Crab Council members include Plaintiffs in this case, such as Phillips Foods, Inc.; Heron Point Seafood, LLC; Newport International of Tierra Verde, Inc.; 3Fish, Inc.; Handy Seafood Inc.; Shaw's Southern Belle Frozen Foods, Inc.; Supreme Crab & Seafood, Inc.; Cebu Pacific LLC; Byrd International Inc.; Crustacea Seafood Company, Inc.

9.      Since 2009, the Crab Council has invested approximately $1 million annually—totaling over $15 million to date—to sponsor Blue Swimming Crab Fisheries Improvement Projects ("FIPs") in Indonesia, the Philippines, Vietnam, India, Thailand, and Sri Lanka. Among

others, many of these were the countries whose fisheries were denied comparability findings in NOAA's September 2, 2025 determinations.

**Structure and Operations of the FIPs**

10.     The Crab Council maintains presence on the ground in major BSC producing countries, including Indonesia, Philippines, Vietnam, Thailand, and India via partnerships and contractors. Until 2023 this included full-time Council staff personnel based in Jakarta and throughout the region who worked directly with processors, fishermen, and government officials.

11.     These are not theoretical or paper-based initiatives. The Crab Council's partners are on the docks, in the processing facilities, and in the fishing communities every day, working to implement and verify compliance with sustainability standards.  We have in depth knowledge of how the fisheries operate including their potential for interaction with marine mammals based on gear type and conditions where crab are harvested.

**Concrete Sustainability Measures Implemented Through the FIPs**

12.     The FIPs have implemented specific, enforceable sustainability measures that directly protect blue swimming crab populations and marine ecosystems. These measures go far beyond what would be required for basic commercial operations and demonstrate genuine sustainability commitment. For example, this includes science-based initiatives, management framework development, and gear exchange programs.

13.     As a condition of participating in the Crab Council, companies agree that they will not source from any supplier in any country who takes berried females. A "berried female" is a female crab carrying eggs. Harvesting these animals directly removes the next generation from the population. This prohibition is strictly enforced any supplier found to be harvesting berried females is immediately cut off from the U.S. supply chain.

14.    The FIPs implement and enforce minimum size requirements for harvested crabs, ensuring that animals have the opportunity to reproduce before being taken from the population.

15.    In addition, the FIPs include support for gear exchange programs.  These programs aim to encourage use of more sustainable gear in order to improve blue swimming crab fisheries and grow the spawning potential of the biomass.

16.    All participating companies agree to source only from suppliers who comply with these sustainability standards. The Council conducts regular fishery audits in order to ensure they are complying and progressing based on Marine Stewardship Council ("MSC") standards.

17.    These measures have been extraordinarily successful. Over the past fifteen years, blue swimming crab populations in the FIP countries have remained stable or increased.

**Recognition from Conservation Organizations**

18.    The Crab Council's work has earned recognition and support from leading conservation organizations.

19.    The Walton Family Foundation has provided financial support for our FIP initiatives, recognizing the genuine value of industry-led sustainability efforts.

20.    We have had collaborative relationships with the Monterey Bay Aquarium Seafood Watch program. The Monterey Bay Aquarium is widely recognized as one of the most rigorous and environmentally focused seafood sustainability evaluators in the world.

**The Marine Mammal "Problem" That Doesn't Exist**

21.    To the Crab Council's knowledge, none of its members utilizes fisheries that have on- going, problematic marine mammal interactions or "take," because such interactions are virtually nonexistent in BSC pot and trap fisheries.

22.    The physical characteristics of BSC pot and trap fisheries make marine mammal interactions implausible. These pots and traps tend to be made of bamboo or wire traps

approximately the size of a laptop computer, deployed in shallow coastal waters typically less than 30 feet deep, used to catch crabs that weigh a few ounces to a pound.

23.     These traps are not comparable to the longline gear, purse seine nets, or lobster pot vertical lines that have been associated with marine mammal entanglements in other fisheries. BSC pots sit on the bottom in shallow water. The traps themselves are far too small to pose an entanglement risk to dolphins, porpoises, or other marine mammals.

24.     Based on the Crab Council's fifteen years of intensive work in BSC fisheries across six countries, including direct daily contact with fishermen, processors, and government officials, marine mammal interactions with BSC pot or trap fishing gear are extremely rare or nonexistent. The physical characteristics of this gear—small traps deployed in shallow coastal waters to catch crabs weighing a few ounces—present minimal entanglement risk to dolphins, porpoises, or other marine mammals.

25.     In addition, the size, placement and construction material of gill nets utilized in blue swimming crab and red swimming crab fisheries are unlikely to lead to marine mammal "take." In Sri Lanka and Indonesia, as a result of the FIPs, increased mesh sizes pilots have illustrated the success of these types of reforms.

26.     This is not to say that marine mammal protection is unimportant. We wholeheartedly support the Marine Mammal Protection Act and its conservation objectives. But NOAA's comparability finding denials appear to treat all fishing gear and all fisheries as equally risky to marine mammals, without regard to actual interaction rates or biological plausibility. This is a solution in search of a problem.

27.     The irony is that NOAA's compressed timeline will undermine rather than advance marine mammal protection. Once U.S. companies are forced to abandon these supply chains on

January 1, 2026, the economic incentive for foreign governments and fishermen to complete these reforms disappears.

28.     The U.S. seafood industry is completely dependent on imports of blue swimming crab and red swimming crab from Asian fisheries for production of crab cakes, crab soup and many other non whole crab products. There is no viable domestic alternative.

29.     It is critical to understand the difference between whole live crab and pasteurized crabmeat. The United States has substantial domestic crab fisheries, including the Chesapeake Bay blue crab fishery. But the vast majority of domestic crab is sold either live or as whole steamed crabs (sold by the bushel to restaurants and consumers). Very little domestic crab is picked and pasteurized for use in processed products like crab cakes, crab soups, or other value-added items.

30.     NOAA's September 2, 2025 comparability finding denials will have a catastrophic impact on the U.S. seafood industry, affecting approximately:

- $3.89 billion in annual seafood imports (13% of total U.S. seafood import value of $27.5 billion)

- 1.09 billion pounds of seafood (16% of total U.S. seafood import volume of 6.8 billion pounds)

- 240 fisheries across 46 nations

- Tens of thousands of jobs in the United States and abroad

31.     For the BSC sector specifically, the impact is existential. Crab Council member companies face:

- Immediate supply cutoff beginning January 1, 2026

- Plant closures and facility shutdowns

- Layoffs of U.S. workers

- Potential breaches of customer contracts and supply agreements

- Loss of financing tied to inventory and receivables

- Permanent loss of skilled labor that cannot be readily replaced

- Permanent loss of market share as restaurant and retail customers reformulate products without crab

32.    Many Crab Council member companies derive the majority of their revenue from products sourced from the denied fisheries. Based on the financial information our members have shared with us, several companies face insolvency within months if the import prohibitions take effect.

