**UNITED STATES COURT OF INTERNATIONAL TRADE**

NATIONAL FISHERIES INSTITUTE, et al.,

*Plaintiffs,*

v.

UNITED STATES, et al.,

*Defendants.*

Case No. 1:25-cv-00223-JAL

Before: Judge Joseph A. Laroski, Jr.

**ORDER**

Upon consideration of the motion of Center for Biological Diversity, Natural Resources Defense Council, and Animal Welfare Institute to intervene as intervenor-defendants and upon consideration of all other papers and proceedings, it is hereby,

ORDERED that Applicant-Intervenor-Defendants' motion is granted, and it is further

ORDERED that Applicant-Intervenor-Defendants be entered as Intervenor-Defendants in the above-captioned action; and it is further

ORDERED that Applicant-Intervenor-Defendants' answer (ECF No. 23-1) is deemed filed.

SO ORDERED.

Dated:_____
        New York, New York

_____
JUDGE JOSEPH A. LAROSKI, JR.

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| NATIONAL FISHERIES INSTITUTE, et al., | |
| *Plaintiffs,* | |
| v. | Case No. 1:25-cv-00223-JAL |
| UNITED STATES, et al., | |
| *Defendants,* | Before: Judge Joseph A. Laroski, Jr. |
| and | |
| CENTER FOR BIOLOGICAL DIVERSITY, NATURAL RESOURCES DEFENSE COUNCIL, and ANIMAL WELFARE INSTITUTE, | |
| *Applicant-Intervenor-Defendants.* | |

**MOTION OF CENTER FOR BIOLOGICAL DIVERSITY, NATURAL RESOURCES DEFENSE COUNCIL, AND ANIMAL WELFARE INSTITUTE TO INTERVENE AS INTERVENOR-DEFENDANTS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 4

APPLICANTS FOR INTERVENTION ............................................................................. 8

ARGUMENT ..................................................................................................................... 11

    I.    Conservation Groups Have Standing.................................................................... 11

        A.    Conservation Groups Have Piggyback Standing Because They Seek the Same Relief as Federal Defendants................................................ 11

        B.    Conservation Groups Have Standing in their Own Right......................... 12

    II.    Conservation Groups Are Entitled to Intervene as of Right. ............................... 14

        A.    Conservation Groups' Motion to Intervene Is Timely.............................. 15

        B.    Conservation Groups and Their Members Have Legally Protected Interests at Stake. ...................................................................................... 16

        C.    If Successful, Plaintiffs' Action Would Impair Conservation Groups' Interests. ................................................................................... 19

        D.    Conservation Groups' Interests May Not Be Adequately Represented by the Existing Parties........................................................ 20

    III.    Alternatively, the Court Should Permit Conservation Groups to Intervene Permissively. ........................................................................................................ 27

CONCLUSION.................................................................................................................. 29

CERTIFICATE OF COMPLIANCE ................................................................................. 31

## TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*100Reporters LLC v. U.S. Dep't of Just.*,
   307 F.R.D. 269 (D.D.C. 2014) ................................................................27

*Amerigen Pharms. Ltd. v. UCB Pharma GmBH*,
   913 F.3d 1076 (Fed. Cir. 2019) ...........................................................13

*Auxin Solar, Inc. v. United States*,
   698 F. Supp. 3d 1353 (Ct. Int'l Trade 2024) ....................................11, 15, 16, 27, 28

*Berger v. N.C. State Conf. of the NAACP*,
   597 U.S. 179 (2022) ..........................................................21, 22, 23, 28

*Bost v. Ill. State Bd. of Elections*,
   75 F.4th 682 (7th Cir. 2023) ...............................................................21, 22

*Brumfield v. Dodd*,
   749 F.3d 339 (5th Cir. 2014) ..............................................................26

*Cal. Steel Indus., Inc. v. United States*,
   48 F.4th 1336 (Fed. Cir. 2022) ...........................................................12

*Callahan v. Brookdale Senior Living Cmtys., Inc.*,
   42 F.4th 1013 (9th Cir. 2022) .............................................................21

*Çelik Fabrikaları T.A.Ş. v. U.S. Int'l Trade Comm'n*,
   639 F. Supp. 3d 1245 (Ct. Int'l Trade 2023) .........................................28

*Coal. of Ariz./N.M Cntys. for Stable Econ. Growth v. Dep't of Interior*,
   100 F.3d 837 (10th Cir. 1996) .............................................................17, 24, 25

*Crossroads Grassroots Pol'y Strategies v. FEC*,
   788 F.3d 312 (D.C. Cir. 2015) ............................................................21

*Ctr. for Biological Diversity v. Pritzker*,
   No. 14-cv-00157 (Ct. Int'l Trade Aug. 1, 2016) ....................................5

*Field v. Anadarko Petroleum Corp.*,
   35 F.4th 1013 (5th Cir. 2022) .............................................................18

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ..........................................................................12

*Fund for Animals, Inc. v. Norton*,
   322 F.3d 728 (D.C. Cir. 2003) ............................................................24

*Grutter v. Bollinger*,
    188 F.3d 394 (6th Cir.1999) ...................................................................19

*Idaho Farm Bureau Fed'n v. Babbitt*,
    58 F.3d 1392 (9th Cir. 1995) ...................................................17, 20, 24

*Jones v. Prince George's Cnty.*,
    348 F.3d 1014 (D.C. Cir. 2003)...........................................................16

*Kane Cnty. v. United States*,
    94 F.4th 1017 (10th Cir. 2024) ........................................................22, 23

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).........................................................................12, 13, 17

*Māui & Hector's Dolphin Defs. NZ Inc. v. NMFS*,
    No. 24-00218, 2025 WL 2452468 (Ct. Int'l Trade Aug. 26, 2025).........................5, 6, 25, 26

*Mausolf v. Babbitt*,
    85 F.3d 1295 (8th Cir. 1996) ..............................................................23

*N. Am. Interpipe, Inc. v. United States*,
    519 F. Supp. 3d 1313 (Ct. Int'l Trade 2021) ......................................11, 14, 15, 16

*Nat. Res. Def. Council, Inc. v. Ross* (*NRDC I*),
    331 F. Supp. 3d 1338 (Ct. Int'l Trade 2018) ....................................5, 6, 12, 13, 25

*NRDC v. Lutnick* (*NRDC II*),
    774 F. Supp. 3d 1348 (Ct. Int'l Trade 2025) ..............................6, 14, 18, 19, 24, 25

*Nuesse v. Camp*,
    385 F.2d 694 (D.C. Cir. 1967) ...........................................................16

*Sagebrush Rebellion v. Watt*,
    713 F.2d 525 (9th Cir. 1983) ..............................................................20

*Sea Shepherd N.Z v. United States*,
    606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022) ................................5, 6, 13, 25, 26, 28

*Sierra Club v. Glickman*,
    82 F.3d 106 (5th Cir. 1996) ...............................................................18

*Stone v. First Union Corp.*,
    371 F.3d 1305 (11th Cir. 2004) .........................................................20

*Superior Optical Labs, Inc. v. United States*,
    171 Fed. Cl. 50 (2024)........................................................................22

*Sw. Ctr. for Biological Diversity v. Berg*,
  268 F.3d 810 (9th Cir. 2001) ....................................................................................18

*Sw. Power Pool, Inc. v. FERC*,
  736 F.3d 994 (D.C. Cir. 2013) ...................................................................................14

*Texas v. United States*,
  805 F.3d 653 (5th Cir. 2015) .....................................................................................22

*Trbovich v. United Mine Workers*,
  404 U.S. 528 (1972) ...............................................................................................21, 24

*Utah Ass'n of Cntys. v. Clinton*,
  255 F.3d 1246 (10th Cir. 2001) .................................................................................23

*W. Energy All. v. Zinke*,
  877 F.3d 1157 (10th Cir. 2017) ............................................................................17, 18

*Wineries of the Old Mission Peninsula Ass'n v. Twp. of Peninsula*,
  41 F.4th 767 (6th Cir. 2022) ............................................................................23, 24, 26

