## UNITED STATES COURT OF INTERNATIONAL TRADE

NATIONAL FISHERIES INSTITUTE, et al.

*Plaintiffs,*

v.

UNITED STATES, et al.,

*Defendants,*

and

CENTER FOR BIOLOGICAL DIVERSITY, et al.,

*Intervenor-Defendants.*

Case No. 1:25-cv-00223-JAL

Before: Judge Joseph A. Laroski, Jr.

## [PROPOSED] INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iv

INTRODUCTION .................................................................................. 1

LEGAL BACKGROUND ........................................................................ 3

    I.    MMPA Standards for Fisheries Bycatch. ............................................ 5

    II.    The MMPA Import Provisions and Implementing Regulations. ............................ 7

FACTUAL BACKGROUND .................................................................... 8

    I.    Bycatch Is the Greatest Threat to Marine Mammals Worldwide. ........................... 8

    II.    NMFS Gave Nations and Importers Nearly Ten Years of Notice Before Implementing Any MMPA Import Bans. ............................................ 11

    III.    NMFS Denied Comparability Findings for Fisheries with Serious Bycatch Problems and Inadequate Regulation. ............................................ 13

LEGAL STANDARDS ............................................................................ 15

ARGUMENT ......................................................................................... 16

    I.    Plaintiffs Are Not Likely to Succeed on the Merits. ................................ 17

        A.    The Determinations Are Consistent with the MMPA. ........................... 18

            1.    The MMPA Requires an Import Ban Unless Exporting Nations Provide Reasonable Proof that Bycatch Does Not Exceed U.S. Standards. .................................. 18

            2.    The Plain Meaning of U.S. Standards Includes All U.S. Standards Governing Bycatch in Domestic Fisheries. ................... 20

            3.    The Standards in the MMPA Regulations Are Necessary to Determine Whether Bycatch in Foreign Fisheries Is, In Fact, In Excess of U.S. Standards. ................................ 23

            4.    Plaintiffs Fail to Demonstrate that NMFS's Application of the MMPA Regulations in the Challenged Comparability Findings Was Contrary to Statute. ................................ 25

        B.    Plaintiffs Have Not Established NMFS Failed to Consider Relevant Evidence. .................................. 27

C.    Plaintiffs Have Not Established NMFS Unlawfully Failed to Consider Reliance Interests..........................................................29

D.    Any Violation from a Reapplication Restriction Does Not Warrant Enjoining the Import Bans. ..........................................31

II.    Plaintiffs Have Failed to Establish a Sufficient Likelihood of Irreparable Harm. ..........................................................................32

A.    Plaintiffs Have Not Alleged Harm from Nearly 99% of the Import Bans They Seek to Enjoin..........................................32

B.    Plaintiffs' Alleged Harm from the BSC Fishery Import Bans Is Unsupported and Largely Self-Inflicted. ...................................33

1.    Conclusory and Unsupported Assertions....................................33

2.    Self-Inflicted Harms......................................................35

III.    The Equities and Public Interest Weigh Heavily Against an Injunction. ..............38

A.    An Injunction Would Have Significant Harms to Marine Mammals..........................................................................38

B.    There Is No Public Interest in Allowing Imports that Violate the MMPA. ..........................................................................41

CONCLUSION........................................................................44

CERTIFICATE OF COMPLIANCE ............................................................46

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Akal Sec., Inc. v. United States*,
   87 Fed. Cl. 311 (2009) ...................................................................38

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ........................................................42

*Altx, Inc. v. United States*,
   211 F. Supp. 2d 1378 (Ct. Int'l Trade 2002) .................................32

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
   271 F. Supp. 2d 230 (D.D.C. 2003) ...............................................40

*Ass'n of Priv. Sector Colls. & Univs. v. Duncan*,
   681 F.3d 427 (D.C. Cir. 2012) .......................................................28

*Avail Vapor, LLC v. U.S. Food & Drug Admin.*,
   55 F.4th 409 (4th Cir. 2022) ....................................................30, 31

*Aviation Consumer Action Project v. Washburn*,
   535 F.2d 101 (D.C. Cir. 1976) .......................................................33

*BlephEx, LLC v. Myco Indus., Inc.*,
   24 F.4th 1391 (Fed. Cir. 2022) ......................................................16

*Califano v. Yamasaki*,
   442 U.S. 682 (1979).......................................................................17

*CRAssociates, Inc. v. United States*,
   103 Fed. Cl. 23 (2012) ...................................................................35

*Ctr. for Biological Diversity v. Pritzker*,
   No. 14-cv-00157 (Ct. Int'l Trade Aug. 1, 2016)............................11

*Ctr. for Marine Conservation v. NMFS*,
   No. 99-00152, 2000 WL 33964303 (D. Haw. June 23, 2000)..............22

*Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge
207 v. Raimondo*,
   18 F.4th 38 (1st Cir. 2021)........................................................39, 41

*Earth Island Inst. v. Mosbacher*,
   746 F. Supp. 964 (N.D. Cal. 1990) ................................................43

*Elkem Metals Co. v. United States*,
   135 F. Supp. 2d 1324 (Ct. Int'l Trade 2001) ......................33, 34, 35

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016)..................................................................................29

*Eskridge Rsch. Corp. v. United States*,
  92 Fed. Cl. 88 (2010) ...............................................................................40

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*,
  98 F.4th 1180 (9th Cir. 2024) ..................................................................39

*HMTX Indus. LLC v. United States*,
  No. 2023-1891, 2025 WL 2726274 (Fed. Cir. Sept. 25, 2025) .................27

*Int'l Custom Prods., Inc. v. United States*,
  30 C.I.T. 21 (Ct. Int'l Trade 2006) ...........................................................34

*Int'l Fresh Trade Corp. v. United States*,
  26 F. Supp. 3d 1363 (Ct. Int'l Trade 2014) ..............................................35

*J. Conrad LTD v. United States*,
  457 F. Supp. 3d 1365 (Ct. Int'l Trade 2020) ............................................34

*Kentuckians for Commonwealth Inc. v. Rivenburgh*,
  317 F.3d 425 (4th Cir. 2003) ....................................................................32

*Kisor v. Wilkie*,
  588 U.S. 558 (2019)..................................................................................16

*League of Women Voters of the U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ......................................................................41

*Lewis v. Casey*,
  518 U.S. 343 (1996)..................................................................................31

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)............................................................................16, 20

*Māui & Hector's Dolphin Defs. NZ Inc. v. NMFS* (*MHDD*),
  No. 24-00218, 2025 WL 2452468 (Ct. Int'l Trade Aug. 26, 2025).............. *passim*

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*,
  463 U.S. 29 (1983)....................................................................................16

*Mozilla Corp. v. FCC*,
  940 F.3d 1 (D.C. Cir. 2019) ................................................................30, 31

*Nat. Res. Def. Council, Inc. v. Evans*,
  232 F. Supp. 2d 1003 (N.D. Cal. 2002) ....................................................41

*Nat. Res. Def. Council, Inc. v. Lutnick* (*NRDC II*),
 774 F. Supp. 3d 1348 (Ct. Int'l Trade 2025) ................................................ *passim*

*Nat. Res. Def. Council, Inc. v. Ross* (*NRDC I*),
 331 F. Supp. 3d 1338 (Ct. Int'l Trade 2018) ................................................ *passim*

*Otter Prods., LLC v. United States*,
 37 F. Supp. 3d 1306 (Ct. Int'l Trade 2014) ........................................................ 33

*Quince Orchard Valley Citizens Ass'n v. Hodel*,
 872 F.2d 75 (4th Cir. 1989) ................................................................................ 38

*Retractable Techs., Inc. v. United States*,
 739 F. Supp. 3d 1330 (Ct. Int'l Trade 2024) ...................................................... 32

*Rodriguez v. Dep't of Veterans Affs.*,
 8 F.4th 1290 (Fed. Cir. 2021) ............................................................................ 27

*Rotkiske v. Klemm*,
 589 U.S. 8 (2019) ................................................................................................ 20

*Sea Shepherd N.Z v. United States*,
 606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022) .................................................. *passim*

*Seko Customs Brokerage, Inc. v. United States*,
 719 F. Supp. 3d 1279 (Ct. Int'l Trade 2024) ...................................................... 32

*Sierra Club v. U.S. Army Corps of Eng'rs*,
 645 F.3d 978 (8th Cir. 2011) .............................................................................. 40

*Silfab Solar, Inc. v. United States*,
 892 F.3d 1340 (Fed. Cir. 2018) .......................................................................... 16

*Solenex LLC v. Bernhardt*,
 962 F.3d 520 (D.C. Cir. 2020) ...................................................................... 29, 30

*SSAB N. Am. Div. v. U.S. Bureau of Customs & Border Prot.*,
 571 F. Supp. 2d 1347 (Ct. Int'l Trade 2008) ...................................................... 42

*Trump v. CASA, Inc.*,
 606 U.S. 831 (2025) ............................................................................................ 16

*Trump v. Int'l Refugee Assistance Project*,
 582 U.S. 571 (2017) ............................................................................................ 16

*Wind Tower Trade Coal. v. United States*,
 741 F.3d 89 (Fed. Cir. 2014) ........................................................................ 38, 41

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................15, 16, 38

**Statutes**

5 U.S.C. § 706 ......................................................................................16, 31

16 U.S.C. § 1361 ...............................................................................3, 4, 42

16 U.S.C. § 1362 ..................................................................................5, 21

16 U.S.C. § 1371 ................................................................................ *passim*

16 U.S.C. § 1386 ....................................................................................4, 5

16 U.S.C. § 1387 ................................................................................ *passim*

16 U.S.C. § 1853 ......................................................................................22

16 U.S.C. § 1862 ......................................................................................22

**Regulations**

50 C.F.R. § 216.3 .............................................................................7, 21, 24

50 C.F.R. § 216.24 .............................................................................. *passim*

50 C.F.R. § 229.2 ......................................................................................6

50 C.F.R. § 229.7 ....................................................................................22

**Legislative Materials**

118 Cong. Rec. 25270 (1972) ...................................................................43

**Federal Register**

80 Fed. Reg. 48172 (Aug. 11, 2015) .........................................................23

81 Fed. Reg. 54390 (Aug. 15, 2016) .........................................7, 11, 24, 36

85 Fed. Reg. 69515 (Nov. 3, 2020) ......................................................12, 36

87 Fed. Reg. 63955 (Oct. 21, 2022) ..........................................................12

88 Fed. Reg. 80193 (Nov. 17, 2023) ..........................................................12

89 Fed. Reg. 77789 (Sep. 24, 2024) .............................................................6

90 Fed. Reg. 42395 (Sept. 2, 2025) ......................................................13, 14

## Other Authorities

11A Charles A Wright et al., *Fed. Prac. & Proc. Civ.* § 2948.1 (3d ed. 2025)..............................35

NMFS, *2020 Final List of Foreign Fisheries* (Oct. 8, 2020),
https://www.fisheries.noaa.gov/foreign/international-affairs/list-foreign-
fisheries ................................................................................................................36

NMFS, *Criteria for Determining Negligible Impact under MMPA Section
101(a)(5)(E)*, Procedural Directive 02-204-02 (June 17, 2020),
https://media.fisheries.noaa.gov/dam-migration/02-204-02.pdf................................6

NOAA Fisheries, *2025 Final Comparability Finding Approvals* (2025),
https://www.fisheries.noaa.gov/s3/2025-08/2025-Final-Comparability-
Finding-Approvals-lined.pdf .....................................................................................13

NOAA Fisheries, *2025 Final Comparability Finding Denial*s (2025),
https://www.fisheries.noaa.gov/s3/2025-08/2025-Final-Comparability-
Finding-Denials-lined.pdf...........................................................................................13

NOAA, *Marine Mammal Protection Act Import Provisions Comparability
Finding Application Final Report: Brazil* (2025),
https://www.fisheries.noaa.gov/s3/2025-08/Brazil-Final-2025-508.pdf; ................14

NOAA, *Marine Mammal Protection Act Import Provisions Comparability
Finding Application Final Report: Mexico* (2025),
https://www.fisheries.noaa.gov/s3/2025-08/Mexico-final-2025-508.pdf................15

NOAA, *Marine Mammal Protection Act Import Provisions Comparability
Finding Application Final Report: Republic of Korea* (2025),
https://www.fisheries.noaa.gov/s3/2025-08/Republic-of-Korea-final-2025-
508.pdf .....................................................................................................................27

NOAA, *Marine Mammal Protection Act Import Provisions Comparability
Finding Application Final Report: Russian Federation* (2025),
https://www.fisheries.noaa.gov/s3/2025-08/Russia-final-2025-508.pdf ..................14

## INTRODUCTION

Bycatch in commercial fisheries is the number one threat to marine mammals worldwide. When Congress enacted the Marine Mammal Protection Act (MMPA) in 1972, it sought to reduce marine mammal bycatch within U.S. fisheries toward zero and to pressure foreign fisheries to do the same. Since its inception, the MMPA has required the government to ban seafood imports from any fishery that causes serious injury or death to marine mammals "in excess of United States standards." 16 U.S.C. § 1371(a)(2). But for 50 years, seafood from those fisheries has been crossing the U.S. border and making its way onto American plates, while the government has ignored its directive from Congress. That will change on January 1, 2026, when, as a result of a decade-long administrative process, the government will finally ban imports from fisheries that do not meet the MMPA's standard. Plaintiffs seek to bar the government from implementing *any* of those bans, based on arguments specific to a few fisheries. Plaintiffs fail to carry their burden for a preliminary injunction as to those individual fisheries, let alone for the sweeping injunction they request. The Court should deny the motion.

