## UNITED STATES COURT OF INTERNATIONAL TRADE

**Before: Judge Joseph A. Laroski, Jr.**

| | | |
|---|---|---|
| NATIONAL FISHERIES INSTITUTE, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 25-223 |
| | ) | |
| UNITED STATES, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

## [PROPOSED] BRIEF OF *AMICI CURIAE* ALASKA LONGLINE FISHERMEN'S ASSOCIATION, ET AL. FILED IN SUPPORT OF FEDERAL DEFENDANTS AND DEFENDANT-INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Elizabeth L. Lewis
Eubanks & Associates PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
lizzie@eubankslegal.com
(202) 618-1007

*Attorney for Amici Curiae*
*Alaska Longline Fishermen's Ass'n, et al.*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES...........................................................................................iii

INTEREST OF *AMICI CURIAE* .............................................................................. 1

I.    INTRODUCTION AND SUMMARY OF ARGUMENT .................................................. 2

II.   ARGUMENT ........................................................................................ 5

    A.  The Equities Compel Denial of Preliminary Relief........................................ 6

    B.  The Public Interest Demands Denial Of Plaintiffs' Motion........................................... 17

    C.  At The Very Least, The Equities Compel Denial Of Plaintiffs' Request
For Broad Relief ............................................................................. 24

III.    CONCLUSION.......................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ............................................................23

*Allina Health Servs. v. Sebelius*,
  756 F.Supp.2d 61 (D.D.C. 2010) .........................................................17

*Am. Inst. for Imported Steel, Inc. v. United States*,
  8 C.I.T. 314 (Ct. Int'l Trade 1984) ...............................................16, 22

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
  271 F. Supp. 2d 230 (D.D.C. 2003) ....................................................19

*Ariz. Pub. Serv. Co. v. EPA*,
  562 F.3d 1116 (10th Cir. 2009) ..........................................................25

*Bailey v. Chattem, Inc.*,
  684 F.2d 386 (6th Cir. 1982) ..............................................................21

*Comm. of 100 on the Fed. City v. Foxx*,
  87 F. Supp. 3d 191 (D.D.C. 2015) .........................................................9

*Debt Buyers' Ass'n v. Snow*,
  481 F. Supp. 2d 1 (D.D.C. 2006) ...........................................................9

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
  108 F.4th 194 (3d Cir. 2024) .................................................................6

*Dine Citizens Against Ruining Our Env't v. Haaland*,
  59 F. 4th 1016 (10th Cir. 2023) ..........................................................11

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) ...............................................................5

*Earth Island Inst. v. Mosbacher*,
  746 F. Supp. 964 (N.D. Cal. 1990) ................................................12, 23

*Florida v. Dep't of Health & Human Servs.*,
  19 F.4th 1271 (11th Cir. 2021) ......................................................27

*FMC Corp. v. United States*,
  3 F.3d 424 (Fed. Cir. 1993) ..........................................................27

*Gill v. Whitford*,
  585 U.S. 48 (2018).........................................................................24

*H&R Block, Inc. v. Block, Inc.*,
  58 F.4th 939 (8th Cir. 2023) ............................................................6

*Hoover Transp. Servs., Inc. v. Frye*,
  77 Fed. Appx. 776 (6th Cir. 2003) (per curiam)..............................21

*League of Wilderness Defs./Blue Mountains Biodifersity Proj. v. Connaughton*,
  752 F.3d 755 (9th Cir. 2014) ...........................................................6

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016).............................................................19

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 49 (2010)....................................................................24, 25

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)..........................................................................26

*NRDC, Inc. v. Ross*,
  331 F. Supp. 3d 1338 (Ct. Int'l Trade 2018) ...................7, 8, 18, 20

*Pac. Ranger, LLC v. Pritzker*,
  211 F. Supp. 3d 196 (D.D.C. 2016) .................................................19

*Paisa, Inc. v. N & G Auto*,
  928 F. Supp. 1009 (C.D. Cal. 1996) ................................................19

*Safari Club Int'l v. Salazar*,
  852 F. Supp. 2d 102 (D.D.C. 2012) ...........................................8, 9, 11

*SAGAM Securite Senegal v. United States*,
  No. 2021-2279, 2023 WL 6632915 (Fed. Cir. Oct. 12, 2023)...........24

*Sea Shepherd New Zealand v. United States*,
  606 F. Supp. 3d 1286 (Ct. Int'l Trade 2022) .....................................3

*Serono Labs., Inc. v. Shalala*,
  158 F.3d 1313 (D.C. Cir. 1998)........................................................17

*Shakhnes v. Berlin*,
  689 F.3d 244 (2012) .................................................................................27

*Sierra Mil. Health Servs., Inc. v. United States*,
  58 Fed. Cl. 573 (2003) .............................................................................10

*Starbucks Corp. v. McKinney*,
  144 S. Ct. 1570 (2024) ...............................................................................5

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) .....................................................................................9

*Texas v. United States*,
  328 F. Supp. 3d 662 (S.D. Tex. 2018) ......................................................6

*Tozzi v. EPA*,
  148 F. Supp. 2d 35 (D.D.C. 2001) ............................................................9

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ...................................................................................25

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ...................................................................................27

*Trump v. Int'l Refugee Assistance Proj.*,
  582 U.S. 571 (2017) .....................................................................................5

*Ugine-Savoie Imphy v. United States*,
  24 C.I.T. 1246 (Ct. Int'l Trade 2000) ......................................................20

*Winter v. NRDC, Inc.*,
  555 U.S. 7 (2008) ...............................................................................5, 6, 17

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) .................................................................10

**Statutes**

16 U.S.C. § 1361 ............................................................................................2, 7

16 U.S.C. § 1371(a)(2) .....................................................................3, 11, 16, 26

16 U.S.C. § 1378 ..................................................................................................2

**Other Authorities**

50 C.F.R. § 216.24(h) ........................................................................................3

118 Cong. Rec. 25,270 (1972) (statement of Sen. Tunney) .................12, 23

81 Fed. Reg. 54390, 54391-93 (Aug. 15, 2016) ...............................................................3

Exec. Order. No. 14,276 (Apr. 17, 2025) ......................................................................16

H.R. REP. NO. 92-707 (1972)........................................................................................18

## INTEREST OF *AMICI CURIAE*

*Amici* Alaska Longline Fishermen's Association, Alaska Marine Conservation Council, Hawaii Longline Association, Cape Cod Commercial Fishermen's Alliance, Maine Coast Fishermen's Association, New England Young Fishermen's Alliance, The Commercial Fisheries Center of Rhode Island, and the Southern Shrimp Alliance are associations of commercial fishermen that are committed to the sustainable harvest and management of our nation's fisheries to ensure a thriving marine economy for generations to come. They represent fishermen in securing sustainable access to domestic fisheries, including, but not limited to, salmon, halibut, yellowfin tuna, shrimp, and more. Crucially, they support science-based fisheries management through collaborative research, advocacy, and innovation, and work to safeguard ocean health, sustain the prosperity of United States fishing communities, and improve the economic viability of fishing.