33.    This is not hyperbole. These are family-owned American businesses, some operating for over a century, that will shut their doors permanently because there is no alternative source of supply.

Inadequate Implementation Timeline

**Impact on American Consumers**

34.    American consumers will bear the direct consequences of NOAA's determinations through:

- Elimination of crab products from grocery stores, restaurants, and food service establishments

- Significant price increases for remaining crab products from the small number of approved sources; also subject to limited seasonality

- Reduced access to affordable protein and healthy seafood options

- Loss of product variety and consumer choice

**Destruction of Voluntary Conservation Investments**

35.     NOAA's determinations undermine voluntary industry conservation efforts and create perverse incentives for future compliance.

36.     The Crab Council and its member companies invested $15 million over fifteen years specifically to achieve impactful sustainability goals. This was done voluntarily to ensure source fisheries operate in a responsible manner.

37.     By disregarding these investments and denying market access based on procedural deficiencies and documentation gaps rather than conservation outcomes, NOAA has eliminated industry incentives for future voluntary conservation measures. Further, the Agency has cut industry out of the process, refusing to engage with industry experts.  We have been rebuffed in our efforts to discuss with NMFS certain misconceptions about the nature of crab fisheries in these countries.  In any event, the Agency will not review its September 2, 2025 determinations until after January 1, 2026.

38.     This approach is counterproductive to the MMPA's conservation objectives. It discourages exactly the kind of industry-led, on-the-ground conservation work that has proven most effective in improving fishing practices and protecting marine resources.  Our efforts such as fishery education and stock assessments should be factored into any assessment of a country's progress towards meeting "US standards" for marine mammal protection.

39.     Going forward, rational economic actors will conclude that investments in actual conservation outcomes are worthless if they are not accompanied by government bureaucratic processes that mirror U.S. regulatory structures. This will shift resources away from on-the-ground conservation work and toward hiring consultants to produce paperwork for NOAA—the opposite of what serves marine mammal protection.

**No Adequate Remedy at Law**

40.    The harms described in this declaration cannot be remedied through monetary damages after the fact.

41.    Once member companies become insolvent, lose their skilled workforce, end customer relationships, and exit the market, these businesses cannot be resurrected even if import restrictions are later lifted.

42.    The permanent loss of supply chains built over decades, processing facilities and equipment, trained workers, market relationships, brand reputation, and consumer access to crab products constitutes irreparable harm for which there is no adequate remedy at law.

43.    Skilled crab-picking is a specialized trade that requires significant training and experience. Once these workers are laid off and find other employment, they will not return. The specialized knowledge of quality control, processing techniques, and food safety protocols that has been built up over decades will be permanently lost.

44.    Customer relationships in the food service and retail sectors are built on reliability and consistent quality over many years. Once our member companies fail to deliver product and customers are forced to reformulate menus and product lines without crab, those relationships cannot be rebuilt simply by resuming supply at a later date.

45.    Real estate leases will be terminated, processing equipment will be sold or scrapped, and the physical infrastructure of the industry will be dismantled. Even if import restrictions are lifted in the future, the industry would have to be rebuilt—a process that would take years and require millions of dollars in capital investment that may not be available.

**NOAA's Restriction on Reapplications**

46.    NOAA's September 2, 2025 Federal Register notice states that nations denied comparability findings "may reapply for a comparability finding for the affected fisheries at any

time after January 1, 2026." NFI is unaware of any timeline for the agency to act on a nation's reapplication; NOAA/NMFS could take a year or more to do so.

47.    This delays any remedy until after companies have shut down operations, laid off workers, cancelled contracts, and suffered permanent business disruption.

48.    NFI and our member companies have been in contact with representatives from affected nations, including Indonesia, the Philippines, and Vietnam. These governments have expressed frustration that they cannot reapply for comparability findings until after January 1, 2026.

49.    These governments believe—and we believe—that many of the comparability finding denials were based on factual misunderstandings, incomplete information, or failure to credit conservation measures that were actually in place. If given the opportunity to provide additional information, clarification, and evidence of ongoing reforms before the January 1st deadline, several countries believe they could address NOAA's concerns and obtain comparability findings.

50.    But NOAA has refused to engage in any meaningful dialogue with foreign governments or industry stakeholders between September 2, 2025 and January 1, 2026.  Can we say they refuse to do something in future time?  Should this say something more like:  NOAA has not engaged in any dialogue with plaintiffs since the September announcement, despite numerous requests.  The Agency has repeated its plan not to review any actions until after January 1, 2026. I declare under penalty of perjury that the foregoing is true and correct.

Executed on October ‗13th‗, 2025.


Lisa Wallenda Picard
President & CEO
National Fisheries Institute

# EXHIBIT G

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NATIONAL FISHERIES INSTITUTE, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES, *et al.*<br><br>Defendants. | Case No. 1:25-cv-223 |

## DECLARATION OF BRICE PHILLIPS IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Brice Phillips, pursuant to 28 U.S.C. § 1746, declare as follows:

1.    My name is Brice Phillips. I am the Vice President of Business Development and Sustainability for Phillips Foods, Inc. ("Phillips Foods"), a Maryland corporation headquartered in Baltimore, Maryland. I am also part of the family ownership of Phillips Foods.

2.    I have personal knowledge of the facts stated herein based on my direct involvement in Phillips Foods' daily operations, financial management, supplier relationships, sustainability initiatives, and strategic planning.

3.    I submit this declaration in support of Plaintiffs' Motion for Preliminary Injunction to stay the import prohibitions scheduled to take effect on January 1, 2026, following the National Marine Fisheries Service's ("NMFS") September 2, 2025, comparability finding determinations. As I explain in further detail below, Phillips Foods is concerned with the potential for a ban on imports of blue swimming crab and tuna from various countries. If the import ban is enforced, it will force Phillips Foods into insolvency within a few months.

**Phillips Foods' Business Operations and Scale**

4.    Phillips Foods is a major importer of blue swimming crab, both as pasteurized crab meat and in value-added products. We also import tuna, but crab is an essential part of our business. Founded on the Chesapeake Bay, we are a family-operated food and restaurant business that has been in operation for over 100 years. *See* https://www.phillipsfoods.com/our-story/, **Exhibit 1**. We started with a seafood packing plant, which sourced wild crabs, fish and oysters from the Chesapeake Bay in season and sold the seafood to fishmongers and restaurants. In 1956 we opened a "crab shack" in the resort town of Ocean City, Maryland which grew into a restaurant that eventually seated 1,400 guests. Since then, we have opened dozens more Phillips Restaurants. We also have a line of premium pasteurized crab meat, seafood appetizers, gourmet soups and crab and seafood cakes that we sell to thousands of independent restaurants and national chains. We have also expanded into grocery stores and warehouse club stores across the United States.