*Wolfsen Land & Cattle Co. v. Pac. Coast Fed'n of Fishermen's Ass'ns*,
  695 F.3d 1310 (Fed. Cir. 2012)......................................................................15, 19, 21, 22

*Wolfsen Land & Cattle Co. v. United States*,
  98 Fed. Cl. 507 (2011) ...............................................................................................15

**Statutes**

16 U.S.C. § 1361 ...............................................................................................................4

16 U.S.C. § 1371 .........................................................................................................4, 26

16 U.S.C. § 1386 ...............................................................................................................4

16 U.S.C. § 1387 ...............................................................................................................4

28 U.S.C. § 2631 .............................................................................................................27

**Other Authorities**

50 C.F.R. § 216.24 .....................................................................................................5, 6, 24

81 Fed. Reg. 54390 (Aug. 15, 2016)................................................................................5

88 Fed. Reg. 80193 (Nov. 17, 2023)..............................................................................23

90 Fed. Reg. 42395 (Sept. 2, 2025) ............................................................................7, 8

iv

7C Charles A. Wright et al., *Fed. Prac. & Proc. Civ.* § 1914 (3d ed. 2025)................................15

NOAA, *Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report: Ecuador* (2025), https://www.fisheries.noaa.gov/s3/2025-08/Ecuador-Final-2025-508.pdf.............................7

NOAA, *Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report*: *Mexico* (2025), https://www.fisheries.noaa.gov/s3/2025-08/Mexico-final-2025-508.pdf.................................7

NOAA, *Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report*: *Republic of Korea* (2025), https://www.fisheries.noaa.gov/s3/2025-08/Republic-of-Korea-final-2025-508.pdf ................................................................................................................7

## INTRODUCTION

The Center for Biological Diversity (the Center), Natural Resources Defense Council (NRDC), and Animal Welfare Institute (AWI) (collectively, Conservation Groups) respectfully move under Rule 24 of this Court to intervene as defendants in this action to protect their and their members' interests in minimizing harms to marine mammals from bycatch in foreign fisheries that export seafood to the United States. Conservation Groups request expedited briefing and consideration of this motion by the deadline for oppositions to Plaintiffs' motion for a preliminary injunction, which Plaintiffs have moved to also expedite.[1]

When Congress enacted the Marine Mammal Protection Act (MMPA) in 1972, it sought to reduce marine mammal bycatch within U.S. fisheries toward zero while also pressuing foreign fisheries to do the same by banning seafood imports from fisheries that harm marine mammals in excess of U.S. standards. As a result of these robust standards, marine mammal bycatch within the United States has declined over the past 30 years. Yet bycatch remains the greatest threat to survival of whales and dolphins globally, continuing to kill over 500,000 marine mammals each year.

For decades, Federal Defendants failed to implement the MMPA's import requirements, allowing thousands of foreign fisheries to continue to engage in harmful fishing practices and sell their fish to the U.S. market, in violation of the MMPA. It was only when Conservation Groups took action that Federal Defendants were forced out of their inertia and began to fully implement the MMPA import provisions. Since 2008, Conservation Groups have sought to enforce the government's compliance with its statutory duties, through petitions for rulemaking and import bans, collaboration with fishers, litigation in this Court, as well as conducting other

---

[1] If there is not a ruling on this motion by that deadline (presently, November 4), Conservation Groups intend to file a proposed opposition to the preliminary injunction motion on that date.

advocacy. This advocacy culminated in a 2025 settlement agreement in this Court under which Defendant National Marine Fisheries Service (NMFS) was required to finally issue determinations—or "comparability findings"—on whether approximately 2,500 fisheries from 135 nations comply with the MMPA's standards for marine mammal protection in the course of commercial fishing activities.

NMFS published those final determinations on September 2, 2025. While NMFS found most foreign fisheries meet U.S. standards, it found some fisheries do not. Federal Defendants will ban imports from those fisheries on January 1, 2026, as the MMPA requires. Among those that will recieve a ban are several fisheries in Southeast Asia that use dangerous gear that catches imperiled Irrawaddy dolphins, Indo-Pacific finless porpoises, and Indian Ocean humpback dolphins, as well as other marine mammals in which Conservation Groups' members have a concrete and direct interest in protecting.

Such import bans are an effective mechanism to induce foreign nations to establish or improve their bycatch programs to regain access to the U.S. market, just as Congress intended. Import bans shift U.S. market demand away from harmful fisheries, thereby reducing fishing pressure and the risk of marine mammal bycatch and increasing support for fisheries that adopt strong measures to reduce bycatch. And import bans provide assurance to American consumers—including Conservation Groups' members—that the seafood they are purchasing and eating will not unintentionally kill thousands of marine mammals or contribute to population declines in any part of the world.

Now, Plaintiff importers of foreign seafood seek to undo both the bans and NMFS's implementation of the MMPA's import provisions. Plaintiffs make a sweeping request to vacate not only the determinations for Southeast Asian blue swimming crab fisheries, but *all* of the

2025 comparability findings. Their requested relief would allow imports from fisheries that have the highest levels of marine mammal bycatch in the world and the lowest levels of regulatory protection. If Plaintiffs succeed, marine mammals that Conservation Groups' members enjoy—and that their prior litigation and settlement helped to protect—will be caught and killed in service of U.S. markets, drastically setting back progress towards reducing bycatch in Southeast Asia and ultimately around the world.

Conservation Groups seek intervention as of right under Rule 24(a) or, alternatively, permissive intervention under Rule 24(b). Conservation Groups have worked for decades to protect marine mammals from bycatch in foreign fisheries, and devoted many years to compelling NMFS to finally issue the legally required determinations challenged here. Conservation Groups and their members have legally cognizable interests in protecting marine mammals, which are harmed by U.S. markets for fisheries that excessively injure and kill those animals. Those interests will be seriously impaired if Plaintiffs succeed in their action to block the imposition of import bans. Conservation Groups are not adequately represented by Federal Defendants in this action, given their demonstrated adversity on several of the core issues in this case. Conservation Groups therefore respectfully request that this Court grant their motion to intervene as defendants to protect their and their members' interests.

Counsel for Conservation Groups conferred with counsel for Plaintiffs and Federal Defendants about this motion by email on October 20–22, 2025. Plaintiffs indicated they oppose. Federal Defendants indicated they will take a position after having sufficient time to review this motion.

**BACKGROUND**

Bycatch in commercial fisheries is the number one threat to marine mammals worldwide.[2] In recognition of this fact, Congress enacted the MMPA with the goal of reducing bycatch of marine mammals in both the United States and globally to insignificant levels approaching zero. 16 U.S.C. §§ 1361, 1371(a)(2). Achieving this goal requires three fundamental elements: 1) understanding what level of bycatch is low enough to avoid declines in a particular marine mammal population, 2) on-the-water measures that reduce bycatch, and 3) having evidence through monitoring that those actions are in fact working and reducing bycatch to necessary levels. Accordingly, the MMPA imposes mandatory requirements on domestic fisheries that include stock assessments of marine mammal populations, bycatch limits and tailored take reduction plans, and bycatch monitoring and reporting programs. *E.g.*, 16 U.S.C. §§ 1386(a), 1387(b), (d), (f).

To achieve the insignificant bycatch goal internationally, the MMPA requires Federal Defendants to "ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." *Id.* § 1371(a)(2). The MMPA places the burden on foreign governments to provide "reasonable proof" on the "effects" of their fisheries on marine mammals to assess whether they meet that requirement. *Id.* § 1371(a)(2)(A) [collectively, hereinafter the Import Provisions]. While the MMPA does not define the term "United States standards," this Court has held numerous times that, at a minimum, these standards include certain "statutory markers" of marine mammal bycatch

---

[2] Paul R. Wade et al., *Best Practices for Assessing and Managing Bycatch of Marine Mammals*, 8 Frontiers Marine Sci. 1, 1 (2021) (attached as Exhibit 1); FAO, *Fishing Operations: Guidelines to prevent and reduce bycatch of marine mammals in capture fisheries* 1, FAO Technical Guidelines for Responsible Fisheries No. 1, Suppl. 4 (2021) (excerpts attached as Exhibit 2).

management under the MMPA: a zero mortality rate goal, bycatch limits, take reduction plans, monitoring programs, and stock assessments. *Māui & Hector's Dolphin Defs. NZ Inc. v. NMFS*, No. 24-00218, 2025 WL 2452468 (Ct. Int'l Trade Aug. 26, 2025); *Sea Shepherd N.Z v. United States*, 606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022); *Nat. Res. Def. Council, Inc. v. Ross* (*NRDC I*), 331 F. Supp. 3d 1338 (Ct. Int'l Trade 2018). In other words, there is no "reasonable proof" that bycatch meets U.S. standards if either it is unknown how much bycatch a marine mammal population is suffering, there are not bycatch limits sufficient to sustain populations, *or* it is unknown whether bycatch reduction measures have in fact limited bycatch to the degree necessary.