The MMPA places the burden on exporting nations to provide "reasonable proof" of their fisheries' effects on marine mammals. That proof must be sufficient for Federal Defendants to determine whether bycatch exceeds applicable limits or standards. In 2016, Defendant National Marine Fisheries Service (NMFS) published regulations implementing the reasonable proof requirement and establishing the framework for exporting nations to obtain a comparability determination that their fisheries satisfy the MMPA Import Provisions and may export to the United States. NMFS effectively gave exporting nations and stakeholders nearly ten years of notice of the required reasonable proof. On September 2, 2025, NMFS published comparability determinations for approximately 2,500 fisheries from 135 nations. It concluded that the vast

majority of fisheries around the globe *do* meet U.S. bycatch standards.[1] However, the agency denied comparability findings for 272 fisheries from 46 nations that do not meet U.S. standards. Federal Defendants will ban imports from those fisheries on January 1, 2026, as the MMPA requires.

Among those that will recieve a ban are four blue swimming crab (BSC) fisheries in the Philippines, Vietnam, and Indonesia that pose a known bycatch threat to imperiled dolphins and porpoises. Three of those fisheries employ gillnets, the most dangerous type of fishing gear for entangling marine mammals. Plaintiff importers of BSC have moved to enjoin import bans on those fisheries. Pls.' Mot. Prelim. Inj., ECF No. 17 [hereinafter PI Mot.].

But Plaintiffs' injunction request is not limited to just those four fisheries; rather they appear to seek to enjoin *all* import bans set to take effect on January 1, 2026. That would mean that other fisheries, many of which are infamous for killing high, unsustainable numbers of marine mammals, would escape a ban, as would fisheries from nations that did not even apply for a comparability finding. Plaintiffs' arguments, however, focus on only a few crab fisheries. Those narrow arguments do not establish a right to an injunction against each and every import ban for the other 268 fisheries.

Nor do Plaintiffs carry their heavy burden to justify an even narrower injunction against the four BSC import bans. First, Plaintiffs are not likely to prevail on the merits of their claim that NMFS violated the MMPA by denying comparability findings based on the absence of bycatch information, because the MMPA expressly *requires* NMFS to condition import decisions on receiving adequate bycatch information from nations seeking to export to the

---

[1] Applicant-Intervenor-Defendant Conservation Groups do not agree with NMFS that all of these fisheries meet U.S. standards and may challenge those positive determinations in the coming months.

United States. For Plaintiffs' claim to succeed would require ignoring Congress' directive requiring "reasonable proof." Second, Plaintiffs overstate the harm from the four challenged BSC import bans by ignoring the numerous other sources of swimming crab—including Indonesia's pot and trap fisheries—that received comparability findings and thus can continue to supply U.S. markets. Further, any harm from the select BSC import bans is largely self-inflicted, because Plaintiffs have long been aware these fisheries were at risk of receiving an MMPA import ban. Third, the equities do not favor rescuing Plaintiffs from their business decisions when enjoining the import bans puts imperiled marine mammals at risk. Finally, there is no public interest in requiring the government to allow seafood imports that the MMPA mandates shall be banned. Nor do Plaintiffs address the significant adverse effects their injunction would have on U.S. fishers, whose industry and livelihoods are undermined when they must compete with cheap imports from fisheries that do not comply with equivalent bycatch mitigation standards.

For these reasons, the Court should deny Plaintiffs' prelimininary injunction motion.

## LEGAL BACKGROUND

Congress enacted the MMPA to protect and restore marine mammal populations that "are, or may be, in danger of extinction or depletion as a result of man's activities," and to ensure that these populations do not become "diminish[ed] beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part." 16 U.S.C. § 1361(1), (2). Congress intended to protect not just marine mammals within the United States, but also those abroad, recognizing that "marine mammals have proven themselves to be resources of great international significance, esthetic and recreational as well as economic, and … they should be protected and encouraged to develop to the greatest extent feasible." *Id.* § 1361(6). Accordingly, the MMPA seeks to reduce bycatch of marine mammals in both the United States

and globally to insignificant levels approaching zero. *Id.* §§ 1361, 1371(a)(2), 1387(a)(1). With great precision, the statute recognizes that three fundamental elements are necessary to achieve this goal: 1) understanding what level of bycatch is low enough to avoid declines in a particular marine mammal population, 2) on-the-water measures that sufficiently limit bycatch, and 3) having monitoring to ensure those measures are in fact working and limiting bycatch to acceptable levels. The MMPA imposes mandatory standards for domestic fisheries to accomplish these elements, including stock assessments (i.e., population assessments), bycatch limits and take reduction plans, and monitoring of fishing activity. *E.g.*, 16 U.S.C. §§ 1386(a), 1387(b), (d), (f).

To achieve the goal of insignificant bycatch internationally, the MMPA requires Federal Defendants to "ban the importation of commercial fish or products from fish which have been caught with commercial fishing technology which results in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." *Id.* § 1371(a)(2). The MMPA places the burden on foreign governments to provide NMFS with "reasonable proof" of the "effects" their fisheries have on marine mammals for the agency to assess whether they meet that requirement. *Id.* § 1371(a)(2)(A) [collectively, hereinafter the Import Provisions].

While the MMPA does not define the term "United States standards" within the Import Provisions, the statute's clear standards for domestic fisheries elucidate what those standards are. This Court has on multiple occasions defined "United States standards" to include those key domestic elements. *Māui & Hector's Dolphin Defs. NZ Inc. v. NMFS* (*MHDD*), No. 24-00218, 2025 WL 2452468, at *4, *10 (Ct. Int'l Trade Aug. 26, 2025); *Sea Shepherd N.Z v. United States*, 606 F. Supp. 3d 1286, 1294 (Ct. Int'l Trade 2022); *Nat. Res. Def. Council, Inc. v. Ross* (*NRDC I*), 331 F. Supp. 3d 1338, 1346, 1363 (Ct. Int'l Trade 2018). Ultimately, "the MMPA

aims to protect marine mammals by setting forth standards applicable to both domestic commercial fisheries and to foreign fisheries that wish to export their products to the United States." *Nat. Res. Def. Council, Inc. v. Lutnick* (*NRDC II*), 774 F. Supp. 3d 1348, 1353 (Ct. Int'l Trade 2025).

## I.    <u>MMPA Standards for Fisheries Bycatch.</u>

In order to ensure the MMPA's population goals can be met, the statute first requires conducting "stock assessments" for each marine mammal population. The assessments evaluate the population size and trends, and the threats and other factors affecting the population. 16 U.S.C. § 1386(a); *see* Decl. of Dr. Timothy Ragen ¶¶ 35-54. That information is used to calculate the Potential Biological Removal (PBR) level: "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population." 16 U.S.C. § 1362(20).[2] In effect, PBR sets the maximum level of serious injury and mortality a marine mammal population can tolerate from fisheries and other sources before falling below the MMPA's sustainable population objective. Ragen Decl. ¶¶ 23-27.

PBR is the standard that triggers federal regulation to limit bycatch. If bycatch exceeds PBR, a marine mammal population is assigned a "strategic stock" designation (any marine mammal listed or likely to be listed as threatened or endangered under the Endangered Species Act is also automatically a strategic stock, regardless of bycatch rate). 16 U.S.C. § 1362(19). The MMPA requires NMFS to implement a "take reduction plan" to reduce bycatch mortality below the PBR level within six months for any strategic stock. *Id.* §§ 1387(f)(1), (2); *see id.* §

---

[2] PBR is a numerical value that is calculated as: the minimum population estimate of the stock, times one-half the maximum theoretical or estimated net productivity rate of the stock at a small population size, times a recovery factor of between 0.1 and 1.0. 16 U.S.C. § 1362(20).

1387(c)(3) (requiring fishers that cause bycatch to comply with take reduction plan requirements). For the most vulnerable marine mammal populations, stricter requirements apply to enable these populations to recover. In particular, fisheries may not cause incidental mortality or serious injury that has more than a "negligible impact" on the stock, which is capped at just a small percentage of the PBR level. *Id.* §§ 1371(a)(5)(E)(i); NMFS, *Criteria for Determining Negligible Impact under MMPA Section 101(a)(5)(E)*, Procedural Directive 02-204-02 (June 17, 2020), https://media.fisheries.noaa.gov/dam-migration/02-204-02.pdf; *see* Ragen Decl. ¶¶ 31-33.

Ultimately, U.S. fisheries must meet the MMPA's "goal that the incidental mortality or serious injury of marine mammals occurring in the course of commercial fishing operations be reduced to insignificant levels approaching a zero mortality and serious injury rate"—known as the zero mortality rate goal. 16 U.S.C. § 1387(a)(1); *see* Ragen Decl. ¶¶ 28-30. NMFS defines the upper limit of bycatch that meets that goal as 10% of the PBR value. 50 C.F.R. § 229.2. For fisheries that do not meet the zero mortality rate goal level, the MMPA requires NMFS to implement a take reduction plan with measures that will reduce the fisheries' bycatch to insignificant levels within five years. 16 U.S.C. § 1387(b)(4), (f)(2).

To be able to know how much bycatch is occurring, the MMPA requires NMFS to "establish a program to monitor incidental mortality and serious injury of marine mammals during the course of commercial fishing operations," which must be sufficient to "obtain statistically reliable estimates." *Id.* § 1387(d). Often, this involves using onboard observers on a sufficient portion of the fishing fleet to ensure a statistically valid sample size. *Id.* NMFS then uses monitoring data to determine if the PBR, negligible impact, and zero mortality rate bycatch limits are being exceeded. *See, e.g.*, 89 Fed. Reg. 77789, 77791 (Sep. 24, 2024). This Court has

expressly held all of these elements are "statutory markers of 'United States standards.'" *Sea Shepherd*, 606 F. Supp. 3d at 1295.

## II.    <u>The MMPA Import Provisions and Implementing Regulations.</u>

Although Congress enacted the MMPA in 1972, Federal Defendants largely failed to comply with their statutory duty under the Import Provisions for decades. In 2016, NMFS finally issued regulations to implement those Provisions. 81 Fed. Reg. 54390 (Aug. 15, 2016) (codified at 50 C.F.R. § 216.24(h) [hereinafter MMPA Regulations]); *see Sea Shepherd*, 606 F. Supp. 3d at 1311-15.