The Comparability Findings and import bans are crucial to achieving the MMPA's purposes of protecting marine mammals and promoting sustainable fisheries in the United States. United States fishermen have heavily invested their time and money into compliance with the MMPA's strict rules aimed at reducing marine mammal injury and mortality in fisheries. The prohibition on imports of seafood products from foreign fisheries that fail to demonstrate that they have a regulatory program on par with that required by the MMPA will ensure that all participants in the United States seafood market adhere to similar sustainability and conservation requirements, protecting both law-abiding United States fishermen and domestic consumers. The Comparability Findings and import bans will also incentivize marine mammal conservation by restricting access to the lucrative United States seafood market to those foreign fisheries that protect marine mammals at least as well as United States fisheries.

*Amici* and their members have considerable experience in the United States's commercial fisheries and are intimately familiar with the requirements, compliance costs, and conservation benefits of the Marine Mammal Protect Act ("MMPA"). *Amici* and their members also participate in fisheries that directly and indirectly compete with foreign fisheries that were denied a Comparability Finding and will be subjected to an import ban on January 1, 2026. *Amici* and their members have therefore experienced firsthand the competitive and economic harms that the import prohibitions seek to prevent. Accordingly, *amici* file this brief in strong support of the arguments made by Federal Defendants and Defendant-Intervenors seeking an order from this Court denying a preliminary injunction and allowing the National Marine Fisheries Service ("NMFS") to implement the long-delayed rules prohibiting the import of seafood products from nations that fail to meet strict marine mammal protection requirements.

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Passed in 1972, the MMPA, 16 U.S.C. §§ 1361-1423h, evinces Congress's intent to establish a national policy to prevent marine mammal species and populations from "diminish[ing] beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part." 16 U.S.C. § 1361(1), (2).[1] To that end, the MMPA's "Import Provision" leverages the United States' position as a major seafood importer to protect

---

[1] Relevant here, the MMPA clearly established Congress's intent to protect not just marine mammals within the United States, but also those abroad. Indeed, the MMPA recognized that "marine mammals have proven themselves to be resources of great international significance, esthetic and recreational as well as economic, and . . . they should be protected and encouraged to develop to the greatest extent feasible." 16 U.S.C. § 1361(6); *cf. id.* § 1378 (directing the Secretaries of Commerce and State to initiate negotiations to develop bilateral and multilateral agreements to advance the protection of marine mammals internationally, and specifically calling for the development of such agreements between "all foreign governments which are engaged in, or which have persons or companies engaged in, commercial fishing operations which are found by the Secretary to be unduly harmful to any species or population stock of marine mammal").

marine mammal populations outside of U.S. waters by requiring the Secretary of the Treasury to ban the import of seafood products from foreign commercial fisheries that result "in the incidental kill or incidental serious injury of ocean mammals in excess of United States standards." *Id.* § 1371(a)(2).[2] Put differently, the Import Provision requires that foreign exporters of seafood products meet marine mammal protection standards that are comparable to those that govern United States fisheries.

To implement this requirement, NMFS—which is delegated authority by the Secretary of the Treasury—reviews each foreign export fishery that may incidentally catch marine mammals and, if the fishery is in compliance with the Import Provision, issues a "Comparability Finding." 81 Fed. Reg. 54390, 54391-93 (Aug. 15, 2016).[3] Any foreign fishery without a "valid" Comparability Finding in effect (generally referred to as a "denied fishery") is considered out of compliance with the Import Provision, and imports to the United States from these fisheries are prohibited. *See* 50 C.F.R. § 216.24(h)(1)(i), (ii), (h)(9); *Sea Shepherd*, 606 F. Supp. 3d at 1324

---

[2] The term "United States standards" as used in the Import Provision encompasses, at a minimum, the provisions of the MMPA that are relevant to managing incidental mortality and serious harm to marine mammals from commercial fisheries. *See Sea Shepherd New Zealand v. United States*, 606 F. Supp. 3d 1286, 1294-95 (Ct. Int'l Trade 2022) (identifying "statutory markers of 'United States standards'" with reference to MMPA requirements). The Import Provision's plain text thus requires the government to ban imports if an export fishery's bycatch rate "is in excess of" what the bycatch limit would be under U.S. standards. *Id.* § 1371(a)(2). An export fishery also operates in excess of U.S. standards if it lacks regulatory measures comparable in effectiveness to those in the United States. *Id.*; *see also* 50 C.F.R. § 216.24(h).

[3] Exporting nations can apply for a Comparability Finding by submitting "reasonable proof" of the effects that their export fisheries have on marine mammals and documentary evidence demonstrating that they comply with the Import Provision's standards. 16 U.S.C. § 1371(a)(2)(A); 50 C.F.R. § 216.24(h)(6)(i), (ii). To issue a positive Comparability Finding, NMFS must determine that the exporting nation "maintains a regulatory program with respect to the fishery that is comparable in effectiveness to the U.S. regulatory program with respect to incidental mortality and serious injury of marine mammals in the course of commercial fishing operations." 50 C.F.R. § 216.24(h)(6)(iii)(B), (h)(7). A comparability finding is operative for four years from its publication, unless otherwise indicated. *Id.* § 216.24(h)(8)(iv).

(explaining if "fisheries do not have valid comparability findings in effect, the importation of fish or fish products into the United States from them is per se in excess of U.S. standards . . . and thereby prohibited").

Plaintiffs in this case—a coalition of seafood importers, processors, and distributor—seek a preliminary injunction to force Federal Defendants to allow the import of seafood products from foreign fisheries that employ unsustainable fishing practices, risk the injury and mortality of marine mammals that are protected by federal law, and unfairly compete with United States fishermen. Plaintiffs' request should be denied.

The balance of the equities favors Federal Defendants. The Comparability Findings and import bans further the Import Provision's dual purposes of promoting marine mammal conservation and establishing a level playing field for United States fishermen by ensuring that foreign fisheries seeking to participate in the United States seafood market adhere to strict rules that result in marine mammal bycatch mitigation parity with United States fisheries. Should Plaintiffs obtain their requested relief, the intended beneficiaries of the Import Provisions— marine mammals and the United States fishing industry—will suffer irreparable harm from the continued participation of unsustainable and artificially cheap foreign fisheries in the United States seafood market. The purported harms to Plaintiffs' economic interests do not outweigh these considerable benefits that are enshrined in federal law.

Nor do the public interests purported by Plaintiffs tip the scales in their favor. The public has a definitive interest in promoting sustainable fisheries worldwide, in ensuring fair, equitable, and competitive markets domestically, and in promoting the conservation of federally protected marine mammals. Additionally, the public benefits from the existence of a prosperous United States fishing industry, resilient fishing communities, and public confidence in a domestic

seafood market that is supplied with sustainably harvested seafood products, as opposed to products derived from foreign fisheries that do not meet the same strict MMPA standards with which United States fisheries must comply. Again, Plaintiffs' private economic interests pale in comparison.

For these reasons, as well as those below, the Court should deny Plaintiffs' request for a preliminary injunction.