5.    Phillips Foods employs a total █████ people across our operations.

**Import Operations Over Three Years**

6.    Simply put, crab fisheries in the United States are insufficient to meet current domestic demand for crab products sourced from countries that were banned. Therefore, to meet this demand, wild-caught blue swimming crab from the tropical waters of Southeast Asia, is harvested, hand-picked and pasteurized to ensure freshness for 18 months.

7.    Phillips Foods has imported the following volumes and values of seafood products over the past three years:

| Year | Volume (lbs) | Import Value |
|------|--------------|--------------|
| 2023 | ██████ | ██████ |
| 2024 | | |
| 2025 (Year-to-Date) | | |
| TOTAL | | |

8.    Assuming a 20% production yield, this equates to ███████ pounds of blue swimming crab and tuna just to support Phillips Foods. This volume is not available domestically.

9.    These figures demonstrate scale of Phillips Foods' operations and our complete dependence on imports from Asian fisheries.

**Sources from Denied Fisheries**

10.    Phillips Foods sources products from the following countries, all of which are substantially or entirely subject to the September 2, 2025 comparability denials:

- Indonesia: ████████████████
- Philippines: ███████████
- Vietnam: ██████████████

11.    In 2024, our imports from these countries totaled:

- Indonesia: ██████ lbs valued at ████████
- Philippines: ███████ lbs valued at ████████
- Vietnam: ██████ lbs valued at ████████

12.    Virtually all of these sources are subject to import prohibitions under the January 1, 2026 deadline.

**Complete Dependence on Denied Fisheries**

13.    All of Phillips Foods' imports are affected by the comparability denials, whether the products are produced in Asia or in the United States, because all our production and sales in the United States rely on the raw materials shipped from Asia—both blue swimming crab and tuna.

14.    ████████████████████████████████████████████████████████████████████████████████

15.    This is not hyperbole or exaggeration—it is a ████████████ based on our ████████ ██████ requirements, and complete dependence on Asian supply chains. ████████████████

16.    In 2024, Phillips Foods generated the following sales:

3



TOTAL: $179,986,956.27

17.    Of this $179,986,956.27 in total annual business ▮▮▮▮▮ comes from the fisheries that will be prohibited from exporting.

18.    Phillips Foods maintains sales programs with distributors, restaurants, retailers, and club stores, ▮▮▮▮▮▮▮▮▮

19.    All of our customers will be affected by the import prohibitions.

20.    The annual contract revenue at risk totals ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23.    If we were able to continue importing BSC and tuna, the amount we would bring in from mid-October through December would total ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮

**Impact on Customer Relationships**

24.    Phillips Foods serves major customers, ▮▮▮▮▮▮ which maintains consistent demand for our products.

25.    We will be unable to satisfy our customer's programs due to the loss of blue swimming crab and tuna from the fisheries denied.

4

███████████████████████████████████████████

**Layoffs and Plant Closures**

27.     All of the ███████ obs depend on our ability to import from the fisheries that currently face import bans. If the import prohibitions take effect on January 1, 2026, Phillips Foods will be

███████████████████████████████████████████

28.     These devastating impacts will begin in October 2025, ████████████████

████████████████████████████

29.     The layoffs will result in permanent loss of skilled labor, particularly employees who have specialized expertise in seafood processing, quality control, and production operations.

30.     Retraining new workers would be necessary if operations ever resume, but there is no guarantee that skilled workers will be available or that we could afford to restart operations after insolvency.



**Permanent Loss of Market Share**

34.     All Asian competitors are affected by the comparability denials and face the same challenges as Phillips Foods.

35.    However, the import prohibitions will not shift market share among Asian suppliers. Instead, crab meat and crab products will disappear from domestic menus and retail shelves entirely, causing a permanent contraction of the US market for these products.

36.    Once customers reformulate menus or product offerings without crab, they will not return to crab-based products even if import restrictions are later lifted.

37.    Consumer preferences and restaurant menus will have permanently shifted to alternative proteins.

**Irreparable Reputational Harm**

38.    Phillips Foods anticipates severe and irreparable reputational harm as a result of our inability to fulfill customer programs and maintain consistent supply.

39.    The longer the ban remains in place, the more difficult it will be to reestablish long-lasting relationships and business that have been built over decades.

40.    In the seafood industry, reliability and consistent supply are paramount. Once we fail to deliver, customers will have no choice but to find permanent replacements or eliminate crab products entirely.

**There Are No Viable Alternative Sources**

41.    Phillips Foods cannot source substitute products from approved fisheries by January 1, 2026, or at any time in the foreseeable future.

42.    Crab meat is not available in sufficient quantities in the United States to satisfy nationwide demand. This is precisely why Phillips Foods and the entire industry source from Asian countries.

43.    To replace the imports of blue swimming crab that will be banned, U.S. landings would need to increase by approximately 600 million pounds—more than five times current landings.

6

44.     This increase is not feasible based on U.S. biological limits and labor constraints. Domestic fisheries are already operating at or near sustainable harvest limits.

45.     Given that there is no substitute, the import prohibitions will eliminate the supply of crab products to the U.S. market, not shift it to domestic sources.

**Decades of Reliance on Asian Supply Chains**

46.     Phillips Foods has imported crab products from Asian countries since 1989—over 35 years.

47.     Our business model, facilities, customer relationships, and operations have been built entirely around the availability of high-quality crab and tuna from Asia.

48.     Phillips Foods has $14,682,353 in property, plant, and equipment as of December 2024, representing substantial capital investments in facilities and systems designed to process and distribute imported seafood products.

49.     These capital investments—both in the United States and abroad—will be rendered worthless if we cannot import the raw materials necessary for our operations.

**Aggressive Compliance Efforts**

50.     Phillips Foods has taken unprecedented steps to comply with NOAA's comparability findings, despite facing significant obstacles.

51.     We have actively engaged in discussions and processes that previously excluded industry participation. However, the comparability process has been conducted on a government-to-government basis, with limited opportunities for industry input.

52.     Our in-country Sustainability associations are working directly with fisheries ministers in Asian countries to understand NOAA's expectations and to coordinate efforts regarding marine mammal protection. However, they have been cut out of this process and now

7

understand that NMFS will not even consider acting until after January 1, 2026. Unfortunately, at that point it will be too late.

### Nature of the Harm

53.    The harm Phillips Foods faces from January 1, 2026 import prohibitions is immediate, catastrophic, and irreparable.

54.    The import prohibitions threaten not just Phillips Foods ████████ but the livelihoods of thousands of workers and their families across the United States, Canada, and Asia.

### Commitment to Sustainability

55.    Phillips Foods has always maintained a strong commitment to sustainability and responsible fishing practices, as reflected in my title as Vice President of Business Development and Sustainability. I have also served as Chairman of the NFI Crab Council, elected annually by my competitor peers since 2019.

56.    Our business depends on long-term healthy fisheries and marine ecosystems, and we partner with our suppliers to ensure that they live up to these principles.

57.    To our knowledge, the fisheries from which we source have not caused marine mammal population declines or failed to meet comparable conservation outcomes. Pot fishing for crab in particular is a sustainable method that avoids entanglement, minimizes harm and reduces bycatch to almost zero.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on October 13, 2025.