For decades, Federal Defendants largely failed to comply with their statutory duty under the Import Provisions until they were prompted to by Conservation Groups' advocacy efforts. In 2008, the Center filed a rulemaking petition requesting that NMFS implement the Import Provisions. When NMFS did not act by 2014, the Center and NRDC filed litigation that resulted in a settlement agreement requiring NMFS to issue implementing regulations by a date certain. *See* Am. Settlement Agreement & Stip. Dismissal, *Ctr. for Biological Diversity v. Pritzker*, No. 14-cv-00157 (Ct. Int'l Trade Aug. 1, 2016) (ECF No. 28-1). In 2016, NMFS issued regulations to implement the MMPA Import Provisions. 81 Fed. Reg. 54390 (Aug. 15, 2016) (codified at 50 C.F.R. § 216.24(h) [hereinafter MMPA Regulations]). All three Conservation Groups were heavily involved in the rulemaking process.

The MMPA Regulations establish a process for foreign nations to apply for and receive "comparability findings" that their fisheries do not catch marine mammals in excess of U.S. standards, and therefore, may be allowed to export seafood to the United States. 50 C.F.R. § 216.24(h)(6), (7); *see NRDC I*, 331 F. Supp. 3d at 1347–48. To issue a comparability finding,

NMFS is required to consider whether the harvesting nation's regulatory program "provides for, or effectively achieves comparable results as" key U.S. standards, including marine mammal stock assessments, science-based bycatch limits, the zero mortality rate goal, and monitoring programs. 50 C.F.R. § 216.24(h)(6), (7).

In 2018, Conservation Groups continued their Import Provisions advocacy to protect the critically endangered vaquita porpoise from bycatch in Mexican fisheries. Conservation Groups filed a lawsuit in this Court, resulting in a preliminary injunction ordering Federal Defendants to ban imports of shrimp and other seafood products from Mexican fisheries that caught vaquita porpoises in excess of U.S. standards. *NRDC I*, 331 F. Supp. 3d 1338. Other environmental organizations have filed and prevailed in similar lawsuits to protect the critically endangered Māui dolphin from bycatch in New Zealand fisheries. *Māui & Hector's Dolphin Defs.*, 2025 WL 2452468; *Sea Shepherd*, 606 F. Supp. 3d 1286.

In 2024, Conservation Groups sued Federal Defendants again for failing to make MMPA import determinations and ban imports from fisheries whose bycatch exceeds U.S. standards, including fisheries from Canada, Ecuador, France, India, Indonesia, Mexico, South Africa, the United Kingdom, and South Korea. Compl., *NRDC v. Lutnick* (*NRDC II*), 774 F. Supp. 3d 1348 (Ct. Int'l Trade 2025) (No. 24-cv-00148) (ECF No. 1). Earlier this year, the parties reached a settlement agreement whereby NMFS would issue comparability findings for approximately 2,500 fisheries from 135 nations by September 1, 2025. *NRDC II*, 774 F. Supp. 3d at 1354–56. Under the terms of the agreement, Conservation Groups may not initiate a legal challenge to any of the comparability findings before January 1, 2026. *Id.* at 1355. This Court has retained jurisdiction to enforce the terms of the agreement. *Id.* at 1357.

NMFS published the comparability findings on September 2, 2025. 90 Fed. Reg. 42395 (Sept. 2, 2025). While NMFS determined that the vast majority of foreign fisheries exporting to the United States operate under a regulatory program that is "comparable in effectiveness" to U.S. standards, it found that marine mammal bycatch in some fisheries is in excess of U.S. standards. *Id.* at 42397–98. Federal Defendants will ban imports from fisheries that were denied a comparability finding effective January 1, 2026. *Id.* at 42397. Many of those fisheries use techniques and gear with a high risk of catching marine mammals, have little to no monitoring to estimate bycatch, and/or overlap with endangered or critically endangered species that are likely to go extinct if bycatch continues.[3] They include several blue swimming crab fisheries in Southeast Asia that are known to catch and kill Irrawaddy dolphins, and likely also catch and kill Indian Ocean humpback dolphins, Indo-Pacific humpback dolphins, finless porpoises, Indo-Pacific bottlenose dolphins, pantropical spotted dolphins, long-snouted spinner dolphins, short-beaked common dolphins, short-finned pilot whales, killer whales, rough-toothed dolphins, Risso's dolphins, Fraser's dolphins, and spinner dolphins. Compl. Ex. A, at 1, 6, 8 (Philippines Comparability Finding), Ex. E, at 1, 10–11 (Vietnam Comparability Finding), Ex. F, at 1, 6, 8–9 (Indonesia Comparability Finding), Ex. G, at 8 (Sri Lanka Comparability Finding), ECF No. 2. Of the fisheries that were the focus of Conservation Groups' 2024 lawsuit, NMFS issued only

---

[3] *See, e.g.*, NOAA, *Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report: Ecuador* (2025), https://www.fisheries.noaa.gov/s3/2025-08/Ecuador-Final-2025-508.pdf (Ecuador Comparability Finding); Compl. Ex. F, ECF No. 2 (Indonesia Comparability Finding); NOAA, *Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report*: *Mexico* (2025), https://www.fisheries.noaa.gov/s3/2025-08/Mexico-final-2025-508.pdf (Mexico Comparability Finding); NOAA, *Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report*: *Republic of Korea* (2025), https://www.fisheries.noaa.gov/s3/2025-08/Republic-of-Korea-final-2025-508.pdf (South Korea Comparability Finding); Compl. Ex. G (Sri Lanka Comparability Finding).

partial denials for Ecuador, Indonesia, Mexico, Republic of Korea, and found full comparability for Canada, France, India, South Africa, and the United Kingdom. 90 Fed. Reg. at 42397; *see also 2025 Marine Mammal Protection Act Comparability Finding Determinations for Harvesting Nations*, NOAA Fisheries, https://www.fisheries.noaa.gov/international-affairs/2025-marine-mammal-protection-act-comparability-finding-determinations (last updated Sept. 2, 2025).

On October 9, 2025, Plaintiffs filed this case challenging apparently all of the 2025 comparability findings "in their entirety." Compl. 46 (Prayer for Relief). They ask the Court to declare that the findings violate the MMPA and Administrative Procedure Act (APA), vacate and remand the findings, and order NMFS to accept and adjudicate reapplications for comparability findings within 90 days of submission. *Id.* On October 14, 2025, Plaintiffs moved for a preliminary injunction against only the determinations denying comparability findings to prevent any import bans from being implemented on January 1, 2026. Pls.' Mot. Prelim. Inj., ECF. No. 17. Federal Defendants have moved to stay the deadline to respond to that motion. ECF No. 21.