The MMPA Regulations establish a process for foreign nations to submit "reasonable proof" of the effects that their export fisheries have on marine mammals and documentary evidence demonstrating that they comply with the Import Provisions' standards. 16 U.S.C. § 1371(a)(2)(A); 50 C.F.R. § 216.24(h)(6)(i), (ii). NMFS reviews the evidence and determines in a "comparability finding" whether nations have met the conditions identified in the MMPA Regulations. 50 C.F.R. § 216.3 (defining "comparability finding"); 81 Fed. Reg. at 54391-93. To issue a positive comparability finding, NMFS must find that the exporting nation "maintains a regulatory program with respect to the fishery that is comparable in effectiveness to the U.S. regulatory program with respect to incidental mortality and serious injury of marine mammals." 50 C.F.R. § 216.24(h)(6)(iii)(B). NMFS must make certain specified findings and consider mandatory factors before making such a finding. *Id.* § 216.24(h)(6)(iii), (h)(7); *see Sea Shepherd*, 606 F. Supp. 3d at 1312. A comparability finding authorizes imports for four years from its publication, unless otherwise indicated. 50 C.F.R. § 216.24(h)(8)(iv). Any fishery without a "valid" comparability finding in effect is considered out of compliance with the Import Provisions, and Federal Defendants must ban imports from these fisheries. *Id.* § 216.24(h)(1)(i), (ii), (h)(9); *see Sea Shepherd*, 606 F. Supp. 3d at 1324 (explaining if "fisheries do not have valid

comparability findings in effect, the importation of fish or fish products into the United States from them is per se in excess of U.S. standards … and thereby prohibited").

## FACTUAL BACKGROUND

**I.    <u>Bycatch Is the Greatest Threat to Marine Mammals Worldwide.</u>**

Bycatch occurs when marine mammals die or sustain injuries from becoming entangled or hooked in fishing gear targeting other marine species. Bycatch is the most significant threat to marine mammals worldwide: over 650,000 whales, dolphins, and porpoises are estimated to die each year from bycatch, though that is likely an underestimate. Wang Decl. ¶ 20. In addition to the suffering of individual animals, bycatch has caused severe declines and even extinction of marine mammal populations. *Id.* ¶ 26, Ex. B, at 1 (Wade et al. 2021).

Among the fishing gear types that kill marine mammals, gillnets (which hang like a fence in the water) are the most dangerous and are responsible for the vast majority of deaths because they present such a high risk of marine mammals becoming entangled and drowning. *Id.* ¶¶ 21, 23, 25. Marine mammal bycatch in gillnets is so common that experts "assume that bycatch is occurring in areas where gillnets and marine mammals co-occur"; "[i]t is often not a question of whether bycatch occurs, but how many animals are caught." *Id.* ¶ 29. Other types of gear, including longlines, trawls, traps, and pots, also regularly entangle marine mammals. *Id.* ¶ 22.

Marine mammal bycatch threatens several species in Southeast Asia. Bycatch is an existential threat to the Irrawaddy dolphin. The International Union for Conservation of Nature (IUCN) has assessed the species as Endangered, with subpopulations in Indonesia, the Philippines, and Vietnam assessed as Critically Endangered because they each number fewer than 100 animals. *Id.* ¶ 42(a). Bycatch is "well documented, severe, pervasive, and potentially increasing," and mortality "in small-scale fisheries, especially gillnets" is the "primary factor responsible for population declines." *Id.*, Ex. E, at 1, 2 (Minton, 2017). Due to their extremely

vulnerable state, experts have warned that all bycatch "must be eliminated" for Irrawaddy

dolphin subpopulations—particularly in Indonesia and the Philippines—to avoid extinction. *Id.*,

Ex. C, at 289 (Brownell et al. 2019). Finless porpoises (assessed by IUCN as Vulnerable) and

Indo-Pacific humpback dolphins (also Vulnerable) are also gravely threatened by bycatch in

these nations. *Id.* ¶ 42(b)-(d).

Blue swimming crab (BSC) fisheries catch and kill marine mammals, including

endangered Irrawaddy dolphins. Though monitoring and reporting of these incidents are limited,

researchers reported that five Irrawaddy dolphins "were accidentally killed in bottom-set nylon

gillnets used to catch crabs" in just eight months in the Philippines in 2001, *id.* ¶ 44, Ex. F, at 49

(Smith et al. 2004), with another 10 deaths from gillnet bycatch documented from 2009 to 2011.

*id.* ¶ 44, Ex. G, at 1039 (Whitty 2016). The Philippines government has acknowledged "injury of

Irrawaddy dolphins" in the BSC gillnet fishery. PI Mot. Ex. B, at 8 (Philippines Comp. Finding).

In Indonesia, 18 Irrawaddy dolphins were observed to have died from gillnet entanglement

between 2000 and 2019, though it is hard to know from which gillnet fishery. PI Mot. Ex. C, at 8

(Indonesia Comp. Finding) (also noting (at 6) deaths of imperiled finless porpoise and Indo-

Pacific humpback dolphins due to likely gillnet interactions).

In addition to these documented bycatch events, it is virtually certain that undocumented

Irrawaddy dolphin bycatch is occurring because gillnets pose such a high risk of entanglement

and BSC gillnet fisheries overlap with the species. As marine mammal expert Dr. John Wang

states, "[a]nywhere gillnets and small cetaceans overlap greatly in distribution (and time),

bycatch is certain to occur. … The absence of evidence of bycatch should not be interpreted as

evidence that bycatch is nonexistent, or of little consequence to a marine mammal population."

Wang Decl. ¶ 25, Ex. B, at 5 ("gillnets[ ] nearly always catch marine mammals if they co-

occur"); *see also, e.g.*, Philippines Comp. Finding 8 (stating BSC fisheries "co-occur with Irrawaddy dolphins and have a high-risk of interactions based on gear type"). The Monterey Bay Aquarium Seafood Watch program has rated BSC gillnet fisheries in Indonesia, the Philippines, and Vietnam as "Red" with a recommendation to avoid purchasing due to marine mammal bycatch concerns and "ineffective" fisheries management overall.[3]

BSC fisheries that use pot and trap gear also cause Irrawaddy dolphin bycatch. This gear consists of a series of traps set along the seabed and connected to one another with rope lines in which marine mammals can become entangled. Researchers have reported deaths in bottom-set crab pots in the Philippines based on fisher interviews. Wang Decl. ¶ 48, Ex. G, at 1039; *see also id.* Ex. C, at 289 (noting need for restrictions on crab pots in the Philippines to address Irrawaddy dolphin bycatch threats). Additionally, Seafood Watch rates BSC pot and trap fisheries in Indonesia, the Philippines, and Vietnam as "Red," in part due to marine mammal bycatch risk.[4]

BSC fisheries also pose a serious bycatch threat to other small marine mammals with which the fisheries overlap in distribution, such as the pantropical spotted dolphin, long-snouted spinner dolphins, short-beaked common dolphin, Indo-Pacific bottlenose dolphins, rough-toothed dolphins, and others. *See, e.g.*, Indonesia Comp. Finding 6. For example, 25 species of small cetaceans inhabit Indonesian waters; though, other than Irrawaddy dolphin, no absolute

---

[3] Monterey Bay Aquarium Seafood Watch, *Blue Swimming Crab: Indonesia Bottom gillnet, pots* (Aug. 7, 2023), https://www.seafoodwatch.org/recommendation/crab/blue-swimming-crab-39606) (Indonesia Seafood Watch Report), attached as Ex. 1; Monterey Bay Aquarium Seafood Watch, *Blue Swimming Crab: Philippines Set gillnets, Pots* (Dec. 19, 2018), https://www.seafoodwatch.org/recommendation/crab/blue-swimming-crab-401?species=285 (Philippines Seafood Watch Report), attached as Ex. 2; Monterey Bay Aquarium Seafood Watch, *Blue Swimming Crab: Vietnam and Gulf of Thailand Bottom gillnet, Pots, Set gillnets, Traps* (Aug. 7, 2023), https://www.seafoodwatch.org/recommendation/crab/blue-swimming-crab-39277?species=285 (Vietnam Seafood Watch Report), attached as Ex. 9.
[4] Indonesia Seafood Watch Report; Philippines Seafood Watch Report; Vietnam Seafood Watch Report.

abundance population estimates exist for these species. Wang Decl. Ex. D, at 37. Bycatch is

"considered the major threat to all marine mammals in Indonesian waters, and especially to small

cetaceans," yet the extent is unknown because bycatch monitoring is limited. *Id.* at 40.

## II.    NMFS Gave Nations and Importers Nearly Ten Years of Notice Before Implementing Any MMPA Import Bans.

Since 1972, the MMPA has required NMFS to ban the import of fish products that do not

meet U.S. bycatch standards. 16 U.S.C. § 1371(a)(2); *NRDC I*, 331 F. Supp. 3d at 1363 ("The

text of the Imports Provision imposes on the Government an immediate and continuous duty to

ban fish caught with fishing gear that kills marine mammals, such as the vaquita, in excess of

United States standards."). However, Federal Defendants largely ignored their statutory duty for

decades until Conservation Groups sued to force action. *See* Am. Settlement Agreement & Stip.

Dismissal, *Ctr. for Biological Diversity v. Pritzker*, No. 14-cv-00157 (Ct. Int'l Trade Aug. 1,

2016) (ECF No. 28-1).

As a result, in 2016, NMFS finalized the MMPA Regulations implementing the MMPA

Import Provisions after receiving 92,000 comments, including from Plaintiff National Fisheries

Institute (NFI) and other fishing industry representatives. 81 Fed. Reg. at 54395; Letter from

Lisa Weddig, NFI, to John Henderschedt, Dir. of Office of Int'l Affairs, re: Proposed Rule: Fish

and Fish Product Import Provisions of the Marine Mammal Protection Act (Nov. 9, 2015)

[hereinafter NFI 2015 Comment], attached as Ex. 3. However, NMFS did not require immediate

compliance with the MMPA Regulations. Instead, NMFS granted exporting nations an initial

five-year extension until January 1, 2022, before import bans would come into effect "to provide

nations with adequate time to assess marine mammal stocks, estimate bycatch, and develop

regulatory programs to mitigate that bycatch." 81 Fed. Reg. at 54397, 54413; *see* 50 C.F.R.

§ 216.24(h)(2)(ii).

In November 2020, NMFS extended the compliance deadline until January 1, 2023, due to disruptions from the coronavirus pandemic. 85 Fed. Reg. 69515, 69516 (Nov. 3, 2020). NMFS explained the extension would "result in fewer disruptions to international seafood trade and a more predictable impact to U.S. seafood wholesalers and retailers when the regulation enters into full effect." *Id.*; *see also* Letter from John Connelly, NFI, to Paul Doremus, NMFS, re: Proposed Rule: Modification of Deadlines Under the Fish and Fish Product Import Provisions of the Marine Mammal Protection Act, Interim Final Rule (Dec. 3, 2020) [hereinafter NFI 2020 Comment] (agreeing extension would reduce impacts), attached as Ex. 4. NMFS extended the compliance deadline again in October 2022, and yet again in November 2023, ultimately to January 1, 2026. 87 Fed. Reg. 63955 (Oct. 21, 2022); 88 Fed. Reg. 80193 (Nov. 17, 2023).

Conservation Groups sued the responsible agencies in 2024 over their continued delay and reached a settlement under which the agencies would implement legally required bans in four steps. First, by January 15, 2025, NMFS was required to "issue notifications to all harvesting nations that NMFS ha[d] preliminarily determined will be denied a comparability finding for one or more of their fisheries." Stip. Settlement Agmt. ¶ 1(b), *NRDC II*, 774 F. Supp. 3d 1348 (No. 24-cv-00148) (ECF No. 29) [hereinafter *NRDC II* Settlement]; *see* 50 C.F.R. § 216.24(h)(8)(iii)(A)(1) (requiring NMFS to notify nations of preliminary determinations). NMFS was also required to "provide each such harvesting nation an opportunity to submit *reliable* information to refute the preliminary denial on or before April 1, 2025." *NRDC II* Settlement ¶ 1(c) (emphasis added). NMFS confirmed its compliance with this requirement. Letter from A. Koprowski, Dep't of Just., to C. Marshall, U.S. Dep't of Justice (Jan. 16, 2025) (on file with Center for Biological Diversity). Thus all nations, including Indonesia, the Philippines, and Vietnam, were provided clear notification of which fisheries were going to be banned and were

given a full opportunity to respond and provide additional information to Federal Defendants. Second, NMFS was required to "issue final comparability findings for all harvesting nations" by September 1, 2025. *NRDC II* Settlement ¶ 1(c). Finally, NMFS, in coordination with the Departments of Treasury and Homeland Security, "shall identify and prohibit the importation of fish and fish products into the United States from all harvesting nations or fisheries for which NMFS has denied a comparability finding." *Id.* ¶ 1(d).