## II.   <u>ARGUMENT</u>

Plaintiffs ask that this Court: (1) "enjoin enforcement" of *all 240* "import prohibitions . . . arising from the . . . comparability findings"; and (2) "declare unlawful and enjoin enforcement of the . . . restriction prohibiting harvesting nations from reapplying" for a Comparability Finding until after January 1, 2026. *See* ECF No. 17 at 1. To justify either form of preliminary relief, Plaintiffs "must make a clear showing that '[they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest.'" *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 22 (2008)). The final two factors—which merge where, as here, the government is the opposing party, *see Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)—require the Court to "explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Trump v. Int'l Refugee Assistance Proj.,* 582 U.S. 571, 580 (2017). "A preliminary injunction is an extraordinary remedy never awarded as of right," *Winter*, 555 U.S. at 24, and whether to grant such relief is "often dependent as much on the equities of a given case as the substance of the legal issues it presents," *Int'l Refugee Assistance Proj.*, 582 U.S. at 580. Accordingly, this Court can deny the requested preliminary relief based solely on the

equitable factors, *see, e.g.*, *Winter*, 555 U.S. at 23-24 (denying preliminary injunction solely based on the equities); *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 952 (8th Cir. 2023) (finding lack of irreparable harm sufficient to deny relief); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 202, 206 (3d Cir. 2024); *Texas v. United States*, 328 F. Supp. 3d 662, 736-42 (S.D. Tex. 2018). It should do so here.

First, the equities compel denial of any preliminary relief in light of the tremendous benefits of the Comparability Findings and import bans to United States fisheries, the integrity of the domestic seafood market, and marine mammal conservation, which far outweigh Plaintiffs' alleged complaints. Second, a ruling in Plaintiffs' favor would substantially harm the domestic fishing industry and the public by frustrating marine mammal conservation, promoting unfair competition, circumventing United States market incentives for sustainable fishing and bycatch reduction, and decreasing transparency in the seafood market. Finally, at the very least, the equities compel denying relief beyond the blue swimming crab fishery, as Plaintiffs do not identify *any* harms from the application of the Comparability Findings to any other fishery.[4]

### A.   The Equities Compel Denial of Preliminary Relief

Here, Plaintiffs' grievances do not outweigh the significant harms to Federal Defendants' crucial interests in sustainably managing marine mammals, promoting equitable and fair competition for domestic fisheries, and ensuring consumer confidence in the seafood supply. The balance of equities thus heavily weighs against the issuance of preliminary relief.

---

[4] Although courts "at times subsume[] th[e] [public interest] inquiry into the balancing of the hardships, it is better seen as an element that deserves separate attention in cases where the public interest may be affected." *League of Wilderness Defs./Blue Mountains Biodiversity Proj. v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). Where, as here, the interests of additional parties (e.g., intervenors or *amici*) are implicated, Courts have recognized that it may be "appropriate to consider the factors separately." *Id.*

As an initial matter, "when weighing the factors for a preliminary injunction, the court should be guided by Congress's purpose in enacting the underlying statute." *NRDC, Inc. v. Ross*, 331 F. Supp. 3d 1338, 1369 (Ct. Int'l Trade 2018) (citing *Tennessee Valley Auth.*, 437 U.S. at 184-88). The MMPA's purpose is to "protect[] and encourage[]" marine mammal populations "to develop to the greatest extent feasible," *id.* § 1361(6); *accord NRDC*, 331 F. Supp. 3d at 1369-70 (explaining that this Court "has noted multiple times that the purpose of the MMPA is, in summary, the preservation of marine mammal species" (citation omitted)). Federal Defendants' efforts to effectuate this goal are significantly advanced by prohibiting the entry into the United States of seafood products from fisheries that fail to meet the United States's marine mammal protection standards.

The United States is one of the largest markets for seafood products in the world.[5] Imports account for between seventy-five to ninety percent of domestic seafood consumption, and the seafood trade deficit stands at over $20 billion.[6] Accordingly, the United States "ha[s] a major impact on the sustainability of the world's fisheries and in global seafood trade."[7] In light of this considerable market influence, trade restrictions that condition access to the lucrative United States seafood market on compliance with domestic conservation standards promote the adoption and enforcement of sustainable fishing practices by foreign fisheries. Consequently, by

---

[5] NMFS, Leadership Message, United States Takes Leading Role in Global Fisheries Management (Nov. 20, 2019), https://tinyurl.com/ykm27h8m [hereinafter NMFS, *Leading Role*] (attached as Exhibit 3). According to NMFS's most recent report on Fisheries of the United States, Americans consume approximately nineteen pounds of seafood per capita annually. NMFS, *Fisheries of the United States 2022* 23 (Oct. 2024) [hereinafter *Fisheries of the US*] (attached as Exhibit 4).

[6] *Fisheries of the US*, *supra* note 5 at 19, 23, Ex. 4.

[7] NMFS, *Leading Role*, *supra* note 5, Ex. 3.

prohibiting the enforcement of the Comparability Findings and import bans, the issuance of an injunction would mean fewer protections for marine mammals. Such a result is flatly contrary to the purposes of the MMPA. On this factor alone, the balance of the equities tips in favor of Federal Defendants and against injunctive relief. *Cf. Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 125 (D.D.C. 2012) (concluding that "the balance of equities tips towards [Federal Defendant] here given its Congressionally mandated role of protecting endangered species").

Undeterred, Plaintiffs broadly allege that enforcement of the Comparability Findings and import bans will result in two kinds of "consequences": economic harm and harm to marine mammal conservation. *See* ECF No. 17 at 34-37. However, the speculative nature of these alleged harms is hyperbolic when grounded in the appropriate factual and legal contexts, and do not outweigh the concrete equities favoring the continued enforcement of the Comparability Findings and import bans.

Plaintiffs' allegations regarding harms to private conservation efforts are easily dispensed with. Plaintiffs insist that the "comparability findings will also undermine environmental progress" by removing the incentive to participate in voluntary conservation initiatives. ECF No. 17 at 36-37. However, there is "no reason to entrust the interest of" marine mammals to private parties, "when Congress has already delegated that authority elsewhere" (i.e., to Federal Defendants). *Safari Club Int'l*, 852 F. Supp. 2d at 125; *accord NRDC*, 331 F. Supp. 3d at 1370-71 ("In any event, it is beyond the province of the court to engage in such prognostication or to ignore the Congressional directive reflected in the Imports Provision."). This is particularly true when the conservation efforts depend largely on the actions of Plaintiffs' members' foreign seafood suppliers (i.e., participants in foreign fisheries). Notwithstanding the efforts of Plaintiffs and their members to support foreign third parties in contributing more to the protection of

marine mammals, Congress has determined that the compelling public interest in marine mammals demands federal involvement and management. "Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforce them." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978). Accordingly, if Plaintiffs believe they have been harmed by the implementation and enforcement of the MMPA's Import Provision, they must direct their complaints to Congress, not this Court or Federal Defendants. The balance of the equities thus tips towards Federal Defendants. *See Safari Club Int'l*, 852 F. Supp. 2d at 125 (citing *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 261 (D.D.C. 2003)).