_____
Brice Phillips
Vice President of Business Development/Sustainability
Phillips Foods, Inc.

8

# EXHIBIT 1

Phillips Seafood - Family Owned for 100+ Years - Read Our Story



GROCERY +    RECIPES    T    WHERE TO BUY

OUR STORY

RESTAURANTS

# OUR STORY

Few family-owned food and restaurant companies have been around for 100 years and achieved the levels of success of Phillips Seafood. From their humble beginnings on the Chesapeake Bay, to the opening of their first restaurant in 1956, to their overseas expansion into sourcing high-quality crab meat, the Phillips family has become a powerful force on the global seafood market.

The below links should give you a great overview of all things Phillips – click through to learn about our history and heritage, as well as some of the things we're working on today!

This website uses cookies to ensure you have the best user experience. By continuing to use this website, you authorize us to do so. To learn more, view our Privacy Policy.

I AGREE

How would Phillips Seafood get started? Read our... /Hoopers Island Heritage.



100+ YEARS ON THE WATER  Sustainability    Contact    Foodservice    Seafood Shipping



GROCERY **+**      RECIPES      T      WHERE TO BUY

OUR STORY

‹ **OUR STORY**

RESTAURANTS

# OUR HOOPERS ISLAND HERITAGE

Born of the Chesapeake Bay, destined to work the water...

# Humble Beginnings

The story of Phillips Seafood is an intriguing American tale of humble beginnings, hard work, and the courage to take risks to achieve one's vision. Brice and Shirley Phillips grew up on Hoopers Island, a small community off Maryland's Chesapeake Bay where most residents worked on the water.

Privacy  Terms

How the Phillips Seafood got started — Real Maryland crab, Hoopers Island Heritage



100+ YEARS ON THE WATER  Sustainability  Contact  Foodservice  Seafood Shipping



GROCERY +   RECIPES   T   WHERE TO BUY

# All...

## OUR STORY

Faced with surplus crabs one season, Brice and Shirley Phillips opened a simple "crab shack" in the small resort town of Ocean City, Maryland with a $2000 loan from their families. What began as a one-room carryout in 1956 grew dining room by dining room over the years until it finally seated 1400 guests. Business grew quickly from there, as the family expanded into new locations and markets.

From the very beginning, the Phillips family has focused on bringing the culinary traditions and welcoming hospitality of the Eastern Shore to their guests. They know there is no replicating authenticity. That's why many of their recipes are generations old, passed to their chefs straight from the kitchen of Shirley Phillips.

**PHILLIPS SEAFOOD RESTAURANTS**

**LEARN MORE ABOUT OUR RESTAURANT GROWTH  >**

*Sign up and save!*

Subscribe to the Phillips Seafood E-Club

SIGN UP TODAY

Be the first to receive details on recipes, cooking tips and our newest grocery product info.

## THE PHILLIPS FAMILY

Bringing the culinary traditions and welcoming hospitality of Maryland's Eastern Shore.



100+ YEARS ON THE WATER    Sustainability    Contact    Foodservice    Seafood Shipping



GROCERY +    RECIPES    T    WHERE TO BUY

OUR STORY

< OUR STORY

RESTAURANTS

# GROWTH OF PHILLIPS SEAFOOD RESTAURA

After 100 years, Phillips Seafood remains family-owned an family-operated.

This website uses cookies to ensure you have the best user experience. By continuing to use this website, you authorize us to do so. To learn more, view our Privacy Policy.

I AGREE

Phillips Seafood remains family-owned and operated after 100 years



100+ YEARS ON THE WATER    Sustainability    Contact    Foodservice    Seafood Shipping



GROCERY +    RECIPES    T    **WHERE TO BUY**

## OUR STORY

How does a restaurant group keep moving forward in this day and age? Phillips has taken 60+ years experience operating high-volume restaurants and expanded into non-traditional venues. Through strategic partnerships, Phillips has opened locations in over a dozen high-traffic airports, travel plazas and casinos, with additional locations in the plans for future development.

RESTAURANTS

# A Family Affair

After 100 years, Phillips Seafood remains family-owned and family-operated. Just as Brice and Shirley passed down their dedication to their business to their sons, so has the next generation become an integral part of the company's future, fulfilling a wide variety of roles at Phillips.

Yet there is another "Phillips Family" that Brice and Shirley always spoke of: their loyal family of employees. In an industry with a high rate of turnover, Phillips has been lucky to hold on to many of those who contributed to the company's success over the years. Phillips' family-style management and promote-from-within policy have resulted in many employees who have 20 or more years of service with Phillips Seafood.

CLASSICS
NEVER
GO

TODAY'S
PASSION
FOR

This website uses cookies to ensure you have the best user experience. By continuing to use this website, you authorize us to do so. To learn more, view our Privacy Policy.

I AGREE

Phillips Seafood | A year-round supply of crab from Southeast Asia



100+ YEARS ON THE WATER Sustainability    Contact    Foodservice    Seafood Shipping    

GROCERY +    RECIPES    T    WHERE TO BUY

## OUR STORY

trends and demanding innovation from his research and development team.

Phillips is a global food manufacturer, vertically integrated to ensure a dependable, safe product supply. To provide the highest levels of safety and quality, Phillips owns and manages our own crab, seafood and fish processing plants throughout Southeast Asia as well as our original plant in Hoopers Island, Maryland. This allows us to maintain 100% control over quality and consistency, from water to table.

RESTAURANTS

FOODSERVICE PRODUCTS

**LEARN MORE ABOUT OUR SUSTAINABILITY EFFORTS  >**

## RETAIL GROWTH ACROSS THE NATION

Phillips Seafood's retail success story is begging to be told. Phillips' products are sold in nearly all major markets in the United States, and rank as the #1 brand of 8 oz. pasteurized crab meat, frozen crab cakes and frozen seafood soups in the nation, according to AC Nielsen data.

What started as a small line has grown into an extensive portfolio of crab meat, seafood appetizers, seafood cakes and gourmet seafood soups. The Phillips product range includes authentic family recipes as well as chef-crafted dishes. With an experienced research and development team at the helm, Phillips will launch many exciting new products in coming years, as they continue to expand their retail presence across the United States.

RETAIL PRODUCTS    **DISCOVER CREATIVE WAYS TO COOK WITH CRAB!  >**

This website uses cookies to ensure you have the best user experience. By continuing to use this website, you authorize us to do so. To learn more, view our Privacy Policy.

I AGREE

Phillips Seafood - Family history and commitment to Quality and Safety



GROCERY **+**    RECIPES    T    WHERE TO BUY

OUR STORY

## STEAMING AND HAND-PICKING

RESTAURANTS

The crabs are steamed immediately upon receipt at the mini plant, then cooled and debacked. The meat is immediately extracted by an individual picker or a team of pickers. At this point, it is separated into the grades of crab meat. This picking is done over ice in a cooled room to keep the crab meat at the proper temperature. Once this initial pick is completed, the crab meat is ready for transport to one of our main plants.