## APPLICANTS FOR INTERVENTION

Applicant Center for Biological Diversity (the Center) is a 501(c)(3) nonprofit corporation with over 93,000 active members from within the United States and abroad. The Center works through science and environmental law to advocate for the protection of endangered, threatened, and rare species and their habitats. Through its Oceans and International programs, the Center has worked for years to protect marine mammals around the world's oceans that are threatened by unsustainable or harmful fishing practices, including through advocacy, litigation, and participation as appointed members of five MMPA-authorized Take Reduction Teams. Decl. of Brendan Cummings ¶¶ 3–5. The Center has been actively involved in implementation of the MMPA Import Provisions for nearly two decades. As described above, the

Center filed an APA rulemaking petition in 2008, requesting that NMFS implement the MMPA Import Provisions. The Center has subsequently filed litigation to 1) compel NMFS to issue implementing regulations for the MMPA Import Provisions, 2) compel a ban on imports from Mexican fisheries that cause bycatch of critically endangered vaquita, and 3) compel NMFS to implement the Import Provisions for all fisheries that export to the United States. Center members regularly use marine waters to view and study marine wildlife, including in the Philippines, Indonesia, and other Southeast Asian nations, as well as in other nations throughout the world where bycatch threatens marine mammals. *See* Decl. of Kristine Akland ¶¶ 3–6; Decl. of Brett Hartl ¶¶ 6–9; Decl. of Kristen Monsell ¶¶ 3–7. Bycatch harms many of the marine wildlife species that Center members enjoy viewing and studying, decreasing their likelihood of viewing these species in the wild. Federal Defendants' decision to ban imports from certain high-bycatch-risk fisheries provides a substantial incentive for those nations to monitor, regulate, and protect these marine mammals. Reversing the ban eliminates this critical incentive.

Applicant NRDC is a not-for-profit membership corporation with hundreds of thousands of members and online activists. NRDC has worked for more than thirty years to implement and enforce the MMPA and to protect marine mammals in the United States and around the world. NRDC advocates, litigates, participates in Take Reduction Teams authorized by the MMPA to reduce bycatch for at risk stocks, and helps develop policy to reduce marine mammal mortality and serious injury from commercial fisheries. NRDC has been actively involved in implementation of the MMPA Import Provisions for more than a decade. Decl. of Gina Trujillo ¶ 6. As described above, NRDC has filed litigation to 1) compel NMFS to issue implementing regulations for the MMPA Import Provisions, 2) compel a ban on imports from Mexican fisheries that cause bycatch of critically endangered vaquita, and 3) compel NMFS to implement

the Import Provisions for all fisheries that export to the United States. NRDC members live near and regularly travel to locations including the the Atlantic, Indian, and Pacific Oceans and related Seas where they delight in looking for and seeing marine mammals. They plan to continue visiting these regions and hope to observe marine mammals in the future. For example, NRDC members regularly travel to the Philippines and other countries where they observe and take joy from seeing marine mammals thriving in the wild. *See* Akland Decl. ¶¶ 3–12. NRDC members derive recreational, conservation, aesthetic, and other benefits from seeing marine mammals in the wild. Bycatch harms many of the marine wildlife species that NRDC members enjoy viewing and studying, decreasing their likelihood of viewing these species in the wild. Federal Defendants' decision to ban imports from certain high-bycatch-risk fisheries provides a substantial incentive for nations to monitor, regulate, and protect marine mammals. Reversing the ban eliminates this critical incentive.

Applicant Animal Welfare Institute (AWI) is a nonprofit organization with more than 160,000 members and supporters. Since its founding in 1951, AWI's mission has been to alleviate human-inflicted animal suffering and exploitation by vigorously defending animals' interests through advocacy, research, education and engagement with key stakeholders. AWI engages policymakers, scientists, industry professionals, non-governmental organizations, and the public in fulfilling its mission. AWI advocates for the protection and welfare of marine wildlife, including marine mammals, in the United States and throughout the world. AWI promotes increased protections of marine mammals from unsustainable fishing practices around the globe, especially those practices that cause death due to entanglement in fishing gear. AWI regularly prepares and issues fact sheets, peer-reviewed and policy papers, and news alerts to educate its members and online activists about marine wildlife and the threats they face;

monitors legislation and research activities that may affect the well-being of marine mammals; and briefs members of Congress and their staff about agency actions, legislation, international developments, and other activities that bear on these issues. Decl. of Susan Millward ¶¶ 5–7. AWI has worked for many years, through a variety of advocacy efforts (including the 2024 litigation to compel NMFS to comply with the Import Provisions), to protect marine mammals from bycatch. AWI members strongly desire increased protections for imperiled marine wildlife to increase the likelihood of species recovery. AWI members purchase and consume or seek to purchase and consume fish that has been caught with minimal impacts to marine mammals. And AWI members live near and regularly travel to locations along the coast of Indonesia and the Philippines, where they delight in the continued existence of marine mammals, advocate for imperiled species of marine mammals, and have specific plans to return in hopes of observing marine mammals in their natural habitat. *See* Decl. of Scarlett Adler ¶¶ 4–6.

## ARGUMENT

### I.    Conservation Groups Have Standing.

In this Court, "a putative intervenor has the burden of demonstrating either its independent constitutional standing or its 'piggyback standing,' i.e., standing based on seeking the same relief sought by an existing party to the case." *N. Am. Interpipe, Inc. v. United States*, 519 F. Supp. 3d 1313, 1322 (Ct. Int'l Trade 2021), *aff'd sub nom. Cal. Steel Indus., Inc. v. United States*, 48 F.4th 1336 (Fed. Cir. 2022). Conservation Groups demonstrate both.

### A.    Conservation Groups Have Piggyback Standing Because They Seek the Same Relief as Federal Defendants.

"Where a putative intervenor seeks only the same relief as an existing party to the litigation, the proposed intervenor may 'piggyback' on the existing party's standing." *Auxin Solar, Inc. v. United States*, 698 F. Supp. 3d 1353, 1373 (Ct. Int'l Trade 2024) (quoting *Cal.*

*Steel*, 48 F.4th at 1343). Conservation Groups ask the Court to enter judgment in Federal

Defendants' favor and dismiss Plaintiffs' complaint. *See* Proposed Answer 27, filed herewith.

Although Federal Defendants have not yet filed an answer, presumably they will also seek

judgment in their own favor. Because Conservation Groups' prayer for relief is substantively

identical to Federal Defendants' presumed relief, Conservation Groups have piggyback standing.

*See Cal. Steel*, 48 F.4th at 1343. That is sufficient for intervention.

### B.    Conservation Groups Have Standing in their Own Right.

Even if Conservation Groups did not have piggyback standing, they have associational

standing in their own right. "An association has standing to bring suit on behalf of its members

when its members would otherwise have standing to sue in their own right, the interests at stake

are germane to the organization's purpose, and neither the claim asserted nor the relief requested

requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v.

Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Article III standing requires a

showing of: (1) injury in fact; (2) a causal relationship between the injury and the challenged

action, such that the injury can be fairly traced to the challenged action; and (3) the likelihood

that a favorable decision will redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61

(1992). "The injury may be indirect so long as it is fairly traceable to defendants' conduct."

*NRDC I*, 331 F. Supp. 3d at 1357.

Conservation Groups' members include individuals who derive recreational and aesthetic

enjoyment, or scientific and professional value, from observing or studying in the wild some of

the marine mammals that are harmed by bycatch in fisheries that received a negative

comparability finding. For example, one member travels to Indonesia at least once a year and

looks for blue whales, bottlenose dolphins, and other cetacean species while snorkeling and

recreating in the waters around Bali, Gili, Nusa Penida, Komodo, Sulawesi, and Flores. Adler

12

Decl. ¶¶ 4–5; *see also* Monsell Decl. ¶¶ 3–7; Akland Decl. ¶¶ 3–6; Hartl Decl. ¶¶ 6–9.[4] "[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for the purpose of standing." *Lujan*, 504 U.S. at 562–63; *accord NRDC I*, 331 F. Supp. 3d at 1357. "Harm to one . . . member is enough to establish injury for purposes of standing." *NRDC I*, 331 F. Supp. 3d at 1358. Conservation Groups have established, through the attached declarations, that their injuries are concrete, particularized, and actual or imminent. *See id.* at 1359. Protecting each of the above interests is both germane and an important part of Conservation Groups' organizational missions. *See, e.g.*, Cummings Decl. ¶¶ 3–5; Trujillo Decl. ¶¶ 5–6; Millward Decl. ¶¶ 4–7.