In total, foreign fisheries have been apprised since at least 2016 of precisely what standards they needed to meet to continue exporting seafood to the United States. Foreign fisheries were granted nine years of extensions to do so, in addition to the 44-year de facto exemption they enjoyed since Congress enacted the Import Provisions. This is ample time to ensure these fisheries meet bycatch standards.

## III.    **NMFS Denied Comparability Findings for Fisheries with Serious Bycatch Problems and Inadequate Regulation.**

On September 2, 2025, NMFS finally determined which foreign fisheries must be banned under the MMPA. 90 Fed. Reg. 42395 (Sept. 2, 2025); 16 U.S.C. § 1371(a)(2). NMFS reviewed approximately 2,500 fisheries from 135 different nations and concluded that the vast majority meet U.S. standards. 90 Fed. Reg. at 42397; *see* NOAA Fisheries, *2025 Final Comparability Finding Approvals* (2025), https://www.fisheries.noaa.gov/s3/2025-08/2025-Final-Comparability-Finding-Approvals-lined.pdf [hereinafter 2025 CF Approvals]. NMFS denied comparability findings for 272 fisheries that do not meet U.S. standards. NOAA Fisheries, *2025 Final Comparability Finding Denial*s (2025), https://www.fisheries.noaa.gov/s3/2025-

Final-Comparability-Finding-Denials-lined.pdf [hereinafter 2025 CF Denials]; 90 Fed. Reg. at

42398.[5]

For certain nations, NMFS denied comparability findings for all of the nations' export

fisheries. 90 Fed. Reg. at 42395. For example, neither Venezuela nor Iran applied to continue

exporting. *Id.* at 42398. Other nations, like Russia, were denied comparability findings for all

export fisheries because their comparability applications were vague, replete with mistakes, and

just plain dubious. *E.g.*, NOAA, *Marine Mammal Protection Act Import Provisions*

*Comparability Finding Application Final Report: Russian Federation* 14 (2025),

https://www.fisheries.noaa.gov/s3/2025-08/Russia-final-2025-508.pdf (finding Russia's report

that bycatch is "zero" for nearly every marine mammal throughout its national fisheries is "not

likely" accurate).

For other nations, NMFS denied comparability for a subset of fisheries that NMFS found

use high-risk gear, lack mitigation measures, and pose a threat to at-risk marine mammal species.

90 Fed. Reg. at 42397. For example, NMFS banned imports from Brazil's bluefish and mackerel

gillnet fishery because Brazil reported a stunning Franciscana dolphin bycatch rate of more than

five times the annual reported bycatch limit of 100 animals. NOAA, *Marine Mammal Protection*

*Act Import Provisions Comparability Finding Application Final Report: Brazil* 3 (2025),

https://www.fisheries.noaa.gov/s3/2025-08/Brazil-Final-2025-508.pdf; *see* A.N. Zerbini et al.,

*Pontoporia blainvillei, Franciscana. The IUCN Red List of Threatened Species* 1 (2017),

https://www.iucnredlist.org/species/17978/123792204 (describing how Franciscana dolphins are

---

[5] The Finding Denials lists 240 fisheries, but does not include the denials for fisheries associated
with the four countries that did not submit an application—Benin (2), Haiti (7), Iran (5), and
Venezuela (18). NMFS mistakenly placed those nations' fisheries on the 2025 CF Approvals list
(at 12, 57, 62, 123-24), even though they were clearly denied, *see* PI Mot. Ex. A, at 18 (Decision
Memo); 90 Fed. Reg. at 42398.

already threatened by bycatch and are expected to suffer further population decline), attached as Ex. 5. NMFS also banned the import of blue shrimp from fisheries in Mexico's Upper Gulf of California because they "contribut[e] to the exceedance of the bycatch limit" for the gravely imperiled vaquita. NOAA, *Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report: Mexico* 14-15 (2025),

https://www.fisheries.noaa.gov/s3/2025-08/Mexico-final-2025-508.pdf.

At issue here, NMFS denied comparability findings for swimming crab gillnet and entangling net fisheries in the Philippines and Indonesia, swimming crab pot and trap fisheries in the Philippines, and combined gillnet/entangling net, trawl, and trap/stationary net fisheries in Vietnam. 2025 CF Denials 3, 6-7, 12. Of note, NMFS *granted* a comparability finding for swimming crab pot and trap fisheries in Indonesia. 2025 CF Approvals 62. In addition to Indonesia's swimming crab pot and trap fisheries, NMFS granted comparability findings to nearly four dozen other swimming crab fisheries globally that Plaintiffs do not address.[6]

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

---

[6] 2025 CF Approvals 3, 5-8, 10, 46-48, 55, 59, 61, 65, 71, 73, 79, 82, 90, 94, 107, 109, 113-15, 118-19, 124 (approving swimming crab fisheries for Australia, Bangladesh, China, Colombia, Costa Rica, Greece, India, Japan, Mexico, Myanmar, New Zealand, Nicaragua, Spain, South Korea, Taiwan, Thailand, Tunisia, Turkiye, and Yemen). These approved fisheries include crab from the Portunidae family and its subgenus *Callinectes*. *See* U.S. Int'l Trade Comm'n, *Investigation No. TA_201-71, Crabmeat from Swimming Crabs: Determination and Views of the Commission* (Aug. 2000), https://www.usitc.gov/publications/docs/pubs/201/pub3349.pdf, attached as Ex. 6 (finding domestic crabmeat (mainly *Callinectes sapidus*) is substantially identical to imported crabmeat (mainly *Portunus pelagicus*)).

and that an injunction is in the public interest." *Id.* at 20; *accord Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018). "The burden is always on the movant to show that it is likely to succeed on the merits." *BlephEx, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1398 (Fed. Cir. 2022). A court may not issue an injunction that is any "broader than necessary to provide complete relief to each plaintiff with standing to sue." *Trump v. CASA, Inc.*, 606 U.S. 831, 831 (2025); *see also Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) ("[A] court 'need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case.'" (citation omitted)).

Courts review challenges to a final agency action under the Administrative Procedure Act (APA) to determine whether the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); *see Sea Shepherd*, 606 F. Supp. 3d at 1306. An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Questions of statutory interpretation are for a court's independent judgment. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). Courts give appropriate deference to an agency's interpretations of its own ambiguous regulations under *Kisor v. Wilkie*, 588 U.S. 558, 573-79 (2019).

## ARGUMENT

Plaintiffs seek to prevent the federal government from implementing legally required import bans on fisheries that fail to meet U.S. bycatch standards. It is not clear from Plaintiffs' motion which import bans they are seeking to enjoin. Their proposed order covers "the import

prohibitions that are set to take effect January 1, 2026," broadly. PI Mot. 44. Parts of their motion also suggest they are seeking to enjoin import bans of all 272 fisheries (240 by their count) that were denied a comparability finding. *E.g.*, *id.* at 1, 8, 15 n.1 (describing three Asian nations' determinations as "examples" "[f]or purposes of this motion"). Such an injunction would prevent NMFS from banning imports from nations that did not even apply for comparability findings, such as Venezuela, as well as those that were denied a comparability finding because they are well known to catch and kill imperiled marine mammals. *See supra* pp. 13-15.

The focus of Plaintiffs' arguments on each injunction factor, however, address only four BSC fisheries from three nations (the Philippines, Indonesia, and Vietnam). They make no argument about the other 268 fisheries, so have not met their burden to establish a right to an injunction against any of the bans for those fisheries. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established."). Even for the BSC fisheries, it is often unclear where Plaintiffs' arguments concern BSC gillnet fisheries (all of which are banned), pot and trap fisheries (only some of which are banned), or both, so it is difficult to decipher which of the injunction factors Plaintiffs even seek to establish for each of the four BSC fisheries. A failure to establish a right to an injunction for any given BSC fishery necessitates excluding that fishery from the scope of any injunction. Overall, Plaintiffs have not met their heavy burden to establish that all four factors justify an injunction against *any* import ban.

## I.    <u>Plaintiffs Are Not Likely to Succeed on the Merits.</u>

As an initial matter, Plaintiffs make no merits arguments concerning determinations for any fishery other than the BSC fisheries in the Philippines, Indonesia, and Vietnam. Plaintiffs thus have not met their burden to show any likelihood of success in a challenge to the

comparability denials for the other 268 fisheries. Plaintiffs have not shown they are likely to succeed on the merits for the BSC fisheries, either.

### A.    The Determinations Are Consistent with the MMPA.

The MMPA unambiguously requires that Federal Defendants "shall ban" imports from any foreign fishery where marine mammal bycatch is "in excess of United States standards." 16 U.S.C. § 1371(a)(2). And, to comply with that mandate, the MMPA unambiguously requires that the Secretary "shall insist on reasonable proof" from foreign governments about the effects of their fisheries on marine mammals. *Id.* § 1371(a)(2)(A). Plaintiffs claim that NMFS exceeded its statutory authority under these provisions by conditioning the 2025 comparability findings "on adopting U.S.-style regulatory forms, processes, monitoring templates, or documentation requirements." PI Mot. 24-25. Not so. By considering stock assessments, bycatch limits, mitigation measures, and monitoring—factors this Court has expressly held are applicable "United States standards"—NMFS was applying its nondiscretionary statutory duty to "insist on reasonable proof" regarding the "effects" of the fisheries on marine mammals as a required condition of making an import determination. Plaintiffs fail to establish that NMFS unlawfully exceeded its authority by simply requiring reasonable proof of exporting nations of the effects their fisheries have on marine mammals.

### 1.    The MMPA Requires an Import Ban Unless Exporting Nations Provide Reasonable Proof that Bycatch Does Not Exceed U.S. Standards.

The Import Provisions place the burden on exporting nations to prove that their fisheries do not cause bycatch in excess of U.S. standards. This is clear from the requirement that the Secretary "shall *insist* on reasonable *proof* from the government of any nation" when making import decisions. 16 U.S.C. § 1371(a)(2)(A) (emphases added); *see NRDC II*, 774 F. Supp. 3d at 1353 (stating purpose of this requirement is "[t]o ensure compliance with th[e] mandate" to ban

18

imports if bycatch exceeds U.S. standards). That same provision indicates that such proof is required before "fish or fish products *will be* exported"—future tense—to the United States. 16 U.S.C. § 1371(a)(2)(A) (emphasis added). If an exporting nation fails to provide reasonable proof showing that bycatch does not exceed U.S. standards, then the MMPA requires Federal Defendants to ban imports from those fisheries.

Insisting on proof means that exporting nations cannot simply claim their marine mammal bycatch does not exceed U.S. standards; they must back up the claim with substantive, convincing evidence, i.e., "reasonable proof." As discussed, the reasonable proof must encompass at a minimum the elements necessary to understand if bycatch is exceeding U.S. standards: information about the marine mammal population's status, how much bycatch is occurring, measures to limit bycatch, and whether the measures are working as intended. This is all information required to know whether bycatch in domestic fisheries is exceeding the MMPA's standards, so it is similarly required to know whether foreign fisheries are achieving outcomes comparable in effectiveness to U.S. standards, Ragen Decl. ¶ 34, 50; it is "outcomes-relevant information," PI Mot. 28. There can be no "reasonable proof" that bycatch meets U.S. standards if it is unknown how much bycatch a marine mammal population can tolerate, there are not sufficiently stringent bycatch limits, *or* it is unknown what level of bycatch is actually occurring to determine whether bycatch measures are adequate.