With respect to Plaintiffs' economic harms, such allegations are largely speculative and concern purely monetary losses, and they should therefore be afforded little weight in the balancing of harms. *See Comm. of 100 on the Fed. City v. Foxx*, 87 F. Supp. 3d 191, 220 (D.D.C. 2015) (holding that "balance of the equities tip[ped] decidedly" against party whose asserted harms were "speculative at best"); *Debt Buyers' Ass'n v. Snow*, 481 F. Supp. 2d 1, 15 (D.D.C. 2006) (refusing to weigh asserted speculative harm in injunctive relief analysis); *Tozzi v. EPA*, 148 F. Supp. 2d 35, 50 (D.D.C. 2001) (weighing, "in balancing interest between the parties," demonstrated harm more heavily than "speculative reputational and economic loss"). Plaintiffs insist that the import bans will lead to "lost profits," as well as "permanent losses of going-concern value, supply relationships, processing capacity, and market position." ECF No. 17 at 35; *see also*, *e.g.*, Phillips Decl. ¶¶ 34-37, ECF No. 17 at 126-27 (insisting without evidence that the import ban will permanently shift customer and consumer preferences away from blue swimming crab); Weir Decl. ¶¶ 47-48, ECF No. 17 at 149 (insisting without evidence that the import ban will "permanently shift" customer preferences "to alternative protein sources or other

suppliers," and even if the ban is later lifted, "we will not be able to recover these customers").

However, aside from vague, unsupported, and conclusory statements insisting, e.g., that Plaintiffs

"cannot source substitute products from approved fisheries" prior to the deadline, Weir Decl.

¶ 40, ECF No. 17 at 148, or that the import bans will result in permanent reputational damage

and loss of market shares, *see, e.g.*, Turkin Decl. ¶¶ 23-28, 36-37, ECF No. 17 at 158-59; Weir

Decl. ¶¶ 47-48, ECF No. 17 at 149; Phillips Decl. ¶¶ 38-43, ECF No. 17 at 127, Plaintiffs offer

little in the way of hard evidence to support their catastrophizing, which falls far short of their

formidable burden to demonstrate entitlement to the extraordinary remedy of a preliminary

injunction.

Even assuming, *arguendo*, that Plaintiffs' allegations of economic harms are true, they

should still be afforded little weight when considering the equities because the law is clear that

"economic loss," even if significant, "does not, in and of itself, constitute irreparable harm." *Wis.*

*Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Rather, "[o]nly economic loss that

threatens the survival of a movant's business constitutes irreparable harm." *Sierra Mil. Health*

*Servs., Inc. v. United States*, 58 Fed. Cl. 573, 582 (2003) (quoting *Found. Health Fed. Servs. v.*

*United States*, No. 93-1717, 1993 WL 738426, at *3 (D.D.C. Sept. 23, 1993)). Significantly,

although Plaintiffs' declarants allege that the import bans may result in layoffs or lost revenue, at

no point do the declarants allege that the import bans will render their businesses uneconomical

or obsolete or cause them to close. To the contrary, even as Plaintiffs' declarants insist that the

"denied fisheries constitute their core revenue," ECF No. 17 at 35, they begrudgingly imply that

other revenue streams remain available, *see, e.g.*, Phillips Decl. ¶ 4, ECF No. 17 at 123

(acknowledging multiple revenue streams, including the preparation of seafood products other

than blue swimming crab); Weir Decl. ¶ 3, ECF No. 17 at 144 ("Heron Point is an importer and

distributor of pasteurized crab meat *and other seafood products*." (emphasis added)); Turkin Decl. ¶ 11, ECF No. 17 at 156 (acknowledging implicitly that while "the denied fisheries supply Supreme's *highest-margin* products," they do not supply *all* of Supreme's products).

Plaintiffs' economic harms should also be discounted because they are largely self-inflicted. *See Dine Citizens Against Ruining Our Env't v. Haaland*, 59 F. 4th 1016, 1050 (10th Cir. 2023) ("[W]hen assessing the balance of hardships, financial harms should be considered but financial concerns alone generally do not outweigh environmental harm, especially if the financial harm is 'self-inflicted.'" (citation and internal quotation marks omitted)); *cf. Safari Club Int'l*, 47 F. Supp. 3d at 33 (explaining that self-inflicted harm does not "satisfy the irreparable harm criterion"). For years, Plaintiffs profited from an unlawful system—i.e., one that allowed them to purchase cheap seafood products without any evidence that the foreign fisheries from which the products were sourced were in fact compliant with the United States's marine mammal protection standards, in direct contravention of Congress's clear command in the MMPA. *See* 16 U.S.C. § 1371(a)(2). This was no secret; as early as 2019, "industry members of the Crab Council" (which Plaintiffs' declarant Brice Phillips has chaired since 2019, Phillips Decl. ¶ 55, ECF No. 17 at 129) have been aware of "weak management of crab fisheries in Southeast Asia," citing overexploitation driven largely by unsustainable fishing practices as "one of the key drivers of volatility in crab production costs."[8] Indeed, according to Plaintiffs' declarants, the Crab Council has invested heavily in voluntary conservation efforts, *see, e.g.*, Picard Decl. ¶ 36, ECF No. 17 at 117, perhaps in part to avoid punitive trade restrictions. Yet, despite knowing since 2016 that NMFS would undertake a review of all foreign fisheries that

---

[8] World Wildlife Fed'n et al., *The Impact of Blue Swimming Crab Fishery Management on the Profitability of US Buyers* 5 (Mar. 2019), https://tinyurl.com/yc86xajf (attached as Exhibit 5).

export seafood products to the United States and that those foreign fisheries that fail to meet marine mammal protection requirements risked an import ban, Plaintiffs continued to invest in—and profit from—unsustainable foreign fisheries, in importing products from those fisheries, facilitating an inequitable domestic seafood market. Plaintiffs should not be allowed to benefit from their assumption of the risks inherent to those choices—i.e., that Federal Defendants would, as announced nine years ago, enforce the law.

Against these speculative and/or purely economic harms, the Court must weigh the significant and substantial harms that will ensue if Federal Defendants are enjoined from enforcing the Comparability Findings and import bans. Beginning again with the statutory purpose, the Import Provision (like the rest of the MMPA) aims to conserve marine mammal populations; however, it also seeks to "to protect the domestic fishing industry from unfair foreign competition which might otherwise result from passage of [the MMPA]." 118 Cong. Rec. 25,270 (1972) (statement of Sen. Tunney); *see also Earth Island Inst. v. Mosbacher*, 746 F. Supp. 964, 968 (N.D. Cal. 1990) (MMPA import ban "help[s] to protect United States fishermen and women from unfair competition.").[9]

United States fishermen have heavily invested their time and money into compliance with the MMPA's strict rules aimed at reducing marine mammal injury and mortality in fisheries. Behnken Decl. ¶¶ 13, 15 (citing examples of investments by the United States fishing industry to reduce harmful marine mammal interactions with commercial fisheries) (attached as Exhibit 1). Yet, some foreign fisheries—which supply up to ninety percent of the United States's consumable seafood products—are not subject to rules that are on par with the standards set by

---

[9] For the same reasons articulated, *supra* at 7-8, the conservation purpose of the Import Provision would not be served—and, indeed, would be frustrated—by an injunction.