## MICROTESTING AND SENSORY EVALUATION

Upon its arrival at the main plant, the crab meat goes through an organoleptic check. This includes a temperature test and a sensory evaluation that quantifies how the product looks, tastes, smells and feels. We do elaborate and constant microbiological and organoleptic testing from the time the crabs are purchased until the product is released to our customers. Once the meat passes inspection, it will come under our quality-assurance program, passing on to the next stage of processing.

## THE QUALITY OF THE CAN COUNTS

Every detail is considered – even the crab meat container itself is constructed with safety in mind. A double seam sealing process creates a thermal barrier. The inside is lined with a double lacquer to stop tin migration. In addition to our in-house microbiologist, we have seamer mechanics and technicians on staff at all of our plants. Using a seam scope, a can technician is able to thoroughly examine the seam of the can.

## TRACEABILITY

Each can is coded so that the product can be traced to origin, plant and half-hour of production; we offer complete forward and backward traceability.

This website uses cookies to ensure you have the best user experience. By continuing to use this website, you authorize us to do so. To learn more, view our Privacy Policy.

**I AGREE**

Phillips Seafood | Family history from hard work to Quality and Safety

100+ YEARS ON THE WATER    Sustainability    Contact    Foodservice    Seafood Shipping





GROCERY +    RECIPES    T    WHERE TO BUY

OUR STORY

temperature recorders. These devices allow us to determine what the temperature was at every 55 minutes of the crab meat's two-month shipping time to the United States.

Once received into the United States, a percentage of the crab meat containers are once again opened and go through an organoleptic evaluation before being cleared for use in our facility, shipment to distributors and retailers, or for shipment to our offices throughout the country.

RESTAURANTS

WHERE TO BUY GROCERY PRODUCTS    **PRODUCTS FOR PROFESSIONAL CHEFS >**

## Sign up and save!

Subscribe to the Phillips Seafood E-Club

Be the first to receive details on recipes, cooking tips and our newest grocery product info.

SIGN UP TODAY

# THE PHILLIPS FAMILY

Bringing the culinary traditions and welcoming hospitality of Maryland's Eastern Shore.

### Dine In    ### Grocery Products

This website uses cookies to ensure you have the best user experience. By continuing to use this website, you authorize us to do so. To learn more, view our Privacy Policy.

I AGREE

Why is sustainability so important?



100+ YEARS ON THE WATER     Sustainability     Contact     Foodservice     Seafood Shipping



GROCERY +     RECIPES     T     WHERE TO BUY

OUR STORY

‹ **OUR STORY**

RESTAURANTS

# WHY DOES SUSTAINAB MATTER?

Our oceans are being overfished at an alarming rate, but we can work together to help this precious resource recover.

This website uses cookies to ensure you have the best user experience. By continuing to use this website, you authorize us to do so. To learn more, view our Privacy Policy.

I AGREE

100+ YEARS ON THE WATER    Sustainability    Contact    Foodservice    Seafood Shipping





GROCERY +    RECIPES    T    WHERE TO BUY

OUR STORY

RESTAURANTS

*Sustainability means to me the ability to provide for the needs of the world's current population without damaging the ability of future generations to provide for themselves."*

*– Steve Phillips, CEO of Phillips Foods*

- ° As many as one million people throughout the world, many in developing countries, rely on seafood for their livelihood.
- ° Our fisheries are currently endangered due to overfishing, destructive fishing methods, pollution, and Illegal, Unreported & Unregulated (IUU) fishing practices.
- ° Globally, there has been a decline in the abundance of fish stocks, between 50-90% depending on species, due to these factors.
- ° Science-based fishery management — which establishes science-based catch limits, reduces bycatch and protects habitat — is helping the oceans rebound and recover where it is established.

### A Sustainable Future

The demand for sustainable seafood has grown significantly in the past decade as consumers becoming increasingly knowledgeable about the importance of preserving

This website uses cookies to ensure you have the best user experience. By continuing to use this website, you authorize us to do so. To learn more, view our Privacy Policy.

I AGREE



Phillips

GROCERY +    RECIPES    T    WHERE TO BUY



Keep reading to find out how Phillips practices sustainability, or check out the links below to learn more about general seafood sustainability.

**LEARN MORE ABOUT THE IMPACT OF SUSTAINABLE SEAFOOD ON DEVELOPING COUNTRIES** ›

**LEARN MORE ABOUT IUU FISHING PRACTICES** ›

**LEARN MORE ABOUT PROTECTING AND RESTORING OUR OCEANS** ›

NEXT: COMMITTED TO CRAB

This website uses cookies to ensure you have the best user experience. By continuing to use this website, you authorize us to do so. To learn more, view our Privacy Policy.

I AGREE

# EXHIBIT H

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NATIONAL FISHERIES INSTITUTE, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES, *et al.*<br><br>Defendants. | Case No. 1:25-cv-223 |

## DECLARATION OF TOM WEIR IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Tom Weir, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      My name is Tom Weir. I am the President of Heron Point Seafood, LLC ("Heron Point"), a New Hampshire limited liability company headquartered in Newmarket, New Hampshire. I have personal knowledge of the facts stated herein based on my direct involvement in Heron Point's daily operations, financial management, supplier relationships, and strategic planning.

2.      I submit this declaration in support of Plaintiffs' Motion for Preliminary Injunction related to the import prohibitions scheduled to take effect on January 1, 2026, following the National Marine Fisheries Service's ("NMFS") September 2, 2025, comparability finding determinations. This will result in a ban on imports of blue swimming crab and red swimming crab from various countries, which will devastate Heron Point's operations.

1

**Heron Point's Business Operations**

3.      Heron Point is an importer and distributor of pasteurized crab meat and other seafood products. We maintain a physical presence in New Hampshire and Virginia and distribute our products throughout the United States.

4.      Heron Point has employees in the United States. ███████████████████

████████████████████████████████████████████████████████████████████████

by import prohibitions from the denied fisheries.

5.      Heron Point is an importer of blue swimming crab, red swimming crab, and fish products including mahi- mahi and tuna.

6.      Heron Point has been importing crab from Southeast Asia for 20 years. We have never faced import restrictions before.

**Import Volume and Financial Scale**

7.      Heron Point's annual product import volume is:

| Product | Volume (lbs) | Import Value |
|---|---|---|
| Blue Swimming Crab | ████████ | ████████ |
| Red Swimming Crab | | |
| Fish | | |

8.      For context, we imported ████████ pounds of blue swimming crab (in 2023) and ████████ in 2024); additionally, we imported ████████ pounds of red swimming crab (in 2023) and ████████ (in 2024), demonstrating the consistency and scale of our operations.

9.      ████████ percent of our blue swimming crab and red swimming crab products are pasteurized crabmeat.