Vacating or otherwise enjoining import bans on the fisheries with a negative comparability finding would erase the bans' benefits to the members' concrete interests in affected marine mammals. Congress recognized that an embargo is "the most effective remedy for foreign threats to marine mammals." *NRDC I*, 331 F. Supp. 3d at 1360. Similar import bans have been shown to compel responses from foreign governments that reduce bycatch dangers to marine mammals. *E.g.*, *id.* at 1359–60; *Sea Shepherd*, 606 F. Supp. 3d at 1307 n.38. That is why this Court has found parties in other cases challenging a lack of an MMPA import ban have met the traceability and redressability standing prongs. *Sea Shepherd*, 606 F. Supp. 3d at 1307 n.38; *NRDC I*, 331 F. Supp. 3d at 1356–61. The prongs are met here for the same reasons.

In sum, because a ruling in favor of Plaintiffs would allow foreign fisheries to continue exporting to the United States without taking any measures to reduce bycatch of marine

---

[4] A party's factual allegations are "accept[ed] as true . . . for purposes of assessing its standing." *Amerigen Pharms. Ltd. v. UCB Pharma GmBH*, 913 F.3d 1076, 1083 (Fed. Cir. 2019).

mammals in which Conservation Groups' members have a legally protectable interest, Conservation Groups have standing in their own right to intervene.

Separately, Conservation Groups have concrete interests in the contractual terms of their settlement agreement with Federal Defendants in *NRDC II. See Sw. Power Pool, Inc. v. FERC*, 736 F.3d 994, 996 (D.C. Cir. 2013) (holding action affecting contractual rights confers standing on party to contract). Conservation Groups agreed to dismiss their case with prejudice and waive certain other rights in exchange for Federal Defendants' obligation to issue comparability findings by September 1, 2025, and ban imports from all fisheries that were denied a comparability finding by January 1, 2026. Stip. Dismissal, *NRDC II*, 774 F. Supp. 3d 1348 (No. 24-cv-00148) (ECF No. 29) [hereinafter *NRDC II* Settlement]. A ruling for Plaintiffs would eliminate the bargained-for benefits of the settlement for Conservation Groups. That loss could be redressed if the Court rules against Plaintiffs. Conservation Groups thus also have standing in their own right to protect the terms of their settlement agreement.

## II.    Conservation Groups Are Entitled to Intervene as of Right.

USCIT Rule 24(a)(2) provides, in pertinent part, "On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."[5] The Court applies a four-part test under this rule: "(1) the motion must be timely; (2) the moving party must claim an interest in the property or transaction at issue that is legally protectable—merely economic interests will not suffice; (3) that interest's

---

[5] This language is identical to Federal Rule of Civil Procedure 24, so it is appropriate to look to applications of that rule in applying USCIT Rule 24. *See N. Am. Interpipe*, 519 F. Supp. 3d at 1323 n.15.

relationship to the litigation must be of such a direct and immediate character that the intervenor will either gain or lose by the direct legal operation and effect of the judgment; and (4) the movant must demonstrate that said interest is not adequately addressed by the government's participation." *N. Am. Interpipe*, 519 F. Supp. 3d at 1323 (cleaned up) (quoting *Wolfsen Land & Cattle Co. v. Pac. Coast Fed'n of Fishermen's Ass'ns*, 695 F.3d 1310, 1315 (Fed. Cir. 2012)). "These requirements are construed in favor of intervention." *Wolfsen*, 695 F.3d at 1315; *see also* 7C Charles A. Wright et al., *Fed. Prac. & Proc. Civ.* § 1914 (3d ed. 2025) ("The pleading is construed liberally in favor of the pleader-intervenor and the court will accept as true the well-pleaded allegations in the pleading."). Conservation Groups satisfy each of the Rule's elements.

## A. Conservation Groups' Motion to Intervene Is Timely.

The Court considers three factors in assessing timeliness:

> (1) the length of time during which the would-be intervenor actually knew or reasonably should have known of his right to intervene in the case before he applied to intervene; (2) whether the prejudice to the rights of existing parties by allowing intervention outweighs the prejudice to the would-be intervenor by denying intervention[;] (3) existence of unusual circumstances militating either for or against a determination that the application is timely.

*Auxin Solar*, 698 F. Supp. 3d at 1375 (cleaned up) (quoting *Sumitomo Metal Indus., Ltd. v. Babcock & Wilcox Co.*, 669 F.2d 703, 707 (Fed. Cir. 1982)). Conservation Groups' motion is unquestionably timely. This case is still in its infancy. Plaintiffs filed their complaint less than two weeks ago. The deadline for Federal Defendants to file an answer is several weeks from now. *See* CIT Rule 12(a)(1)(A). The amount of time that has elapsed since Conservation Groups knew or should have known of their interests in this case is minimal. Conservation Groups have not delayed intervention in a way that causes any prejudice to the existing parties. *See Wolfsen Land & Cattle Co. v. United States*, 98 Fed. Cl. 507, 517 (2011) ("The prejudice inquiry 'measures only the prejudice caused by a potential intervenor's delay and not that caused by the

intervention itself.'" (citation omitted)), *aff'd sub. nom. Wolfsen*, 695 F.3d 1310. Conservation Groups do not seek to delay any ongoing or future proceedings. In addition, Conservation Groups are filing their motion approximately two weeks before the deadline for opposing the Plaintiffs' motion for a preliminary injunction so that, if granted intervention, they could participate in that pending motion in accordance with existing deadlines. In sum, Conservation Groups' motion is timely. *See, e.g.*, *Auxin Solar*, 698 F. Supp. 3d at 1376 (motion timely when filed within 30 days of complaint); *N. Am. Interpipe*, 519 F. Supp. 3d at 1323 & n.16 (motions timely when filed shortly after complaint).[6]

### B.    Conservation Groups and Their Members Have Legally Protected Interests at Stake.

Rule 24 requires an applicant for intervention to possess a legally protectable interest relating to the property or transaction that is the subject matter of the litigation. This requirement is not rigid. Rather, "[t]he 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967)). Conservation Groups have multiple legally protectable interests at stake.

First, as explained above, Conservation Groups and their members have aesthetic, recreational, and scientific interests in the marine mammals that are caught and killed by the foreign fisheries at issue here. *See supra* Section I.B; *see Jones v. Prince George's Cnty.*, 348 F.3d 1014, 1018–19 (D.C. Cir. 2003) ("[B]ecause [intervenor] has suffered a cognizable injury sufficient to establish Article III standing, [intervenor] also has the requisite interest under Rule 24(a)(2)."). These include marine mammals caught in the blue swimming crab fisheries in Indonesia, Vietnam, the Philippines, and Sri Lanka, such as Irrawaddy dolphins, Indo-Pacific

---

[6] There are no unusual circumstances relevant to this inquiry in this case.

humpbacked dolphin, finless porpoise, Indo-Pacific bottlenose dolphins, and Indian Ocean humpback dolphin. *See, e.g.,* Hartl Decl. ¶¶ 4–9; Adler Decl. ¶¶ 4–6; Monsell Decl. ¶¶ 6–7.[7] They also include marine mammals caught in other fisheries that are within the scope of Plaintiffs' action: i.e., fisheries that received negative comparability findings and that will be subject to an import ban on January 1, 2026. *E.g.*, Hartl Decl. ¶¶ 4–9; Akland Decl. ¶¶ 4–9; Adler Decl. ¶¶ 4–6; ; Monsell Decl. ¶¶ 6–7.[8]  It is "indisputable that a prospective intervenor's environmental concern is a legally protectable interest" for intervention purposes. *W. Energy All. v. Zinke*, 877 F.3d 1157, 1165 (10th Cir. 2017) (citation omitted); *see Lujan*, 504 U.S. at 562–63 ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing.").

Second, Conservation Groups have an interest in implementation of import bans they have long worked to compel. Courts have recognized that "[a] public interest group is entitled as a matter of right to intervene in an action challenging the legality of a measure it has supported." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1397 (9th Cir. 1995); *accord W. Energy All.*, 877 F.3d 1165–67 (same); *see also Coal. of Ariz./N.M Cntys. for Stable Econ. Growth v. Dep't of Interior*, 100 F.3d 837, 841 (10th Cir. 1996) (explaining a party with a "persistent record of advocacy for [the environmental] protection" adopted by an agency that is subsequently challenged in court has a "direct and substantial interest" sufficient "for the purpose of intervention as of right"). Conservation Groups engaged in decades of advocacy and litigation

---

[7] *See* Compl. Ex. A, at 1, 6, 8 (Philippines Comparability Finding), Ex. E, at 1, 10–11 (Vietnam Comparability Finding), Ex. F, at 1, 6, 8–9 (Indonesia Comparability Finding), Ex. G, at 8 (Sri Lanka Comparability Finding).