Plaintiffs get the burden backwards. They suggest the MMPA puts the burden on NMFS to demonstrate that bycatch *is* in excess of U.S. standards. *E.g.*, *id.* at 9. This contravenes the plain text of the MMPA, which requires the exporting government to provide the reasonable proof and obligates the Secretary to ban imports from any fishery whose bycatch exceeds U.S. standards. The MMPA does not say the Secretary shall ban imports only "if NMFS provides

reasonable proof" that bycatch exceeds U.S. standards. *See Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) ("It is a fundamental principle of statutory interpretation that absent provisions cannot be supplied by the courts." (cleaned up)). It also would make no sense to put the evidentiary burden on NMFS, because then a nation could avoid an import ban simply by withholding information on bycatch in its fisheries. The MMPA accordingly conditions import decisions on whether the exporting nation has provided sufficient proof that the effects of bycatch in its fishery are not, in fact, in excess of U.S. standards.

### 2.    The Plain Meaning of U.S. Standards Includes All U.S. Standards Governing Bycatch in Domestic Fisheries.

It is not clear what Plaintiffs interpret "United States standards" to mean. However, it *is* clear what Congress meant by the phrase, which this Court has independently interpreted on multiple occasions. *MHDD*, 2025 WL 2452468, at *4–11; *Sea Shepherd*, 606 F. Supp. 3d at 1294-95, 1319; *NRDC I*, 331 F. Supp. 3d at 1346, 1354-55 (rejecting government's argument that term is "ambiguous"), 1362-63; *cf.* PI Mot. 22 (asserting Court must interpret statute independently under *Loper Bright*).

At a minimum, required U.S. standards are those setting the maximum permissible rate of serious injury or mortality that the MMPA considers acceptable to meet population outcomes: the PBR level and zero mortality rate goal, *Sea Shepherd*, 606 F. Supp. 3d at 1295; *NRDC I*, 331 F. Supp. 3d at 1354–55, 1363, and, for strategic stocks, the negligible impact limit, *MHDD*, 2025 WL 2452468, at *6; *see generally supra* pp. 3-7. The MMPA requires the Secretary to ban imports that are in excess of U.S. standards if they incidentally kill marine mammals "in excess of their PBR." *NRDC I*, 331 F. Supp. 3d at 1365. The statute also requires the Secretary to ban "offending imports in order to meet the" zero mortality rate goal. *Id.* at 1354 (quoting 16 U.S.C. § 1371(a)(2)). And, to ensure that vulnerable stocks of marine mammals are adequately protected

from bycatch, NMFS must evaluate whether fisheries meet "the negligible impact standard or an effective equivalent." *MHDD*, 2025 WL 2452468, at \*6 (citing 16 U.S.C. § 1371(a)(5)(E)(i)).

However, NMFS cannot evaluate if these standards are met without certain information. First, NMFS must know what numeric *bycatch limit* is comparable to U.S. limits to determine if bycatch exceeds U.S. standards, which requires stock assessments. Specifically, to calculate a metric comparable to PBR, NMFS must know the minimum population estimate of the stock, the maximum theoretical net productivity rate, and a recovery factor. *See* 16 U.S.C. § 1362(20); 50 C.F.R. § 216.3 (defining "bycatch limit" for comparability purposes as the PBR or a "comparable scientific metric").

A "minimum population estimate" is "an estimate of the number of animals in a stock" that "provides reasonable assurance that the stock size is equal to or greater than the estimate." 16 U.S.C. § 1362(27). That means NMFS must have sufficient information on a stock's abundance to calculate a valid PBR level or equivalent that the foreign fishery must not exceed, which requires a stock assessment or other study with comparable reliability. *See NRDC I*, 331 F. Supp. 3d at 1363-64 (citing 16 U.S.C. § 1386(a)); *see also MHDD*, 2025 WL 2452468, at \*10-11 (requiring exporting nation to have system for estimating abundance that is "effectively comparable" to MMPA's stock assessment requirements); *Sea Shepherd*, 606 F. Supp. 3d at 1295 (same). Because the negligible impact and zero mortality rate goal levels are calculated based on the PBR level, those standards also depend on having sufficient population information. *See supra* pp. 5-6.

Second, NMFS needs to have sufficient information on marine mammal bycatch to know whether the *rate* of serious injury and mortality is "in excess of" the PBR, negligible impact, or zero mortality rate goal levels. That necessarily requires fisheries to be adequately monitored to

observe and report incidents of marine mammal bycatch. Ragen Decl. ¶¶ 55, 61. As this Court

noted, "a city c[an]not use evidence of a lack of speeding tickets issued as proof that people are

not speeding if the police department is not monitoring the roadways and enforcing the speed

limit." *Sea Shepherd*, 606 F. Supp. 3d at 1320. A comparability finding that lists the mortality

rate as "unknown" does not mean bycatch meets U.S. standards, nor could it.

Not just any monitoring will do. It must be capable of acquiring "statistically reliable

estimates" of incidental mortality and serious injury. 16 U.S.C. § 1387(d)(1)(A); *see MHDD*,

2025 WL 2452468, at *9-10. For this reason, Congress, NMFS, and the courts have often

required putting independent observers on fishing boats to document bycatch because self-

reporting of bycatch by fishers is notoriously unreliable. *E.g.*, 16 U.S.C. §§ 1853(b)(3), 1862(b);

50 C.F.R. § 229.7; Ragen Decl. ¶¶ 62-67; *Ctr. for Marine Conservation v. NMFS*, No. 99-00152,

2000 WL 33964303, at *2 (D. Haw. June 23, 2000) (requiring 100% observer coverage). There

must be enough monitoring data to reliably determine how much total bycatch is occurring, and

if and when it exceeds an applicable limit. Ragen Decl. ¶ 34.

The critical point is that assessing "actual mortality or serious injury relative to U.S.

standards—supported by reasonable proof of effects," PI Mot. 24, requires knowing both the

acceptable level of bycatch (i.e., PBR, negligible impact, and zero mortality rate goal or

functional equivalents) and how much bycatch is occurring. So achieving a "results-oriented

standard," *id.* at 9, necessitates this information. Absent sufficient information, then there is no

reasonable proof that the fisheries are achieving the results-oriented U.S. standards.

Of course, meeting a results-oriented standard demands more than just knowing if the

standard is met, but taking corrective action to actually achieve the standard if it is ever

exceeded. The MMPA does this domestically by requiring implementation of a take reduction

plan any time the PBR or zero mortality rate goal is exceeded. 16 U.S.C. §§ 1387(b)(4), (c)(3), (f)(1), (2); *see Sea Shepherd*, 606 F. Supp. 3d at 1317-19. If bycatch of a threatened or endangered population exceeds the negligible impact threshold, NMFS must take immediate "emergency" action to protect the population. 16 U.S.C. § 1371(a)(5)(E). Reasonable proof that a fishery's bycatch does not exceed U.S. standards requires evidence that the harvesting nation, too, will take prompt, sufficient corrective action if bycatch exceeds the applicable, comparable bycatch limits at any point.

### 3. The Standards in the MMPA Regulations Are Necessary to Determine Whether Bycatch in Foreign Fisheries Is, In Fact, In Excess of U.S. Standards.

NMFS promulgated the MMPA Regulations to establish a framework for evaluating whether there is "reasonable proof" that bycatch in a foreign fishery does not exceed applicable U.S. standards. 80 Fed. Reg. 48172, 48188 (Aug. 11, 2015) (explaining NMFS was requiring that "nations provide documentary evidence of sufficient detail and an attestation that the evidence is accurate to allow NMFS to evaluate the effects on ocean mammals of the commercial fishing technology"). The Regulations require sufficient information to evaluate the components discussed above: population assessments, bycatch monitoring, and corrective action. The MMPA Regulations do not require nations to adopt identical mechanisms to the United States, but rather require that nations' mechanisms be "comparable in effectiveness." 50 C.F.R. § 216.24(h)(6)(iii).

Like the Import Provisions, the MMPA Regulations put the evidentiary burden on exporting nations by requiring them to apply for a comparability finding and provide "documentary evidence demonstrating that the harvesting nation has met the conditions [for a comparability finding] for each … fisher[y], including reasonable proof as to the effects on marine mammals of the" fisheries. *Id.* § 216.24(h)(6)(i). If there is not sufficient evidence of

comparable effectiveness to U.S. bycatch standards, NMFS may not issue a comparability finding. *Id.* § 216.24(h)(6)(iii).

To find comparable effectiveness, NMFS must be able to conclude that the nation's regulatory program "provides for, or effectively achieves comparable results" as certain elements required to evaluate whether bycatch is exceeding acceptable limits: in particular, "[m]arine mammal assessments that estimate population abundance," a "requirement to implement measures in the export fishery designed to" limit bycatch, "monitoring procedures in the export fishery designed to estimate incidental mortality or serious injury … including an indication of the statistical reliability of those estimates," "[c]alculation of bycatch limits," and a "[c]omparison of the incidental mortality and serious injury of each marine mammal stock … in relation to the bycatch limit for each stock." *Id.* § 216.24(h)(6)(iii)(C)*(1)*, *(3)*, *(4)-(6)*; *see* 81 Fed. Reg. at 54391-92 ("The conditions specified in paragraph (h)(6)(iii) are features of the U.S. regulatory program."). The regulations define "bycatch limit" as the PBR or a "comparable scientific metric." 50 C.F.R. § 216.3.[7] These requirements ensure that NMFS has sufficient information to determine what a comparable bycatch limit would be, how much bycatch is actually occurring under any required mitigation measures, and whether the bycatch rate is exceeding acceptable limits. As discussed above, absent *sufficient* information on bycatch monitoring *and* marine mammal population status, there is no way for NMFS to conclude that bycatch is not in excess of U.S. standards; so it cannot issue a determination that the fishery *has* effectively achieved comparable results as those required by U.S. standards. Accordingly,

---

[7] The regulations fail to require bycatch limits comparable to the MMPA's negligible impact or zero mortality rate goal limits. While the failure to require compliance with these standards would be inconsistent with the Imports Provisions, that is not at issue here, where NMFS denied comparability findings on other grounds. *See MHDD*, 2025 WL 2452468, at *4-6 (holding comparability finding unlawful because it did not address these standards).

consistent with the statutory burden of proof, the MMPA Regulations specify that any fishery without a "valid comparability finding" is deemed out of compliance with the Import Provisions. *Id.* § 216.24(h)(1)(i).

### 4. <u>Plaintiffs Fail to Demonstrate that NMFS's Application of the MMPA Regulations in the Challenged Comparability Findings Was Contrary to Statute.</u>

Plaintiffs assert NMFS violated the MMPA by denying comparability findings for the BSC fisheries based on "paperwork gaps and the absence of U.S.-style documentation" rather than "outcomes." PI Mot. 25. This ignores the statutory structure, the relevant regulations, and totally misses the point. Because the applicant nations failed to provide reasonable proof of the effects of their fisheries on marine mammals, NMFS was unable to establish that the "outcomes" are comparable in effectiveness to U.S. standards. What Plaintiffs characterize as "paperwork gaps" are actually an absence of the "reasonable proof" that the MMPA requires for fisheries to be permitted to export to the United States.

As discussed below, the Southeast Asia BSC fisheries are known to present a serious bycatch risk to marine mammals. *See infra* Argument Section III.A; Wang Decl. ¶¶ 45, 47, 48. That risk formed the starting point for NMFS's assessments. *E.g.*, Philippines Comp. Finding 8 ("In particular, the gillnet fisheries, including the blue swimming crab fisheries, co-occur with Irrawaddy dolphins and have a high-risk of interactions.").

At its simplest, even determining whether bycatch in these fisheries meets a "results-oriented standard" requires having evidence on how much bycatch is occurring (i.e., the results), but NMFS found none. The Philippines, Indonesia, and Vietnam all report that the amount of bycatch in the denied BSC fisheries is "unknown" and provide no evidence of an observer program. Indonesia Comp. Finding 4, 6; Philippines Comp. Finding 4, 6; PI Mot. Ex. D, at 7, 10 (Vietnam Comp. Finding). This means that those nations do not collect reliable bycatch

information *at all* for those fisheries. *See* Wang Decl. ¶ 47 (describing how little to no marine mammal monitoring occurs in these nations). By including an insistence on reasonable proof requirement, Congress disallowed imports in precisely this situation, where a nation asserts it achieves comparable results without any evidence to back up the claim.