the MMPA. In the absence of trade restrictions, weakly regulated foreign fisheries subject to lower compliance costs are able to enter the United States seafood market at a substantially reduced wholesale price point, allowing foreign fishermen, as well as their importers and distributers—which includes Plaintiffs and their members—to undercut the United States fishermen who play by the rules. *See, e.g.*, Behnken Decl. ¶ 9, Ex. 1 (reporting that "[f]or years," the "different legal regimes that exist for U.S. domestic and foreign fisheries with respect to marine mammal protection and fisheries management" have enabled foreign fisheries, importers, and distributors of foreign seafood products to "drastically undercut" seafood prices across several fisheries, including salmon, crab, and sablefish); Alward Decl. ¶¶ 18-21 (explaining that even as "operating costs are much higher," "adjusted for inflation, the prices" fishermen are paid for salmon today "are significantly lower than they were in 1994" largely because "Russian salmon," *which was denied a Comparability Finding*, is "sold at rock-bottom prices international and domestically") (attached as Exhibit 2).[10] As a result, United States fishermen find themselves forced to sell their responsibly-harvested seafood products at a price that competes with artificially cheap, foreign-sourced seafood products that do not include the cost of environmental compliance. *See, e.g.*, Behnken Decl. ¶ 14, Ex. 1 ("When [United States fishermen] are up against foreign fisheries whose expenses and operating costs are lower and catch rates are higher, the result is foreign seafood products that are less expensive than domestic seafood products, which in turn lessens the profits of small-scale fisheries, including my own profits as a commercial fisherman. We see this in markets for Alaska salmon and crab, although certainly other fisheries are also affected."); Alward Decl. ¶ 19, Ex. 2 (explaining that as cheap,

---

[10] *See also* NMFS, Marine Mammal Protection Act Import Provisions Comparability Finding Application, Final Report: Russian Federation (2025), https://tinyurl.com/36jeah98 (denying Comparability Finding to all Russian fisheries) (attached as Exhibit 8).

unsustainable Russian salmon flooded the domestic and international seafood market, "prices were so low that it was not a sustainable business model for fishermen"; in fact, "[m]any fishermen I know operated at a loss"). The Comparability Findings and import bans thus create a level playing field for United States fishermen by eliminating the competitive disadvantage created by the MMPA without compromising the statute's conservation mandate. Granting the injunction would directly undermine these efforts and significantly harm the interests of *amici*'s member fishermen and the United States fishing community at large. *Accord* Behnken Decl. ¶ 14, Ex. 1 (explaining that the import ban is "so important" because it "improve[s] protections for marine mammals" and "helps to ensure fair competition and promote the recovery of the U.S. fishing industry"); Alward Decl. ¶ 20, Ex. 2 ("The [NMFS] import ban on fish and fish products from fisheries that fail to obtain a valid comparability finding under the Marine Mammal Protection Act is important to ensure fair competition and to promote the U.S. fishing industry."); *id.* ¶ 22 ("If we want parity for the American seafood industry, then the rest of the world should follow the same standards we do, including the MMPA standards.").

In contrast to Plaintiffs' bald allegations of harm in the absence of preliminary relief, the harm to *amici*'s members and the fishing community that would result from enjoining the Comparability Findings and import bans is not theoretical. In the absence of import bans, cheap, noncompliant, foreign seafood products will continue to flood the United States seafood market, artificially suppressing prices and unfairly restricting competition. *Cf.* Alward Decl. ¶ 20, Ex. 2. Unlike Plaintiffs' alleged harms, which are largely limited to a single fishery (i.e., the blue swimming crab fishery), the impacts of the cost-price squeeze due to the availability of cheap, low-priced imports are felt by United States fishermen across fisheries and oceans. *See, e.g.*, Behnken Decl. ¶ 14, Ex. 1 ("[I]f the [import] ban[s] do[] not take effect, it will be to the

detriment of me, my family, ALFA, our small-scale fisheries, and fishermen across Alaska and the U.S. because it will allow foreign fisheries with excessive levels of marine mammal bycatch to continue exporting their seafood to the U.S. and sell it at cheaper prices than what we as small-scale Alaskan fisheries can reasonably compete with."); Alward Decl. ¶¶ 19-22, Ex. 2; U.S. Int'l Trade Comm'n, Investigation No. 731-TA-752, Crawfish Tail Meat from China 24 (Aug. 1997) (finding that "underselling" of low-priced crawfish tail meat imported from China "is significant," and further, that such low-priced imports "have suppressed prices for the domestic product *to a significant degree*" (emphasis added)) (attached as Exhibit 6); Akbar Marvasti & David William Carter, *Domestic and imports sources of supply to the US shrimp market and anti-dumping duties*, 43 J. Econ. Studies 1039, 1043-45 (2017) (explaining that the price of shrimp in the United States has fallen precipitously as imports of shrimp from foreign suppliers increased to meet growing consumer demand, causing the United States shrimp fishery to heavily consolidate and seek relief from the government) (attached as Exhibit 7). These are direct, dollar-for-dollar injuries that erode the profitability of domestic fishing businesses, stifle investment in the United States fishing industry, and make it increasingly difficult for American fishing families and coastal communities to survive. *Accord* Alward Decl. ¶ 19, Ex. 2 (reporting that due to the artificial price suppression driven by the flood of cheap, non-compliant foreign seafood products into the domestic seafood market, "[m]any fishermen I know operated at a loss").

The challenges facing the domestic fishing industry have been elevated to the highest levels of government; in his recent Executive Order, President Trump declared it a national priority to address "unfair trade practices have put our seafood markets at a competitive disadvantage." Exec. Order. No. 14,276 (Apr. 17, 2025). Accordingly, the government, including

Federal Defendants, is undertaking actions to "address unfair trade practices, eliminate unsafe imports, level the unfair playing field that has benefited foreign fishing companies, promote ethical sourcing, . . . and ensure the integrity of the seafood supply chain." *Id.* The Comparability Findings and import bans "align with" these goals by requiring all participants in the United States seafood market to play by the same rules, thereby "restor[ing] seafood competitiveness, protect[ing] American jobs, and ensur[ing] fair trade practices that prioritize the domestic market."[11] The issuance of an injunction would therefore significantly undermine Federal Defendants' lawful, *legally-mandated* efforts to protect a multibillion dollar domestic industry that supports millions of jobs across the country by mitigating the harms wrought by their own decades-long failures to implement the Import Provision earlier. *See* 16 U.S.C. § 1371(a)(2). Plaintiffs' alleged harms—which again, primarily amount to economic losses that are likely to be at least partially mitigable by investments in new revenue streams—pale in comparison. *See Am. Inst. for Imported Steel, Inc. v. United States*, 8 C.I.T. 314, 322 (Ct. Int'l Trade 1984) (refusing to enjoin embargo prohibiting the importation of steel products where an injunction carried a "substantial risk of irreparable harm to domestic [steel] producers . . . since significant quantities of [steel] would be imported").