2

**Sources of Supply Subject to Import Prohibitions**

10.     Heron Point sources blue swimming crab from Indonesia, Vietnam, Tunisia, and Sri Lanka. All of these sources except Tunisia are subject to the September 2, 2025 comparability denials.

11.     Heron Point sources red swimming crab ████████████████, which was denied comparability findings on September 2, 2025.

**Dependence on Denied Fisheries**

12.     Blue swimming crab represents ███ of Heron Point's total business. Red swimming crab represents ███ of Heron Point's total business. Thus, combined, over ███ of our business relies on crab species that will be subject to the January 1, 2026 import ban.

13.     Our total annual business from crab products is approximately $██ million ██████
████████████████████████████████████████████

14.     We are fundamentally a crab importing company, with almost ███ of our business tied to international crab fisheries.

**Long-Term Supply Chain Relationships**

15.     Heron Point has ██████████████████████████ and one in ██████████—that pack almost exclusively for Heron Point Seafood, with approximately ███ of their business dedicated to us.

16.     These suppliers along with Heron Point employ thousands of workers, domestically and abroad, whose livelihoods are tied directly to our crab imports.

17.     These relationships have been developed and maintained over 20 years of operations. They represent substantial investments in quality standards, processing specifications, and mutual trust.

**Impact on All Customer Contracts**

18.     The import prohibitions will affect all of our customer contracts. Every one of our customers relies on us for crab, so denied fisheries would directly disrupt our entire customer base.

19.     Approximately ███ of our customers rely solely on Heron Point for the products we supply.

20.     Our annual contract revenue at risk totals ███████

21.     ████████████████████████████████████████████████████████████████

**Immediate Harm**

22.     Heron Point currently has approximately ████████ orders issued to our packers with delivery dates after January 1, 2026. These orders represent future shipments of crab that are essential to fulfilling our customer commitments.

23.     We have customer contracts with clients who depend solely on Heron Point Seafood for their crab supply. Any disruption in imports would directly impact these customers' operations, as they rely on us for consistent, high-quality crab throughout the year.

**Supply Chain Timeline and Stranded Inventory**

24.     Current average transit time for ocean shipments from Southeast Asia is eight to ten weeks once the containers depart.

25.     This means that any product shipped after October 15, 2025 would not reach the U.S. until after January 1, 2026, and would be held up indefinitely by U.S. Customs and Border Protection.

26.     During this next quarter, Heron Point is set to receive approximately 

per week,

27.     Based on our current purchase orders, products shipped after October 15th represent an estimated value of ▮▮▮▮▮—equivalent to approximately ▮▮▮▮ of supply at risk until the situation is resolved.

**Supplier Operations**

31.     October 15, 2025, would be the last viable shipment date from Southeast Asia to avoid having product arrive after the January 1, 2026 deadline.

32.     Even if import restrictions were later lifted, there is no guarantee these suppliers could restart operations. Skilled workers will have found other jobs, equipment will deteriorate, and re-establishing operations will require substantial capital that may not be available.

35.    These are skilled employees with expertise in seafood quality control, import compliance, cold chain management, and customer relations. Once lost to other employment opportunities, these employees cannot be easily replaced if operations resume.



**No Viable Alternative Sources**

40.    Heron Point cannot source substitute products from approved fisheries by January 1, 2026, or at any time in the foreseeable future.

41.    The comparability denials impact approximately 89% of available blue swimming crab fisheries worldwide and 100% of red swimming crab fisheries worldwide.

42.    Blue swimming crab: The Chesapeake Bay fishery is the only significant U.S.-based source. However, it is already overfished and cannot serve as a substitute for our supply. Relying on it would place additional stress on the ecosystem, undermining two decades of restoration efforts. Moreover, Chesapeake Bay supply is already fully allocated to existing buyers and cannot possibly absorb the volume that Heron Point requires.

43.    Red swimming crab: There are no approved fisheries globally for red swimming crab. Vietnam is the primary global producer, and with that source denied, there is no substitute available anywhere in the world for the quantities required for Heron Point to continue operations.

44.    The few remaining NOAA-approved sources cannot provide sufficient volume, and sourcing them would result in exorbitant pricing that would push customers to other protein sources entirely, permanently eliminating the market for crab products.

**Irreparable and Cascading Harms**

45.    The harm Heron Point faces is immediate, certain, and irreparable.

47.    Permanent loss of market share: Without the ability to supply customers, they will permanently shift to alternative protein sources or other suppliers. Even if restrictions are later lifted, we will not be able to recover these customers.

48.    Reputational damage: Without packers or inventory, Heron Point would effectively cease operations, destroying our reputation and the long-standing customer relationships that are the foundation of our business.

7

**Capital Investment at Risk**

51.     Heron Point's capital investment is the company itself—twenty years of carefully cultivated supplier relationships, domestic systems for processing and distribution, and a reputation for consistent quality.

52.     These long-term partnerships are the foundation that enables us to operate as a top-five U.S. importer and processor of pasteurized crab meat.

53.     Our investments in relationships, infrastructure, and market development represent enduring assets that took decades to build and cannot be recreated.

54.     Continued access to international crab fisheries is essential to preserve and grow this capital and to ensure that U.S. consumers continue to benefit from a stable supply of high-quality crab.

**Compliance Efforts and Industry Participation**

55.     Heron Point has always acted in good faith to comply with applicable regulations and has been in compliance with the U.S. Seafood Import Monitoring Program (SIMP) since 2022 when SIMP was expanded to include Nicaraguan blue swimming crab.

56.     Initial comparability communications and determinations, including the Vietnam Preliminary Determinations in January 2025, were government-to-government only. Packers and importers such as Heron Point were not allowed to participate or to provide any information concerning the fishery, limiting our ability to take earlier actions to provide the needed information for fisheries approval.

57.     As an importer, Heron Point's ability to influence sustainable fishing practices occurs primarily through our participation in industry initiatives such as the National Fisheries Institute ("NFI").

8

58.     Heron Point is an active and major participant in NFI, which focuses on crab fishery improvement, sustainability, and maintenance.

59.     Despite these constraints, we have acted in good faith throughout and have taken all reasonable steps available to us.

60.     It is deeply concerning that final determinations were made based on technical data over three years old and with zero industry engagement. Neither Heron Point nor our packers have been invited to participate in the government-to-government process, and it has been made clear that NMFS will only consider information that comes directly from the country itself.

**Commitment to Sustainability**

61.     Heron Point has always supported marine mammal conservation and sustainable fishing practices. Our business depends on long-term responsible fisheries.

62.     To our knowledge, there is no evidence that the fisheries from which we source have caused marine mammal population declines or failed to meet comparable conservation outcomes given how the crab is caught (small boat operations).

**Timing and Urgency**

63.     Given the extremely short timeline, with clear statements from NMFS that reapplication for comparability findings will not be considered prior to January 1, 2026, Heron Point faces immediate and severe operational and financial risk.