[8] *See* Philippines Comparability Finding 1, 6, 8; Vietnam Comparability Finding 1, 10–11; Indonesia Comparability Finding 1, 6, 8–9; Sri Lanka Comparability Finding 1, 8; Mexico Comparability Finding 1–4, 14.

with Federal Defendants to obtain bans on imports from fisheries where marine mammal bycatch is in excess of U.S. standards. *See supra* pp. 5–6, 8–11. A settlement agreement in *NRDC II* imposed a deadline for Federal Defendants to issue the comparability findings at issue here. *NRDC II* Settlement. And, importantly, the agreement requires Federal Defendants to implement import bans on January 1, 2026, for any fishery that was denied a comparability finding. *NRDC II* Settlement, Attach. A, at 3–4 (term 1.d). Conservation Groups have a legally protectable interest in the execution of their settlement agreement. *See Field v. Anadarko Petroleum Corp.*, 35 F.4th 1013, 1019 (5th Cir. 2022) (holding interest in enforcing arbitration agreement related to the plaintiff's claims constituted a protectable legal interest); *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001) (holding "[c]ontract rights are traditionally protectable interests" sufficient for intervention).

Finally, Conservation Groups have an additional stake in this case because they may file a challenge on or after January 1, 2026 (under the terms of their settlement) to certain *positive* comparability findings authorizing imports from fisheries that catch marine mammals in excess of U.S. standards. Plaintiffs' complaint here seeks a declaration on the legality of all "the 2025 Comparability Findings," which presumably includes those that Conservation Groups may challenge. Compl. 46 (Prayer for Relief). Conservation Groups thus have a concrete interest in participating in this litigation to defend against a ruling that may impede their ability to challenge those positive findings. *See, e.g.*, *W. Energy All.*, 877 F.3d at 1165 ("A protectable interest is one that would be impeded by the disposition of the action." (cleaned up)); *Sierra Club v. Glickman*, 82 F.3d 106, 109–10 (5th Cir. 1996) ("[T]he *stare decisis* effect of an adverse judgment constitutes a sufficient impairment to compel intervention.").

### C.     If Successful, Plaintiffs' Action Would Impair Conservation Groups' Interests.

An applicant for intervention must show what it "will either gain or lose by the *direct* legal operation and effect of the judgment." *Wolfsen*, 695 F.3d at 1315 (citation omitted). "To satisfy this element of the intervention test, a would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied. This burden is minimal." *Grutter v. Bollinger*, 188 F.3d 394, 399 (6th Cir.1999) (citation omitted); *see* USCIT Rule 24(a)(2) (like FRCP 24(a)(2), requiring that applicant be "so situated that disposing of the action *may* as a practical matter impair or impede the movant's ability to protect its interest" (emphasis added)). There are at least three primary ways in which a successful case by Plaintiffs would impair Conservation Groups' interests.

First, Plaintiffs' requested remedy would authorize imports from the numerous fisheries described above that catch and kill marine mammals in which Conservation Groups and their members have protectable interests. *See supra* pp. 12–13, 16–18. By Plaintiffs' own admission, the United States was a major market for these fisheries. Compl. ¶ 142. Under the comparability finding denials, the nations will have to take action to reduce incidental harm and mortality of marine mammals to access U.S. markets. If Plaintiffs' suit is successful, marine mammals can continue to be caught in these fisheries at current rates without any limits on imports.

Second, Plaintiffs seek to vacate all comparability determinations that were issued in direct response to Conservation Groups' suit to vindicate their interests in protecting marine mammals. If successful, Plaintiffs would also prevent Federal Defendants from satisfying one of the terms of the settlement in that case: that, by January 1, 2026, Federal Defendants "shall . . . prohibit the importation of fish and fish products into the United States from all . . . fisheries for which NMFS has denied a comparability finding." *NRDC II* Settlement, Attach. A, at 3–4.

Conservation Groups would directly lose the benefit of their settlement agreement if Plaintiffs are successful here. Plaintiffs' action would undermine Conservation Groups' missions to protect marine mammals from bycatch in fisheries that export to the United States. Courts have found such impairment sufficient to sustain intervention for conservation groups in other industry challenges to environmental protection rules. *E.g.*, *Idaho Farm Bureau*, 58 F.3d at 1398 (concluding decision to remove species from endangered species list would impair conservation groups' interest in preservation); *Sagebrush Rebellion v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983) ("An adverse decision in this suit would impair the [intervenor's] interest in the preservation of birds and their habitats.").

Third, resolution of Plaintiffs' case could affect Conservation Groups' ability to protect their interests in any potential future challenge to certain comparability findings authorizing imports. Plaintiffs here raise several arguments concerning the proper interpretation of the MMPA and NMFS's regulations. *See* Compl. ¶¶ 95–112, 155–161. If adopted by the Court, those interpretations could affect the CIT's review of Conservation Groups' intended claims, if Conservation Groups bring such a case. *See, e.g.*, *Stone v. First Union Corp.*, 371 F.3d 1305, 1310 (11th Cir. 2004) (recognizing that "one court's ruling . . . could influence later suits," even though "a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects").

Because Conservation Groups are so situated that the disposition of this action may, as a practical matter, impair their ability to protect their interests in marine mammals and bycatch reduction, Conservation Groups plainly satisfy Rule 24's impairment-of-interest requirement.

**D.     Conservation Groups' Interests May Not Be Adequately Represented by the Existing Parties.**

Finally, an applicant for intervention as of right must show that its interests may not be

adequately represented by the existing parties to the litigation. "The burden of showing inadequacy of representation is 'minimal,' requiring only a showing that an existing party's representation of [the proposed intervenor's] interests 'may be' inadequate as to some aspect of the case at bar." *Wolfsen*, 695 F.3d at 1315 (quoting *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)); *see also Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 195 (2022) (Rule 24's "test . . . present[s] proposed intervenors with only a minimal challenge."); *Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 321 (D.C. Cir. 2015) ("[A] movant 'ordinarily should be allowed to intervene unless it is *clear* that the [existing] party will provide adequate representation.'" (emphasis added) (citation omitted)). Federal Defendants diverge from Conservation Groups in numerous respects that makes it highly unlikely, if not a certainty, that they cannot adequately represent Conservation Groups' interests.

The Federal Circuit has applied a presumption of adequate representation when there is a government defendant. *Wolfsen*, 695 F.3d at 1316 (drawing from other circuits). However, the Supreme Court in *Berger v. North Carolina State Conference of the NAACP* recently called into question whether any presumption of adequate representation is appropriate. 597 U.S. 179, 196–97 (2022); *see Bost v. Ill. State Bd. of Elections*, 75 F.4th 682, 689 n.3 (7th Cir. 2023) (calling presumption of adequate representation into question in light of *Berger*); *Callahan v. Brookdale Senior Living Cmtys., Inc.*, 42 F.4th 1013, 1021 n.5 (9th Cir. 2022) (same); *cf. Wolfsen*, 695 F.3d at 1319–21 (Reyna, J., concurring) (explaining why a presumption of adequate representation is contrary to Rule 24). The Court explained, "Where the absentee's interest is similar to, but not identical with, that of one of the parties, that normally is not enough to trigger a presumption of adequate representation." *Berger*, 597 U.S. at 197 (cleaned up); *see also id.* at 196 ("Rather than endorse a presumption of adequacy, the [*Trbovich*] Court held that a movant's burden in

circumstances like these 'should be treated as minimal.'" (quoting *Trbovich*, 404 U.S. at 538, n.10)). Conservation Groups' interests are not identical to those of Federal Defendants.