It is notable that nowhere in their motion, complaint, or declarations do Plaintiffs aver that any of the BSC fisheries *do* achieve comparable results to U.S. standards. Plaintiffs fail to demonstrate the nations at issue provided any reliable information to NMFS to establish that their bycatch rates are below PBR or other applicable metrics.

Plaintiffs instead simply cite a handful of selected facts about the fisheries. PI Mot. 25-26 & n.4. These are red herrings. While Plaintiffs note dockside inspections and port sampling occur in the Philippines and Indonesia, those procedures do not monitor how many marine mammals are actually captured during fishing at sea (given that fishers do not retain bycaught marine mammals for landing). Logbooks are not sufficiently reliable sources of monitoring, which is why the United States and most other nations require onboard observers. *See* Ragen Decl. ¶ 64. And even if "pot and trap gear presents lower entanglement risk for marine mammals than gillnets," PI Mot. 25, that does not necessarily mean their bycatch is within U.S. standards. Gillnets are among the most dangerous types of fishing gear for marine mammal entanglement and death. *See supra* pp. 8-10. Claiming pot and trap gear is not dangerous because it poses a lower risk is akin to claiming a car crash poses no risk of bodily harm simply because it presents less risk than a plane crash. Moreover, it undermines Plaintiffs' claim that import bans on BSC *gillnet* fisheries are unjustified. Plaintiffs ultimately do not point to any evidence, much less reasonable proof, establishing that the serious injury or mortality of marine mammals in the BSC fisheries—or any other fishery that was denied a comparability finding—meets U.S. bycatch

26

limit standards.

NMFS's denial of comparability findings where it was unable to establish that bycatch rates do not exceed U.S. standards is consistent with the MMPA's plain language. What Plaintiffs claim was an unlawful "process-centric approach" is actually compelled by the statutorily and regulatorily required process for evaluating "reasonable proof" of bycatch.[8] Conversely, had NMFS defaulted to granting comparability findings when it lacked sufficient bycatch information, that would have been contrary to the statute's reasonable proof requirement and conservation purpose.

### B.     Plaintiffs Have Not Established NMFS Failed to Consider Relevant Evidence.

Plaintiffs assert that NMFS failed to consider available, relevant evidence based solely on a footnote in NMFS's Decision Memorandum suggesting NMFS did not "consider submissions outside formal comment periods." PI Mot. 27-29 (citing Decision Memo. 8 n.16, PI Mot. Ex. A). Regardless of this admittedly oddly-worded footnote, numerous comparability findings demonstrate that NMFS *did* consider such submissions. *E.g.*, Indonesia Comp. Finding 11 ("NMFS has taken the information [submitted by Conservation Groups] into consideration, as appropriate, in our evaluations."); NOAA, *Marine Mammal Protection Act Import Provisions Comparability Finding Application Final Report: Republic of Korea* (2025),

---

[8] Plaintiffs' vague suggestion that NMFS lacks authority to regulate the "significant economic activity" here misses the point that Congress has expressly directed Federal Defendants to regulate the significant economic activity of seafood trade through MMPA import bans. PI Mot. 26; *see Rodriguez v. Dep't of Veterans Affs.*, 8 F.4th 1290, 1305 (Fed. Cir. 2021) ("An issue that is merely alluded to and not developed as an argument in a party's brief is deemed waived."). "Such 'clear congressional authorization' for the challenged [import bans] means that this cannot be a major questions case." *HMTX Indus. LLC v. United States*, No. 2023-1891, 2025 WL 2726274, at *12 (Fed. Cir. Sept. 25, 2025) (quoting *West Virginia v. EPA*, 597 U.S. 697, 724 (2022)).

https://www.fisheries.noaa.gov/s3/2025-08/Republic-of-Korea-final-2025-508.pdf (South Korea

Comparability Finding) (same).

Moreover, Plaintiffs offer no indication that they even attempted to provide fishery-

specific information to NMFS. They cannot claim NMFS arbitrarily disregarded their

submissions if they made no submissions. *Cf. Ass'n of Priv. Sector Colls. & Univs. v. Duncan*,

681 F.3d 427, 448 (D.C. Cir. 2012) (rejecting argument because party "points to no data or study

the Department ignored"). Plaintiffs generally discuss their efforts to "promote sustainability" in

the BSC fisheries, but point to no documents, data, or any other source of information on those

efforts that was presented to NMFS but ignored. PI Mot. 28. Remarkably, Plaintiffs acknowledge

that NMFS *did* discuss that information in the comparability findings. *Id.* at 28-29. NMFS

simply concluded there was not *sufficient* information to demonstrate bycatch levels do not

exceed U.S. standards, given known bycatch risks. Indonesia Comp. Finding 6-7 (finding

effectiveness of mitigation "unknown"; not "not pertinent" as Plaintiffs claim, PI Mot. 29). The

issue is not that NMFS failed to consider relevant information, but that Plaintiffs disagree with

the conclusions NMFS reached after considering that information.

While Plaintiffs repeatedly argue the test for comparability findings is whether the

harvesting nation's program is "comparable in effectiveness to U.S. requirements," nowhere do

Plaintiffs provide evidence that the regulatory programs for those fisheries achieve comparable

effectiveness. They cite no evidence that bycatch rates are below PBR levels, meet the zero

mortality rate goal, have no more than a negligible impact on strategic stocks, or otherwise meet

the suite of requirements the regulations require for comparability. For all their dissatisfaction

with NMFS's comparability finding documents, at the end of the day, there is no "reasonable

proof" that bycatch in these fisheries does not exceed U.S. standards. Plaintiffs have not shown

NMFS's determinations to that effect are arbitrary and capricious.

### C.   Plaintiffs Have Not Established NMFS Unlawfully Failed to Consider Reliance Interests.

Plaintiffs argue the 2025 Determinations are arbitrary because NMFS failed to address Plaintiffs' reliance on the 2016 MMPA Regulations. While an agency must account for reliance interests "[w]hen an agency *changes* its existing position," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (emphasis added), NMFS did not change its existing position with the 2025 Determinations. Rather, it was implementing the very regulations on which Plaintiffs claim they relied. NMFS was under no obligation to address Plaintiffs' reliance interests on the 2016 Regulations.

A party bringing a reliance interest claim must articulate harm that is "specifically identified, reasonably incurred, and causally tied to the" prior policy. *Solenex LLC v. Bernhardt*, 962 F.3d 520, 529 (D.C. Cir. 2020) (stating "unidentified and unproven reliance interests are not a valid basis on which to undo agency action"). Plaintiffs' claim is that they acted in reliance on the policy in "[t]he 2016 rule and subsequent extensions" (i.e., the MMPA Regulations), and that NMFS "abandoned" the regulations' approach when making the 2025 Determinations. PI Mot. 31-32. But as discussed above, NMFS followed the requirements of the MMPA Regulations when issuing the challenged denials. Nothing about its policy or position changed. The MMPA Regulations have always required "documentary evidence" and "reasonable proof" of bycatch effects as necessary conditions for a fishery to receive a comparability finding. 50 C.F.R. § 216.24(h)(6)(i). And they have always required a harvesting nation's regulatory program to include sufficient "[m]arine mammal assessments," "monitoring procedures," calculated "bycatch limits," mitigation "measures," and other specific components to ensure that fisheries are, in fact, demonstrating bycatch outcomes that are comparable in effectiveness to U.S.

standards. *Id.* § 216.24(h)(6)(iii)(B), (C). If a nation does not have sufficient marine mammal abundance data or conduct sufficient bycatch monitoring, the regulations require NMFS to deny a comparability finding. *Id.* ("The following are conditions for the Assistant Administrator to issue a comparability finding for the fishery … ."). Requiring exporting nations to meet those conditions in the 2025 Determinations was not a change in policy. In claiming reliance on the MMPA Regulations, Plaintiffs were aware or should have been aware of the regulations' prerequisites for a comparability finding. *See Avail Vapor, LLC v. U.S. Food & Drug Admin.*, 55 F.4th 409, 422-23 (4th Cir. 2022) (rejecting reliance interests argument where agency "told manufacturers about the type and quality of evidence required" and issued a denial because the manufacturer "failed to include this evidence").

To the extent Plaintiffs were relying on NMFS taking a different approach from that in the MMPA Regulations, such reliance is not "reasonably incurred." *Solenex*, 962 F.3d at 529; *see also Mozilla Corp. v. FCC*, 940 F.3d 1, 64 (D.C. Cir. 2019) (holding agency not required to account for "unreasonable" reliance). First, Plaintiffs cite their investment in conservation programs in BSC fisheries. PI Mot. 32. The problem is there is no evidence the fisheries have achieved comparable results as U.S. standards, even with those programs, so the outcome-based MMPA Regulations require denying a comparability finding. It is unreasonable for Plaintiffs to assume that simply investing in a conservation program is sufficient to guarantee a fishery a comparability finding, regardless of the bycatch outcomes. Second, Plaintiffs cite their capital and supply-chain investments in the BSC fisheries on the apparent belief that the fisheries would not receive an MMPA import ban. *Id.* Plaintiffs made their investments with full awareness that export fisheries could be subject to a ban under the Import Provisions and MMPA Regulations. As discussed below, Plaintiffs knew or should have known that the BSC fisheries in particular

were likely to receive an import ban for multiple reasons, so any reliance on their assumption otherwise was unreasonable. *See infra* pp. 36-38; *Avail Vapor*, 55 F.4th at 423 ("It is not, however, the fault of FDA that petitioners failed to look at the 2019 guidance in any depth."). Finally, insofar as Plaintiffs imply that the repeated extensions of the exemption period induced reliance, PI Mot. 32-33, it would be unreasonable to assume NMFS would never implement import bans that are required by statute. *See Mozilla*, 940 F.3d at 64.

### D. Any Violation from a Reapplication Restriction Does Not Warrant Enjoining the Import Bans.

Plaintiffs take issue with a statement in the Federal Register that nations denied a comparability finding "may reapply … at any time after January 1, 2026," under the MMPA Regulations' "Discretionary Review" provision. PI Mot. 30 (quoting 90 Fed. Reg. at 42398).[9] Regardless of whether that statement is consistent with the MMPA or regulations, it does not justify enjoining the denials of previously filed comparability finding applications or the import bans based on those denials. A "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). The Federal Register's forward-looking statement that nations may reapply after January 1 did not "produce" the September 2025 denials or associated import bans that Plaintiffs seek to enjoin. Accordingly, the most Plaintiffs could be entitled to for this claim would be an order compelling NMFS to accept and review reapplications before January 1, 2026. *See* 5 U.S.C. §

---

[9] Plaintiffs offer no evidence that any nation has attempted to reapply and been rebuffed, so NMFS's failure to act on a reapplication is purely theoretical. Moreover, NMFS already gave affected nations an opportunity to address the agency's concerns by inviting them to submit additional information and clarification after receiving a preliminary denial. *See supra* p. 12; *contra* PI Mot. Ex. F, Decl. of L. Picard (NFI) ¶¶ 50-51 ("If given the opportunity to provide additional information, clarification, and evidence of ongoing reforms before the January 1st deadline, several countries believe they could address NOAA's concerns and obtain comparability findings.").

706(1) ("The reviewing court shall … compel agency action unlawfully withheld or unreasonably delayed."). *But see* 50 C.F.R. § 216.24(h)(8)(vii)(A) ("Upon receiving a request, the Assistant Administrator has the discretion to determine whether to proceed with a review or reconsideration.").

**II.**    **Plaintiffs Have Failed to Establish a Sufficient Likelihood of Irreparable Harm.**

Plaintiffs bear the "extremely heavy" burden of establishing a likelihood of irreparable harm before a preliminary injunction can be granted. *Retractable Techs., Inc. v. United States*, 739 F. Supp. 3d 1330, 1340 (Ct. Int'l Trade 2024). The mere possibility of injury is not enough: "Only a viable threat of serious harm which cannot be undone authorizes exercise of a court's equitable power to enjoin before the merits are fully determined." *Altx, Inc. v. United States*, 211 F. Supp. 2d 1378, 1380 (Ct. Int'l Trade 2002) (citation omitted). Plaintiffs have not even alleged harm from the overwhelming majority of import bans they seek to enjoin, which cover fisheries around the globe. They only allege harm from select BSC import bans. But even that asserted harm is largely self-inflicted and otherwise suffers from allegations that are often conclusory and unsupported.