In sum, the vague and speculative harms alleged by Plaintiffs do not outweigh the substantial, concrete harms an injunction would incur to marine mammal conservation, as well as to the interests of *amici*'s members and fishing communities. Even if taken as true, Plaintiffs' alleged injuries fail to tip the scale in their favor. Indeed, "[i]t often happens that . . . one party or

---

[11] *See* NMFS, Press Release, *NOAA Fisheries Bolsters American Seafood Industry with New Import Bans* (Aug. 29, 2025), https://tinyurl.com/236fwb5j (attached as Exhibit 9); *accord id.* (explaining that "[b]y holding foreign fisheries to the same rigorous standards" that domestic fisheries must meet, the Comparability Findings "safeguard[] the integrity of American seafood while creating a level playing field for [domestic] fishermen").

the other will be injured whichever course is taken," and so "[a] sound disposition . . . must [then] depend on a reflective and attentive appraisal as to the outcome on the merits." *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998) (some alterations in original) (citation and quotation marks omitted). When the issuance of a preliminary injunction, while preventing harm to one party, causes injury to the other, this factor does not weigh in favor of granting preliminary injunctive relief. *See, e.g.*, *Allina Health Servs. v. Sebelius*, 756 F.Supp.2d 61, 69 (D.D.C. 2010) (finding that the balance of the equities weighs against issuing an injunction because the alleged economic injury to the movant would be offset by economic injury to the Department of Health and Human Services); *see also Serono Labs.*, 158 F.3d at 1326 (finding the balance of the harms "results roughly in a draw" where one of the parties would be harmed regardless of court's decision). Because Plaintiffs have not shown (and cannot show) that the equities tip in their favor—let alone heavily—the Court should deny Plaintiffs' motion.

**B.     The Public Interest Demands Denial Of Plaintiffs' Motion**

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. 7 at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)). Here, Plaintiffs' private economic interests that might be served by an injunction—based largely, if not entirely, on the fact that Plaintiffs took advantage of a long overdue loophole due to substantial delay in implementation and enforcement of the Import Provision—do not outweigh the substantial, concrete public interests that would be injured should the Court grant the requested relief.

Plaintiffs' contention that an injunction will not harm the public interest is belied by the fact that their motion fundamentally misapprehends the role of the Import Provision in achieving

the underlying purposes of the MMPA. *See NRDC*, 331 F. Supp. 3d at 1371 (explaining that the public interest inquiry must be "guided by reference to 'the underlying statutory purposes at issue'" (quoting *SSAB N. Am. Div. v. U.S. Bureau of Customs & Border Prot.*, 32 C.T.T. 795, 801 (Ct. Int'l Trade 2008))). Plaintiffs never explain how an injunction prohibiting the enforcement of the MMPA's provisions intended to protect marine mammals globally from harmful and unsustainable fishing practices, *see, e.g.*, *supra* note 1, could possibly be consistent with Congress's explicit instruction that the MMPA "be administered for the benefit of the protected species rather than for the benefit of commercial exploitation." *Id.* at 1345 (quoting *Kokechik Fishermen's Ass'n v. Sec'y of Commerce*, 839 F.2d 795, 800 (D.C. Cir. 1988)); *see also* H.R. REP. NO. 92-707, at 4154 (1972) ("The primary objective of this management must be to maintain the health and stability of the marine ecosystem; this in turn indicates that the animals must be managed for their benefit and not for the benefit of commercial exploitation."); *supra* at 2, note 1 (explaining that the MMPA requires the United States to wield its considerable power to incentivize the negotiation and adoption of international agreements and treaties that protect marine mammals across the globe, including in the course of commercial fishing); *cf.* Behnken Decl. ¶ 16, Ex. 1 (explaining that "protecting marine mammals" on both the domestic *and international* levels "helps fishermen succeed" because "[i]f marine mammal stocks are allowed to plummet, it will have a direct negative impact on fisheries, and in many cases, it will lead to tighter restrictions for US fishermen").

Instead, Plaintiffs argue, in effect, that the purported public interest in the availability of "affordable and widely used" blue swimming crab protein, ECF No. 17 at 38, and ongoing voluntary conservation efforts by industry, *id.* at 39, trump Congress's clear command in the MMPA that "the wellbeing of marine mammals takes precedence," *Pac. Ranger, LLC v. Pritzker*,

211 F. Supp. 3d 196, 216 (D.D.C. 2016). Not so. First, while there is undoubtedly a significant

(and growing) public interest in the promotion of sustainably sourced seafood products (and

likewise, a clear interest by *amici* in defending the integrity of the domestic seafood market

against the entry of unsustainably harvested foreign seafood products), enjoining the

Comparability Findings and import bans undercuts, rather than serves, that interest. Indeed, by

ensuring that all seafood products entering the United States market were obtained in compliance

with the MMPA, the Import Provision ensures that United States consumer demand does not fuel

unfair competition from cheap imports harvested in fisheries that benefit from a lack of

conservation standards. *Accord* Alward Decl. ¶ 22, Ex. 2; Behnken Decl. ¶¶ 14-18, Ex. 1.

Conversely, enjoining the import bans would allow the continued entry of cheap, non-compliant,

unsustainable seafood products into the United States market, confusing the consumer and

damaging the reputation of *all* seafood producers and market participants. *See Paisa, Inc. v. N &*

*G Auto*, 928 F. Supp. 1009, 1013 (C.D. Cal. 1996) (recognizing the public interest in preventing

consumer confusion and fraud); *see also* Behnken Decl. ¶ 18, Ex. 1 (reporting that "Alaska

fisheries—and many U.S. fisheries overall—have suffered repercussions from misconceptions"

where "the poor fishing practices of one country or one sector . . . give all fishermen a bad

name," which then "make[s] consumers hesitant to purchase any seafood" because they "believe

. . . [fishing] is inherently damaging to the ocean environment").

It is axiomatic that "[t]he public interest is served when the legislation that Congress has

enacted," like the MMPA, "is complied with." *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F.

Supp. 2d 230, 262 (D.D.C. 2003); *see also League of Women Voters of U.S. v. Newby*, 838 F.3d

1, 12 (D.C. Cir. 2016) (holding that that is there generally no public interest in unlawful agency

action). For over fifty years, Plaintiffs and their members have profited from Federal Defendants'

failure to implement and enforce the Import Provision. An injunction allowing Plaintiffs to continue to take advantage of a legal loophole to the detriment of *amici*, the United States fishing community, the marine environment, and the public at large eviscerates the public interest, and therefore, must not issue.

Second, Plaintiffs' argument that the implementation of the import bans will "collapse" voluntary industry-led conservation programs by "removing" the United States "market incentive," ECF No. 17 at 39, is debunked by common sense and fundamental economics. *See supra* at 12-16. It is far more likely that exclusion from the lucrative United States seafood market would incentivize greater efforts to comply with our nation's marine mammal protection standards in order to reenter the United States seafood market once compliance is achieved.