**Nature of the Harm**



67.    Monetary damages cannot restore 20 years of supplier relationships, customer trust, skilled employees, or market position.

69.    Without relief, Heron Point Seafood will effectively cease to exist as an operating company.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October _12_, 2025.

Tom Weir
President
Heron Point Seafood, LLC

10

# EXHIBIT I

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| NATIONAL FISHERIES INSTITUTE, *et al.*<br><br>       Plaintiffs,<br><br>v.<br><br>UNITED STATES, *et al.*<br><br>       Defendants. | Case No. 1:25-cv-223 |

<u>**DECLARATION OF TROY TURKIN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**</u>

I, Troy Turkin, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      My name is Troy Turkin. I am the Chief Executive Officer of Supreme Crab & Seafood, Inc. ("Supreme"), a Florida corporation headquartered in Weston, Florida. I have held this position since 2024 and have worked in the seafood import business for 31 years.

2.      I submit this declaration in support of Plaintiffs' Motion for Preliminary Injunction to stay the import prohibitions scheduled to take effect on January 1, 2026, following the National Marine Fisheries Service's ("NMFS") September 2, 2025, comparability finding determinations. This will result in a ban on imports of blue & red swimming crab from various countries with whom we regularly purchase and import crab.

3.      I have personal knowledge of the facts stated herein based on my direct involvement in Supreme's daily operations, financial management, supplier relationships, and strategic planning.

**Supreme's Business Operations**

4.      Supreme imports and distributes seafood products nationwide to foodservice and retail customers and maintains employees in the United States.

5.      Supreme is one of the more diverse importers of crab meat in the United States. 

6.      The crab species we import are native to Southeast Asia and do not exist in U.S. waters. There is no domestic substitute for these species. Moreover, U.S. demand exceeds available domestic supply.

**Supreme's Reliance on Denied Fisheries**

7.      Supreme has long-term supply relationships with crab processors in Indonesia, Vietnam and China developed over many years:

- Indonesia: since ███████████
- Vietnam: since ███████████
- China: since ███████████

8.      These relationships reflect decades of investment in reliable supply chains, quality standards, and consistent product specifications.

9.      In 2024, Supreme's business from products affected by the September 2, 2025, denials and import prohibitions total approximately ███████████████████.

10.     The following table summarizes Supreme's 2024 import volume and value from denied fisheries:

| Country | Product | Annual Volume (lbs) | Value | % of Total |
|---------|---------|---------------------|-------|------------|
| Indonesia | Blue Swimming Crab | ▮ | ▮ | ▮ |
| Indonesia | Frozen Fish | ▮ | ▮ | ▮ |
| Indonesia | Granulosa | ▮ | ▮ | ▮ |
| Indonesia | King Crab | ▮ | ▮ | ▮ |
| Indonesia | Rock Crab | ▮ | ▮ | ▮ |
| Indonesia | Snow Crab | ▮ | ▮ | ▮ |
| Indonesia | Soft Shell Crab | ▮ | ▮ | ▮ |
| Indonesia | Scallop | ▮ | ▮ | ▮ |
| Vietnam | Red Swimming Crab | ▮ | ▮ | ▮ |
| China | Red Swimming Crab | ▮ | ▮ | ▮ |
| Tunisia | Whole Clean Crab | ▮ | ▮ | ▮ |
| TOTAL | | ▮ | ▮ | ▮ |

11.　　These denied fisheries supply Supreme's highest-margin products, with no viable alternative sources. Prohibiting the import of these seafood products means that they will be completely unavailable in the United States.

**Impact on Customers and Operations**

12.　　Supreme supplies approximately ▮ who purchase products sourced from China, Vietnam, and Indonesia combined. Many have structured their own businesses, menus, and product offerings around these crab species.

13.　　If the import prohibitions take effect on January 1, 2026, Supreme will have no way to supply these customers because no alternative sources exist.

3

14.    The inability to serve ████████ would ██████████████████
████████████, diverse supplier.

15.    Because seafood imports logistics operate on long lead times, the January 1 deadline requires immediate and irreversible action.

**Supply Chain Timelines and Imminent Loss**

16.    Typical lead times for Southeast Asia seafood imports are:

- Production: 1-2 weeks for processing and packaging

- Ocean shipping: ~60 days to U.S. ports

- Clearance: up to 30 days if FDA sampling

- Total pipeline: 60-90 days minimum from foreign country to available in the United States

17.    Containers leaving Asia after mid-October 2025 will arrive in the U.S. ports after January 1, 2026 and be refused entry by U.S. Customs and Border Protection.

18.    ████████████████████████████████████████████
████████████████

19.    Supreme currently has ████████ of Red Swimming Crab from ██████ scheduled to arrive in January and February 2026, ████████████████████.

20.    If the ban takes effect, we must cancel these containers within the next 30 days to avoid seizure or destruction.

21.    Supreme had also planned monthly shipments of ██████ each ████████████ ████████) to maintain supply. All must be cancelled if the prohibition remains.

22.     Of course, this also impacts those in foreign countries that sell us the product and package it, with whom we have built relationships over the past decade. They have informed us that this will also have a crushing impact on their business.

**Irreparable Business Harm**

23.     ███████████████████████████████████████████

███████████████

▪ ███████████████████████████████s;

•    Reputational damage as an unreliable supplier; and

•    ███████████████████████████

24.     Once customers move to alternate suppliers, Supreme will not be able to recover them even if restrictions are later lifted.

25.     These ████████ represent ████████████████████████; ███████████

████████████████████.

26.     The denied fisheries account for ████████ in annual revenue and our highest-margin product lines, which sustain the rest of our operations.

27.     Without that business, we will be forced to lay off a substantial portion of our U.S. workforce—employees skilled in seafood quality, import compliance, and customer relations.

28.     Once lost, these employees cannot be easily rehired if operations resume; the institutional knowledge and expertise will be irretrievably gone.

**Effects on Related Processing Facilities**

29.     Supreme has a close working relationship with ████████████████████.

30.     ██████████████████████████████████████

████████████████████████.

31.     Even if import restrictions are later lifted, there is no guarantee these facilities could restart. Skilled workers will have found other jobs, equipment will deteriorate, and re-establishing operations will require substantial capital.

**Dependence on Red Swimming Crab Fisheries**

32.     Red Swimming Crab is one of Supreme's core products and a significant part of our crab business. Vietnam produces the majority of global supply, and China is the only other significant producer. Certain China fisheries were also denied comparability findings on September 2, 2025, meaning virtually the entire global supply—estimated at over 95% of what serves the U.S. market—has been cut off.

33.     No other nation produces Red Swimming Crab in commercial quantities, and the species does not exist in U.S. waters.

34.     As a result, there are no realistic substitute sources from which Supreme can obtain comparable products either by January 1, 2026, or in the foreseeable future.

35.     Red Swimming Crab accounts for a substantial portion of Supreme's ███ million in annual revenue and represents our highest-margin line. Losing this species eliminates not just a product but ████████████████ with cascading effects on ██████████ ████████████████.