Even if a presumption of adequate representation applied here (it does not, under *Berger*), it is overcome or negated if a prospective intervenor shows "divergence in either motivations or approaches between itself and the government as to this case"—in other words, divergence in interests. *Wolfsen*, 695 F.3d at 1317; *see Kane Cnty. v. United States*, 94 F.4th 1017, 1033 (10th Cir. 2024) (following *Berger* to conclude no presumption of adequate representation applied because conservation group's interests were not "'identical' to the United States' interests"); *Texas v. United States*, 805 F.3d 653, 662 (5th Cir. 2015) (stating presumption of adequate representation is overcome if prospective intervenor "demonstrate[s] that its interests diverge from the [government's] interests in a manner germane to the case"); *Superior Optical Labs, Inc. v. United States*, 171 Fed. Cl. 50, 54 n.3 (2024) ("Where a party and a proposed intervenor have distinct interests, the Federal Circuit does not evaluate whether a party's arguments ought to have satisfied a proposed intervenor, but whether the party and intervenor have different 'incentives affecting decisions about how to conduct the litigation.'" (quoting *Apotex, Inc. v. Daiichi Sankyo, Inc.*, 781 F.3d 1356, 1361 (Fed. Cir. 2015)). "[E]ven if the United States and [an intervenor] are pursuing the same form of relief for purposes of piggyback standing, that does not render their *interests* identical under Rule 24(a)(2)." *Kane Cnty.*, 94 F.4th at 1032 (explaining that equating relief and interests would create an improper *per se* bar to intervention); *see also Bost*, 75 F.4th at 688 ("For the potential intervenor and the named party to have 'the same goal,' it is not enough that they seek the same outcome in the case. . . . [T]hey have 'the same goal' only where the interests are genuinely 'identical.'"). Conservation Groups' interests, motivations,

and approaches diverge from those of Federal Defendants in several respects that could affect this litigation.

First, a presumption of adequate representation is rebutted when the broad scope of interests "the government is obligated to represent may differ from the would-be intervenor's particular interest." *Utah Ass'n of Cntys. v. Clinton*, 255 F.3d 1246, 1255 (10th Cir. 2001); *see e.g.*, *Wineries of the Old Mission Peninsula Ass'n v. Twp. of Peninsula*, 41 F.4th 767, 774–77 (6th Cir. 2022); *Mausolf v. Babbitt*, 85 F.3d 1295, 1303–04 (8th Cir. 1996). On numerous occasions when developing and subsequently implementing the MMPA Regulations, the government has inserted international trade policy, economic impacts, and practicality considerations into its approach. For example, the government has deferred implementing MMPA import bans out of concerns they would "undermine U.S. trade and adversely affect U.S. consumers" and "to provide harvesting nations with adequate time to assess marine mammal stocks, estimate bycatch, and develop regulatory programs that mitigate that bycatch." 88 Fed. Reg. 80193, 80193–94 (Nov. 17, 2023). Plaintiffs also contend NMFS was obligated to consider "reliance interests" of fisheries and seafood importers in deciding whether to implement a ban. Compl. ¶¶ 132–44. Conservation Groups do not share all of these interests that the government considers. Their interests are focused on protecting marine mammals from harmful bycatch in fisheries. *See, e.g.*, Hartl Decl. ¶¶ 4–10; Akland Decl. ¶¶ 2–11; Adler Decl. ¶¶ 3–6; Monsell Decl. ¶¶ 2–8. "Rule 24(a)(2) requires that the interests of [Conservation Groups] and the United States be *identical*, not just 'harmonious'" to find adequate representation. *Kane Cnty.*, 94 F.4th at 1033 (citation omitted); *see also Berger*, 597 U.S. at 197. Because Federal Defendants represent interests that Conservation Groups do not share, Federal Defendants cannot give Conservation Groups' narrower interests "the kind of primacy that [Conservation Groups] would

give them." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003); *see also Trbovich*, 404 U.S. at 538–39 ("Even if the Secretary is performing his duties, broadly conceived, as well as can be expected, the union member may have a valid complaint about the performance of 'his lawyer.'"). And without giving these interests the same importance that Conservation Groups would, the government cannot—and at least may not—adequately represent those interests.

Indeed, the only reason the government issued the challenged comparability decisions on September 2, 2025, was because Conservation Groups filed litigation to compel that action. This is precisely the sort of situation where courts find a likelihood of inadequate representation. *E.g.*, *Coal. of Cntys*, 100 F.3d at 845; *Idaho Farm Bureau*, 58 F.3d at 1398 (finding agency "was unlikely to make strong arguments in support of its own actions considering that it proceeded to make [the challenged] decision largely to fulfill the settlement agreement in the suit [prospective intervenors] filed"). Further, in the *NRDC II* settlement agreement, Federal Defendants expressly reserved the right to reconsider the September comparability findings "in accordance with 50 C.F.R. § 216.24(h)(8)(vii), or [to] comply with a court order," raising the very real possibility that Federal Defendants may not vigorously defend the comparability findings they were so reluctant to issue in the first place. *NRDC II* Settlement, Attach. A, at 4; *see Wineries*, 41 F.4th at 774 ("In assessing whether a proposed intervenor has fulfilled this requirement, courts must remember that certainty about future events is not required" because an applicant need only show "'that representation of his interest "*may be*" inadequate.'" (quoting *Trbovich*., 404 U.S. at 538 n.10)). The broader adversarial history between Conservation Groups and Federal Defendants regarding the MMPA Import Provisions—including litigation to ban imports from fisheries that catch and kill the vaquita—provides additional evidence that representation may be inadequate.

*See, e.g.*, *Coal. of Cntys.*, 100 F.3d at 845–46 (holding government did not adequately represent conservationist where history of litigation existed).

Second, while Conservation Groups agree with Federal Defendants' likely position that the import bans are lawful, Conservation Groups' arguments diverge from Federal Defendants' when it comes to many of the MMPA Import Provisions at the center of this suit. For example, Conservation Groups have a demonstrated interest in the application of robust legal standards to NMFS's comparability findings that authorize imports from fisheries that harm marine mammals. *See, e.g.*, *NRDC I*, 331 F. Supp. 3d 1338. Federal Defendants have opposed those standards. *See id.*; *see also Māui & Hector's Dolphin Defs.*, 2025 WL 2452468; *Sea Shepherd*, 606 F. Supp. 3d 1286. Conservation Groups have sought and will continue to seek to hold NMFS accountable in providing adequate explanations and imposing the statutorily required burden on applicant nations to provide reasonable proof of the impact their fisheries are having on marine mammals when supporting its comparability findings. *See, e.g.*, Compl. ¶¶ 143–148, *NRDC II*, 774 F. Supp. 3d 1348 (ECF No. 1); *see also Māui & Hector's Dolphin Defs.*, 2025 WL 2452468, at *3–12. Plaintiffs here have challenged the adequacy of NMFS's explanations and its alleged failure to use the best available science in numerous comparability findings. Compl. ¶¶ 105–123, 145–161.

Conservation Groups also diverge from NMFS on the consistency between the MMPA Regulations and the statutory requirements of the Import Provisions. For example, Conservation Groups take the position that bycatch may not be "in excess of" two "United States standards" that are not referenced in the implementing regulations: the MMPA's zero mortality rate goal and negligible impact standards. *See NRDC I*, 331 F. Supp. 3d at 1363–64 (citing 16 U.S.C. § 1371(a)(2)); *see also Māui & Hector's Dolphin Defs.*, 2025 WL 2452468, at *4–6. Plaintiffs here

argue that application of the MMPA Regulations is inconsistent with the MMPA's statutory requirements. Compl. ¶¶ 95–104. While Conservation Groups disagree with Plaintiffs' "best reading of § 1371(a)(2)," *id.* ¶ 102, they will likely also take a position adverse to Federal Defendants' interpretation of the provision.

Further, Conservation Groups and Federal Defendants are likely to make diverging arguments on any potential remedy if Plaintiffs prevail on the merits in this case. Plaintiffs here ask the Court to "set aside all import prohibitions resulting from those unlawful [comparability] determinations." Compl. 46 (Prayer for Relief). Conservation Groups' position is that the MMPA *requires* an import ban if a valid comparability determination is not in place. *See Sea Shepherd*, 606 F. Supp. 3d at 1324–25 & nn.62–63. Federal Defendants have taken the position that the only appropriate remedy is remand of the determination to NMFS without any action on implementation of a ban. *See Māui & Hector's Dolphin Defs.*, 2025 WL 2452468, at *13. Conservation Groups and Federal Defendants therefore are likely to be adverse on any remedy.