**A.**    **Plaintiffs Have Not Alleged Harm from Nearly 99% of the Import Bans They Seek to Enjoin.**

As discussed above, the scope of Plaintiffs' requested injunction extends to import bans for 272 fisheries from 46 nations. They offer no evidence of irreparable harm for 268 of those bans. *See* PI Mot. 33-40. That failure is fatal to receiving a preliminary injunction against import bans for those fisheries. *See Seko Customs Brokerage, Inc. v. United States*, 719 F. Supp. 3d 1279, 1284 (Ct. Int'l Trade 2024) ("[T]he requirement that the movant demonstrate some form of irreparable harm is indispensable."). As a result, Plaintiffs' requested injunction far exceeds their scope of alleged harms. *See Kentuckians for Commonwealth Inc. v. Rivenburgh*, 317 F.3d 425,

436 (4th Cir. 2003) (holding injunction against all permitting decisions overbroad where plaintiffs "alleged injury only in connection with" one permit); *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108-09 (D.C. Cir. 1976) ("An injunction must be narrowly tailored to remedy the specific harm shown.").

### B.    Plaintiffs' Alleged Harm from the BSC Fishery Import Bans Is Unsupported and Largely Self-Inflicted.

#### 1.    Conclusory and Unsupported Assertions.

A movant cannot establish irreparable harm by relying on "surmise." *Elkem Metals Co. v. United States*, 135 F. Supp. 2d 1324, 1331 (Ct. Int'l Trade 2001). Irreparable harm must be supported by clear and convincing evidence. *Otter Prods., LLC v. United States*, 37 F. Supp. 3d 1306, 1317 (Ct. Int'l Trade 2014). "[A]ffidavits submitted by interested parties are weak evidence," particularly when they are "controverted" by other evidence. *Elkem Metals*, 135 F. Supp. 2d at 1331 (citation omitted). Plaintiffs' affidavits predicting existential economic harms fail to meet their heavy burden. They omit key facts about substitute crab supply, make statements that are contradictory and unsupported, and are otherwise speculative.

First, Plaintiffs' motion and redacted declarations routinely conflate the BSC fishery types (gillnet vs. pot and trap) in such a way that they fail to acknowledge that Plaintiffs may continue to import BSC from Indonesia's pot and trap fisheries. Those fisheries received a comparability finding and will not have an import ban, unlike Indonesia's BSC gillnet fisheries. *See* 2025 CF Approvals 62. Pot and trap fisheries make up over half of the BSC landings in the Indonesian market.[10] NFI suggests that its members utilize only pot and trap fisheries, Picard Decl. ¶ 21, which, if true, means their Indonesia BSC imports are unaffected by the import bans.

---

[10] Edi Iswanto Wiloso et al., *Life cycle assessment of Indonesian canned crab (*Portunus pelagicus*)*, 26 J. of Industrial Ecology 1947, 1948 (2022), https://doi.org/10.1111/jiec.13276 (Indonesian "[t]raps supplied an estimated 57% of the BSC landed in 2017."), attached as Ex. 7.

Plaintiffs also do not address the extent to which other foreign crab fisheries may provide adequate supply to prevent or mitigate the alleged harm. Beyond the Indonesia pot and trap fishery, NMFS granted comparability findings to at least 44 other swimming crab fisheries, 24 of which are specifically BSC fisheries. *See supra* note 6. Plaintiffs' declarants state that they rely on several of these international sources, including China and Tunisia. *E.g.*, Turkin Decl. ¶ 10; Shaw Decl. ¶ 7; Weir Decl. ¶ 55.[11] Nowhere do Plaintiffs establish that these other international sources will be inadequate to prevent existential harm if the four BSC import bans are implemented. *See Int'l Custom Prods., Inc. v. United States*, 30 C.I.T. 21, 28 (Ct. Int'l Trade 2006) (finding no irreparable harm where Plaintiff "made no effort … to determine if" an alternative supply or product was available). Plaintiffs' claim that no adequate substitute exists presents evidence only about the lack of adequate *domestic* substitutes. PI Mot. 35. Even the assertion in their motion that "[o]ther international sources cannot match the required volume, quality, or form" cites a declaration that expressly concerns the adequacy of domestic substitutes. *Id.* (citing Phillips Decl. ¶¶ 41-45).

It is Plaintiffs' burden to demonstrate by "probative evidence" why they will face irreparable harm despite a continued ability to import swimming crab from Indonesia and numerous other nations. *See Elkem Metals*, 135 F. Supp. 2d at 1331 (citation omitted); *see also J. Conrad LTD v. United States*, 457 F. Supp. 3d 1365, 1378 (Ct. Int'l Trade 2020) (explaining it is plaintiffs' burden to produce evidence of harm, not defendants' "burden to produce record evidence to rebut Plaintiffs' unsubstantiated assertions"). They have not so done.

---

[11] China was granted comparability findings for two swimming crab fisheries, 2025 CF Approvals 46, and denied a comparability finding for one swimming crab fishery (which Plaintiffs have not expressly challenged), 2025 CF Denials 2.

Second, many of the statements by Plaintiffs' declarants are unsupported and contradictory. For example, Heron Point's declarant claims the comparability denials impact "100% of red swimming crab fisheries worldwide" because "Vietnam is the primary global producer" and there is "no substitute available anywhere in the world." Weir Decl. ¶ 41, 43. Yet Supreme's declarant and even Heron Point's own "Crab 101" presentation explain that China—whose red swimming crab fisheries received comparability findings—is a significant exporter of red crab to U.S. markets. Turkin ¶¶ 32-35; Heron Point Seafood, *Crab 101 (Blue & Red Swimming, Blue Swimmer Crab)* (Jan. 2022), attached as Ex. 8 ("China represents roughly 70-80% of annual [red swimming crab] imports into USA."). Numerous other statements lack any evidentiary support, such as Heron Point's assertion that the "comparability denials impact approximately 89% of available blue swimming crab fisheries worldwide," Weir Decl. ¶ 41, or NFI's claim that the denials affect "[t]ens of thousands of jobs," Picard Decl. ¶ 30. Such conclusory and contradictory statements from interested party affidavits unsupported by independent evidence are insufficient to justify a preliminary injunction. *Elkem Metals*, 135 F. Supp. 2d at 1331; *see also Int'l Fresh Trade Corp. v. United States*, 26 F. Supp. 3d 1363, 1368 (Ct. Int'l Trade 2014) (finding affidavits insufficient where "Plaintiff has produced neither independent evidence nor witnesses for cross examination to support its affidavits").

## 2.    Self-Inflicted Harms.

A movant also cannot meet its irreparable harm burden if the alleged harm is self-inflicted. *CRAssociates, Inc. v. United States*, 103 Fed. Cl. 23, 27 (2012) (collecting cases); 11A Charles A Wright et al., *Fed. Prac. & Proc. Civ.* § 2948.1 (3d ed. 2025). Plaintiffs had over ten years of notice that NMFS would impose import bans on crab fisheries that do not meet U.S. standards. *See supra* pp. 11-13. Any harm from a failure to plan for that eventuality is self-inflicted and does not justify enjoining the bans.

While Plaintiffs frame their alleged harm as occurring on a "[c]ompressed [t]imeline" by focusing narrowly on the time between the comparability denials and import bans, PI Mot. 20, they have been aware of NMFS's plans to implement MMPA import bans since at least 2015. That year, NFI submitted comments acknowledging that bans would be implemented after a "one-time only five-year exemption period" that was set to end in January 2022. NFI 2015 Comment 3. Seafood processors at the time asked for a ten-year exemption period to provide sufficient time "to avoid a disruption in trade." 81 Fed. Reg. at 54398. That is what they ended up getting with NMFS's subsequent extensions of the exemption period to January 1, 2026. *See* 85 Fed. Reg. at 69516 (stating 2020 extension would "result in fewer disruptions to international seafood trade and a more predictable impact to U.S. seafood wholesalers and retailers when the regulation enters into full effect."). Plaintiffs' complaint that they cannot adapt to the bans in the next couple of months ignores that NMFS provided them exactly the implementation timeline they asked for.

Plaintiffs also knew or should have known that the Southeast Asian BSC fisheries in particular were likely to be banned. For one, these fisheries pose a documented threat to marine mammals, especially critically endangered marine mammals. *See* Wang Decl. ¶¶ 45, 47, 48. In 2020, NMFS published a list of export fisheries indicating that swimming crab fisheries in Indonesia and the Philippines catch marine mammal species, including the critically endangered Irraway dolphin. NMFS, *2020 Final List of Foreign Fisheries* 137, 174 (Oct. 8, 2020), https://www.fisheries.noaa.gov/foreign/international-affairs/list-foreign-fisheries. Given the stricter U.S. standards when fisheries catch an imperiled species, the universally acknowledged threat gillnets pose to nearly all marine mammals, and the documented threat to Irrawaddy dolphins posed by pot fisheries, Plaintiffs should have known that it would be very difficult for

these fisheries to achieve comparable results and avoid an import ban. Wang Decl. ¶¶ 40-48. In August 2024, Conservation Groups filed a lawsuit in this Court seeking to compel an import ban on Indonesia's BSC gillnet fishery. Compl. ¶¶ 106, 110, Request for Relief 4-5, *NRDC II*, 774 F. Supp. 3d 1348 (ECF No. 1). By January 15, 2025, NMFS was required to notify nations if it preliminarily determined any of their fisheries should be denied a comparability finding. *See supra* p 12. This notification included the Southeast Asia BSC fisheries.[12] At least one Plaintiff indicates it was aware of these January 2025 preliminary determinations. Weir Decl. ¶ 56. NMFS provided these nations an opportunity through April 1, 2025, to submit necessary evidence to demonstrate that their fisheries do not, in fact catch marine mammals in excess of U.S. standards. *See supra* p. 12. Plaintiffs identify no evidence that was presented to NMFS and rejected during that time. Nor do Plaintiffs identify any other action action they or the affected nations took in the intervening time before this suit was filed to change the preliminary determinations.

Plaintiffs have had nearly a decade to prepare for changes in the supply chain, account for them in their customer contracts, and make other adjustments to avoid or minimize any loss of workforce, infrastructure, or credit. *See* PI Mot. 35-36. The import bans are not "immediate" and "sudden," *id.*, but have been slow-developing in large part to minimize disruptions to importers. Yet, despite being on notice of the likely bans, Plaintiffs chose to continue to "make multi-million-dollar commitments" over the past year and accumulate inventory that they now complain will be stranded. *Id.* at 34. Plaintiffs cannot now claim that the harms they inflicted on

---

[12] *See, e.g.*, VFM, *Vietnamese seafood exports face challenges in the U.S. market*, Vietfish Magazine (Apr. 1, 2025), https://vietfishmagazine.com/markets/vietnamese-seafood-exports-face-challenges-in-the-u-s-market.html (discussing preliminary determination); Indonesian Blue Swimming Crab Association, *US MMPA Rules Development Meeting with Stakeholder and Government* (Feb. 7, 2025), https://www.apri.or.id/us-mmpa-rules-development-meeting-with-stakeholder-and-government/.

themselves through their own procrastination and avoidance are sufficient for this Court to halt the statutorily mandated and long-overdue implementation of the Import Provisions. *Cf. Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 79 (4th Cir. 1989) (affirming denial of preliminary injunction motion where district court found any irreparable harm was "very much the result of [plaintiffs'] own procrastination").

## III.    The Equities and Public Interest Weigh Heavily Against an Injunction.

A party seeking an injunction must establish both "that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20; *see Wind Tower Trade Coal. v. United States*, 741 F.3d 89, 100-01 (Fed. Cir. 2014) (requiring plaintiff in suit against federal government to establish both factors). Plaintiffs have not established either. On the contrary, both factors weigh heavily against an injunction.