Moreover, "it is not for this [C]ourt to consider" Plaintiffs' concerns, as Congress already "determined the action to be taken"—i.e., an import ban— where marine mammals are injured or killed by foreign fisheries at rates that exceed those set by the MMPA's standards. *NRDC*, 331 F. Supp. 3d at 1371. With their injunction request, Plaintiffs essentially ask that the Court ignore Congress's explicit intent in enacting the MMPA. The Court should decline this invitation to wade into issues within the exclusive province of Congress.[12]

The public has an interest in the fair and uniform application of the MMPA, particularly those provisions addressing international trade *See Ugine-Savoie Imphy v. United States*, 24 C.I.T. 1246, 1249 (Ct. Int'l Trade 2000) ("It is well settled that the public interest is served by ensuring that the [government] . . . interprets and applies [the] international trade statutes uniformly and fairly." (citation and internal quotation marks omitted)). As explained, since the

---

[12] Plaintiffs speculative assertion also fails because it ignores the possibility that the fisheries denied Comparability Findings will adopt policies consistent with United States domestic fisheries policies to regain access to the lucrative United States seafood market.

passage of the MMPA over fifty years ago, United States commercial fishermen have made considerable costly investments in measures, including specialized equipment and changes in operational practices, that allow them to achieve compliance with the statute's strict conservation requirements. At the same time, the weakly regulated foreign fisheries that were denied a Comparability Finding (and thus, are subject to an import ban) incur far fewer (if any) compliance costs, and thus are able to undercut United States fishermen in the United States seafood market. *See* Behnken Decl. ¶ 14, Ex. 1 ("When [United States fisheries] are up against foreign fisheries whose expenses and operating costs are lower and catch rates are higher, the result is foreign seafood products that are less expensive than domestic seafood products, which in turn lessens the profits of small-scale fisheries, including my own profits as a commercial fisherman."). Fundamental economics suggest—and *amici*, as integral seafood market players, confirm—that those foreign fisheries will continue to flood the United States market with cheaper, non-compliant seafood products, resulting in a significant competitive disadvantage to United States fishermen absent continued implementation and enforcement of the Import Provision. *See, e.g.*, Behnken Decl. ¶ 14, Ex. 1; Alward Decl. ¶ 21, Ex. 2; U.S. Int'l Trade Comm'n, *supra* at 24, Ex. 6; Akbar Marvasti & David William Carter, *supra* at 1043-45, Ex. 7.

Not only does this competitive disadvantage harm *amici*, their members, and the United States fishing community, but it also harms the American public. The public has an interest in the promotion of fair competition and the discouragement of unfair competition. *See, e.g.*, *Hoover Transp. Servs., Inc. v. Frye*, 77 Fed. Appx. 776, 785 (6th Cir. 2003) (per curiam) ("[T]he public has an interest in discouraging unfair trade practices[.]"); *Bailey v. Chattem, Inc.*, 684 F.2d 386, 391 (6th Cir. 1982) (acknowledging "the strong public interest in free and fair competition"). An injunction prohibiting the enforcement of the very provisions expressly intended to ensure fair

and equitable participation in the United States seafood markets would subvert this crucial interest. *Cf. Am. Inst. for Imported Steel*, 600 F. Supp. at 322 (recognizing that efforts to protect domestic industries from foreign competition are in the public interest). In 2022, commercial fisheries in the United States generated over $183 billion in sales and supported 1.6 million jobs across the country.[13] Protecting this vital industry—including the jobs and coastal communities it supports—from unfair foreign competition is a core public good. The Comparability Findings and import bans accomplish this goal by ensuring that access to and participation in the lucrative United States market remains equitable. *Accord* Alward Decl. ¶ 22, Ex. 2 ("If we want parity for the American seafood industry, then the rest of the world should follow the same standards we do, including the MMPA standards."). Without these actions, the import of cheap, non-compliant, foreign seafood products will continue to artificially suppress seafood prices, which in turn, risks driving domestic fishermen out of business. *Accord* Behnken Decl. ¶ 14, Ex. 1; Alward Decl. ¶¶ 19-21, Ex. 2. This inequitable result is contrary to the public interest.

To be sure, there is also a public interest in the jobs created and communities served by Plaintiffs and their members. *See* ECF No. 17 at 39. However, the fact remains that the vast majority of foreign seafood products are *not* subject to the import bans. In fact, the import bans will impact a mere ten percent of seafood product imports.[14] At the same time, seafood products from certain denied fisheries comprise the majority of imports against which individual United

---

[13] *See* NMFS, *Fisheries Economics of the United States 2022* 5 (Nov. 2024) (attached as Exhibit 10).

[14] *See* NMFS, *Issuance of Marine Mammal Protection Act (MMPA) Comparability Findings – Decision Memorandum* 17-18 (July 3, 2025) [hereinafter NMFS, *Decision Memorandum*] (attached as Exhibit 11).

States fisheries directly and indirectly compete.[15] Therefore, contrary to Plaintiffs' alarmist

framing, s*ee id.*, the import bans will not lead to collapse of the restaurant industry. To the

contrary, given the relatively low amount of affected imports, it is highly likely that businesses

will be able to eventually pivot to alternative products, including products produced by *amici*

that comply with the MMPA's mandate to protect marine mammals. Such a result is not only

equitable and consistent with the public interest, but also aligns with Congress's intent in

enacting the Import Provision. *See, e.g.*, *Earth Island Inst.*, 746 F. Supp. at 968 (explaining that

the Import Provision "help[s] to protect United States fishermen and women from unfair

competition."); 118 Cong. Rec. 25,270 (1972) (statement of Sen. Tunney) (explaining that the

Import Provision is intended "to protect the domestic fishing industry from unfair foreign

competition which might otherwise result from passage of [the MMPA]").

The MMPA establishes a clear national policy in favor of protecting marine mammals,

both within the boundaries of the United States and abroad. Robust and sustainable United States

fisheries are part and parcel of this goal. *Accord* Behnken Decl. ¶ 17, Ex. 1 ("What happens

outside US waters impacts marine mammals that also spend part of their life in US waters. If

other countries—particularly those with shared ocean ecosystems—are not taking care of their

marine mammal populations, that puts our fisheries more at risk"). "The Comparability Findings

and import bans thus constitute vital measures that serve the "[t]he well-established "public

interest in preserving nature and avoiding irreparable environmental injury." *All. for the Wild

Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011). If the Court were to grant Plaintiffs'

---

[15] For instance, as reported by Plaintiffs, blue swimming crab imports from foreign fisheries that were denied Comparability Findings (and thus, are subject to import bans) comprise eighty-nine percent of the United States lump crab market. ECF No. 17 at 38. These foreign denied fisheries compete directly with United States crab fishermen operating in several domestic fisheries in multiple regions of the country.

requested relief, *zero* legal protections would apply to marine mammals that interact with foreign fisheries. In other words, participants in weakly regulated foreign fisheries could do anything they wanted to these animals in the course of commercial fishing operations without risking the benefit of participation in the United States seafood market. Plaintiffs would be free to continue to import those cheap, non-compliant products, which in turn, would artificially suppress seafood prices. Meanwhile, the United States fishermen who play by the rules—and in so doing, incur significant compliance costs—get the proverbial short end of the stick. This outcome—i.e., one where private profits of a few seafood importers and distributors is elevated over the protection of marine mammals globally and the long-term survival of the United States domestic fishing fleet—would disfavor the protection of marine mammals, the integrity of United States fishing-based economies and coastal communities, and the public interest. Accordingly, the Court should deny Plaintiffs' requested relief.