**Nature of the Harm**

36.     The harm Supreme faces from the January 1, 2026 import prohibitions are immediate and irreparable. Monetary damages cannot restore lost supply chains, customers, or market positions.

37.     Each month the restrictions remain in place will compound the damage as customers, employees, and suppliers move elsewhere and Supreme's brand reputation erodes.

38.    If the prohibitions take effect, Supreme could lose ███████ in annual revenue and ████████████████████████████████████████

**Commitment to Sustainability**

39.    Supreme has always supported marine mammal conservation and sustainable fishing practices. Our business depends on long-term responsible fisheries.

40.    To our knowledge, there is no evidence that the fisheries from which we source have caused marine mammal population declines or failed to meet comparable conservation outcomes.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 9, 2025.

_____

Troy G. Turkin
Chief Executive Officer
Supreme Crab & Seafood, Inc.

# EXHIBIT J

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NATIONAL FISHERIES INSTITUTE, *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES, *et al.*<br><br>Defendants. | Case No. 1:25-cv-223 |

## DECLARATION OF JOHN R. SHAW III IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, John R. Shaw III, pursuant to 28 U.S.C. § 1746, declare as follows:

1. My name is John R. Shaw III. I am the Director of Business Development for Shaw's Southern Belle Frozen Foods, Inc. ("Shaw's"), a Florida corporation headquartered in Jacksonville, Florida. I have personal knowledge of the facts stated herein based on my direct involvement in Shaw's daily operations, supplier relationships, product sourcing, and strategic planning.

2. I submit this declaration in support of Plaintiffs' Motion for Preliminary Injunction to stay the import prohibitions scheduled to take effect on January 1, 2026, following the National Marine Fisheries Service's ("NMFS") September 2, 2025, comparability finding determinations. This will result in a ban on imports of blue swimming crab from various countries, which will eliminate Shaw's ability to source the crabmeat necessary for our manufacturing operations.

**Shaw's Business Operations**

3. Shaw's is a domestic manufacturer creating American jobs and producing products for American consumers. We purchase our raw materials from U.S.-based importers, and we then use that crabmeat to manufacture value-added fresh and frozen food products.

4.      Shaw's operates a single manufacturing plant in Jacksonville, Florida, where we produce fresh and frozen food products for retail customers. Our products are distributed to customers in all ▆▆▆▆▆

5.      Shaw's employs up to ▆▆▆▆▆▆

6.      Because Shaw's is a manufacturer rather than an importer, we do not have direct control over import operations, vessel schedules, or foreign supplier relationships. We depend entirely on the ability of our suppliers—the importers—to continue importing crabmeat from the fisheries we have relied upon for decades.

**Dependence on Crabmeat from Denied Fisheries**

7.      Shaw's sources crabmeat from multiple countries, including Sri Lanka, Indonesia, Philippines, Vietnam, Thailand, India, and China.

8.      Many of these countries are subject to the September 2, 2025, comparability denials and will be prohibited from exporting crab to the United States after January 1, 2026.

9.      Crabmeat-based products represent approximately ▆▆▆▆ of Shaw's retail volume.

10.     Shaw's generates in excess of ▆▆▆▆▆▆▆ in annual revenue from products that rely on crabmeat sourced from the denied fisheries.

11.     All of the excess of ▆▆▆▆▆▆ of this business comes from fisheries that will be denied under the import prohibitions. Shaw's has no alternative sources that are not subject to the ban.

12.     Shaw's has approximately ▆▆▆ SKUs (stock keeping units) that will be directly affected by the import prohibitions.

13.     All ▆▆▆▆▆ excess in annual contract revenue is at risk if the import prohibitions take effect.

2

**Decades of Reliance on These Supply Chains**

14.     Shaw's has purchased crab meat from these fisheries for decades.



16.     Our reputation in the marketplace depends on consistent quality and reliable supply of our crab-based products.

**No Alternative Sources Available**

17.     Shaw's cannot source substitute crabmeat products from approved fisheries by January 1, 2026, or at any time in the foreseeable future.

18.     The comparability denials affect the vast majority of global crab supply. The remaining approved fisheries cannot provide sufficient volume to replace what will be lost.

19.     Because crab is a wild-caught resource with inherent supply limitations, the approved fisheries cannot simply increase production to meet the demand that will be displaced by the import prohibitions.

21.     The shutdown will impact production representing in excess of ████████ in annual revenue—approximately ████ of our retail product category.

22.     The impacts to Shaw's operations will begin on January 1, 2026, when our suppliers can no longer import the crabmeat we need to manufacture our products. Per our importers, they

have to stop their production around October 15th, 2025, which will lower our inbound crab meat needs and availability.

**Loss of Jobs**



25.    These layoffs will result in the permanent loss of skilled labor. Our employees have specialized knowledge and experience in seafood processing, food safety protocols, quality control, and manufacturing operations.

26.    Once these skilled workers are laid off and find employment elsewhere, Shaw's may not be able to recover this workforce even if import restrictions are later lifted.

27.    The loss of this skilled manufacturing workforce cannot be easily replaced. It takes years to train and develop employees with the expertise necessary to maintain our quality standards and operational efficiency.

**Permanent Loss of Market Share**

28.    Shaw's will lose market share permanently as a result of the import prohibitions.

29.    Once we are unable to supply our retail customers with crab-based products, those customers will stop purchasing products from Shaw's.

30.    Even if import restrictions are later lifted, Shaw's will not be able to recover the shelf space, customer relationships, and market position that will be lost.

31.    Retail shelf space is extremely competitive and difficult to obtain. Once lost, it is nearly impossible to regain.

**Severe Reputational Harm**

32.     Shaw's anticipates severe reputational harm as a result of our inability to fulfill customer orders and maintain consistent supply.

33.     Our reputation as a reliable supplier has been built over decades of consistent performance. The inability to supply our crab-based products will damage relationships with retail customers who depend on us. This is putting our 91-year-old company in jeopardy and family members having severe financial impacts.

34.     In the retail food industry, reliability is paramount. Customers cannot accept empty shelf space or inconsistent supply. Once we fail to deliver, customers will have no choice but to stop purchasing from us.



36.     Our inability to supply crab-based products will

**Nature of the Harm**

37.     The harm Shaw's faces from the January 1, 2026 import prohibitions is immediate, irreparable, and cannot be remedied through monetary damages.

**Commitment to Responsible Sourcing**

40.    Shaw's has always been committed to responsible sourcing practices and compliance with all applicable laws and regulations.

41.    We have relied on our suppliers—the importers—to ensure that the crabmeat we purchase meets all legal requirements and comes from responsibly managed fisheries.

42.    To our knowledge, the fisheries from which our suppliers have sourced crab meat have not caused marine mammal population declines or failed to meet conservation efforts.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 13th, 2025.

John R. Shaw III
Director of Business Development
Shaw's Southern Belle Frozen Foods, Inc.