Conservation Groups are not required to show that these possible impacts *will* occur in order to satisfy the intervention requirements; it is enough that representation *may* be inadequate. *See Wineries*, 41 F.4th at 774; *Brumfield v. Dodd*, 749 F.3d 339, 345–46 (5th Cir. 2014) ("We cannot say for sure that the state's more extensive interests will *in fact* result in inadequate representation, but surely they might, which is all that the rule requires.").[9] As detailed above,

---

[9] The District Court for the District of Columbia persuasively explained why this standard makes sense:

> Requiring [the applicant] to monitor the DOJ's litigation posture from the sidelines until [the applicant] disagrees with a decision by the agency is inefficient and impractical; indeed, [the applicant] likely would have limited, if any, insight into the DOJ's strategy during the litigation, and once [the applicant] did learn of a hypothetical shift in the DOJ's position, such as a decision to release a specific category of materials, it might be too late for [the applicant] to undue any damage

Federal Defendants diverge from Conservation Groups in numerous respects that makes it highly unlikely, if not a certainty, that they cannot adequately represent Conservation Groups' interests.

## III.    Alternatively, the Court Should Permit Conservation Groups to Intervene Permissively.

If the Court denies intervention as of right, Conservation Groups ask the Court to grant permissive intervention. "Subject to the statutory provisions of 28 U.S.C. § 2631(j), permissive intervention is governed by Rule 24(b) of the Rules of this Court." *Auxin Solar*, 698 F. Supp. 3d at 1377 (citation omitted); *see* 28 U.S.C. § 2631(j)(1) ("Any person who would be adversely affected or aggrieved by a decision in a civil action pending in the Court of International Trade may, by leave of court, intervene in such action," subject to three exceptions not applicable here.). "The court may permit a party to intervene under USCIT Rule 24(b) if such a party 'has a claim or defense that shares with the main action a common question of law or fact.'" *Auxin Solar*, 698 F. Supp. 3d at 1377 (quoting USCIT R. 24(b)(1)(B)). Whether to grant permissive intervention is within the court's discretion, and is based on consideration of:

> (1) whether proposed defendant-intervenors have shown that they would be adversely affected or aggrieved by the outcome of the instant action; (2) whether proposed defendant-intervenors' defenses and arguments share a common question of law or fact with those of the government; (3) the timeliness of their motions to intervene; and (4) whether permitting intervention would unduly delay or prejudice plaintiffs in the instant action.

*Id.* at 1378. Conservation Groups meet each of the four factors.

First, as explained above, Plaintiffs action, if successful, would impair the interests of Conservation Groups and their members. *See supra* Section II.C; *see also Auxin Solar*, 698 F. Supp. 3d at 1379 (explaining phrase "adversely affected or aggrieved" is interpreted broadly).

---

done. . . . It also might be too late for [the applicant] to intervene at all, as both Rule 24(a) and Rule 24(b) require a timely motion to intervene.

*100Reporters LLC v. U.S. Dep't of Just.*, 307 F.R.D. 269, 280 & n.2 (D.D.C. 2014).

Second, Conservation Groups' defenses share common questions of both law (the requirements of the Import Provisions and the MMPA Regulations) and fact (the challenged comparability findings and the evidentiary support for them) with those of the existing parties. Third, Conservation Groups' motion is timely. *See supra* Section II.A. Finally, intervention by Conservation Groups at this early stage would not delay this case or prejudice the existing parties or impose any burdens beyond "the bounds of everyday case management." *Berger*, 597 U.S. at 200. If granted intervention, Conservation Groups intend to follow any briefing schedules set by the parties and to support the efficient adjudication of this case. Adding one additional party to an APA case involving review on the agency record "would not 'unduly delay or prejudice the adjudication of the original parties' rights.'" *Ereğli Demir ve Çelik Fabrikaları T.A.Ş. v. U.S. Int'l Trade Comm'n*, 639 F. Supp. 3d 1245, 1259 (Ct. Int'l Trade 2023) (quoting USCIT R. 24(b)).

In addition to meeting the standards for permissive intervention, Conservation Groups' "participation could add some material aspect beyond what is already present." *Auxin Solar*, 698 F. Supp. 3d at 1379 (quoting *Wolfsen*, 695 F.3d at 1318). Conservation Groups seek intervention to ensure that this Court is presented with a key perspective on the issues involved in this case that may aid the Court's review. During their decades of work combatting marine mammal bycatch in domestic and foreign fisheries, Conservation Groups have gained particular knowledge and expertise on the MMPA's Import Provisions, MMPA Regulations, and their implementation. And they have expertise on the MMPA more broadly, which provides "the statutory markers of 'United States standards'" against which bycatch is assessed under the Import Provisions. *Sea Shepherd*, 606 F. Supp. 3d at 1294–95; *see* Cummings Decl. ¶ 5; Trujillo Decl. ¶ 6; Millward Decl. ¶¶ 5–7. The heart of Plaintiffs' case involves how the Import

28

Provisions framework must operate. Conservation Groups disagree with most, but not all, of Plaintiffs' interpretations, and with some, but not all of Federal Defendants' interpretations. Any challenge by Conservation Groups to certain comparability findings would likely make different arguments than those presented by the existing parties in this case. The Court would benefit from having all perspectives in front of it when evaluating Plaintiffs' wholesale challenge to NMFS's entire comparability finding process.

Conservation Groups also have deep knowledge and expertise regarding the facts underlying the challenged comparability findings. For example, their staff participate in numerous international bodies that work to address marine mammal bycatch in fisheries throughout the world. *E.g.*, Millward Decl. ¶ 7; Trujillo Decl. ¶ 6; Cummings Decl. ¶ 5. This sort of information is highly relevant to the Court's review, both of the preliminary injunction standards (i.e., whether evidence of marine mammal harm tips the public interest factor against an injunction) and of the merits of Plaintiffs' argument that Federal Defendants failed to consider the available, relevant information and science. *See* Compl. ¶¶ 145–154.

Conservation Groups have a significant interest in protecting marine mammals from bycatch in foreign fisheries and in using and enjoying affected marine ecosystems. The Groups also have an interest in a valid interpretation of the requirements and limits of the MMPA. Given the importance of the issues involved in this case, the stake Conservation Groups have in upholding factually supported and legally required import bans, and the early stage of the litigation, the Court should at a minimum allow permissive intervention.

## CONCLUSION

For the above reasons, Conservation Groups respectfully ask this Court to grant them intervention as of right, or, in the alternative, by permission, to protect their and their members' interests in the MMPA import bans challenged here.

Respectfully submitted this 22nd day of October, 2025.

/s/ Natalie Barefoot
Natalie Barefoot
Earthjustice
180 Steuart St. #194330
San Francisco, CA 94105
T (415) 217-2000
nbarefoot@earthjustice.org

Sabrina Devereaux
Christopher Eaton
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
T (206) 343-7340
sdevereaux@earthjustice.org
ceaton@earthjustice.org

*Attorneys for Center for Biological Diversity, Natural Resources Defense Council, and Animal Welfare Institute*

Sarah Uhlemann
Center for Biological Diversity
120 State Avenue NE #268
Olympia, WA 98501
T (206) 327-2344
suhlemann@biologicaldiversity.org

*Attorney for Center for Biological Diversity*

Stephen Zak Smith
Natural Resources Defense Council
544 E Main St., Unit B
Bozeman, MT 59715
T (406) 556-9305
zsmith@nrdc.org

*Attorney for Natural Resources Defense Council*

## CERTIFICATE OF COMPLIANCE

This document complies with the word count limitations as provided for in the Court's Standard Chambers Procedures 2(B) because it contains 9,175 words, excluding the parts of the brief exempted by Standard Chambers Procedures 2(B)(1)(c).


*/s/ Natalie Barefoot*
Natalie Barefoot