### A.    An Injunction Would Have Significant Harms to Marine Mammals.

In assessing the equities, a "court must balance the harm plaintiff would suffer without preliminary relief against the harm that preliminary relief would inflict on defendant and on defendant-intervenor." *Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 320 (2009) (denying injunction in part because defendant-intervenor would "be significantly harmed by the issuance of a preliminary injunction"). Here, the balance of equities weighs strongly against Plaintiffs.

An injunction allowing continued imports would harm marine mammals, including imperiled populations, by lifting pressure from nations to finally address bycatch in their waters. *See infra* pp._. The Court's inquiry is "guided by the MMPA's purpose, which—at its base—is to preserve marine mammals." *Sea Shepherd*, 606 F. Supp. 3d at 1329. Congress designed the MMPA Import Provisions to help protect foreign marine mammal populations from the scourge of bycatch in foreign commercial fisheries. *See NRDC I*, 331 F. Supp. 3d at 1360 ("Congress chose embargoes as the most effective remedy for foreign threats to marine mammals."). The

balance of the equities tips strongly in favor of protecting marine mammals when such wildlife protection laws are involved. *Sea Shepherd*, 606 F. Supp. 3d at 1329; *accord NRDC I*, 331 F. Supp. 3d at 1369-70; *see also Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024) (stating in Endangered Species Act context that the "balance of hardships and the public interest … always tip heavily in favor of protected species" (cleaned up)); *Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 49 (1st Cir. 2021) (finding equities weighed strongly against injunction that would "prevent[] a federal agency from undertaking its congressionally assigned task of assuring the right whales are protected from a critical risk of death"). The threat to marine mammals is real and imminent. *See supra* pp. 8-11. For example, in the case of two critically endangered populations of Irrawaddy dolphins in Indonesia and the Philippines, experts have concluded that all bycatch "must be eliminated if" these populations are "to be saved." Wang Decl. ¶ 42a, Ex. C, at 289. For all Irrawaddy dolphins, bycatch is "well documented, severe, pervasive, and potentially increasing." *Id.* ¶ 42a, Ex. E, at 1, 2. The magnitude of harm to the world's marine mammals is even more remarkable when considering that Plaintiffs ask to enjoin all import bans.

Harm to marine mammals from the injunction would also permanently and irrevocably harm the interests of Intervenor-Defendants and their members. *See* Mot. Intervene 19-20, ECF No. 25. Intervenor-Defendants and their members have worked for decades to obtain statutorily required relief for marine mammals caught in fisheries that export to the United States. They have sued repeatedly to advance these interests in court. *See supra* pp. 11-13. Federal Defendants' delay in implementing the MMPA Import Provisions has had a deadly price. While the MMPA "has had a profound effect on marine mammals and marine ecosystems" U.S.

domestic waters and ensured that "numerous populations have either recovered from a severely depleted state or are in the process of recovering," Ragen Decl. ¶¶ 10, 13, those benefits have not yet extended internationally via the Import Provisions as Congress expected. The injunction proposed by Plaintiffs would ensure that delay continues at the expense of marine mammal health and abundance.

Conversely, Plaintiffs' alleged harm in support of their equities argument is unsupported and was self-created. *See supra* Argument Section II.B. No one forced Plaintiffs into betting that NMFS would make positive comparability findings for the foreign fisheries from which they source product, despite knowing those fisheries had a history of poor fishery management outcomes and serious bycatch problems. *See supra* Argument Section II.B.2 (Self-Inflicted Harms); PI Mot. 36 (discussing NFI's awareness that FIPs were needed since 2009 to reduce bycatch). Nonetheless, Plaintiffs continued with business-as-usual and now ask the Court to save them from their choice. "[T]he equities do not favor the plaintiff" when "much of [its] alleged harm is of its own making." *Eskridge Rsch. Corp. v. United States*, 92 Fed. Cl. 88, 100 (2010); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 997 (8th Cir. 2011) (finding company's injury "largely self inflicted" where it made investments "anticipat[ing] a pro forma result" from the agency (citation omitted)).

On one side of the equities ledger is significant and, for some species, potentially existential harm to marine mammals. On the other is Plaintiffs' questionable assertions of harm from limited import bans they should have been long-aware were a likely possibility. Weighing those equities here, where imperiled marine mammals are involved, "the balance must be struck in favor of 'the overwhelming need to devote whatever effort and resources [are] necessary to avoid further diminution of national and worldwide wildlife resources.'" *Am. Rivers v. U.S. Army*

*Corps of Eng'rs*, 271 F. Supp. 2d 230, 261 (D.D.C. 2003) (alteration in original) (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 177 (1978)); *see also District 4*, 18 F.4th at 49 ("The plaintiffs identify no case in which we have permitted an injunction to stand [where] the laws the government seeks to implement are aimed at the protection of an endangered species and when the only alleged injury is of an economic kind.").

### B.    There Is No Public Interest in Allowing Imports that Violate the MMPA.

Plaintiffs have failed to establish there is a public interest in an injunction. As an initial matter, there is no public interest in an injunction when a plaintiff has failed to establish a likelihood of success on the merits, as here. *Wind Tower Trade Coal.*, 741 F3d at 101. Moreover, an injunction would be contrary to the Import Provisions.

As Plaintiffs note, "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). For more than 50 years, Congress has required the executive branch to ban imports from foreign fisheries that catch marine mammals in excess of U.S. standards. And for more than 50 years, the executive branch has failed to comply with that statutory mandate. Now, as Federal Defendants are finally preparing to implement legally required import bans, Plaintiffs seek to perpetuate the government's unlawful inaction even further with their requested injunction. For the duration of this lawsuit, Plaintiffs seek to halt the Government from meeting its "immediate and continuous duty to ban fish caught with fishing gear that kills marine mammals … in excess of United States standards." *NRDC I*, 331 F. Supp. 3d at 1363. Enjoining compliance with that duty is contrary to the public interest.

On the other hand, "[t]he public interest in the survival and flourishing of marine mammals and endangered species, as well as a healthy marine environment, is extremely strong." *Nat. Res. Def. Council, Inc. v. Evans*, 232 F. Supp. 2d 1003, 1053 (N.D. Cal. 2002); *see*

*also All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011) (recognizing "well-established 'public interest in preserving nature and avoiding irreparable environmental injury'" (citation omitted)). "In balancing the public interest, courts have traditionally looked to the underlying statutory purposes at issue." *SSAB N. Am. Div. v. U.S. Bureau of Customs & Border Prot.*, 571 F. Supp. 2d 1347, 1353 (Ct. Int'l Trade 2008); *accord Sea Shepherd*, 606 F. Supp. 3d at 1330. The MMPA Import Provisions are meant to effectuate Congress's intent to protect marine mammals abroad by reducing bycatch of marine mammals in commercial fisheries that export to the United States to insignificant levels approaching zero. 16 U.S.C. §§ 1361, 1371(a)(2), 1387(a)(1). The January 1, 2026 ban on "fish and fish products from [offending] fisheries at issue would effectuate the MMPA's purpose of preserving marine mammal populations" and allow "compliance with a Congressional mandate that an import ban be imposed where marine mammals are killed at unsustainable rates because of commercial fishing technology used to catch other species." *NRDC I*, 331 F. Supp. 3d at 1371. Any other result would undermine the public interest in fulfilling the MMPA's purpose.

While Intervenor-Defendants agree with Plaintiffs that "[e]nvironmental protection is compelling to public interest," PI Mot. 39, the best way to obtain those environmental benefits—the specific marine mammal protection goals contemplated by the MMPA for foreign fisheries—is to require that bycatch be comparable in effectiveness to U.S. standards as a condition of import. If properly implemented, the Import Provisions can have a "profound effect on marine mammals" interacting with foreign fisheries and help the recover "from a severely depleted state," as the MMPA has done for marine mammals interacting with domestic fisheries. Ragen Decl. ¶¶ 10, 13.

Congress was also thinking about jobs when it passed the MMPA, indicating that it wanted "to protect the domestic fishing industry from unfair foreign competition which might otherwise result from the passage of this strict bill." 118 Cong. Rec. 25270 (1972) (statement of Sen. Tunney); *see also Earth Island Inst. v. Mosbacher*, 746 F. Supp. 964, 968 (N.D. Cal. 1990) (explaining MMPA import ban "help[s] to protect United States fishermen and women from unfair competition"). Indeed, many U.S. fishers *support* import bans, as they otherwise must compete with often-cheaper products from fisheries abroad that do not comply with equivalent bycatch mitigation requirements.

For example, as explained in the attached declaration from Blake Price of the Southern Shrimp Alliance, the U.S. wild-sourced shrimp fishery must compete with imported foreign shrimp. *See generally* Decl. of B. Price. In recent years, prices for U.S. shrimp have plummeted. *Id.* ¶¶ 14-15. As a result, the U.S. shrimp industry has been working to distinguish the "beneficial attributes of wild-caught shrimp when compared to foreign, farm-raised shrimp" for American consumers. *Id.* ¶ 16. NMFS has determined that warm-water, wild-caught shrimp from Indonesia and Venezuela must be banned under the Import Rule—Venezuela because it did not apply for a comparability finding, and Indonesia for the same reasons as that country's BSC gillnet fishery (i.e., "[g]ear with high-risk of entanglement risk of 16 U.S.C. § 1387(f)(3) stock(s)"; "[i]nadequate data collection on marine mammal bycatch"; "[b]ycatch limit of 16 U.S.C. § 1387(f)(3) stocks likely exceeded"; and "[m]itigation measures are not likely to reduce bycatch below the bycatch limit"). *Id.* ¶¶ 9-10 (quoting Indonesia Comp. Finding 2). The efforts of the U.S. shrimp fishery "are undermined if the domestic shrimp industry is forced to continue to compete for sales in the U.S. market with foreign, wild-caught shrimp" harvested without

comparable bycatch protections. *Id.* ¶ 17. The same is unquestionably true for other U.S. fisheries.[13]

The sweeping injunction requested by Plaintiffs would harm not only the domestic crab fishery, whose market will be undercut by cheap, poorly regulated BSC imports, but also every other domestic fishery that competes with imports from the other 268 foreign fisheries within the scope of Plaintiffs' requested injunction.

## CONCLUSION

Plaintiffs have not met their heavy burden to establish the factors necessary to obtain an injunction of an import ban on BSC fisheries, much less the two hundred-plus other fisheries that were denied comparability findings.

Respectfully submitted this 30th day of October, 2025.

*/s/ Natalie Barefoot*
Natalie Barefoot
Earthjustice
180 Steuart St. #194330
San Francisco, CA 94105
T (415) 217-2000
nbarefoot@earthjustice.org

Sabrina Devereaux
Christopher Eaton
Earthjustice
810 Third Ave., Suite 610
Seattle, WA 98104
T (206) 343-7340
sdevereaux@earthjustice.org
ceaton@earthjustice.org

---

[13] For example, Maryland crabbers have expressed concern about cheap imports from Venezuela, which will be banned if not for Plaintiffs' requested injunction. *See, e.g.*, T. Oberg, *Maryland crab watermen hope higher tariffs will aid their struggling industry*, NBC Washington (May 12, 2025), https://www.nbcwashington.com/investigations/maryland-crab-watermen-hope-higher-tariffs-will-aid-their-struggling-industry/3911823/, attached as Ex. 10.

*Attorneys for Center for Biological Diversity,*
*Natural Resources Defense Council, and Animal*
*Welfare Institute*

Sarah Uhlemann
Center for Biological Diversity
120 State Avenue NE #268
Olympia, WA 98501
T (206) 327-2344
suhlemann@biologicaldiversity.org

*Attorney for Center for Biological Diversity*

Stephen Zak Smith
Natural Resources Defense Council
544 E Main St., Unit B
Bozeman, MT 59715
T (406) 556-9305
zsmith@nrdc.org

*Attorney for Natural Resources Defense Council*

**CERTIFICATE OF COMPLIANCE**

This document complies with the word count limitations as provided for in the Court's

Standard Chambers Procedures 2(B) because it contains 13,694 words, excluding the parts of the

brief exempted by Standard Chambers Procedures 2(B)(1)(c).

 

 

*/s/ Natalie Barefoot*
Natalie Barefoot