## C. At The Very Least, The Equities Compel Denial Of Plaintiffs' Request For <u>Broad Relief</u>

To the extent the Court finds that Plaintiffs satisfied the stringent standard for a preliminary injunction (which they have not), it must tailor such relief appropriately. "[I]njunctions are to be used sparingly," and "injunctive relief should be narrowly tailored to fit the *specific* legal violations." *SAGAM Securite Senegal v. United States*, No. 2021-2279, 2023 WL 6632915, at *7 (Fed. Cir. Oct. 12, 2023) (emphasis added) (quoting *Gemveto Jewelry Co. v. Jeff Cooper Inc.*, 800 F.2d 256, 259 (Fed. Cir. 1986)); *see also Gill v. Whitford*, 585 U.S. 48, 66 (2018) ("A plaintiff's remedy must be limited to the inadequacy that produced his injury in fact." (cleaned up)); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 49, 39, 165-66 (2010) ("If a less drastic remedy . . . was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted."); *cf. TransUnion LLC v. Ramirez*, 594 U.S.

413, 431 (2021) ("[S]tanding is not dispensed in gross"; a plaintiff must demonstrate standing "for each claim that [it] press[es] *and for each form of relief that [it] seek[s]*." (emphasis added)).

The Comparability Findings and import bans applicable to each individual foreign fishery operate independently of one another and are supported by independent analysis. Accordingly, each determination with respect to a foreign fishery's eligibility for such a finding is severable from the rest. *Cf. Ariz. Pub. Serv. Co. v. EPA*, 562 F.3d 1116, 1122 (10th Cir. 2009) *(*"A regulation is severable if the severed parts operate entirely independently of one another, and the circumstances indicate the agency would have adopted the regulation even without the faulty provision." (internal quotation omitted)). Plaintiffs must therefore establish their entitlement to relief as to each finding. *Cf. Monsanto Co.*, 561 U.S. at 165-66; *TransUnion*, 594 U.S. at 431.

Plaintiffs have failed to carry this heavy burden. As explained above, Plaintiffs broadly seek to enjoin enforcement of *all 240* import prohibitions; they do not single out particular foreign fisheries. However, their motion and declarations primarily focus on alleged economic and conservation harms caused by the denial of Comparability Findings to the foreign blue swimming crab fishery. *See, e.g.*, ECF No. 17 at 8 (singling out the Comparability Finding and import ban on blue swimming crab fishery as the primary cause of Plaintiffs' harms); *id.* at 34 (same); *id.* at 35 (same). Indeed, although some of Plaintiffs' declarations mention other denied fisheries (including, e.g., the red swimming crab industry, *see, e.g.*, Picard Decl. ¶ 25, ECF No. 17 at 114), the blue swimming crab is the *only* fishery singled out in their motion. Plaintiffs thus identify *no* irreparable harm (let alone Article III standing to seek *any* relief) that requires a broad injunction prohibiting enforcement of *every single, legally distinct* Comparability Finding and import ban. Nor would such an overbroad remedy be appropriate in light of the tremendous

benefits the findings and import prohibitions confer on marine mammals, the United States fishing industry, and the public interest.

The absurdity of Plaintiffs' motion is encapsulated by the fact that Plaintiffs request relief from enforcement of the Import Provision with respect to the denied fisheries from nations that *did not even apply* for a Comparability Finding ("non-cooperating nations"). Four nations (Benin, Haiti, Iran, and Venezuela) "did not submit applications for comparability findings."[16] Because NMFS could not obtain the information necessary to determine that the four non-cooperating nations had regulatory programs on par with the MMPA's regulatory requirements, NMFS denied Comparability Findings to all of the fisheries from those nations.[17] The MMPA and blackletter administrative law principles prohibit NMFS from issuing decisions—including determinations implementing and enforcing the Import Provision—without first "examin[ing] the relevant data and articulat[ing] a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also* 16 U.S.C. § 1371(a)(2) (requiring that in applying the Import Provision, NMFS in every instance obtain "reasonable proof from the government of any nation from which fish or fish products will be exported to the United States of the effects on ocean mammals of the commercial fishing [industry]"). Therefore, under clearly established law, NMFS's refusal to issue Comparability Findings to nations whose governments did not bother to provide *any* (let alone "reasonable") proof that their marine mammal regulatory programs met United States standards was lawful. 16 U.S.C. § 1371(a)(2).

---

[16] NMFS, *Decision Memorandum*, *supra* note 14 at 18, Ex. 10.

[17] *Id.*

Plaintiffs nevertheless insist that they are entitled to the extraordinary remedy of preliminary relief from the import bans applicable to fisheries from non-cooperating nations. However, even the most charitable reading of Plaintiffs' Complaint could not identify a legal error in NMFS's decision with respect to non-cooperating nations. Absent even the possibility of success on the merits, an injunction with respect to the four non-cooperating nations would be both inappropriate and overbroad. *See FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993) (refusing to issue a preliminary injunction where plaintiff "fail[ed] to prove a likelihood of success on the merits"); *Shakhnes v. Berlin*, 689 F.3d 244, 257 (2012) ("An injunction is overbroad when it restrains defendants from engaging in legal conduct." (citation omitted)).

In sum, a broad injunction preventing the enforcement of every single Comparability Finding and import ban would be inappropriate here because this case "raises no concerns that a [narrower] preliminary injunction wouldn't provide the plaintiffs with complete relief." *Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021). Plaintiffs have made no showing that enforcement of the findings and import bans in fisheries other than the blue swimming crab fishery would actually harm them (irreparably or otherwise), and the impacts of such a broad order would be harmful to *amici* and the public interest. That is conclusive, and the motion should be denied in its entirety, or at least any remedy must be limited to the one fishery for which Plaintiffs assert any cognizable injury-in-fact that could hypothetically constitute irreparable harm. *See, e.g., Trump v. CASA, Inc.*, 606 U.S. 831, 851, 856 (2025) (holding that the Constitution and federal law do not "justif[y] the award of relief to nonparties"; thus, "[n]othing like a universal injunction was available at the founding, or for that matter, for more than a century thereafter" and, as a result, "federal courts lack authority to issue them").

### III.    <u>CONCLUSION</u>

This Court should deny Plaintiffs' motion for a preliminary injunction. Should the Court grant Plaintiffs' motion a preliminary injunction, the scope of the injunction should be limited to the irreparable harm asserted by Plaintiffs (i.e., to that allegedly caused by the prohibitions on the import of blue swimming crab products from denied fisheries). Controlling authority prohibits any relief broader than that to which Plaintiffs have demonstrated Article III standing and for which the underlying injuries are, in fact, genuinely irreparable.

Dated this 31st day of October, 2025.

Respectfully submitted,

*/s/ Elizabeth L. Lewis*
Elizabeth L. Lewis *(pro hac vice application pending)*
DC Bar No. 229702

EUBANKS & ASSOCIATES, PLLC
1629 K Street NW, Suite 300
Washington, DC 20006
lizzie@eubankslegal.com
(202) 618-1007

*Attorney for Amici Curiae*
*Alaska Longline Fishermen's Ass'n et al.*